**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

TRACEY EDWARDS,

      *Plaintiff*,

  v.

ERIK HOOKS,
in his official capacity as Secretary of the North Carolina
Department of Public Safety,

BENITA WITHERSPOON,
in her personal capacity,

CLAUDETTE EDWARDS,
in her official capacity as the Warden of the North
Carolina Correctional Institution for Women,

JAMES ALEXANDER,
in his personal capacity and in his official capacity as the
Healthcare Facility Health Treatment Administrator of the
North Carolina Correctional Institution for Women,

GARY JUNKER,
in his personal capacity and in his official capacity as the
Director of Health and Wellness Services of the
Department of Public Safety,

ELTON AMOS,
in his personal capacity and in his official capacity as the
Medical Director for the North Carolina Correctional
Institution for Women,

STEPHEN WILSON,
In his personal capacity,

Approximately 25 John and Jane Doe Defendants,
in their personal capacity,

      *Defendants*.

Civil Action No. 21-CV-352

**COMPLAINT**

**JURY TRIAL DEMANDED**

1

# INTRODUCTION

1.      This complaint seeks vindication for barbaric and unlawful treatment Plaintiff Tracey Edwards experienced during the most vulnerable time in her life. During her pregnancy, labor, and postpartum period, Ms. Edwards was shackled and restrained despite presenting no security threat and despite the pain, mental anguish, and trauma that prison officials and corrections officers knew it would cause.

2.      Upon her return from the hospital, Ms. Edwards was denied medically necessary, prescribed treatment for her mental health conditions, including Opioid Use Disorder (OUD) and bipolar disorder. The Defendants in this case chose to let her suffer, knowing that they were exposing her to danger and harm. She seeks money damages and injunctive and declaratory relief.

3.      The North Carolina Correctional Institution for Women is North Carolina's only correctional facility for women and incarcerates hundreds of pregnant people each year, including approximately 100 who give birth while in the custody of the State. The needs of pregnant people are well-known to prison officials and officers, who encounter them on a daily basis and who also have regular contact with treating physicians and advocates who educate them on this population.

4.      The Defendants' conduct in willfully disregarding Ms. Edwards's medical needs and constitutional rights violates the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. By shackling Ms. Edwards during pregnancy, labor, and the postpartum period, Defendants exposed her to a substantial risk of serious harm and caused pain, mental anguish, and trauma. Defendants also exposed Ms. Edwards to an unacceptable level of risk, as well as causing her physical and emotional harm, by denying her access to medication and treatment for her mental health disorders and Opioid Use Disorder postpartum.

2

**JURISDICTION AND VENUE**

5.     This action arises under the United States Constitution, 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     This Court has jurisdiction over Plaintiff's claims for damages, injunctive and declaratory relief pursuant to 28 U.S.C. §§ 1343, 2201, and 2202.

7.     This Court has authority under the ADA (42 U.S.C. § 12205), Section 504 of the Rehabilitation Act (29 U.S.C. § 794a(b)), and 42 U.S.C. § 1988 to award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in the Eastern District of North Carolina; venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Eastern District of North Carolina.

**PARTIES**

9.     Beginning on May 14, 2019, and at the time of the events alleged in the complaint, Plaintiff Tracey Edwards was held in the custody of the North Carolina Correctional Institution for Women (NCCIW) for a nonviolent drug charge. Ms. Edwards was released on June 4, 2021, and currently lives in York, South Carolina.

10.     Defendant Erik Hooks is the Secretary of the North Carolina Department of Public Safety. He has a non-delegable duty to ensure that the conditions in state prisons comply with state and federal law. Ms. Edwards sues Secretary Hooks in his official capacity only.

3

11.     Defendant Benita Witherspoon was the Warden of NCCIW at the time of the events alleged in this complaint. Warden Witherspoon was personally responsible for overseeing and implementing policies at NCCIW and had personal knowledge of the policies and practices regarding shackling and Medication for Opioid Use Disorders (MOUD) at the time of the events described in the complaint. Ms. Edwards sues former Warden Witherspoon in her personal capacity.

12.     Defendant Claudette Edwards in the current Warden of NCCIW. Warden Edwards is responsible for overseeing and implementing policies at NCCIW, including policies regarding shackling and MOUD. Warden Edwards is sued in her official capacity for purposes of injunctive relief.

13.     Defendant James Alexander is the Healthcare Facility Health Treatment Administrator of the NCCIW. Administrator Alexander is responsible for promulgating the policy that limits MOUD to people who are currently pregnant and has personal knowledge of MOUD withdrawal of postpartum individuals. Plaintiff sues Administrator Alexander in his personal and official capacities.

14.     Defendant Gary Junker is the Director of Health and Wellness Services of the Department of Public Safety. Director Junker is personally responsible for overseeing the development and implementation of medical policies for state prisons, including policies related to the use of MOUD at NCCIW. Director Junker has personal knowledge of the MOUD withdrawal policy to which Ms. Edwards was subjected. Ms. Edwards sues Director Junker in his personal and official capacities.

15.     Defendant Elton Amos is the Medical Director at the NCCIW. Dr. Amos is responsible for overseeing the medical care at NCCIW and ensuring that it meets the appropriate

4

standard of care. He is personally aware of the policies and practices at NCCIW, including those regarding MOUD. Ms. Edwards sues Dr. Amos in his personal and official capacities.

16.     Defendant Stephen Wilson is a physician who worked at NCCIW during the time of the allegations in the Complaint who treated Plaintiff while she was in postpartum recovery. He prescribed an Oxycodone taper from MOUD, despite Plaintiff's prescription for Buprenorphine, a more efficacious course of treatment, from physicians who treated her at the hospital during and after childbirth. Dr. Wilson is sued in his personal capacity.

17.     Defendants John and Jane Does (collectively the "Officer Defendants") are officers who shackled Plaintiff during her pregnancy, labor, and postpartum recovery in contravention of her constitutional rights and North Carolina Department of Public Safety (DPS) policy. The Officer Defendants are sued in their personal capacities.

## FACTUAL ALLEGATIONS

18.     Tracey Edwards is from South Carolina. She has long suffered from medical and mental health problems, including bipolar disorder and a platelet disorder.

19.     When Ms. Edwards was approximately 22 or 23, she broke her foot and was prescribed opioid pain medications. Around the same time, she began experiencing symptoms of her undiagnosed platelet disorder, including achiness, pain, fatigue, and night sweats. Doctors continued to prescribe her pain medication, including for tooth pain and for the pain from her platelet disorder. She did not understand how addictive this medication was, and for a long time only took opioid medication under a doctor's supervision.

20.     Eventually, doctors stopped prescribing her pain medication, but her pain continued. She was not receiving adequate treatment for her mental health problems either, and

she turned to buying drugs on the street. Many of these drugs were cut with the dangerous and highly addictive drug fentanyl.

21.     In 2016, Ms. Edwards gave birth to her first child. Along with her mother, she worked hard to raise her child as a single mother. While she was pregnant, she sought treatment for her platelet disorder, including a bone marrow biopsy and 12-hour iron infusions. However, she feared what the treatment involved and stopped attending treatment, and continued to self-medicate her pain with illegal drugs.

22.     In 2017, and again in 2019, she was arrested in connection with her opioid use disorder and drug use. She was incarcerated at the Mecklenburg County Jail beginning on April 7, 2019.

23.     Ms. Edwards entered NCCIW on May 14, 2019. She learned she was pregnant after an intake screening at NCCIW.


***Defendants' Unlawful Shackling of Plaintiff***

24.     Throughout her pregnancy, Ms. Edwards was restrained or shackled whenever Officer Defendants brought her out of the prison, including when she was transported out solely to receive medical care.

25.     On December 19, 2019, Ms. Edwards was 39 weeks pregnant. She was transported by two Officer Defendants to UNC-Chapel Hill Hospital to be induced into labor.

26.     While being transported to the hospital to be induced, Officer Defendants handcuffed her in front of her body, and kept her handcuffed for the entire ride to the hospital where she was to give birth. Under 2018 DPS policy, a prisoner who does not present an immediate, serious risk of hurting themselves or others or "an immediate, credible risk of escape"

6

should not be placed in any restraints—including wrist shackles—when they are "transported or housed in an outside facility for treating labor and delivery."[1]

27.     When she arrived at the hospital, the Officer Defendants brought Ms. Edwards to have her induction medication initiated. According to DPS policy, a prisoner should not be shackled "once the intravenous line has been placed and the induction medication has been started."[2]

28.     However, in direct violation of DPS policy, while Ms. Edwards's IV line was inserted and while she was actively receiving induction medication, the Officer Defendants kept Ms. Edwards's legs shackled together.

29.     Officer Defendants proceeded to shackle Ms. Edwards to the bed by one leg and one arm. Ms. Edwards remained shackled in this manner for the next twelve hours of labor, causing her immense physical pain and emotional anguish.

30.     Confined and constrained by the shackles, Ms. Edwards could not move or adjust her position to alleviate the pain and discomfort of labor. The skin around her ankles became red and raw as the shackles constricted her circulation, leading to excruciating pain and suffering. Any attempt to move or struggle against her ankle shackles caused her even greater discomfort and pain.

31.     Ms. Edwards also felt demeaned and mistreated for being shackled like an animal while she was induced into labor, increasing her anxiety and traumatizing her during this vulnerable time. Her anxiety was exacerbated by her understanding that the Officer Defendants

[1] Exhibit 1, DPS Policy "Transporting Offenders," Ch. F.1104(i)(2)(D).

[2] *Id.* at F.1104(i)(E).

could not have unshackled her fast enough for her to get the care she needed in an event of a medical emergency.

32.    Officer Defendants kept Ms. Edwards shackled in this way even with an IV line in her arm and even though she clearly posed no threat due to her incapacitated physical state.

33.    Only when the UNC doctors told Ms. Edwards to start pushing, more than twelve hours into her labor on December 20, 2019, did Officer Defendants finally remove her shackles and handcuff.

34.    Less than an hour after she gave birth, Officer Defendants re-handcuffed Ms. Edwards and shackled her ankles together once again as they moved her from the delivery room.

35.    Ms. Edwards remained at the hospital for two days after giving birth. During this time, Officer Defendants continued to shackle one leg to the bed and continued to shackle her ankles together at least some of the time, preventing her from moving around to alleviate her significant postpartum discomfort, or even getting up to walk around for her comfort and to prevent a serious medical problem such as a blood clot.

36.    Officer Defendants also frequently handcuffed one of Ms. Edwards's wrists to the bed while she was convalescing. This unlawful and unconstitutional postpartum shackling was painful and humiliating for Ms. Edwards.

37.    At one point, the IV line became entangled in Ms. Edwards's handcuff, causing the IV to come out and causing Ms. Edwards to bleed profusely.

38.    Officer Defendants initially did not uncuff her despite the bleeding. The nurses had to ask for Ms. Edwards to be uncuffed, delaying her treatment.

39.     Ms. Edwards wished to bond with her newborn with the extremely limited time she had by breastfeeding and caring for her baby girl, consoling her when she cried, and changing her diapers.

40.     The shackles prevented Ms. Edwards from caring for or bonding with her newborn. Nurses often requested that her shackles be removed to allow her to care for her newborn, but the Officer Defendants repeatedly refused to remove the restraints.

41.     When Ms. Edwards's baby's heel was pricked to collect blood for testing, Ms. Edwards could hear her baby crying and see the needle going into her foot, but she was unable to hold and comfort her daughter. She desperately wanted to comfort her crying child but was not allowed to because Defendants continued to unlawfully restrain her.

42.     Even when Ms. Edwards was allowed to care for her newborn daughter, she remained shackled, including as she attempted to change her baby's diaper. Because her wrist was handcuffed to the bed, it was very difficult for Ms. Edwards to hold and bond with her newborn. She had to hold her daughter with one hand, limiting their contact, making breastfeeding difficult, and preventing her from fully holding and bonding with her baby in the brief time they had together before Ms. Edwards would be taken back to prison.

43.     Ms. Edwards's ankle shackles were only fully removed to allow her to go to the bathroom and, approximately twice, to push her baby around the hallway in a bassinet. Otherwise, she spent many hours in chains.

44.     Because of the long period of time in ankle shackles, Ms. Edwards's ankle remained red and raw for several days after her delivery, making her postpartum recovery even more uncomfortable. The shackling was especially painful immediately postpartum, when she could not even move around the bed to make herself more comfortable.

9

45. On December 22, 2019, Ms. Edwards returned from the hospital to NCCIW.

46. Officer Defendants severely shackled Ms. Edwards on the transport back to prison, despite knowing the risks it would pose to her in her weakened postpartum state. They shackled her ankles together, handcuffed her, and even placed a belly chain around her stomach, as well as connecting her chains with a "black box" in front of her so that she could not even move her hands.

47. The restraints were painful, particularly at the site of her epidural. Ms. Edwards was not even able to lean back in her seat because the chains were so painful at that point.

48. Once at the prison, Officer Defendants refused to assist Ms. Edwards in exiting the vehicle. Because she was unable to step down from her seat in the car while shackled, Ms. Edwards was forced to jump from the car to the ground two days postpartum. She experienced immense pain upon landing.

49. Despite her precarious postpartum state, Ms. Edwards then had to walk back to the infirmary unit at the prison with her ankles shackled together without assistance from Officer Defendants. Still unsteady from her delivery and in chains, Ms. Edwards walked slowly out of fear of falling and due to the pain and trauma at the site of her shackles.

50. Ms. Edwards was never a risk to herself or others, and she was not a flight risk.

***Shackling during pregnancy, labor, and the postpartum period is a dangerous practice that poses a substantial risk of serious harm.***

51. Shackling poses major risks to the health and safety of pregnant prisoners throughout their pregnancies and postpartum, as well as during the process of childbirth.

52. Shackling and restraints can include handcuffing (in front of or behind the body); ankle shackles that shackle the ankles together and/or shackle one or both legs to another person or an object such as a hospital bed; belly chains; and more.

53.    Restraints during pregnancy can interfere with providers' ability to provide medical care, as well as prevent them from acting quickly when an obstetric emergency arises.[3] Additionally, shackling may place pregnant people off-balance, putting them at significant risk of falling, and prevent them from breaking their fall safely, putting them and their pregnancies at increased risk of harm.[4]

54.    Furthermore, shackling during pregnancy can inhibit mobility, leading to increased risk of blood clots.[5] Shackling is also particularly painful for pregnant people, who are likely to already experience swelling and discomfort that shackling will exacerbate.

55.    Shackling is especially dangerous for pregnant individuals and their newborns at the time of delivery and immediately postpartum. Individuals who are in the process of giving birth should be mobile in order to assume various positions as needed, and shackles greatly limit, if not completely prevent, such mobility.[6]

56.    During all stages of labor, it is important to the delivering physician to be able to react quickly, in order to avoid the potentially life-threatening emergencies for both the pregnant person and the unborn fetus. Physical restraints interfere with the ability of physicians to safely practice medicine by reducing their ability to assess and evaluate the physical condition of the

---

[3] ASS'N OF WOMEN'S HEALTH, OBSTETRIC AND NEONATAL NURSES POSITION STATEMENT, *Shackling Incarcerated Pregnant Women*, *available at* https://www.jognn.org/article/S0884-2175(15)30763-2/fulltext.

[4] *Shackling Pregnant Women Poses Risks to Mother and Fetus*, PSYCHOLOGY BENEFITS SOC'Y (2015), *available at* https://psychologybenefits.org/2015/12/29/shackling-pregnant-women-poses-risks-to-mother-and-fetus/.

[5] CENTERS FOR DISEASE CONTROL & PREVENTION, *Pregnant? Don't Overlook Blood Clots* (last reviewed Feb. 7, 2020), *available at* https://www.cdc.gov/ncbddd/dvt/features/blood-clots-pregnant-women.html.

[6] Jennifer G. Clarke & Rachel E. Simon, *Shackling and Separation: Motherhood in Prison*, AM. J. OF ETHICS (2013), *available at* https://journalofethics.ama-assn.org/article/shackling-and-separation-motherhood-prison/2013-09.

pregnant person and fetus, thereby placing the health and lives of pregnant prisoners and their babies at risk.[7]

57.     For example, if a medical emergency arises that requires a caesarian section, shackling can interfere with providers' ability to move as quickly as this emergency requires, leading to increased risk of harm and death, as well as increased risk to the baby, including risk of stillbirth. Similarly, a provider may not be able to respond quickly enough to sudden and severe bleeding, leading to increased risk of death.

58.     Prisons that shackle pregnant people in labor may engage in this practice ostensibly to prevent escape or ensure the safety of prison and medical staff. This rationale ignores the realities of childbirth, in which a pregnant person undergoes excruciating pain, physical incapacitation, and overwhelming vulnerability. Shackling during labor can greatly increase this pain and lead to lasting emotional trauma.

59.     No pregnant or laboring incarcerated individual has ever been documented as having escaped a hospital.[8] Moreover, the decision to shackle is typically made without regard to the type of crime committed or the risk of harm posed to the individual. The presence of officers is more than adequate to prevent a pregnant person from fleeing and to protect nearby staff from any security concerns.

---

[7] American College of Obstetricians and Gynecologists, Committee Opinion No. 830, *Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals*, https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2021/07/reproductive-health-care-for-incarcerated-pregnant-postpartum-and-nonpregnant-individuals.pdf (July 2021) [hereinafter ACOG Opinion No. 830].

[8] Kayla Tabari House, et al., *Ending Restraint of Incarcerated Individuals Giving Birth*, AMA Journal of Ethics (Apr. 2021), *available at* https://journalofethics.ama-assn.org/article/ending-restraint-incarcerated-individuals-giving-birth/2021-04.

12

60.     Shackling continues to be harmful throughout the postpartum recovery period. Limitation in mobility can continue to increase risk of blood clotting.[9] Furthermore, shackling can inhibit parent-infant bonding, as well as breastfeeding.[10] Because most incarcerated new parents will be brought back to prison shortly after giving birth, it is particularly cruel to inhibit bonding during this brief period, especially when the anguish and trauma of shackling further exacerbates the difficulty in bonding.

61.     Being shackled during labor and delivery amounts to a punishment totally out of proportion to any crime a pregnant person may have committed. For this reason, many medical associations and correctional experts have long recommend prohibiting the use of any restraints throughout pregnancy, except in extremely limited circumstances.

62.     The Federal Bureau of Prisons,[11] the U.S. Marshals Service,[12] the American Correctional Association,[13] the American College of Obstetricians and Gynecologists,[14] and the

---

[9] CENTERS FOR DISEASE CONTROL & PREVENTION, *Pregnant? Don't Overlook Blood Clots* (last reviewed Feb. 7, 2020), *available at* https://www.cdc.gov/ncbddd/dvt/features/blood-clots-pregnant-women.html.

[10] Amanda Glenn, *Shackling Women During Labor: A Closer Look at the Inhumane Practice Still Occurring in Our Prisons*, 29 HASTINGS WOMEN'S L. J. 199, 203 (2018).

[11] Fed. Bureau of Prisons, Program Statement: Escorted Trips, No.5538.06 at § 570.45 (Aug. 29, 2014), available at http://www.bop.gov/policy/progstat/5538_006.pdf.

[12] *See* Gov't Accountability Office Report, *Pregnant Women in DOJ Custody* 32 (Jan. 2021), *available at* https://www.gao.gov/assets/gao-21-147.pdf.

[13] ACA File No. 2008-023, Standards Comm Meetings Minutes, ACA 138th Cong. Of Corr. (Am. Corr. Ass'n, New Orleans, La.) Aug. 8, 2008 at 62, available at https://www.aca.org/aca_prod_imis/docs/Standards%20and%20Accreditation/sac_August_2008.pdf. *See* Anti-Shackling Briefing Paper, Am. Civil Liberties Union 2 (2012), *available at* https://www.aclu.org/sites/default/files/field_document/anti-shackling_briefing_paper_stand_alone.pdf.

[14] ACOG Opinion No. 830, *supra* note 7.

American College of Nurse Midwives[15] all oppose shackling pregnant prisoners during pregnancy, labor, delivery, and postpartum recovery because it is unnecessary and dangerous to their health and well-being.

63.     The American Medical Association[16] and the American Public Health Association[17] have issued statements specifically opposing shackling during labor and postpartum recuperation.

64.     The American Psychological Association has also condemned this particularly barbaric practice, reporting that "[w]omen subjected to restraint during childbirth report severe mental distress, depression, anguish, and trauma."[18]

65.     Most states and the federal government restrict the use of shackling during pregnancy, labor, and the postpartum period.[19] Twelve states have completely prohibited the use of shackling during all stages of labor without exception.

66.     On August 31, 2021, the North Carolina legislature unanimously passed the Dignity for Women Who are Incarcerated bill.[20] The bill prohibits the use of restraints during "labor and

---

[15] THE AMERICAN COLLEGE OF NURSE MIDWIVES POSITION STATEMENT, *Shackling/Restraint of Pregnant Women Who Are Incarcerated* (2012), *available at* http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000276/Anti-Shackling%20Position%20Statement%20June%202012.pdf.

[16] American Medical Association, *An "Act to Prohibit the Shackling of Pregnant Prisoners" Model State Legislation* (2015), available at https://www.ama-assn.org/media/9791/download.

[17] *See* Anti-Shackling Briefing Paper, Am. Civil Liberties Union 2 (2012), *available at* https://www.aclu.org/sites/default/files/field_document/anti-shackling_briefing_paper_stand_alone.pdf.

[18] APA, "End the Use of Restraints on Incarcerated Women and Adolescents during Pregnancy, Labor, Childbirth, and Recovery," *available at* https://www.apa.org/advocacy/criminal-justice/shackling-incarcerated-women.pdf.

[19] *See, e.g.*, The First Step Act, 18 U.S.C. § 4322 (2018) (prohibition on use of restraints except in extraordinary circumstances during pregnancy, labor, and postpartum recovery for individuals in the custody of the Federal Bureau of Prisons or the United States Marshals Service).

[20] *See* H608, Gn. Assemb. (N.C. 2021).

14

delivery" and "in transport when the female incarcerated person is in labor or is suspected to be in labor."[21] Restraints are also prohibited during the six-week period following delivery, unless "a correctional facility employee makes an individualized determination that an important circumstance [i.e., risk of harm or escape] exists" in which case "only wrist handcuffs held in front of the female incarcerated person's body may be used and only when she is ambulatory."[22] Wrist handcuffs are also the only type of restraints permitted during the second and third trimester of pregnancy.[23]

67.     The unanimous, bi-partisan passage of the bill demonstrates the recognition in North Carolina that shackling during pregnancy is harmful, should be extremely limited, and that shackles should never be used during labor. Shackling an incarcerated person during labor and immediately postpartum flies in the face not only of medical consensus but also in the face of the uniform agreement of elected representatives in North Carolina as to how prison officials should treat individuals in their custody.

### *Unconstitutional Shackling at NCCIW Violated DPS Policy*

68.     DPS officials were aware of the harms of shackling. DPS therefore updated its shackling policy in 2018, and this is the policy that was in effect at the time of the allegations in this complaint.

69.     The DPS policy applies to all prisons in North Carolina, including NCCIW, and supersedes any facility-specific policy that is in conflict.

---

[21] *Id.* § 148-25.2(a).

[22] *Id.*

[23] *Id.*

70. DPS Policy F.1100, "Transporting Offenders," prohibits the use of leg, waist, and ankle restraints, as well as wrist restraints applied behind the body, for any pregnant person in DPS custody:

> An offender with a clinical diagnosis of pregnancy shall not be restrained by leg, waist, or ankle restraints. Wrist restraints may be used during any internal escort or external transport. These wrist restraints shall only be applied in the front and in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall. This related [sic] to inmates not in labor or suspected labor and who are escorted out for Ultrasound Addiction Therapy for Pregnant Women or other routine services.[24]

71. During labor, defined as "occurring at the onset of contractions," no restraints at all may be applied "unless there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others . . . or that she presents an immediate, credible risk of escape[.]"[25] Officers are required to notify the Associate Warden for Custody and complete an incident report whenever restraints are applied during labor.

72. The same prohibitions apply to individuals in "post-partum recuperation," those being "transported or housed in an outside medical facility for treating labor and delivery," individuals after an "intravenous line has been placed and the induction medication has been started," and those who are initially bonding with their newborns, "including nursing and skin to skin contact."[26]

73. Upon transport back to prison after childbirth, an individual may only be restrained by the wrists. Leg restraints are permitted only "when there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others, or that she

---

[24] Exhibit 1 at F.1104(i)(1).

[25] *See* Exhibit 1 at F.1104(i)(2).

[26] *Id.* at F.1104(i)(2)(A)-(G).

16

presents an immediate, credible risk of escape that cannot be reasonably contained through other methods."[27] Waist restraints are not permitted during pregnancy or postpartum, including during transportation back to the facility.[28]

74.    NCCIW updated its standard operating procedures governing use of force and restraints in 2019, but these procedures are inconsistent with the 2018 DPS policy.[29]

75.    NCCIW has a "Hospital Admission" policy, that—contrary to the DPS Policy—requires restraint of "one hand restrained by the bed/gurney with a handcuff and the opposite leg restrained to the bed/gurney with a leg iron."[30] The only exception for persons in labor, delivery and postpartum is that "Mechanical restraints will be removed from an offender who is in active labor."[31] Upon information and belief, NCCIW interprets "active labor" to mean the point in which a pregnant person is in the final "pushing" phase of labor and delivery. Contrary to the DPS policy, NCCIW Procedures further specify that, "[t]he offender must remain sitting in her bed or chair while holding the newborn child. Leg irons will remain on the offender."[32]

76.    The NCCIW procedures also require, in violation of DPS policy, that an incarcerated person "shall be restrained after birth of the child and the medical authorities have completed their work" but that they "shall not have [their] hands restrained while bonding and feeding the baby."[33] While this policy states that incarcerated persons must not be restrained during

---

[27]  *Id*. at F.1104(i)(4).

[28] *Id.* at F.1104(i)(5).

[29] *See* Exhibit 2, NCCIW Standard Operating Procedure "Offender Restraints," D.1802(b); Exhibit 3, NCCIW Standard Operating Procedure "Use of Force and Restraints," H.0303(f).

[30] Exhibit 2 at D.1804(l)(10)(B).

[31] *Id.* at D.1804(l)(10)(F).

[32] *Id.* at D.1804(l)(10)(E).

[33] Exhibit 3 at H.0303(f)(8).

"delivery," that same provision limits appear to limit this restriction to "active labor."[34] Again, upon information and belief, NCCIW interprets "active labor" to mean the point in which a pregnant person is in the final "pushing" phase of labor and delivery. In any event, these NCCIW policies are in direct contradiction with the DPS policies, which prohibit "any restraints" from the "onset of contractions," or "once the intravenous line has been placed and the induction medication has been started," transportation to "an outside facility for treating labor and delivery," during "post-partum recuperation," and "during initial bonding with the newborn child, including nursing and skin to skin contact."[35]

### *Defendants Unlawfully Deprived Plaintiff of Medications for her Substance Use Disorder*

77.     Ms. Edwards had been diagnosed with an opioid use disorder prior to her incarceration. Ms. Edwards has also been diagnosed with bipolar disorder, posttraumatic stress disorder (PTSD), anxiety, and depression.

78.     Prior to her incarceration, Ms. Edwards was receiving regular mental health care and was on a medication regimen that worked for her in controlling her mental health and substance use disorders. She had been stable on Lamictal, Hydroxyzine, Gabapentin, Strattera, and Suboxone (a medication used to treat her opioid use disorder).

79.     Doctors at NCCIW prescribed Subutex to Ms. Edwards per their policy to provide MOUD to pregnant prisoners yet discontinued her mental health medications to treat her PTSD, anxiety, depression, and bipolar disorder due to her concern about their impact on her fetus.

---

[34] *Id.*

[35] Exhibit 1 at F.1104(i)(2).

80. Despite medical consensus that medication is the most efficacious treatment for OUD, DPS policy bars prisoners with OUD from taking these FDA-approved, effective medications unless they are currently pregnant. As a provider at NCCIW noted in Ms. Edwards's medical records, MOUD is provided solely to protect a pregnant prisoner's fetus from the harms of withdrawal.

81. On information and belief, DPS's MOUD policy is not designed to minimize harm or risk of relapse of postpartum people.

82. Because Ms. Edwards was pregnant, officers at NCCIW began to take her to Southlight, a clinic at which she was provided with Subutex.

83. Correctional officers took Ms. Edwards to Southlight each morning to receive her Subutex. They searched and handcuffed her every time, despite the fact that the officers knew she was pregnant—and in fact, that was the only reason she was receiving Subutex.

84. On or around December 1, 2019, NCCIW initiated an in-house MOUD program dispensing Suboxone. At that point, Ms. Edwards no longer had to leave the prison to receive her MOUD.

85. While at the hospital for delivery and postpartum from December 19th to 22nd, UNC doctors continued to provide Ms. Edwards with Suboxone. However, on December 23, 2019, three days after Ms. Edwards gave birth, Defendant Wilson ordered that her Suboxone prescription be terminated.

86. Rather than have her continue taking Suboxone to maintain stability and forgo withdrawal, Defendant Wilson instead prescribed Ms. Edwards with an oxycodone taper over the course of nine days.

87.    Defendant Wilson did not provide any medical justification for refusing to provide Ms. Edwards's prescribed MOUD or for providing an inappropriate medication (Oxycodone) to taper Ms. Edwards off of MOUD.

88.    As a result, Ms. Edwards suffered from pain, diarrhea, and vomiting for weeks. She was unable to eat or even shower for days because of the intensity of her symptoms.

89.    Not once was Ms. Edwards seen by a doctor to manage her symptoms while undergoing this severe and life-threatening withdrawal, despite the medical consensus that the postpartum period is one in which individuals with substance use disorders are at particularly high risk of relapse, both in and out of prison.

### *Unconstitutional and Illegal MOUD Practices at NCCIW*

90.    DPS policy, currently and at the time the allegations in this Complaint occurred, is to provide MOUD only to pregnant people in DPS custody who have an opioid use disorder.

91.    DPS does not provide MOUD to non-pregnant people, even those who have a prescription for MOUD and were on MOUD while in the community.

92.    Individuals who are continued or initiated on MOUD while in the custody of DPS and then give birth while in custody are withdrawn from MOUD when they return to the prison, regardless of whether a doctor or hospital provides a prescription for MOUD postpartum.

93.    Per DPS policy and practice, individuals who are on MOUD at the time that they give birth while in DPS custody are tapered with Oxycodone, a prescription opioid only," and are no longer provided with MOUD. No individual medical determination is made regarding whether MOUD is the correct course of treatment for any individual prisoner.

20

***Forced Withdrawal from Medication for Opioid Use Disorder Postpartum Poses a Substantial Risk of Serious Harm.***

94.     Opioid Use Disorder (OUD) is a common pathway to prison for women. A majority of incarcerated women, including many incarcerated pregnant people, have OUD.[36]

95.     The medical standard of care for OUD treatment is Medication for Opioid Use Disorder (MOUD) and has been since well before Plaintiff was withdrawn from her MOUD.[37]

96.     The FDA has approved three MOUD medications: methadone, buprenorphine, and naltrexone. Their duration and dosing must be based on an individualized consideration of a person's medical needs by a trained medical professional. Much like medication-based treatment for any other chronic diseases, the medically necessary duration of MOUD is generally lengthy and, in some cases, lifelong.[38] Once a patient is being treated successfully for OUD through medication, forcibly or abruptly ending that treatment will cause the patient to experience excruciating withdrawal symptoms and puts them at heightened risk for relapse, overdose, and death.

97.     Continued access to MOUD improves retention in treatment, increases abstinence from illicit drugs, and decreases mortality. MOUD has been shown to decrease opioid use, opioid-related overdose deaths, criminal activity, and infectious disease transmission.[39]

---

[36] Carolyn Sufrin et al., *Opioid Use Disorder Incidence and Treatment among Incarcerated Pregnant Women in the United States: Results from a National Surveillance Study*, 115 ADDICTION 2057 (2020).

[37] DEP'T OF HEALTH & HUMAN SERV'S, *Fact Sheet: Combating the Opioid Crisis* (April 2019), *available at* https://www.hhs.gov/sites/default/files/opioids-fact-sheet-april-2019.pdf.

[38] U.S. FOOD & DRUG ADMINISTRATION, *Information about Medication-Assisted Treatment (MAT)*, *available at* https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat.

[39] NAT'L INST. ON DRUG ABUSE, *Effective Treatments for Opioid Addiction*, Policy Brief (2016), *available at* https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction.

98.     For individuals with OUD, provision of MOUD can be lifesaving. Studies have shown that maintenance medication treatments of OUD reduce all-cause and overdose mortality and have a more robust effect on treatment efficacy than behavioral components of treatment, such as counseling.[40]  Methadone and buprenorphine have been clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment without medication, (3) outpatient treatment with placebo medication, and (4) detoxification only.

99.     MOUD is particularly important for individuals who are incarcerated: lack of access to consistent MOUD can lead to greater relapse and overdose rates after release. Formerly incarcerated individuals with OUD suffer from high mortality rates after release, including from opioid-related causes.[41]

100.     One study of a program in Rhode Island that allowed individuals to remain on MOUD throughout their incarceration showed that 95% of individuals continued with treatment after release. The program also decreased post-release deaths by 60% and all opioid-related deaths in the state by over 12%.[42]

101.     Because of the nature of OUD, individuals who are not provided consistent treatment are likely to continue to have contact with the criminal legal system, including multiple stints of incarceration.

---

[40] Laura Amato et al., *Psychosocial Combined with Agonist Maintenance Treatments Versus Agonist Maintenance Treatments Alone for Treatment of Opioid Dependence*, 10 COCHRANE DATABASE SYSTEMIC REVS. (Oct. 5, 2011), at 2.

[41] Consensus Study Report: *Medications for Opioid Use Disorder Save Lives* (2019), *available at* https://www.nap.edu/catalog/25310/medications-for-opioid-use-disorder-save-lives.

[42] Lauren Brinkley-Rubinstein et al., *The Benefits and Implementation Challenges of the First State-Wide Comprehensive Medication for Addictions Program in a Unified Jail and Prison Setting*, 205 DRUG AND ALCOHOL DEPENDENCE (Dec. 2019).

22

102.    Conversely, individuals who are provided and maintained on MOUD during their incarceration are likelier to avoid future incarceration.[43]

103.    For these reasons, numerous correctional and public health organizations advocate for access to MOUD for all individuals with OUD who are incarcerated, including the National Correctional Commission on Health Care, the National Sheriffs' Association,[44] and the American Society for Addiction Medication.[45]

104.    The postpartum period is a particularly important one for treating OUD.  Relapse and death are both more common in the postpartum period than during pregnancy.[46] Medical professionals are therefore in agreement that postpartum people must have consistent access to MOUD.[47]

105.    Taken together, the literature indicates that postpartum incarcerated people who are not provided MOUD are more likely to relapse, and they are also likely to become reincarcerated due to relapse after they are released. Provision of MOUD postpartum therefore is both necessary to avoid the harms of relapse—up to and including death—and to avoid a cycle of reincarceration.

---

[43] NAT'L SHERIFFS' ASSO'C & NAT'L COMM'N ON CORRECTIONAL HEALTH CARE, *Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field* 5 n.3 (2018), *available at* https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf (collecting scientific research).

[44] *See generally id.*

[45] AM. SOC'Y FOR ADDICTION MEDICINE NATIONAL PRACTICE GUIDELINE FOR THE TREATMENT OF OPIOID USE DISORDER 60 (2020), *available at* https://www.asam.org/docs/default-source/quality-science/npg-jam-supplement.pdf?sfvrsn=a00a52c2_2.

[46] Davida M. Schiff et al., *Fatal and Nonfatal Overdose Among Pregnant and Postpartum Women in Massachusetts*, 132 OBSTETRICS AND GYNECOLOGY 466 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6060005/.

[47] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, *Opioid Use and Opioid Use Disorder in Pregnancy*, Committee Opinion No. 711 (Aug. 2017), *available at* https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/08/opioid-use-and-opioid-use-disorder-in-pregnancy.

23

106.    Forced withdrawal, in addition to posing risk of death or serious harm from future relapse, also causes unnecessary pain and suffering.

107.    Withdrawal symptoms include pain, anxiety, irritability, sweating, nausea, tremors, vomiting, diarrhea, insomnia, and muscle spasms.[48] These symptoms can sometimes lead to life-threatening complications.[49]

108.    Opioids, including oxycodone, are not an approved method to treat withdrawal symptoms, and medication-assisted withdrawal is not effective in preventing negative outcomes associated with untreated OUD.

**_Defendants Deprived Plaintiff of Medically Necessary Treatment For Mental Health Disabilities_**

109.    While Ms. Edwards was at the hospital to deliver her daughter, UNC doctors also prescribed Ms. Edwards a two-week supply of Zoloft and Hydroxyzine for depression and anxiety. Her medical records noted her history of anxiety and PTSD.

110.    In her discharge papers, UNC doctors noted that she might "cry easily" or "become very depressed" due to postpartum hormone changes.

111.    Her prescribing doctors also ordered a postpartum "mood check" appointment to take place in two weeks, by January 5, 2020, when Ms. Edwards's supply of psychotropic medications would run out. Doctors would need to write Ms. Edwards a new prescription in order

---

[48] Thomas R. Kosten & Louis E. Baxter, _Review Article: Effective Management of Opioid Withdrawal Symptoms: A Gateway to Opioid Dependence Treatment_, 28 AM. J. ON ADDICTIONS 55 (2019), _available at_ https://onlinelibrary.wiley.com/doi/full/10.1111/ajad.12862.

[49] Veronica Spadotto et al., _Heart Failure Due to "Stress Cardiomyopathy": A Severe Manifestation of the Opioid Withdrawal Syndrome_, 2 ACUTE CARDIOVASCULAR CARE 84 (2013), _available at_ https://academic.oup.com/ehjacc/article/2/1/84/5921860?login=true.

to ensure that she would have consistent access to medications to treat her mental health disabilities.

112.    After she returned from the hospital, Ms. Edwards was housed in the Robin Unit of NCCIW, which is also known as the infirmary. The Robin Unit offers little to no programs, services, or activities to incarcerated individuals, as it solely consists of individual cells and a small dayroom.

113.    While at the Robin Unit, Ms. Edwards had no access to any recreation area beyond the dayroom, no access to mental health or educational programming, and no ability to visit with her family. For the first 24 hours of her confinement at the infirmary, she was refused access to a phone to call her mother to inform her of her delivery and request that she pick up her new granddaughter from the hospital.

114.    Lack of access to recreation, programming, therapy, and visitation all made Ms. Edwards's emotional state even worse. She could not talk to her friends and she worried about her daughter. As noted at the hospital, she was already suffering from anxiety and depression, and her conditions in the Robin Unit made her significantly more depressed and anxious. She had trouble sleeping and her heart raced. Many times, all she could do was cry.

115.    Although she was medically discharged from the Robin Unit on January 8, 2020, she remained in the unit and was not actually moved back to general population for approximately one week after that date.

116.    By January 5, 2020, Ms. Edwards had run out of the Zoloft and Hydroxyzine prescribed by UNC doctors at the hospital. Defendant Wilson and NCCIW providers refused to renew her prescriptions, causing her to immediately withdraw from these prescribed mental health medications without any taper.

117.     Defendant Wilson did not meet with Ms. Edwards or evaluate her before discontinuing her mental health medications.

118.     Defendant Wilson and NCCIW providers also refused to provide Ms. Edwards with the postpartum "mood check" that the UNC doctors had ordered for January 5, 2020.

119.     Defendant Wilson did not provide any medical justification for failing to renew Ms. Edwards's psychotropic medications needed for her diagnosed mental health disorders, or for timely failing to refer her to mental health treatment during the vulnerable postpartum period.

120.     On January 7, 2020, Ms. Edwards submitted a sick call request that her prescriptions be refilled, noting that she was suffering from nightmares, anxiety, and racing thoughts.

121.     On January 10, 2020, Ms. Edwards finally saw a doctor, who noted the need for Zoloft. The doctor noted that NCCIW policy prohibited her from prescribing Zoloft, but agreed that the medication should be refilled. No medical reason was documented for denying Ms. Edwards her medically necessary mental health medication.

122.     On January 12, Ms. Edwards again requested a refill of her prescription medication, noting that she was suffering from "really bad anxiety" and was unable to sleep due to nightmares.

123.     Ms. Edwards was not provided with an appointment with a psychologist until January 15, 2020, nearly a month after she gave birth and weeks after the prison medical staff stopped providing her with the prescriptions ordered for her at the hospital—MOUD, Zoloft, and Hydroxyzine—to treat her mental health conditions and substance use disorder. The health care provider Ms. Edwards saw on January 15 was not a psychiatrist, and she did not renew any of Ms. Edwards's prescriptions.

26

124.     Ms. Edwards was denied mental health treatment—including psychiatric care, mental health therapy, and all psychotropic medications she had previously been prescribed—until March 2020, months after she gave birth and months after her prescriptions expired without being renewed.

### *Access to Mental Health Treatment is Vital in the Postpartum Period*

125.     Although it is always important to provide individuals who have mental health disabilities with appropriate therapy and medication treatment, this need is particularly heightened during the postpartum period, which is a particularly vulnerable period, especially for those with mental health conditions.[50]

126.     Postpartum depression (also called peripartum depression) is a serious public health problem.[51] Approximately 15-20% of people who have recently given birth suffer from some form of postpartum depression.[52] Among individuals who have a past diagnosis of bipolar disorder, that number is even higher: 50% experience a mood episode postpartum, primarily depression.[53]

---

[50] Carolyn Sufrin, *Pregnancy and Postpartum Care in Correctional Settings* 6, Nat'l Comm'n on Correctional Health Care (2018), *available at* https://www.ncchc.org/filebin/Resources/Pregnancy-and-Postpartum-Care-2018.pdf at 6.

[51] Saurabh R. Shrivastava et al., *Antenatal and Postnatal Depression: A Public Health Perspective*, 6 J. Neurosciences in Rural Practice 116 (2015).

[52] Constance Guille et al., *Management of Postpartum Depression* 6 J. Midwifery Women's Health 643, 644 (2013).

[53] *Id.*

27

127.    Symptoms of postpartum depression can be severe: people who have postpartum depression may experience isolation, guilt, helplessness, hopelessness, intrusive thoughts, and relapse for substance abuse. They are also at higher risk of abuse, self-harm, and suicide.[54]

128.    Without proper treatment, these symptoms cause unnecessary suffering as well as risk of harm, particularly if the symptoms include substance use relapse or self-harm.

129.    Postpartum depression may be triggered or exacerbated by stressful situations, as well as pre-existing diagnoses of mental health disabilities.[55] The American College of Obstetricians and Gynecologists notes that "[f]orced separation from one's newborn, as happens by default for most people who give birth in custody, can potentially have devastating maternal effects" and estimates that postpartum depression may be higher among incarcerated people than in the non-incarcerated population.[56]

130.    It is thus essential that mental health treatment is provided postpartum to all individuals, and particularly to those who have been diagnosed with postpartum depression or any other mental health disabilities.

131.    This treatment can include both prescribed medications and psychotherapy as frontline treatment.[57]

---

[54]   Elizabeth Fitelson et al., *Treatment of Postpartum Depression: Clinical, Psychological and Pharmacological Options*, 3 INT'L J. WOMEN'S HEALTH 1, 2 (2011).

[55] *Id.* at 1.

[56] ACOG Opinion No. 830, *supra* note 7.

[57] Carolyn Sufrin, *Pregnancy and Postpartum Care in Correctional Settings* 6, Nat'l Comm'n on Correctional Health Care (2018), *available at* https://www.ncchc.org/filebin/Resources/Pregnancy-and-Postpartum-Care-2018.pdf.

28

132.    Individuals who have consistent access to mental health care during incarceration may also have lower recidivism rates than people who do not.[58]

## COUNT I
### Violation of the Eighth Amendment to the U.S. Constitution (Shackling)
### As to Defendants Hooks, Edwards, Witherspoon, and Officer Defendants

133.    Plaintiff incorporates all preceding paragraphs.

134.    Defendants' policies and practices concerning shackling and restraint of Plaintiff during her pregnancy, labor, and the postpartum period, subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

135.    Exposing Plaintiff to such risks violated contemporary standards of decency that mark the progress of a maturing society.

136.    Defendants promulgated policies allowing this shackling, and shackled Plaintiff, with deliberate indifference to the serious risk of harm that such policies posed.

137.    The policies and practices described above constitute cruel and unusual punishments under the Eighth Amendment.

138.    Officer Defendants, while acting under color of state law, violated their own Department of Public Safety policy by shackling Plaintiff during labor and restraining her with five-point restraints during her transport back to the prison postpartum. They did so with deliberate indifference to the serious risk of harm that such actions exposed Plaintiff to.

139.    As warden of NCCIW during the time of Plaintiff's pregnancy and delivery, Defendant Witherspoon knowingly maintained a shackling policy at NCCIW that permitted the

---

[58] Alene Kennedy-Hendricks et al., *Improving Access to Care and Reducing Involvement in the Criminal Justice System for People with Mental Illness*, 35 HEALTH AFFAIRS 1076 (2016), *available at* https://www.healthaffairs.org/doi/10.1377/hlthaff.2016.0006.

29

shackling of Plaintiff during labor and permitted five-point restraints postpartum despite changes in Department of Public Safety policy.

140.     Defendant Witherspoon was aware that pregnant people at NCCIW were routinely shackled during pregnancy, labor, and postpartum but was deliberately indifferent to the serious risk of harm that these policies and practices posed.

141.     Defendant Witherspoon's failure to halt or update the unconstitutional policies and practices regarding shackling directly posed a substantial and excessive risk of harm to Plaintiff during pregnancy, delivery, and postpartum.

142.     As current warden of NCCIW, Defendant Edwards is aware of the fact that NCCIW policies and practices allow pregnant people to be routinely shackled during pregnancy, labor and postpartum—in direct violation of DPS policy. As warden of NCCIW, Defendant Edwards has responsibility for the provision and overall implementation of DPS and NCCIW policies.

143.     Defendant Edwards is nevertheless deliberately indifferent to the serious risk of harm that NCCIW policies and practices posed and continue to directly pose to pregnant and postpartum individuals.

144.     As Secretary of DPS, Defendant Hooks is aware of the DPS policy that allows pregnant people to be routinely shackled during pregnancy and postpartum. As Secretary of DPS, Defendant Hooks has responsibility for the provision and overall implementation of DPS policies.

145.     Defendant Hooks is deliberately indifferent to the serious risk of harm that DPS policies and practices posed and continue to pose to pregnant and postpartum individuals.

146.     Plaintiff was subject to an unreasonable risk of harm, and experienced actual harm and injury, as a result of these unconstitutional actions. She seeks declaratory and injunctive relief and damages.

## COUNT II
### Violation of the Eighth Amendment (Denial of MOUD)
### As to Defendants Hooks, Edwards, Witherspoon, Wilson, Alexander, Junker, and Amos

147.    Plaintiff incorporates all preceding paragraphs.

148.    Defendants violated Ms. Edwards's clearly established right under the Eighth Amendment to be free from deliberate indifference to her serious medical needs.

149.    At all relevant times, Ms. Edwards had a serious medical need for medication to treat her OUD.

150.    Defendants failed to provide Ms. Edwards with necessary medication to treat her OUD without any medical justification and contrary to recognized standards of care. Defendants thereby subjected her to objectively dangerous conditions that presented substantial risks of serious mental and physical harm.

151.    By denying Ms. Edwards access to MOUD, Defendants placed Ms. Edwards at heightened risk of lowered tolerance to opioids and to a heightened risk of relapse into active addiction, resulting in overdose and death.

152.    Defendants' conduct exposing Ms. Edwards to such risks violated contemporary standards of decency that mark the progress of a maturing society.

153.    Defendants' policies and practices withdrawing her from MOUD postpartum, without regard to her individualized circumstances, subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

154.    Deliberate indifference is found when a prisoner has an objectively serious medical need, such as OUD, and correctional staff have actual knowledge of, but deliberately disregard, such need.

155.    The acts and omissions of the Defendants in failing to provide adequate medical care to Ms. Edwards constituted deliberate indifference to Ms. Edwards's serious medical needs.

156. Defendant Wilson acted with deliberate indifference to Plaintiff's serious medical needs when he denied her access to her prescribed MOUD and prescribed Plaintiff an Oxycodone taper instead of permitting her access to prescribed MOUD, knowing the risk of postpartum relapse and pain such a change in prescription would entail.

157. Defendants Junker and Alexander acted with deliberate indifference when they promulgated and implemented a policy that did not allow Ms. Edwards to have access to prescribed MOUD despite a valid prescription and without taking into consideration her individualized circumstances and medical needs.

158. Defendants Hooks, Witherspoon and Amos approved of and implemented the MOUD policy despite their knowledge of the substantial risk of serious harm this policy posed to Ms. Edwards.

159. Defendants allow the policy to continue despite the known risk of harm.

160. Because Ms. Edwards's criminal appeal is pending, she risks once again being deprived of necessary medical care due to Defendants' cruel and unusual policies.

161. Unless enjoined, Defendants' conduct will continue to inflict injuries for which Plaintiff and others with OUD at NCCIW have no adequate remedy at law.

### COUNT III
### Violation of the Americans with Disabilities Act (Denial of MOUD)
### As to Defendant Hooks

162. Plaintiff incorporates all preceding paragraphs.

163. NCCIW, as represented by Defendant Hooks in his official capacity, is a public entity subject to the Americans with Disabilities Act (ADA). 42 U.S.C. §§ 12131(1).

164. Drug addiction is a "disability" under the ADA. *See* 42 U.S.C. § 12102, 28 C.F.R. § 35.108. The ADA applies to people, like Ms. Edwards, who suffer from OUD.

165.    Ms. Edwards is a "qualified individual with a disability" because she meets the essential eligibility requirements for NCCIW's medical services. 42 U.S.C. § 12131(2).

166.    Title II of the ADA guarantees qualified individuals an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

167.    As a qualifying person with a disability, Ms. Edwards was entitled to receive the benefits of, and equal access to, the medical care system in prison.

168.    On information and belief, NCCIW does not forcibly deny or alter medically necessary, physician-prescribed medications to incarcerated individuals that are provided to accommodate other serious, chronic medical conditions, such as diabetes.

169.    NCCIW's postpartum withdrawal policy automatically and forcibly removed Ms. Edwards from MOUD, which was prescribed to provide long-term management and accommodation for her disability of OUD, thereby denying her the benefits of their medical programs and services on the basis of her disability.

170.    NCCIW refused to make a reasonable accommodation for Ms. Edwards by providing her with access to her prescribed MOUD during her incarceration, even though accommodation would not alter the nature of the healthcare program.

171.    NCCIW acted intentionally and with deliberate indifference to Ms. Edwards's protected rights under the ADA in denying her access to the benefits of its medical program and services.

172.    Defendants had actual knowledge of ongoing discrimination against Ms. Edwards because she was prescribed MOUD for her disability while pregnant, but Defendants failed to respond adequately by accommodating her disabilities when she was postpartum.

173. The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(2).

174. As a result of NCCIW's actions and omissions, Ms. Edwards and others with OUD have suffered and will continue to suffer irreparable harm by suffering from discrimination and unequal access to NCCIW's health care programs, services, or activities.

175. Because Ms. Edwards's criminal appeal is pending, she risks once again being deprived of MOUD accommodations due to NCCIW's discriminatory policy against individuals with OUD. If there is no change in the status quo, Ms. Edwards and others with this chronic disability will continue to be denied their right to the full benefit of the programs, services, or activities offered by NCCIW.

176. NCCIW's failure to meet its obligations to provide equal access to its programs, services, and activities constitutes an ongoing and continuous violation of the ADA and its implementing regulations. Unless restrained from doing so, NCCIW will continue to violate the ADA. Unless enjoined, NCCIW's conduct will continue to inflict injuries for which Ms. Edwards and others with OUD at NCCIW have no adequate remedy at law.

**COUNT IV**
**Violation of the Rehabilitation Act (Denial of MOUD)**
**As to Defendant Hooks**

177. Plaintiff incorporates all preceding paragraphs.

178. Defendants' policies and practices withdrawing Ms. Edwards from MOUD postpartum, without regard to her individualized circumstances, violated the rights secured to her by Section 504 of the Rehabilitation Act and its implementing regulations.

179. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation

34

in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

180.     Ms. Edwards is an otherwise qualified individual with a disability as defined in Section 504 of the Rehabilitation Act. As a prisoner in the custody of the Department of Public Safety, she met the essential eligibility requirements for receipt of services or the participation in programs or activities provided by the Defendants. 29 U.S.C. §§ 705(9)(B), 794.

181.     Defendant Hooks, sued in his official capacity, holds an office that is an agency of state government, which administers a program or activity that receives federal financial assistance.

182.     Under the Rehabilitation Act, Defendants may not "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service," 45 C.F.R. § 84.4(b)(1)(i), "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," 45 C.F.R. § 84.4(b)(1)(vii), or "utilize criteria or methods of administration . . . that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 45 C.F.R. § 84.4(b)(4).

183.     On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

184.     Defendants' postpartum withdrawal policy automatically and forcibly removed Ms. Edwards from her prescribed MOUD. They therefore have denied her the benefits of their medical programs on the basis of her disability.

185.     Defendants have failed to meet their obligations under the Rehabilitation Act by forcibly withdrawing Ms. Edwards from prescribed MOUD without consideration of her

35

individualized circumstances postpartum. Defendants acted with deliberate indifference in failing to provide reasonable accommodation for Ms. Edwards's disability despite actual knowledge of her need for accommodations.

## COUNT V
### Violation of the Eighth Amendment (Denial of Mental Health Treatment Postpartum) As to Defendants Amos and Wilson

186.    Plaintiff incorporates all preceding paragraphs.

187.    Defendants' policies and practices denying Ms. Edwards access to counseling and mental health medication postpartum subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

188.    Defendants, while acting under color of state law, deliberately, purposefully, and knowingly denied Plaintiff access to necessary medical treatment for her mental health disabilities, which constitute a serious medical need.

189.    Denying Ms. Edwards access to necessary medical and mental health treatment postpartum has caused and continues to cause her physical and psychological suffering.

190.    Defendants acted with deliberate indifference when they failed to provide necessary medical and mental health care, including access to her prescribed psychotropic medication, without any medical justification and contrary to recognized standards of care, and thereby subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

191.    Defendants were aware that denial of mental health treatment is particularly dangerous during the postpartum period, and that these risks are heightened for individuals, such as Plaintiff, who have pre-existing substance use disorders and/or mental health disabilities.

192.    Exposing her to such risks violated contemporary standards of decency that mark the progress of a maturing society.

36

193.    Defendant Amos acted with deliberate indifference to Ms. Edwards's serious medical needs when he failed to provide access to necessary prescriptions and counseling, despite knowing the dangers of suddenly discontinuing psychotropic medication postpartum.

194.    Defendant Wilson acted with deliberate indifference to Ms. Edwards's serious medical needs when he denied her access to her prescribed Zoloft, and Hydroxyzine, and failed to provide access to mental health counseling, despite his knowledge of her mental health disabilities, and knowing that the postpartum period is one in which access to mental health treatment is particularly important.

195.    Plaintiff was exposed to an unreasonable risk of harm, and was actually harmed and injured, as a result of these unconstitutional actions. She seeks declaratory and injunctive relief and damages.

## COUNT VI
### Violation of the Americans with Disabilities Act (Denial of Mental Health Treatment Postpartum)
### As to Defendant Hooks

196.    Plaintiff incorporates all preceding paragraphs.

197.    NCCIW, by and through Defendant Hooks acting in his official capacity, is a public entity subject to the Americans with Disabilities Act (ADA).

198.    Ms. Edwards's diagnosis of bipolar disorder establishes her as a qualified person with a disability because her mental illness substantially limits brain function and other major life activities.

199.    Ms. Edwards is a "qualified individual with a disability" because she meets the essential eligibility requirements for NCCIW's medical services. 42 U.S.C. § 12131(2). She is entitled to receive the benefits of the medical care system in jail.

37

200. On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications or other treatment to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

201. Defendants fail to provide a system that allows continued access to mental health counseling and medication for individuals with mental health disabilities. They therefore denied her the benefits of their medical programs on the basis of her disability.

202. Defendants refused to make a reasonable accommodation for Ms. Edwards by providing her with access to her prescribed mental health treatment during her incarceration, even though accommodation would not alter the nature of the healthcare program.

203. Defendants acted with deliberate indifference to Ms. Edwards in denying her access to the benefits of their medical program.

204. Defendants had actual knowledge of ongoing discrimination against Ms. Edwards because she had been prescribed medications and other treatment for her disability, but failed to respond adequately by accommodating her disabilities when she was postpartum.

**COUNT VII**
**Violation of the Rehabilitation Act (Denial of Mental Health Treatment Postpartum)**
**As to Defendant Hooks**

205. Plaintiff incorporates all preceding paragraphs.

206. Defendants have violated Ms. Edwards's rights under Section 504 of the Rehabilitation Act and its implementing regulations by and through their policies and practices, which denied Ms. Edwards access to mental health treatment postpartum without regard to her individualized circumstances,

207. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation

38

in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

208.    Ms. Edwards is an otherwise qualified individual with a disability as defined in Section 504 of the Rehabilitation Act. As a prisoner in the custody of the Department of Public Safety, she met the essential eligibility requirements for receipt of services or the participation in programs or activities provided by the Defendants. 29 U.S.C. §§ 705(9)(b), 794.

209.    Defendant Hooks, sued in his official capacity, holds an office that is an agency of state government, which administers a program or activity that receives federal financial assistance.

210.    Under the Rehabilitation Act, Defendants may not "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service," 45 C.F.R. § 84.4(b)(1)(i), "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," 45 C.F.R. § 84.4(b)(1)(vii), or "utilize criteria or methods of administration . . . that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 45 C.F.R. § 84.4(b)(4).

211.    On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications and other treatment to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

212.    Defendants failed to implement a system to provide access to mental health treatment postpartum, including mental health counseling and prescribed medications. They therefore have denied and continue to deny Ms. Edwards the benefits of their medical programs on the basis of her disability.

39

213.    Defendants have failed to meet their obligations under the Rehabilitation Act by forcibly withdrawing Ms. Edwards from prescribed psychiatric medications and counseling, without consideration of her individualized circumstances postpartum. Defendants acted with deliberate indifference in failing to provide reasonable accommodation for Ms. Edwards's disabilities despite actual knowledge of her need for accommodations.

## PRAYER FOR RELIEF

WHEREFORE, Tracey Edwards prays that this Court grant the following relief:

a.   A declaratory judgment holding that, as applied to Plaintiff, Defendants' policy and practice of forced postpartum MOUD withdrawal violates the Eighth Amendment and ADA, and the Rehabilitation Act;

b.   A declaratory judgment that, as applied to Plaintiff, Defendants' policy and procedure of shackling during pregnancy, labor, and the postpartum period violates the Eighth Amendment;

c.   Enjoin Defendants from shackling people who are pregnant or in postpartum recovery absent an individualized determination that there is an imminent risk that the person will escape or commit assault and that there is no other way to contain this risk;

d.   Enjoin Defendants from shackling people who are in any stage of labor, without exception;

e.   Enjoin Defendants from denying all necessary medical treatment, including MOUD;

f.   Order Defendants to formulate and implement new policies that comply with the Eighth Amendment, the ADA, and the Rehabilitation Act;

g.   Provide compensatory damages for pain and suffering under the Eighth Amendment;

h.   Provide punitive damages under the Eighth Amendment;

i.   Provide compensatory damages under the ADA and Rehabilitation Act;

j.   Retain jurisdiction over this matter until the Court is satisfied that the unconstitutional and illegal practices described above have ceased and will not recur;

k.   Award Plaintiff's costs and reasonable attorneys' fees as allowed by law;

l.   Award any other relief the Court finds proper.


**TRIAL BY JURY IS DEMANDED**

Dated:  September 2, 2021.

Respectfully submitted,

s/ Erika K. Wilson
Erika K. Wilson
N.C. Bar. No.45020
**University of North Carolina**
**School of Law Clinical Programs**
102 Ridge Road
Chapel Hill, NC 27514
Telephone: (919) 962-2552
Fax: (919) 962-2883
wilsonek@live.unc.edu

*Local Rule 83.1 (d) Counsel for Plaintiff*


*Hassan A. Zavareei (*Notice of Special Appearance to be Filed)*
**Lauren Kuhlik (*Notice of Special Appearance to be Filed*; *Admission to Federal Court Pending*)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, STE 1000
Washington, D.C. 20036
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com
            lkuklik@tzlegal.com


*April N. Ross (*Notice of Special Appearance to be Filed*)
NC Bar No. 35478
**Aryeh Mellman (*Notice of Special Appearance to be Filed; Admission to Federal Court Pending*)
**CROWELL & MORING LLP**

41

1001 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 624-2500
Email:  aross@crowell.com
          amellman@crowell.com

*Oren Nimni (*Notice of Special
Appearance to be Filed)*
**Rights Behind Bars**
416 Florida Avenue, NW #26152
Washington, D.C. 20001
Phone: (202) 540-0029
Email: oren@rightsbehindbars.org

*Counsel for Plaintiff*