## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

TRACEY EDWARDS,

     *Plaintiff*,

  v.

EDDIE BUFFALOE, Jr.,
in his official capacity as Secretary of the North Carolina
Department of Public Safety,

BENITA WITHERSPOON,
in her personal capacity,

CLAUDETTE EDWARDS,
in her official capacity as the Warden of the North
Carolina Correctional Institution for Women,

JAMES ALEXANDER,
in his personal capacity and in his official capacity as the
Healthcare Facility Health Treatment Administrator of the
North Carolina Correctional Institution for Women,

GARY JUNKER,
in his personal capacity and in his official capacity as the
Director of Health and Wellness Services of the
Department of Public Safety,

ELTON AMOS,
in his personal capacity and in his official capacity as the
Medical Director for the North Carolina Correctional
Institution for Women,

KAVONA GILL,
in her personal capacity,

TAMARA BROWN,
in her personal capacity,

NIKITIA DIXON,
in her personal capacity,

TAMMY WILLIAMS,
in her personal capacity,

Civil Action No. 5:21-CT-3270-D

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

SHEIDA BRODIE,
in her personal capacity,

TIANNA LYNCH,
in her personal capacity,

LORAFAITH RAGANO,
in her personal capacity,

*Defendants.*

**INTRODUCTION**

1. This complaint seeks vindication for barbaric and unlawful treatment Plaintiff Tracey Edwards experienced during the most vulnerable time in her life. During her pregnancy, labor, and postpartum period, Ms. Edwards was shackled and restrained despite presenting no security threat and despite the pain, mental anguish, and trauma that prison officials and corrections officers knew it would cause.

2. Upon her return from the hospital, Ms. Edwards was denied medically necessary, prescribed treatment for her mental health conditions, including Opioid Use Disorder (OUD) and bipolar disorder. The Defendants in this case chose to let her suffer, knowing that they were exposing her to danger and harm. She seeks money damages and injunctive and declaratory relief.

3. The North Carolina Correctional Institution for Women is North Carolina's largest correctional facility for women and incarcerates hundreds of pregnant people each year, including approximately 100 who give birth while in the custody of the State. The needs of pregnant people are well-known to prison officials and officers, who encounter them on a daily basis and who also have regular contact with treating physicians and advocates who educate them on this population.

4. The Defendants' conduct in willfully disregarding Ms. Edwards's medical needs and constitutional rights violates the Eighth Amendment, the Americans with Disabilities Act, and

the Rehabilitation Act. By shackling Ms. Edwards during pregnancy, labor, and the postpartum period, Defendants exposed her to a substantial risk of serious harm and caused pain, mental anguish, and trauma. Defendants also exposed Ms. Edwards to an unacceptable level of risk, as well as causing her physical and emotional harm, by denying her access to medication and treatment for her mental health disorders and Opioid Use Disorder postpartum.

## JURISDICTION AND VENUE

5.    This action arises under the United States Constitution, 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  The Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343.

6.    This Court has jurisdiction over Plaintiff's claims for damages, injunctive and declaratory relief pursuant to 28 U.S.C. §§ 1343, 2201, and 2202.

7.    This Court has authority under the ADA (42 U.S.C. § 12205), Section 504 of the Rehabilitation Act (29 U.S.C. § 794a(b)), and 42 U.S.C. § 1988 to award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in the Eastern District of North Carolina; venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Eastern District of North Carolina.

## PARTIES

9.    Beginning on May 14, 2019, and at the time of the events alleged in the complaint, Plaintiff Tracey Edwards was held in the custody of the North Carolina Correctional Institution for

Women (NCCIW) for a nonviolent drug charge. Ms. Edwards was released on June 4, 2021, and currently lives in York, South Carolina.

10.    Defendant Eddie Buffaloe, Jr. is the Secretary of the North Carolina Department of Public Safety. He has a non-delegable duty to ensure that the conditions in state prisons comply with state and federal law. Ms. Edwards sues Secretary Buffaloe in his official capacity only.

11.    Defendant Benita Witherspoon was the Warden of NCCIW at the time of the events alleged in this complaint. Warden Witherspoon was personally responsible for overseeing and implementing policies at NCCIW and had personal knowledge of the policies and practices regarding shackling and Medication for Opioid Use Disorders (MOUD) at the time of the events described in the complaint. Ms. Edwards sues former Warden Witherspoon in her personal capacity.

12.    Defendant Claudette Edwards in the current Warden of NCCIW. Warden Edwards is responsible for overseeing and implementing policies at NCCIW, including policies regarding shackling and MOUD. Warden Edwards is sued in her official capacity for purposes of injunctive relief.

13.    Defendant James Alexander is the Healthcare Facility Health Treatment Administrator of the NCCIW. Administrator Alexander is responsible for promulgating the policy that limits MOUD to people who are currently pregnant and has personal knowledge of MOUD withdrawal of postpartum individuals. Plaintiff sues Administrator Alexander in his personal and official capacities.

14.    Defendant Gary Junker is the Director of Health and Wellness Services of the Department of Public Safety. Director Junker is personally responsible for overseeing the development and implementation of medical policies for state prisons, including policies related

to the use of MOUD at NCCIW. Director Junker has personal knowledge of the MOUD withdrawal policy to which Ms. Edwards was subjected. Ms. Edwards sues Director Junker in his personal and official capacities.

15.     Defendant Elton Amos is the Medical Director at the NCCIW. Dr. Amos is responsible for overseeing the medical care at NCCIW and ensuring that it meets the appropriate standard of care. He is personally aware of the policies and practices at NCCIW, including those regarding MOUD. Ms. Edwards sues Dr. Amos in his personal and official capacities.

16.     Defendants Kavona Gill, Tamara Brown, Nikita Dixon, Tammy Williams, Sheida Brodie, Tianna Lynch, and Sergeant Lorafaith Ragano (collectively the "Officer Defendants") are or were officers who shackled Plaintiff during her pregnancy, labor, and postpartum recovery in contravention of her constitutional rights and North Carolina Department of Public Safety (DPS) policy. The Officer Defendants are sued in their personal capacities.

## FACTUAL ALLEGATIONS

17.     Tracey Edwards is from South Carolina. She has long suffered from medical and mental health problems, including bipolar disorder and a platelet disorder.

18.     When Ms. Edwards was approximately 22 or 23, she broke her foot and was prescribed opioid pain medications. Around the same time, she began experiencing symptoms of her undiagnosed platelet disorder, including achiness, pain, fatigue, and night sweats. Doctors continued to prescribe her pain medication, including for tooth pain and for the pain from her platelet disorder. She did not understand how addictive this medication was, and for a long time only took opioid medication under a doctor's supervision.

19.      Eventually, doctors stopped prescribing her pain medication, but her pain continued. She was not receiving adequate treatment for her mental health problems either, and

she turned to buying drugs on the street. Many of these drugs were cut with the dangerous and highly addictive drug fentanyl.

20.     In 2016, Ms. Edwards gave birth to her first child. Along with her mother, she worked hard to raise her child as a single mother. While she was pregnant, she sought treatment for her platelet disorder, including a bone marrow biopsy and 12-hour iron infusions. However, she feared what the treatment involved and stopped attending treatment, and continued to self-medicate her pain with illegal drugs.

21.     In 2017, and again in 2019, she was arrested in connection with her opioid use disorder and drug use. She was incarcerated at the Mecklenburg County Jail beginning on April 7, 2019.

22.     Ms. Edwards entered NCCIW on May 14, 2019. She learned she was pregnant after an intake screening at NCCIW.

### *Defendants' Unlawful Shackling of Plaintiff*

23.     Throughout her pregnancy, Ms. Edwards was restrained or shackled whenever Officer Defendants brought her out of the prison, including when she was transported out solely to receive medical care.

24.     On December 19, 2019, Ms. Edwards was 39 weeks pregnant. She was transported by at least one Officer Defendant, Officer Brodie, to UNC-Chapel Hill Hospital to be induced into labor.

25.     While being transported to the hospital to be induced, the Officer Defendant(s) handcuffed her in front of her body, and kept her handcuffed for the entire ride to the hospital where she was to give birth. Under 2018 DPS policy, a prisoner who does not present an immediate, serious risk of hurting themselves or others or "an immediate, credible risk of escape"

should not be placed in any restraints—including wrist shackles—when they are "transported or housed in an outside facility for treating labor and delivery."[1]

26.     During Ms. Edwards' time in the hospital, Sgt. Ragano and Officers Gill, Brown, Dixon, Williams, and Lynch monitored, guarded, and/or escorted Ms. Edwards.

27.     When she arrived at the hospital, the Officer Defendants brought Ms. Edwards to have her induction medication initiated. According to DPS policy, a prisoner should not be shackled "once the intravenous line has been placed and the induction medication has been started."[2]

28.     However, in direct violation of DPS policy, while Ms. Edwards's IV line was inserted and while she was actively receiving induction medication, the Officer Defendants kept Ms. Edwards's legs shackled together.

29.     Officer Defendants proceeded to shackle Ms. Edwards to the bed by one leg and one arm. Ms. Edwards remained shackled in this manner for the next twelve hours of labor, causing her immense physical pain and emotional anguish.

30.     Confined and constrained by the shackles, Ms. Edwards could not move or adjust her position to alleviate the pain and discomfort of labor. The skin around her ankles became red and raw as the shackles constricted her circulation, leading to excruciating pain and suffering. Any attempt to move or struggle against her ankle shackles caused her even greater discomfort and pain.

31.     Ms. Edwards also felt demeaned and mistreated for being shackled like an animal while she was induced into labor, increasing her anxiety and traumatizing her during this

---

[1] Exhibit 1, DPS Policy "Transporting Offenders," Ch. F.1104(i)(2)(D).

[2] *Id.* at F.1104(i)(E).

vulnerable time. Her anxiety was exacerbated by her understanding that the Officer Defendants could not have unshackled her fast enough for her to get the care she needed in an event of a medical emergency.

32. Officer Defendants kept Ms. Edwards shackled in this way even with an IV line in her arm and even though she clearly posed no threat due to her incapacitated physical state.

33. Only when the UNC doctors told Ms. Edwards to start pushing, more than twelve hours into her labor on December 20, 2019, did Officer Defendants finally remove her shackles and handcuff.

34. Less than an hour after she gave birth, Officer Defendants re-handcuffed Ms. Edwards and shackled her ankles together once again as they moved her from the delivery room.

35. Ms. Edwards remained at the hospital for two days after giving birth. During this time, Officer Defendants continued to shackle one leg to the bed and continued to shackle her ankles together at least some of the time, preventing her from moving around to alleviate her significant postpartum discomfort, or even getting up to walk around for her comfort and to prevent a serious medical problem such as a blood clot.

36. Officer Defendants also frequently handcuffed one of Ms. Edwards's wrists to the bed while she was convalescing. This unlawful and unconstitutional postpartum shackling was painful and humiliating for Ms. Edwards.

37. At one point, the IV line became entangled in Ms. Edwards's handcuff, causing the IV to come out and causing Ms. Edwards to bleed profusely.

38. Officer Defendants initially did not uncuff her despite the bleeding. The nurses had to ask for Ms. Edwards to be uncuffed, delaying her treatment.

39.     Ms. Edwards wished to bond with her newborn with the extremely limited time she had by breastfeeding and caring for her baby girl, consoling her when she cried, and changing her diapers.

40.     The shackles prevented Ms. Edwards from caring for or bonding with her newborn. Nurses often requested that her shackles be removed to allow her to care for her newborn, but the Officer Defendants repeatedly refused to remove the restraints.

41.     When Ms. Edwards's baby's heel was pricked to collect blood for testing, Ms. Edwards could hear her baby crying and see the needle going into her foot, but she was unable to hold and comfort her daughter. She desperately wanted to comfort her crying child but was not allowed to because Defendants continued to unlawfully restrain her.

42.     Even when Ms. Edwards was allowed to care for her newborn daughter, she remained shackled, including as she attempted to change her baby's diaper. Because her wrist was handcuffed to the bed, it was very difficult for Ms. Edwards to hold and bond with her newborn. She had to hold her daughter with one hand, limiting their contact, making breastfeeding difficult, and preventing her from fully holding and bonding with her baby in the brief time they had together before Ms. Edwards would be taken back to prison.

43.     Ms. Edwards's ankle shackles were only fully removed to allow her to go to the bathroom and, approximately twice, to push her baby around the hallway in a bassinet. Otherwise, she spent many hours in chains.

44.     Because of the long period of time in ankle shackles, Ms. Edwards's ankle remained red and raw for several days after her delivery, making her postpartum recovery even more uncomfortable. The shackling was especially painful immediately postpartum, when she could not even move around the bed to make herself more comfortable.

45.     On December 22, 2019, Ms. Edwards returned from the hospital to NCCIW.

46.     At least one Officer Defendant, Officer Williams, severely shackled Ms. Edwards on the transport back to prison, despite knowing the risks it would pose to her in her weakened postpartum state. Officer Defendant(s) shackled her ankles together, handcuffed her, and even placed a belly chain around her stomach, as well as connecting her chains with a "black box" in front of her so that she could not even move her hands.

47.     The restraints were painful, particularly at the site of her epidural. Ms. Edwards was not even able to lean back in her seat because the chains were so painful at that point.

48.     Once at the prison, Officer Defendant(s) refused to assist Ms. Edwards in exiting the vehicle. Because she was unable to step down from her seat in the car while shackled, Ms. Edwards was forced to jump from the car to the ground two days postpartum. She experienced immense pain upon landing.

49.     Despite her precarious postpartum state, Ms. Edwards then had to walk back to the infirmary unit at the prison with her ankles shackled together without assistance from Officer Defendant(s). Still unsteady from her delivery and in chains, Ms. Edwards walked slowly out of fear of falling and due to the pain and trauma at the site of her shackles.

50.     Ms. Edwards was never a risk to herself or others, and she was not a flight risk.

***Shackling during pregnancy, labor, and the postpartum period is a dangerous practice that poses a substantial risk of serious harm.***

51.     Shackling poses major risks to the health and safety of pregnant prisoners throughout their pregnancies and postpartum, as well as during the process of childbirth.

52.     Shackling and restraints can include handcuffing (in front of or behind the body); ankle shackles that shackle the ankles together and/or shackle one or both legs to another person or an object such as a hospital bed; belly chains; and more.

53.     Restraints during pregnancy can interfere with providers' ability to provide medical care, as well as prevent them from acting quickly when an obstetric emergency arises.[3] Additionally, shackling may place pregnant people off-balance, putting them at significant risk of falling, and prevent them from breaking their fall safely, putting them and their pregnancies at increased risk of harm.[4]

54.     Furthermore, shackling during pregnancy can inhibit mobility, leading to increased risk of blood clots.[5] Shackling is also particularly painful for pregnant people, who are likely to already experience swelling and discomfort that shackling will exacerbate.

55.     Shackling is especially dangerous for pregnant individuals and their newborns at the time of delivery and immediately postpartum. Individuals who are in the process of giving birth should be mobile in order to assume various positions as needed, and shackles greatly limit, if not completely prevent, such mobility.[6]

56.     During all stages of labor, it is important to the delivering physician to be able to react quickly, in order to avoid the potentially life-threatening emergencies for both the pregnant person and the unborn fetus. Physical restraints interfere with the ability of physicians to safely practice medicine by reducing their ability to assess and evaluate the physical condition of the

---

[3] ASS'N OF WOMEN'S HEALTH, OBSTETRIC AND NEONATAL NURSES POSITION STATEMENT, *Shackling Incarcerated Pregnant Women*, *available at* https://www.jognn.org/article/S0884-2175(15)30763-2/fulltext.

[4] *Shackling Pregnant Women Poses Risks to Mother and Fetus*, PSYCHOLOGY BENEFITS SOC'Y (2015), *available at* https://psychologybenefits.org/2015/12/29/shackling-pregnant-women-poses-risks-to-mother-and-fetus/.

[5] CENTERS FOR DISEASE CONTROL & PREVENTION, *Pregnant? Don't Overlook Blood Clots* (last reviewed Feb. 7, 2020), *available at* https://www.cdc.gov/ncbddd/dvt/features/blood-clots-pregnant-women.html.

[6] Jennifer G. Clarke & Rachel E. Simon, *Shackling and Separation: Motherhood in Prison*, AM. J. OF ETHICS (2013), *available at* https://journalofethics.ama-assn.org/article/shackling-and-separation-motherhood-prison/2013-09.

pregnant person and fetus, thereby placing the health and lives of pregnant prisoners and their babies at risk.[7]

57.     For example, if a medical emergency arises that requires a caesarian section, shackling can interfere with providers' ability to move as quickly as this emergency requires, leading to increased risk of harm and death, as well as increased risk to the baby, including risk of stillbirth. Similarly, a provider may not be able to respond quickly enough to sudden and severe bleeding, leading to increased risk of death.

58.     Prisons that shackle pregnant people in labor may engage in this practice ostensibly to prevent escape or ensure the safety of prison and medical staff. This rationale ignores the realities of childbirth, in which a pregnant person undergoes excruciating pain, physical incapacitation, and overwhelming vulnerability. Shackling during labor can greatly increase this pain and lead to lasting emotional trauma.

59.     No pregnant or laboring incarcerated individual has ever been documented as having escaped a hospital.[8] Moreover, the decision to shackle is typically made without regard to the type of crime committed or the risk of harm posed to the individual. The presence of officers is more than adequate to prevent a pregnant person from fleeing and to protect nearby staff from any security concerns.

---

[7] American College of Obstetricians and Gynecologists, Committee Opinion No. 830, *Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals*, https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2021/07/reproductive-health-care-for-incarcerated-pregnant-postpartum-and-nonpregnant-individuals.pdf (July 2021) [hereinafter ACOG Opinion No. 830].

[8] Kayla Tabari House, et al., *Ending Restraint of Incarcerated Individuals Giving Birth*, AMA Journal of Ethics (Apr. 2021), *available at* https://journalofethics.ama-assn.org/article/ending-restraint-incarcerated-individuals-giving-birth/2021-04.

60. Shackling continues to be harmful throughout the postpartum recovery period. Limitation in mobility can continue to increase risk of blood clotting.[9] Furthermore, shackling can inhibit parent-infant bonding, as well as breastfeeding.[10] Because most incarcerated new parents will be brought back to prison shortly after giving birth, it is particularly cruel to inhibit bonding during this brief period, especially when the anguish and trauma of shackling further exacerbates the difficulty in bonding.

61. Being shackled during labor and delivery amounts to a punishment totally out of proportion to any crime a pregnant person may have committed. For this reason, many medical associations and correctional experts have long recommend prohibiting the use of any restraints throughout pregnancy, except in extremely limited circumstances.

62. The Federal Bureau of Prisons,[11] the U.S. Marshals Service,[12] the American Correctional Association,[13] the American College of Obstetricians and Gynecologists,[14] and the

---

[9] CENTERS FOR DISEASE CONTROL & PREVENTION, *Pregnant? Don't Overlook Blood Clots* (last reviewed Feb. 7, 2020), *available at* https://www.cdc.gov/ncbddd/dvt/features/blood-clots-pregnant-women.html.

[10] Amanda Glenn, *Shackling Women During Labor: A Closer Look at the Inhumane Practice Still Occurring in Our Prisons*, 29 HASTINGS WOMEN'S L. J. 199, 203 (2018).

[11] Fed. Bureau of Prisons, Program Statement: Escorted Trips, No.5538.06 at § 570.45 (Aug. 29, 2014), available at http://www.bop.gov/policy/progstat/5538_006.pdf.

[12] *See* Gov't Accountability Office Report, *Pregnant Women in DOJ Custody* 32 (Jan. 2021), *available at* https://www.gao.gov/assets/gao-21-147.pdf.

[13] ACA File No. 2008-023, Standards Comm Meetings Minutes, ACA 138th Cong. Of Corr. (Am. Corr. Ass'n, New Orleans, La.) Aug. 8, 2008 at 62, available at https://www.aca.org/aca_prod_imis/docs/Standards%20and%20Accreditation/sac_August_2008.pdf. *See* Anti-Shackling Briefing Paper, Am. Civil Liberties Union 2 (2012), *available at* https://www.aclu.org/sites/default/files/field_document/anti-shackling_briefing_paper_stand_alone.pdf.

[14] ACOG Opinion No. 830, *supra note 7*.

American College of Nurse Midwives[15] all oppose shackling pregnant prisoners during pregnancy, labor, delivery, and postpartum recovery because it is unnecessary and dangerous to their health and well-being.

63.    The American Medical Association[16] and the American Public Health Association[17] have issued statements specifically opposing shackling during labor and postpartum recuperation.

64.    The American Psychological Association has also condemned this particularly barbaric practice, reporting that "[w]omen subjected to restraint during childbirth report severe mental distress, depression, anguish, and trauma."[18]

65.    Most states and the federal government restrict the use of shackling during pregnancy, labor, and the postpartum period.[19] Twelve states have completely prohibited the use of shackling during all stages of labor without exception.

66.    On August 31, 2021, the North Carolina legislature unanimously passed the Dignity for Women Who are Incarcerated bill.[20] The bill prohibits the use of restraints during "labor and

---

[15] THE AMERICAN COLLEGE OF NURSE MIDWIVES POSITION STATEMENT, *Shackling/Restraint of Pregnant Women Who Are Incarcerated* (2012), *available at* http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000276 /Anti-Shackling%20Position%20Statement%20June%202012.pdf.

[16] American Medical Association, *An "Act to Prohibit the Shackling of Pregnant Prisoners" Model State Legislation* (2015), available at https://www.ama-assn.org/media/9791/download.

[17] *See* Anti-Shackling Briefing Paper, Am. Civil Liberties Union 2 (2012), *available at* https://www.aclu.org/sites/default/files/field_document/anti-shackling_briefing_paper_stand_alone.pdf.

[18] APA, "End the Use of Restraints on Incarcerated Women and Adolescents during Pregnancy, Labor, Childbirth, and Recovery," *available at* https://www.apa.org/advocacy/criminal-justice/shackling-incarcerated-women.pdf.

[19] *See, e.g.*, The First Step Act, 18 U.S.C. § 4322 (2018) (prohibition on use of restraints except in extraordinary circumstances during pregnancy, labor, and postpartum recovery for individuals in the custody of the Federal Bureau of Prisons or the United States Marshals Service).

[20] *See* H608, Gn. Assemb. (N.C. 2021).

delivery" and "in transport when the female incarcerated person is in labor or is suspected to be in labor."[21] Restraints are also prohibited during the six-week period following delivery, unless "a correctional facility employee makes an individualized determination that an important circumstance [i.e., risk of harm or escape] exists" in which case "only wrist handcuffs held in front of the female incarcerated person's body may be used and only when she is ambulatory."[22] Wrist handcuffs are also the only type of restraints permitted during the second and third trimester of pregnancy.[23]

67.     The unanimous, bi-partisan passage of the bill demonstrates the recognition in North Carolina that shackling during pregnancy is harmful, should be extremely limited, and that shackles should never be used during labor. Shackling an incarcerated person during labor and immediately postpartum flies in the face not only of medical consensus but also in the face of the the uniform agreement of elected representatives in North Carolina as to how prison officials should treat individuals in their custody.

### *Unconstitutional Shackling at NCCIW Violated DPS Policy*

68.     DPS officials were aware of the harms of shackling. DPS therefore updated its shackling policy in 2018, and this is the policy that was in effect at the time of the allegations in this complaint.

69.     The DPS policy applies to all prisons in North Carolina, including NCCIW, and supersedes any facility-specific policy that is in conflict.

---

[21] *Id.* § 148-25.2(a).

[22] *Id.*

[23] *Id.*

70.     DPS Policy F.1100, "Transporting Offenders," prohibits the use of leg, waist, and ankle restraints, as well as wrist restraints applied behind the body, for any pregnant person in DPS custody:

> An offender with a clinical diagnosis of pregnancy shall not be restrained by leg, waist, or ankle restraints. Wrist restraints may be used during any internal escort or external transport. These wrist restraints shall only be applied in the front and in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall. This related [sic] to inmates not in labor or suspected labor and who are escorted out for Ultrasound Addiction Therapy for Pregnant Women or other routine services.[24]

71.     During labor, defined as "occurring at the onset of contractions," no restraints at all may be applied "unless there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others . . . or that she presents an immediate, credible risk of escape[.]"[25] Officers are required to notify the Associate Warden for Custody and complete an incident report whenever restraints are applied during labor.

72.     The same prohibitions apply to individuals in "post-partum recuperation," those being "transported or housed in an outside medical facility for treating labor and delivery," individuals after an "intravenous line has been placed and the induction medication has been started," and those who are initially bonding with their newborns, "including nursing and skin to skin contact."[26]

73.     Upon transport back to prison after childbirth, an individual may only be restrained by the wrists. Leg restraints are permitted only "when there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others, or that she

---

[24] Exhibit 1 at F.1104(i)(1).

[25] *See* Exhibit 1 at F.1104(i)(2).

[26] *Id.* at F.1104(i)(2)(A)-(G).

presents an immediate, credible risk of escape that cannot be reasonably contained through other methods."[27] Waist restraints are not permitted during pregnancy or postpartum, including during transportation back to the facility.[28]

74. NCCIW updated its standard operating procedures governing use of force and restraints in 2019, but these procedures are inconsistent with the 2018 DPS policy.[29]

75. NCCIW has a "Hospital Admission" policy, that—contrary to the DPS Policy—requires restraint of "one hand restrained by the bed/gurney with a handcuff and the opposite leg restrained to the bed/gurney with a leg iron."[30] The only exception for persons in labor, delivery and postpartum is that "Mechanical restraints will be removed from an offender who is in active labor."[31] Upon information and belief, NCCIW interprets "active labor" to mean the point in which a pregnant person is in the final "pushing" phase of labor and delivery. Contrary to the DPS policy, NCCIW Procedures further specify that, "[t]he offender must remain sitting in her bed or chair while holding the newborn child. Leg irons will remain on the offender."[32]

76. The NCCIW procedures also require, in violation of DPS policy, that an incarcerated person "shall be restrained after birth of the child and the medical authorities have completed their work" but that they "shall not have [their] hands restrained while bonding and feeding the baby."[33] While this policy states that incarcerated persons must not be restrained during

---

[27] *Id*. at F.1104(i)(4).

[28] *Id.* at F.1104(i)(5).

[29] *See* Exhibit 2, NCCIW Standard Operating Procedure "Offender Restraints," D.1802(b); Exhibit 3, NCCIW Standard Operating Procedure "Use of Force and Restraints," H.0303(f).

[30] Exhibit 2 at D.1804(l)(10)(B).

[31] *Id.* at D.1804(l)(10)(F).

[32] *Id.* at D.1804(l)(10)(E).

[33] Exhibit 3 at H.0303(f)(8).

"delivery," that same provision limits appear to limit this restriction to "active labor."[34] Again, upon information and belief, NCCIW interprets "active labor" to mean the point in which a pregnant person is in the final "pushing" phase of labor and delivery. In any event, these NCCIW policies are in direct contradiction with the DPS policies, which prohibit "any restraints" from the "onset of contractions," or "once the intravenous line has been placed and the induction medication has been started," transportation to "an outside facility for treating labor and delivery," during "post-partum recuperation," and "during initial bonding with the newborn child, including nursing and skin to skin contact."[35]

***Defendants Unlawfully Deprived Plaintiff of Medications for her Substance Use Disorder***

77.    Ms. Edwards had been diagnosed with an opioid use disorder prior to her incarceration. Ms. Edwards has also been diagnosed with bipolar disorder, posttraumatic stress disorder (PTSD), anxiety, and depression.

78.    Prior to her incarceration, Ms. Edwards was receiving regular mental health care and was on a medication regimen that worked for her in controlling her mental health and substance use disorders. She had been stable on Lamictal, Hydroxyzine, Gabapentin, Strattera, and Suboxone (a medication used to treat her opioid use disorder).

79.    Doctors at NCCIW prescribed Subutex to Ms. Edwards per their policy to provide MOUD to pregnant prisoners yet discontinued her mental health medications to treat her PTSD, anxiety, depression, and bipolar disorder due to her concern about their impact on her fetus.

80.    Despite medical consensus that medication is the most efficacious treatment for OUD, DPS policy bars prisoners with OUD from taking these FDA-approved, effective

---

[34] *Id.*

[35] Exhibit 1 at F.1104(i)(2).

medications unless they are currently pregnant. As a provider at NCCIW noted in Ms. Edwards's medical records, MOUD is provided solely to protect a pregnant prisoner's fetus from the harms of withdrawal.

81.     On information and belief, DPS's MOUD policy is not designed to minimize harm or risk of relapse of postpartum people.

82.     Because Ms. Edwards was pregnant, officers at NCCIW began to take her to Southlight, a clinic at which she was provided with Subutex.

83.     Correctional officers took Ms. Edwards to Southlight each morning to receive her Subutex. They searched and handcuffed her every time, despite the fact that the officers knew she was pregnant—and in fact, that was the only reason she was receiving Subutex.

84.     On or around December 1, 2019, NCCIW initiated an in-house MOUD program dispensing Suboxone. At that point, Ms. Edwards no longer had to leave the prison to receive her MOUD.

85.     While at the hospital for delivery and postpartum from December 19th to 22nd, UNC doctors continued to provide Ms. Edwards with Suboxone. However, on December 23, 2019, three days after Ms. Edwards gave birth, a doctor at NCCIW ordered that her Suboxone prescription be terminated, consistent with DPS and NCCIW policy.

86.     Rather than have her continue taking Suboxone to maintain stability and forgo withdrawal, the doctor instead prescribed Ms. Edwards with an oxycodone taper over the course of nine days, again consistent with DPS and NCCIW policy.

87.     No doctor, including Defendant Amos, provided any medical justification for refusing to provide Ms. Edwards's prescribed MOUD or for providing an inappropriate medication (Oxycodone) to taper Ms. Edwards off of MOUD.

88.     As a result, Ms. Edwards suffered from pain, diarrhea, and vomiting for weeks. She was unable to eat or even shower for days because of the intensity of her symptoms.

89.     Not once was Ms. Edwards seen by a doctor to manage her symptoms while undergoing this severe and life-threatening withdrawal, despite the medical consensus that the postpartum period is one in which individuals with substance use disorders are at particularly high risk of relapse, both in and out of prison.

### *Unconstitutional and Illegal MOUD Practices at NCCIW*

90.     DPS policy, currently and at the time the allegations in this Complaint occurred, is to provide MOUD only to pregnant people in DPS custody who have an opioid use disorder.

91.     DPS does not provide MOUD to non-pregnant people, even those who have a prescription for MOUD and were on MOUD while in the community.

92.     Individuals who are continued or initiated on MOUD while in the custody of DPS and then give birth while in custody are withdrawn from MOUD when they return to the prison, regardless of whether a doctor or hospital provides a prescription for MOUD postpartum.

93.     Per DPS policy and practice, individuals who are on MOUD at the time that they give birth while in DPS custody are tapered with Oxycodone, a prescription opioid only," and are no longer provided with MOUD. No individual medical determination is made regarding whether MOUD is the correct course of treatment for any individual prisoner.

### *Forced Withdrawal from Medication for Opioid Use Disorder Postpartum Poses a Substantial Risk of Serious Harm.*

94.    Opioid Use Disorder (OUD) is a common pathway to prison for women. A majority of incarcerated women, including many incarcerated pregnant people, have OUD.[36]

95.    The medical standard of care for OUD treatment is Medication for Opioid Use Disorder (MOUD) and has been since well before Plaintiff was withdrawn from her MOUD.[37]

96.    The FDA has approved three MOUD medications: methadone, buprenorphine, and naltrexone.  Their duration and dosing must be based on an individualized consideration of a person's medical needs by a trained medical professional. Much like medication-based treatment for any other chronic diseases, the medically necessary duration of MOUD is generally lengthy and, in some cases, lifelong.[38] Once a patient is being treated successfully for OUD through medication, forcibly or abruptly ending that treatment will cause the patient to experience excruciating withdrawal symptoms and puts them at heightened risk for relapse, overdose, and death.

97.    Continued access to MOUD improves retention in treatment, increases abstinence from illicit drugs, and decreases mortality. MOUD has been shown to decrease opioid use, opioid-related overdose deaths, criminal activity, and infectious disease transmission.[39]

98.    For individuals with OUD, provision of MOUD can be lifesaving. Studies have shown that maintenance medication treatments of OUD reduce all-cause and overdose mortality

---

[36] Carolyn Sufrin et al., *Opioid Use Disorder Incidence and Treatment among Incarcerated Pregnant Women in the United States: Results from a National Surveillance Study*, 115 ADDICTION 2057 (2020).

[37] DEP'T OF HEALTH & HUMAN SERV'S, *Fact Sheet: Combating the Opioid Crisis* (April 2019), *available at* https://www.hhs.gov/sites/default/files/opioids-fact-sheet-april-2019.pdf.

[38] U.S. FOOD & DRUG ADMINISTRATION, *Information about Medication-Assisted Treatment (MAT)*, *available at* https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat.

[39] NAT'L INST. ON DRUG ABUSE, *Effective Treatments for Opioid Addiction*, Policy Brief (2016), *available at* https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction.

and have a more robust effect on treatment efficacy than behavioral components of treatment, such as counseling.[40] Methadone and buprenorphine have been clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment without medication, (3) outpatient treatment with placebo medication, and (4) detoxification only.

99. MOUD is particularly important for individuals who are incarcerated: lack of access to consistent MOUD can lead to greater relapse and overdose rates after release. Formerly incarcerated individuals with OUD suffer from high mortality rates after release, including from opioid-related causes.[41]

100. One study of a program in Rhode Island that allowed individuals to remain on MOUD throughout their incarceration showed that 95% of individuals continued with treatment after release. The program also decreased post-release deaths by 60% and all opioid-related deaths in the state by over 12%.[42]

101. Because of the nature of OUD, individuals who are not provided consistent treatment are likely to continue to have contact with the criminal legal system, including multiple stints of incarceration.

102. Conversely, individuals who are provided and maintained on MOUD during their incarceration are likelier to avoid future incarceration.[43]

---

[40] Laura Amato et al., *Psychosocial Combined with Agonist Maintenance Treatments Versus Agonist Maintenance Treatments Alone for Treatment of Opioid Dependence*, 10 COCHRANE DATABASE SYSTEMIC REVS. (Oct. 5, 2011), at 2.

[41] Consensus Study Report: *Medications for Opioid Use Disorder Save Lives* (2019), *available at* https://www.nap.edu/catalog/25310/medications-for-opioid-use-disorder-save-lives.

[42] Lauren Brinkley-Rubinstein et al., *The Benefits and Implementation Challenges of the First State-Wide Comprehensive Medication for Addictions Program in a Unified Jail and Prison Setting*, 205 DRUG AND ALCOHOL DEPENDENCE (Dec. 2019).

[43] NAT'L SHERIFFS' ASSO'C & NAT'L COMM'N ON CORRECTIONAL HEALTH CARE, *Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field* 5

103.     For these reasons, numerous correctional and public health organizations advocate for access to MOUD for all individuals with OUD who are incarcerated, including the National Correctional Commission on Health Care, the National Sheriffs' Association,[44] and the American Society for Addiction Medication.[45]

104.     The postpartum period is a particularly important one for treating OUD.  Relapse and death are both more common in the postpartum period than during pregnancy.[46] Medical professionals are therefore in agreement that postpartum people must have consistent access to MOUD.[47]

105.     Taken together, the literature indicates that postpartum incarcerated people who are not provided MOUD are more likely to relapse, and they are also likely to become reincarcerated due to relapse after they are released. Provision of MOUD postpartum therefore is both necessary to avoid the harms of relapse—up to and including death—and to avoid a cycle of reincarceration.

106.     Forced withdrawal, in addition to posing risk of death or serious harm from future relapse, also causes unnecessary pain and suffering.

---

n.3 (2018), *available at* https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf (collecting scientific research).

[44] *See generally id.*

[45] AM. SOC'Y FOR ADDICTION MEDICINE NATIONAL PRACTICE GUIDELINE FOR THE TREATMENT OF OPIOID USE DISORDER 60 (2020), *available at* https://www.asam.org/docs/default-source/quality-science/npg-jam-supplement.pdf?sfvrsn=a00a52c2_2.

[46] Davida M. Schiff et al., *Fatal and Nonfatal Overdose Among Pregnant and Postpartum Women in Massachusetts*, 132 OBSTETRICS AND GYNECOLOGY 466 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6060005/.

[47] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, *Opioid Use and Opioid Use Disorder in Pregnancy*, Committee Opinion No. 711 (Aug. 2017), *available at* https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/08/opioid-use-and-opioid-use-disorder-in-pregnancy.

107.    Withdrawal symptoms include pain, anxiety, irritability, sweating, nausea, tremors, vomiting, diarrhea, insomnia, and muscle spasms.[48] These symptoms can sometimes lead to life-threatening complications.[49]

108.    Opioids, including oxycodone, are not an approved method to treat withdrawal symptoms, and medication-assisted withdrawal is not effective in preventing negative outcomes associated with untreated OUD.

### *Defendants Deprived Plaintiff of Medically Necessary Treatment For Mental Health Disabilities*

109.    While Ms. Edwards was at the hospital to deliver her daughter, UNC doctors also prescribed Ms. Edwards a two-week supply of Zoloft and Hydroxyzine for depression and anxiety. Her medical records noted her history of anxiety and PTSD.

110.    In her discharge papers, UNC doctors noted that she might "cry easily" or "become very depressed" due to postpartum hormone changes.

111.    Her prescribing doctors also ordered a postpartum "mood check" appointment to take place in two weeks, by January 5, 2020, when Ms. Edwards's supply of psychotropic medications would run out. Doctors would need to write Ms. Edwards a new prescription in order to ensure that she would have consistent access to medications to treat her mental health disabilities.

112.    After she returned from the hospital, Ms. Edwards was housed in the Robin Unit of NCCIW, which is also known as the infirmary. The Robin Unit offers little to no programs,

---

[48] Thomas R. Kosten & Louis E. Baxter, *Review Article: Effective Management of Opioid Withdrawal Symptoms: A Gateway to Opioid Dependence Treatment*, 28 AM. J. ON ADDICTIONS 55 (2019), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/ajad.12862.

[49] Veronica Spadotto et al., *Heart Failure Due to "Stress Cardiomyopathy": A Severe Manifestation of the Opioid Withdrawal Syndrome*, 2 ACUTE CARDIOVASCULAR CARE 84 (2013), *available at* https://academic.oup.com/ehjacc/article/2/1/84/5921860?login=true.

services, or activities to incarcerated individuals, as it solely consists of individual cells and a small dayroom.

113.    While at the Robin Unit, Ms. Edwards had no access to any recreation area beyond the dayroom, no access to mental health or educational programming, and no ability to visit with her family. For the first 24 hours of her confinement at the infirmary, she was refused access to a phone to call her mother to inform her of her delivery and request that she pick up her new granddaughter from the hospital.

114.    Lack of access to recreation, programming, therapy, and visitation all made Ms. Edwards's emotional state even worse. She could not talk to her friends and she worried about her daughter. As noted at the hospital, she was already suffering from anxiety and depression, and her conditions in the Robin Unit made her significantly more depressed and anxious. She had trouble sleeping and her heart raced. Many times, all she could do was cry.

115.    Although she was medically discharged from the Robin Unit on January 8, 2020, she remained in the unit and was not actually moved back to general population for approximately one week after that date.

116.    By January 5, 2020, Ms. Edwards had run out of the Zoloft and Hydroxyzine prescribed by UNC doctors at the hospital. NCCIW providers refused to renew her prescriptions, causing her to immediately withdraw from these prescribed mental health medications without any taper.

117.    No doctor met with Ms. Edwards or evaluated her before discontinuing her mental health medications.

118.    NCCIW providers also refused to provide Ms. Edwards with the postpartum "mood check" that the UNC doctors had ordered for January 5, 2020.

119.     No doctors provided any medical justification for failing to renew Ms. Edwards's psychotropic medications needed for her diagnosed mental health disorders, or for timely failing to refer her to mental health treatment during the vulnerable postpartum period.

120.     On January 7, 2020, Ms. Edwards submitted a sick call request that her prescriptions be refilled, noting that she was suffering from nightmares, anxiety, and racing thoughts.

121.     On January 10, 2020, Ms. Edwards finally saw a doctor, who noted the need for Zoloft. The doctor noted that NCCIW policy prohibited her from prescribing Zoloft, but agreed that the medication should be refilled. No medical reason was documented for denying Ms. Edwards her medically necessary mental health medication.

122.     On January 12, Ms. Edwards again requested a refill of her prescription medication, noting that she was suffering from "really bad anxiety" and was unable to sleep due to nightmares.

123.     Ms. Edwards was not provided with an appointment with a psychologist until January 15, 2020, nearly a month after she gave birth and weeks after the prison medical staff stopped providing her with the prescriptions ordered for her at the hospital—MOUD, Zoloft, and Hydroxyzine—to treat her mental health conditions and substance use disorder. The health care provider Ms. Edwards saw on January 15 was not a psychiatrist, and she did not renew any of Ms. Edwards's prescriptions.

124.     Ms. Edwards was denied mental health treatment—including psychiatric care, mental health therapy, and all psychotropic medications she had previously been prescribed—until March 2020, months after she gave birth and months after her prescriptions expired without being renewed.

### *Access to Mental Health Treatment is Vital in the Postpartum Period*

125.　Although it is always important to provide individuals who have mental health disabilities with appropriate therapy and medication treatment, this need is particularly heightened during the postpartum period, which is a particularly vulnerable period, especially for those with mental health conditions.[50]

126.　Postpartum depression (also called peripartum depression) is a serious public health problem.[51] Approximately 15-20% of people who have recently given birth suffer from some form of postpartum depression.[52] Among individuals who have a past diagnosis of bipolar disorder, that number is even higher: 50% experience a mood episode postpartum, primarily depression.[53]

127.　Symptoms of postpartum depression can be severe: people who have postpartum depression may experience isolation, guilt, helplessness, hopelessness, intrusive thoughts, and relapse for substance abuse. They are also at higher risk of abuse, self-harm, and suicide.[54]

128.　Without proper treatment, these symptoms cause unnecessary suffering as well as risk of harm, particularly if the symptoms include substance use relapse or self-harm.

129.　Postpartum depression may be triggered or exacerbated by stressful situations, as well as pre-existing diagnoses of mental health disabilities.[55] The American College of

---

[50] Carolyn Sufrin, *Pregnancy and Postpartum Care in Correctional Settings* 6, Nat'l Comm'n on Correctional Health Care (2018), *available at* https://www.ncchc.org/filebin/Resources/Pregnancy-and-Postpartum-Care-2018.pdf at 6.

[51] Saurabh R. Shrivastava et al., *Antenatal and Postnatal Depression: A Public Health Perspective*, 6 J. NEUROSCIENCES IN RURAL PRACTICE 116 (2015).

[52] Constance Guille et al., *Management of Postpartum Depression* 6 J. MIDWIFERY WOMEN'S HEALTH 643, 644 (2013).

[53] *Id.*

[54] Elizabeth Fitelson et al., *Treatment of Postpartum Depression: Clinical, Psychological and Pharmacological Options*, 3 INT'L J. WOMEN'S HEALTH 1, 2 (2011).

[55] *Id.* at 1.

Obstetricians and Gynecologists notes that "[f]orced separation from one's newborn, as happens by default for most people who give birth in custody, can potentially have devastating maternal effects" and estimates that postpartum depression may be higher among incarcerated people than in the non-incarcerated population.[56]

130.    It is thus essential that mental health treatment is provided postpartum to all individuals, and particularly to those who have been diagnosed with postpartum depression or any other mental health disabilities.

131.    This treatment can include both prescribed medications and psychotherapy as frontline treatment.[57]

132.    Individuals who have consistent access to mental health care during incarceration may also have lower recidivism rates than people who do not.[58]

**COUNT I**
**Violation of the Eighth Amendment to the U.S. Constitution (Shackling)**
**As to Defendants Buffaloe, Edwards, Witherspoon, Gill, Brown, Dixon, Williams, Brodie, Lynch, and Ragano**

133.    Plaintiff incorporates all preceding paragraphs.

134.    Defendants' policies and practices concerning shackling and restraint of Plaintiff during her pregnancy, labor, and the postpartum period, subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

---

[56] ACOG Opinion No. 830, *supra* note 7.

[57] Carolyn Sufrin, *Pregnancy and Postpartum Care in Correctional Settings* 6, Nat'l Comm'n on Correctional Health Care (2018), *available at* https://www.ncchc.org/filebin/Resources/Pregnancy-and-Postpartum-Care-2018.pdf.

[58] Alene Kennedy-Hendricks et al., *Improving Access to Care and Reducing Involvement in the Criminal Justice System for People with Mental Illness*, 35 HEALTH AFFAIRS 1076 (2016), *available at* https://www.healthaffairs.org/doi/10.1377/hlthaff.2016.0006.

135.    Exposing Plaintiff to such risks violated contemporary standards of decency that mark the progress of a maturing society.

136.    Defendants promulgated policies allowing this shackling, and shackled Plaintiff, with deliberate indifference to the serious risk of harm that such policies posed.

137.    The policies and practices described above constitute cruel and unusual punishments under the Eighth Amendment.

138.    Officer Defendants, while acting under color of state law, violated their own Department of Public Safety policy by shackling Plaintiff during labor and restraining her with five-point restraints during her transport back to the prison postpartum. They did so with deliberate indifference to the serious risk of harm that such actions exposed Plaintiff to.

139.    As warden of NCCIW during the time of Plaintiff's pregnancy and delivery, Defendant Witherspoon knowingly maintained a shackling policy at NCCIW that permitted the shackling of Plaintiff during labor and permitted five-point restraints postpartum despite changes in Department of Public Safety policy.

140.    Defendant Witherspoon was aware that pregnant people at NCCIW were routinely shackled during pregnancy, labor, and postpartum but was deliberately indifferent to the serious risk of harm that these policies and practices posed.

141.    Defendant Witherspoon's failure to halt or update the unconstitutional policies and practices regarding shackling directly posed a substantial and excessive risk of harm to Plaintiff during pregnancy, delivery, and postpartum.

142.    As current warden of NCCIW, Defendant Edwards is aware of the fact that NCCIW policies and practices allow pregnant people to be routinely shackled during pregnancy, labor and

postpartum—in direct violation of DPS policy. As warden of NCCIW, Defendant Edwards has responsibility for the provision and overall implementation of DPS and NCCIW policies.

143. Defendant Edwards is nevertheless deliberately indifferent to the serious risk of harm that NCCIW policies and practices posed and continue to directly pose to pregnant and postpartum individuals.

144. As Secretary of DPS, Defendant Buffaloe is aware of the DPS policy that allows pregnant people to be routinely shackled during pregnancy and postpartum. As Secretary of DPS, Defendant Buffaloe has responsibility for the provision and overall implementation of DPS policies.

145. Defendant Buffaloe is deliberately indifferent to the serious risk of harm that DPS policies and practices posed and continue to pose to pregnant and postpartum individuals.

146. Plaintiff was subject to an unreasonable risk of harm, and experienced actual harm and injury, as a result of these unconstitutional actions. She seeks declaratory and injunctive relief and damages.

**COUNT II**
**Violation of the Eighth Amendment (Denial of MOUD)**
**As to Defendants Buffaloe, Edwards, Witherspoon, Alexander, Junker, and Amos**

147. Plaintiff incorporates all preceding paragraphs.

148. Defendants violated Ms. Edwards's clearly established right under the Eighth Amendment to be free from deliberate indifference to her serious medical needs.

149. At all relevant times, Ms. Edwards had a serious medical need for medication to treat her OUD.

150. Defendants failed to provide Ms. Edwards with necessary medication to treat her OUD without any medical justification and contrary to recognized standards of care. Defendants

thereby subjected her to objectively dangerous conditions that presented substantial risks of serious mental and physical harm.

151.    By denying Ms. Edwards access to MOUD, Defendants placed Ms. Edwards at heightened risk of lowered tolerance to opioids and to a heightened risk of relapse into active addiction, resulting in overdose and death.

152.    Defendants' conduct exposing Ms. Edwards to such risks violated contemporary standards of decency that mark the progress of a maturing society.

153.    Defendants' policies and practices withdrawing her from MOUD postpartum, without regard to her individualized circumstances, subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

154.    Deliberate indifference is found when a prisoner has an objectively serious medical need, such as OUD, and correctional staff have actual knowledge of, but deliberately disregard, such need.

155.    The acts and omissions of the Defendants in failing to provide adequate medical care to Ms. Edwards constituted deliberate indifference to Ms. Edwards's serious medical needs.

156.    Defendants Junker and Alexander acted with deliberate indifference when they promulgated and implemented a policy that did not allow Ms. Edwards to have access to prescribed MOUD despite a valid prescription and without taking into consideration her individualized circumstances and medical needs.

157.    Defendants Witherspoon and Amos approved of and implemented the MOUD policy despite their knowledge of the substantial risk of serious harm this policy posed to Ms. Edwards.

158.    Defendants allow the policy to continue despite the known risk of harm.

159.    Because Ms. Edwards's criminal appeal is pending, she risks once again being deprived of necessary medical care due to Defendants' cruel and unusual policies.

160.    Unless enjoined, Defendants' conduct will continue to inflict injuries for which Plaintiff and others with OUD at NCCIW have no adequate remedy at law.

## COUNT III
### Violation of the Americans with Disabilities Act (Denial of MOUD)
### As to Defendant Buffaloe

161.    Plaintiff incorporates all preceding paragraphs.

162.    NCCIW, as represented by Defendant Buffaloe in his official capacity, is a public entity subject to the Americans with Disabilities Act (ADA). 42 U.S.C. §§ 12131(1).

163.    Drug addiction is a "disability" under the ADA. *See* 42 U.S.C. § 12102, 28 C.F.R. § 35.108. The ADA applies to people, like Ms. Edwards, who suffer from OUD.

164.    Ms. Edwards is a "qualified individual with a disability" because she meets the essential eligibility requirements for NCCIW's medical services. 42 U.S.C. § 12131(2).

165.    Title II of the ADA guarantees qualified individuals an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

166.    As a qualifying person with a disability, Ms. Edwards was entitled to receive the benefits of, and equal access to, the medical care system in prison.

167.    On information and belief, NCCIW does not forcibly deny or alter medically necessary, physician-prescribed medications to incarcerated individuals that are provided to accommodate other serious, chronic medical conditions, such as diabetes.

168.    NCCIW's postpartum withdrawal policy automatically and forcibly removed Ms. Edwards from MOUD, which was prescribed to provide long-term management and accommodation for her disability of OUD, thereby denying her the benefits of their medical programs and services on the basis of her disability.

169.    NCCIW refused to make a reasonable accommodation for Ms. Edwards by providing her with access to her prescribed MOUD during her incarceration, even though accommodation would not alter the nature of the healthcare program.

170. NCCIW acted intentionally and with deliberate indifference to Ms. Edwards's protected rights under the ADA in denying her access to the benefits of its medical program and services.

171. Defendants had actual knowledge of ongoing discrimination against Ms. Edwards because she was prescribed MOUD for her disability while pregnant, but Defendants failed to respond adequately by accommodating her disabilities when she was postpartum.

172. The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(2).

173. As a result of NCCIW's actions and omissions, Ms. Edwards and others with OUD have suffered and will continue to suffer irreparable harm by suffering from discrimination and unequal access to NCCIW's health care programs, services, or activities.

174. Because Ms. Edwards's criminal appeal is pending, she risks once again being deprived of MOUD accommodations due to NCCIW's discriminatory policy against individuals with OUD. If there is no change in the status quo, Ms. Edwards and others with this chronic disability will continue to be denied their right to the full benefit of the programs, services, or activities offered by NCCIW.

175. NCCIW's failure to meet its obligations to provide equal access to its programs, services, and activities constitutes an ongoing and continuous violation of the ADA and its implementing regulations. Unless restrained from doing so, NCCIW will continue to violate the ADA. Unless enjoined, NCCIW's conduct will continue to inflict injuries for which Ms. Edwards and others with OUD at NCCIW have no adequate remedy at law.

## COUNT IV
### Violation of the Rehabilitation Act (Denial of MOUD)
### As to Defendant Buffaloe

176.    Plaintiff incorporates all preceding paragraphs.

177.    Defendants' policies and practices withdrawing Ms. Edwards from MOUD postpartum, without regard to her individualized circumstances, violated the rights secured to her by Section 504 of the Rehabilitation Act and its implementing regulations.

178.    Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

179.    Ms. Edwards is an otherwise qualified individual with a disability as defined in Section 504 of the Rehabilitation Act. As a prisoner in the custody of the Department of Public Safety, she met the essential eligibility requirements for receipt of services or the participation in programs or activities provided by the Defendants. 29 U.S.C. §§ 705(9)(B), 794.

180.    Defendant Buffaloe, sued in his official capacity, holds an office that is an agency of state government, which administers a program or activity that receives federal financial assistance.

181.    Under the Rehabilitation Act, Defendants may not "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service," 45 C.F.R. § 84.4(b)(1)(i), "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," 45 C.F.R. § 84.4(b)(1)(vii), or "utilize criteria or methods of administration . . . that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 45 C.F.R. § 84.4(b)(4).

182.     On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

183.     Defendants' postpartum withdrawal policy automatically and forcibly removed Ms. Edwards from her prescribed MOUD. They therefore have denied her the benefits of their medical programs on the basis of her disability.

184.     Defendants have failed to meet their obligations under the Rehabilitation Act by forcibly withdrawing Ms. Edwards from prescribed MOUD without consideration of her individualized circumstances postpartum. Defendants acted with deliberate indifference in failing to provide reasonable accommodation for Ms. Edwards's disability despite actual knowledge of her need for accommodations.

### COUNT V
### Violation of the Eighth Amendment (Denial of Mental Health Treatment Postpartum)
### As to Defendant Amos

185.     Plaintiff incorporates all preceding paragraphs.

186.     Defendants' policies and practices denying Ms. Edwards access to counseling and mental health medication postpartum subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

187.     Defendants, while acting under color of state law, deliberately, purposefully, and knowingly denied Plaintiff access to necessary medical treatment for her mental health disabilities, which constitute a serious medical need.

188.     Denying Ms. Edwards access to necessary medical and mental health treatment postpartum has caused and continues to cause her physical and psychological suffering.

189.     Defendants acted with deliberate indifference when they failed to provide necessary medical and mental health care, including access to her prescribed psychotropic medication,

without any medical justification and contrary to recognized standards of care, and thereby subjected her to objectively dangerous conditions that presented substantial risks of serious harm.

190.    Defendants were aware that denial of mental health treatment is particularly dangerous during the postpartum period, and that these risks are heightened for individuals, such as Plaintiff, who have pre-existing substance use disorders and/or mental health disabilities.

191.    Exposing her to such risks violated contemporary standards of decency that mark the progress of a maturing society.

192.    Defendant Amos acted with deliberate indifference to Ms. Edwards's serious medical needs when he failed to provide access to necessary prescriptions and counseling, despite knowing the dangers of suddenly discontinuing psychotropic medication postpartum.

193.    Plaintiff was exposed to an unreasonable risk of harm, and was actually harmed and injured, as a result of these unconstitutional actions. She seeks declaratory and injunctive relief and damages.

## COUNT VI
### Violation of the Americans with Disabilities Act (Denial of Mental Health Treatment Postpartum) As to Defendant Buffaloe

194.    Plaintiff incorporates all preceding paragraphs.

195.    NCCIW, by and through Defendant Buffaloe acting in his official capacity, is a public entity subject to the Americans with Disabilities Act (ADA).

196.    Ms. Edwards's diagnosis of bipolar disorder establishes her as a qualified person with a disability because her mental illness substantially limits brain function and other major life activities.

197.    Ms. Edwards is a "qualified individual with a disability" because she meets the essential eligibility requirements for NCCIW's medical services. 42 U.S.C. § 12131(2). She is entitled to receive the benefits of the medical care system in jail.

198.    On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications or other treatment to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

199.    Defendants fail to provide a system that allows continued access to mental health counseling and medication for individuals with mental health disabilities. They therefore denied her the benefits of their medical programs on the basis of her disability.

200.    Defendants refused to make a reasonable accommodation for Ms. Edwards by providing her with access to her prescribed mental health treatment during her incarceration, even though accommodation would not alter the nature of the healthcare program.

201.    Defendants acted with deliberate indifference to Ms. Edwards in denying her access to the benefits of their medical program.

202.    Defendants had actual knowledge of ongoing discrimination against Ms. Edwards because she had been prescribed medications and other treatment for her disability, but failed to respond adequately by accommodating her disabilities when she was postpartum.

## COUNT VII
### Violation of the Rehabilitation Act (Denial of Mental Health Treatment Postpartum)
### As to Defendant Buffaloe

203.     Plaintiff incorporates all preceding paragraphs.

204.     Defendants have violated Ms. Edwards's rights under Section 504 of the Rehabilitation Act and its implementing regulations by and through their policies and practices, which denied Ms. Edwards access to mental health treatment postpartum without regard to her individualized circumstances,

205.     Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

206.     Ms. Edwards is an otherwise qualified individual with a disability as defined in Section 504 of the Rehabilitation Act. As a prisoner in the custody of the Department of Public Safety, she met the essential eligibility requirements for receipt of services or the participation in programs or activities provided by the Defendants. 29 U.S.C. §§ 705(9)(b), 794.

207.     Defendant Buffaloe, sued in his official capacity, holds an office that is an agency of state government, which administers a program or activity that receives federal financial assistance.

208.     Under the Rehabilitation Act, Defendants may not "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service," 45 C.F.R. § 84.4(b)(1)(i), "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," 45 C.F.R. § 84.4(b)(1)(vii), or "utilize criteria or methods of administration . . . that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 45 C.F.R. § 84.4(b)(4).

209. On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications and other treatment to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

210. Defendants failed to implement a system to provide access to mental health treatment postpartum, including mental health counseling and prescribed medications. They therefore have denied and continue to deny Ms. Edwards the benefits of their medical programs on the basis of her disability.

211. Defendants have failed to meet their obligations under the Rehabilitation Act by forcibly withdrawing Ms. Edwards from prescribed psychiatric medications and counseling, without consideration of her individualized circumstances postpartum. Defendants acted with deliberate indifference in failing to provide reasonable accommodation for Ms. Edwards's disabilities despite actual knowledge of her need for accommodations.

## PRAYER FOR RELIEF

WHEREFORE, Tracey Edwards prays that this Court grant the following relief:

a. A declaratory judgment holding that, as applied to Plaintiff, Defendants' policy and practice of forced postpartum MOUD withdrawal violates the Eighth Amendment and ADA, and the Rehabilitation Act;

b. A declaratory judgment that, as applied to Plaintiff, Defendants' policy and procedure of shackling during pregnancy, labor, and the postpartum period violates the Eighth Amendment;

c. Enjoin Defendants from shackling people who are pregnant or in postpartum recovery absent an individualized determination that there is an imminent risk that the person will escape or commit assault and that there is no other way to contain this risk;

d.   Enjoin Defendants from shackling people who are in any stage of labor, without exception;

e.   Enjoin Defendants from denying all necessary medical treatment, including MOUD;

f.   Order Defendants to formulate and implement new policies that comply with the Eighth Amendment, the ADA, and the Rehabilitation Act;

g.   Provide compensatory damages for pain and suffering under the Eighth Amendment;

h.   Provide punitive damages under the Eighth Amendment;

i.   Provide compensatory damages under the ADA and Rehabilitation Act;

j.   Retain jurisdiction over this matter until the Court is satisfied that the unconstitutional and illegal practices described above have ceased and will not recur;

k.   Award Plaintiff's costs and reasonable attorneys' fees as allowed by law;

l.   Award any other relief the Court finds proper.

**TRIAL BY JURY IS DEMANDED**

Dated:  April 1, 2022.                                      Respectfully submitted,

<div style="margin-left:50%">

*/s/ Lauren Kuhlik*
Lauren Kuhlik (*By Special Appearance*)
*Hassan A. Zavareei (*Notice of Special Appearance to be Filed*)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, STE 1000
Washington, D.C. 20036
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: lkuhlik@tzlegal.com
          hzavareei@tzlegal.com

</div>

Erika K. Wilson
N.C. Bar. No.45020
**UNIVERSITY OF NORTH
CAROLINA SCHOOL OF LAW
CLINICAL PROGRAMS**
102 Ridge Road
Chapel Hill, NC 27514
Telephone: (919) 962-2552
Fax: (919) 962-2883
wilsonek@live.unc.edu

*Local Rule 83.1 (d) Counsel for
Plaintiff*

April N. Ross (*By Special
Appearance*)
NC Bar No. 35478
**Aryeh Mellman (*Notice of Special
Appearance to be Filed; Admission
to Federal Court Pending*)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 624-2500
Email:  aross@crowell.com
          amellman@crowell.com

*Oren Nimni (*Notice of Special
Appearance to be Filed*)
**RIGHTS BEHIND BARS**
416 Florida Avenue, NW #26152
Washington, D.C. 20001
Phone: (202) 540-0029
Email: oren@rightsbehindbars.org

*Counsel for Plaintiff*

# EXHIBIT 1



**State of North Carolina**
**Department of Public Safety**
**Prisons**

Chapter:       F
Section:       .1100
Title:         Transporting Offenders
Issue Date:    09/06/18
Supersedes:    03/26/18

## POLICY AND PROCEDURE

### .1101  General

Correctional staff tasked with custodial supervision of offenders to be transported within the state act as authorized agents of the Director of Prisons.  Prisons staff is vested with the authority of peace officers for this purpose.  Prisons staff is responsible for the safety and security of all offenders assigned to them. This policy will outline procedures governing the transportation of offenders outside of the institution/facility and from one jurisdiction to another. Procedures governing the use and security of institution vehicles will also be outlined.  **.1102 Security**

Precautions will be taken to maintain order and security.  The following provisions should not be construed as excluding the employment of additional precautions that may be necessary.

(a)     Each facility will maintain a written procedure establishing specific guidelines for the transport of all offenders to include those transported to outside medical facilities, court trips, funerals/private viewings, and by persons other than department or facility staff. These facility procedures shall also prohibit notification of an offender of the date, time, route and destination of the trip and the release of the information to persons not having a need to know.

(b)     Armed Supervision.  All offenders other than those classified in minimum custody will be supervised by armed, certified correctional staff during transportation. Officers in possession of firearms will not place themselves in a position that will allow the offender to gain possession of the weapon.

(c)     Mechanical Restraints.  Handcuffs and leg cuffs will be used when the officer-in-charge of the offenders or responsible line staff deem the restraints necessary for custodial reasons. The restraints will be frequently and carefully examined.  No offender classified in control status, close custody or medium custody will be transported without leg cuffs, handcuffs with black box and security chain in a non-security vehicle. If offenders classified in control status, close custody and medium custody are transported with minimum custody offenders, all offenders will be handcuffed.

(d)     Ballistic Body Armor.  All offenders classified in close custody and medium custody that are transported outside the confines of a correctional facility shall be supervised by correctional staff wearing ballistic body armor.  This body armor is to be worn on the outside of the uniform shirt. Exceptions are authorized ~~only for road squad officers and~~ in emergency situations at the discretion of the OIC (Officer-In-Charge).

(e)     Searches.  Offenders being transported classified in control status, close custody and medium custody will be completely searched (strip search) upon leaving and entering a close or medium security prison facility.  The transporting officer shall be present while a complete search of each offender is conducted.  Strip searches shall be thorough, and shall be conducted consistent with policy.  Offenders will not be allowed to have any items that may be used as a weapon or instrument for escape. For additional specifics on searches, refer to DOP Policy F.0100 (Operational Searches).

(f)     Copies of security alert comments should be provided to transporting officers so that appropriate security measures can be taken to reduce the likelihood of escape and/or assault.

    (1) Certain offenders with security alert comments may require transportation by special teams, either PERT or SORT.  These offenders are usually classified on the F12 Security Alert Screen as Extreme Escape Risk.  The decision for identifying these offenders and identifying the special team utilized for transport will be made in concert by the Assistant Director of Auxiliary Services and the Assistant Director of Security Accountability.

(g)     In the event the offender is being transported for a court appearance, the transporting officers shall be provided a copy of the court's writ prior to departing the facility in case questions arise related to the court appearance.

(h)     Vehicles.  Vehicles used in transporting offenders will be thoroughly inspected before offenders are loaded.  This inspection will insure there is no contraband, particularly which could be used to assist offenders to escape.  When a security vehicle is used, stops for security inspections will be accomplished frequently when offenders of a high custodial risk are being transported.  When practical, offenders will be transported during daylight hours and will be kept under observation at all times while in transit.  The transporting officer shall maintain continuous communication capability with facility and/or local/state law enforcement officials throughout the duration of the trip.

(i)     Routes.  Offenders shall not be provided prior information regarding the time of departure or the route that will be taken when they are transported.  Generally, the most direct route should be taken when transporting offenders.  The officer-in-charge may authorize deviation from the most direct route for security reasons.  Facilities with offender transfer

bus routes shall maintain documentation of alternating use of their assigned primary and secondary travel routes.

(j)      Traffic Laws.  Prison staff driving vehicles must have a valid driver's license when operating a motor vehicle.  All traffic laws must be followed at all times.  Prison staff transporting offenders shall not travel in excess of the posted speed limit.

(k)      Cell Phones.  Prison staff shall not carry personal cell phones while transporting offenders outside the confines of any prison facility unless authorized by the OIC.

(l)      Emergency Stops. Each facility shall maintain a written procedure establishing specific guidelines to follow when stopping for emergency reasons, to permit staff or offenders to use the restroom, and to manage disruptive offenders.

(m)     Identification. Transporting officers must have a current photo, offender fact sheet and a brief description of the offender in their possession during the transport. Each offender at close and medium custody facilities will be positively identified by a picture ID prior to exiting/entering the facility.

(n)      Property.  Offender's property will be kept separate from the offenders during transport.

(o)      Offenders transported by automobiles and vans must be secured in the vehicle utilizing the safety restraint system (i.e., seatbelts).

(p)      Medical Staff.  Medical staff shall be notified of all planned transports to determine if there are medical impediments or if medications must accompany the offender.

## .1103 Certified Staff to Offender Ratio

(a)      Custody Levels.  Under normal circumstances, the following certified staff to offender ratio should be utilized in these custody categories.  Based on the individual situation, additional security precautions may be authorized.

        (1)      Close Custody.  Two certified staff with one or more offenders.

        (2)      Medium Custody.  One certified staff member with one offender; two certified staff with two or more offenders.

    (3)    Minimum Custody.  Staff to offender ratio shall be determined by facility head or designee.

(b)    Control Status.  Under normal circumstances, the following certified staff to offender ratio should be utilized in these control categories.  Based on the individual situation, additional security precautions may be authorized.

    (1)    High Security Maximum Control.  Two certified staff members with one offender.  More than one offender will require two certified staff in the security vehicle and two certified staff in a chase vehicle.

    (2)    Restrictive Housing for Control Purposes (RHCP).  Two certified staff members with one to four offenders.  Five offenders and above requires a chase vehicle.

    (3)    Death Row.  Two certified staff with one offender.

    (4)    Protective Control.  Security consistent with the offender's custody level.

    (5)    Restrictive Housing for Disciplinary Purposes (RHDP).  Security consistent with the offender's custody level.

        (A)    Offenders in regular population transferring to a facility for RHDP may be transferred on the regular transfer bus.

        (B)    Offenders already on RHDP or RHAP that are transferring to a facility to continue restrictive housing shall not be transferred on the regular transfer bus.

    (6)    Restrictive Housing for Administrative Purposes (RHAP).  Transportation is consistent with the offender's custody level.

    Offenders being transferred for RHAP should not be transferred on the regular transfer bus.

    (8) Security Alert Offenders (Extreme Escape Risk).  Transportation is consistent with the special team's training and will be approved by the Assistant Director of Security Accountability or designee.

## .1104 Special Security Issues

(a)    Medical/Hospital Transportation

    (1)    All transportation decisions for medical purposes should be made in consultation with medical staff.

    (2)    Close and medium custody offenders being transported on an emergency basis without a scheduled appointment should be transported with two officers to one offender.

    (3)    Close and medium custody offenders being transferred for an outside medical clinic should be transferred with two staff to one offender; however, three staff may transport two offenders if the site and clinic schedule will allow one staff to observe one offender in the waiting area while two staff escorts one offender to the examination/treatment area.  All staff should be armed.

    (4)    Except when medical conditions prohibit, medium and close custody offenders are required to remain in restraints during medical examinations and treatment. The

facility OIC shall be the approving authority for any deviations from this requirement.

(b)     Safekeepers

   (1)     Misdemeanant.  One staff member with one or more offenders.

   (2)     Felon.  Two staff with one offender.

(c)     Security Risk Group

Security will be consistent with the offender's custody classification.

(d)     Mental Health

Security will be consistent with the offender's custody classification.

(e)     Helicopter Transport

   (1)     With Staff
      (A)     Officer should not be armed.

      (B)     Restraints should be placed on the offender as the medical condition will allow.

      (C)     Contact should be made with a nearby prison facility and a request made for an armed officer to go to the hospital.

      (D)     Local law enforcement near the hospital should be notified and assistance requested.

      (E)     Hospital security should be notified.

   (2)     Without Staff

      (A)     Restraints should be placed on the offender as the medical condition will allow.

(B)   Contact should be made with a nearby prison facility and a request made for an armed officer to go to the hospital.

(C)   Local law enforcement near the hospital should be notified and assistance requested.

(D)   Hospital security should be notified.

(f)   Ambulance Transport

(1)   The officer riding in the ambulance should not be armed.  A chase vehicle with an armed officer should follow.

(2)   Radio communications between the officers in the ambulance and the chase vehicle should be maintained.

(3)   Restraints should be placed on the offender as medical condition will allow.

(g)   Vehicle Transportation

In cases where an offender experiences a medical or psychiatric emergency during transport, the transporting officers should immediately pull over and call 911.

(h)   Emergency Leave

(1)   Any offender in close custody or medium custody approved for an emergency leave is supervised by two armed staff with one offender.

(2)   Inmate supervision for minimum custody offenders is at the discretion of the facility head.

(3)   Offenders assigned to HCON and Restrictive Housing for Control Purposes (RHCP) shall not be allowed to attend a funeral service or private viewing. Close custody and medium custody offenders shall not be allowed to attend a funeral service.  The Region Director, designee or duty officer may approve a close custody offender in the regular population or on RHAP or RHDP to attend a private viewing. The facility head or designee is the approving authority for medium custody offenders in regular population or on RHAP or RHDP to attend a private viewing.

Close custody and medium custody offenders approved for a private viewing may only have immediate family present at the time of the private viewing. Minimum custody offenders may, at the discretion of the facility head or designee, attend either a private viewing or funeral service. The Region Director, designee or duty officer is the approving authority for emergency leave for all offenders with Life sentences regardless of custody classification.

(4)     Additional information regarding emergency leave is found in DOP Policy F.0400 (Emergency Leave).

(i)     Pregnant Offenders:

(1)     An offender with a clinical diagnosis of pregnancy shall not be restrained by leg, waist, or ankle restraints. Wrist restraints may be used during any internal escort or external transport. These wrist restraints shall only be applied in the front and in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall. This related to inmates not in labor or suspected labor and who are escorted out for Ultrasound Addiction Therapy for Pregnant Women or other routine services. The Associate Warden for Custody will be notified anytime an offender is transported externally for delivery.

(2)     The following offenders should not be placed in any restraints, including wrist restraints, unless there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others, including her fetus or child, or that she presents an immediate, credible risk of escape that cannot be reasonably contained through other methods:

(A)     An offender who is in labor, which is defined as occurring at the onset of contractions;

(B)     An offender who is delivering her baby;

(C)     An offender who is identified by medical staff as in post-partum recuperation;

(D)     An offender who is transported or housed in an outside medical facility for treating labor and delivery;

(E)     An offender for induction once the intravenous line has been placed and the induction medication has been started;

(F)     An offender who is being transported from the holding room to the Operating

Room for C-section; or

(G)     An offender during initial bonding with the newborn child, including nursing   and skin to skin contact.  If restraints are required, they should allow for the mother's safe handling of her infant.

(3)     When the use of restraints during labor occurs, officers must immediately notify the Associate Warden for Custody of the reasons why restraints were applied and an incident report must be completed.

(4)     Upon medical discharge, wrist restraints shall be applied for transport back to the correctional facility. Leg restraints may be applied when there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others, or that she presents an immediate, credible risk of escape that cannot be reasonably contained through other methods.

(5)     Waist restraints shall not be used at any time during pregnancy or post-delivery, to include transport back to the facility.

(j)     Compliance with State Laws

Staff transporting or providing security in a chase vehicle must comply with all applicable state laws to include maintaining posted speeds and obeying all traffic lights and traffic signs.

_____          09/06/18_____

Director of Prisons                           Date

F.1100_09_06_18.doc

# EXHIBIT 2



***State of North Carolina***
***Department of Public Safety***
***Prisons – North Carolina***
***Correctional Institution for***
***Women***

Chapter:    D
Section:    .1800
Title:    **Offender Restraints**
Issue Date:  02/01/19
Supersedes:  06/20/18

## *Standard Operating Procedures*

### .1801 PURPOSE

(a)    The purpose of this Standard Operating Procedure is to provide staff assigned to the North Carolina Correctional Institution for Women with direction in the use of mechanical restraints when transporting offenders from the facility to court, medical appointments, transfers between correctional facilities, emergency leave, hospital admissions, movement within the facility, or other reasons deemed necessary by the Officer in Charge.

### .1802 POLICY

(b)    It is the policy of the Division of Prisons that, at no time, should an offender be unrestrained while outside the security confines of the correctional facility from which they are assigned.  Exceptions have been provided for the removal of restraints when a (an):

    (1)    Judge has directed the removal of restraints while the offender is involved in a court proceeding

    (2)    Medical doctor is performing a medical procedure affecting a restrained arm or leg.

    (3)    Pregnant offender is in active labor.

    (4)    Offender is being transferred in a security vehicle from one correctional facility to another, and the loading/unloading will be accomplished in a secure vehicle sallyport.

### .1803 DEFINITIONS

(c)    <u>Mechanical restraints</u>:  includes handcuffs, waist chains, leg irons, handcuff covers ("black box"), pad locks, grip restraints, and flex cuffs (plastic cuffs).

(d)    <u>Court</u>:  offender is legally required to physically appear in a courtroom setting for disposition of a legal matter of which they are involved.

(e)    <u>Medical Appointment</u>:  offender is scheduled to receive medical treatment at an outside medical facility.

(f)     <u>Transfers between correctional facilities</u>:  offenders are transferred between correctional facilities for duty, segregation purposes, closer to home, court, etc.

(g)     <u>Emergency leave</u>:  offender has received approval to attend a private viewing at a private facility, i.e. funeral home

(h)     <u>Hospital admission</u>:  offender is hospitalized at a civilian medical facility to receive medical treatment for standard or emergency purposes.

(i)     <u>NCCIW</u>:  North Carolina Correctional Institute for Women

(j)     <u>Facility</u>:  North Carolina Correctional Institute for Women; NCCIW

## .1804 PROCEDURAL GUIDELINES

(k)     Transporting/Escorting Offenders outside the security confines of NCCIW.

   (1)     Correctional staff assigned to transport or escort offenders outside the security confines of NCCIW are responsible to maintain order and to ensure the safety and security of the offender(s) being transported or escorted.  Mechanical restraints will be utilized on all offenders, regardless of custody level, when leaving the security confines of the facility, unless otherwise directed by the Officer in Charge.

   (2)     The Transportation Officer shall be armed with a .40 cal handgun, and additional ammunition. The Transportation Officer shall wear the ballistic body armor on all transports of offenders. The Officers will be aware of their weapon and their surroundings concerning not only the offender, but the public also. The Officer shall not place themselves in a position which may allow the offender to gain control of their weapon.

   (3)     Mechanical restraints will be checked out from the NCCIW Armory for use when transporting/escorting an offender.  Mechanical restraints have been issued to the Intake/Transportation section and are maintained in the equipment locker in the Intake Building.

   (4)     Prior to use, mechanical restraints will be carefully inspected for damage and functionality.  Any malfunctioning and/or damaged mechanical restraint will be returned to the Armory for repair and a replacement issued. During their use, mechanical restraints will be frequently and carefully examined to ensure security of the offender.

   (5)     When using a non-security vehicle for transport purposes, all offenders will be transported with leg cuffs, handcuffs, black box and waist chain.

   (6)     When being transported with close custody, medium custody, or with offenders classified in a control status, minimum custody offenders will wear full restraints.

(7)  In emergency situations, when being transported by ambulance, offenders will be restrained with handcuffs and leg irons. The Officer in Charge will direct specific restraint procedures based on the medical status of the offender being transported.

(8)  At NO time will an offender direct or provide input as to the type of mechanical restraint to be used or to when the mechanical restraint be removed.

(9)  The senior transport/escort officer will immediately notify the Officer in Charge should an offender remove, attempt to remove or tamper with the mechanical restraints being used on them.

(10) **Grip restraints will be utilized, in lieu of handcuffs, waist chain and/or leg irons, when an offender's medical condition prohibits the correct use of the metal restraints.

(l)  **Application of Mechanical Restraints**

(1)  Regardless of the type of mechanical restraint being utilized, ensure you have the appropriate key to unlock the mechanical restraint in your possession at all times you are escorting/transporting the offender.

(2)  **Handcuffs**

(A)  Wrists are cuffed with key holes facing out with the double strand to the top of the wrist to make is easier to double lock and unlock later.

(B)  Use large handcuffs on offenders with large wrists.

(C)  Ensure handcuffs are not applied to cause injury to the offender, i.e. applied too tight.

(D)  Double lock and double check

(3)  **Leg irons**

(A)  Ankles are cuffed with key holes facing down.

(B)  Have offender kneel or sit to facilitate leg iron application.

(C)  Apply leg irons over socks to prevent injury to offender.

(D)  Ensure leg irons are not applied to cause injury to the offender, i.e. applied too tight.

(E)  Double lock and double check

(F)  No pregnant offender will wear leg irons

(4)  **Waist Chain**

(A)    Apply the waist chain so that the chain is snug but not too tight that it becomes uncomfortable to sit.

(B)    Excess chain is carried around the waist and secured to the main body of the chain.

(C)    Work handcuffs through the large link on the waist chain so they are hanging by the cuff chain, then loop handcuffs through the large link and apply on offender.

(D)    No pregnant offender shall wear a waist chain.

(5)    **Black Box**

(A)    When used, place black box over handcuff chain.

(B)    Ensure large link of waist chain is pushed through hole in black box.

(C)    Attach a lock to the large link.

(D)    Ensure you have a key to the lock in your possession at all times the black box is in use.

(6)    **Grip Restraints**

(A)    To be used when the medical status of an offender prohibits the correct application of the metal restraints.

(B)    Ensure the nylon grip restraint is security fastened around the offender's ankle, waist and/or wrists when applied.

(7)    **Court Appearances**

(A)    All offenders, regardless of custody level, will be restrained with handcuffs, waist chain, and leg irons.

(B)    Two armed correctional staff will transport the offender to court.

(C)    Restraints will be removed once the offender has been delivered to and custody transferred to appropriate county jail staff

(D)    For "stay with" court appointments, the restraints will remain on the offender, unless directed to be removed by the judge.  If the restraints are removed, BOTH transporting officers will remain with the offender until the restraints are reapplied.

(8)    **Medical Appointments**

(A)    Close and medium custody offenders will be restrained with handcuff, waist chain, and leg irons.

(B)     Minimum custody and pregnant offenders will be restrained with handcuffs.

(C)     Minimum custody offenders housed in the Raleigh unit are not required to use restraints, however the transportation officer may use their discretion in use of handcuffs for the transport.

(D)     Offenders will not be handcuffed to crutches or wheelchairs.

(E)     Offenders will remain restrained at all times.

(F)     The Officer in Charge must be notified when, due to a medical device being worn by an offender, it is necessary to alter the type or level of mechanical restraint being utilized. (Ex: No leg irons due to medical shoe/boot).

(G)     Hand irons or leg irons can be removed to complete a medical procedure.

(H)     Leg irons will be applied to a minimum custody offender when the medical appointment requires the removal of the handcuffs, i. e. mammogram.

(I)     Flex cuffs will be utilized when the medical appointment involves an MRI. (Metal or grip restraints cannot be utilized during the procedure.) Ensure you have a flex cuff cutter with you when using the flex cuffs.

(J)     The Officer in Charge will be notified when the metal/grip restraints are being removed and the flex cuffs applied for the MRI.

(K)     Two armed correctional staff will escort an offender in close or medium custody.

(L)     Three armed correctional staff can escort two offenders if the site and clinic schedule will allow one staff to observe one offender in the waiting area while two staff escorts one offender to the examination/treatment area.

(9)     **Transfers Between Correctional Facilities**

(A)     When traveling in a security vehicle (van or jail bus), the senior transport officer will determine if mechanical restraints are necessary for custodial reasons.

(B)     Any time minimum custody offenders are transported by car with close or medium custody offenders, all offenders will be handcuffed upon direction of the Officer in Charge.

(C)     Emergency Leave

(D)    Offenders will be transported with handcuffs, waist chain and leg irons.

(E)    Two armed correctional staff will escort the offender to the emergency leave site.

(F)    At no time will the mechanical restraints be removed from the offender.

(10)   **Hospital Admission**

(A)    The correctional officer will have a mechanical restraint bag containing the following equipment while escorting an offender at a civilian hospital:

    (i)    One set of handcuffs

    (ii)    One set of leg irons

    (iii)    One waist chain

    (iv)    One black box

    (v)    One key ring with black box and handcuff key

    (vi)    Two flex cuffs

    (vii)    One flex cuff cutter

(B)    While lying in their assigned hospital bed or treatment gurney, offenders will be secured with one hand restrained to the bed/gurney with a handcuff and the opposite leg restrained to the bed/gurney with a leg iron.

(C)    At the doctor's direction, the handcuff OR leg iron can be removed to complete a medical procedure. At NO time will an offender be unrestrained while lying in a hospital bed or treatment gurney.

(D)    The Officer in Charge will be notified when a mechanical restraint must be removed for a medical procedure.

(E)    The handcuffs will be removed from an offender, who has recently given birth, in order for the offender to hold her newborn child. The offender must remain sitting in her bed or chair while holding the newborn child. Leg irons will remain on the offender.

(F)    Mechanical restraints will be removed from an offender who is in active labor.

(11)   **Escorting Offenders within the Security Confines of NCCIW.**

(A)    When moving an offender from one area of the facility to another for security reasons, the offender will be handcuffed from the back.

(12) **In the Event of an Emergency**

    (A) The transportation officer will contact 911 to request medical assistance.

    (B) Contact will also be made with the nearest prison facility, Highway Patrol station, or local law enforcement office to request additional security for the transport vehicle.

    (C) The officer will stop the vehicle at the first available location where vehicle security can be maintained.

    (D) Notify the OIC

    (E) Once additional back up security arrives, one unarmed, transportation officer may enter the bus/or open the van or car door to better assess the medical emergency.

    (F) The offender requiring medical attention will be removed from the vehicle and transported either by EMS or other law enforcement to the nearest hospital. The nearest prison facility shall provide sufficient staff to travel with the offender requiring medical attention and remain with him/her at the hospital until treatment is completed or relieved by other DPS staff.

    (G) The transfer vehicle will continue its scheduled route.

    (H) If the offender must be transported prior to backup assistance arriving from another prison facility, the correctional officer will accompany the offender on the emergency vehicle and the Lead Correctional Officer will remain with the transport vehicle and provide necessary security to the remaining offenders. The vehicle will not continue its normal route until such time as assistance from the nearest facility arrives on the scene.

(13) **Reporting Procedures**

    (A) Report all security and offender supervision problems to the Officer in Charge immediately.

(14) **Responsibilities**

    (A) Officer in Charge.  Overall responsibility for all offender movement outside and inside the correctional facility.  (919) 508-1486  or (919) 733-4340

    (B) Officer in Charge. Overall responsibility for all offender movement outside and inside the correctional facility.  (919) 508-1486  or (919) 733-4340

    (C) Transportation Sergeant.  Responsible for daily scheduling for offender

transportation to court, medical appointments, and emergency leave. (919) 508-1477 or (919) 733-4340

(D)     Security Supervisor.  Responsible for ensuring accountability and security for all offenders admitted to civilian medical facilities.

(E)     Transportation Officers.   Responsible for ensuring accountability and security for offenders assigned to their control for a specific transport purpose.

(F)     Escort Officers.  Responsible for ensuring accountability and security for offenders assigned to their control during a specific medical hospitalization or any other type transport. All escort Officers will have a weapon and wear the ballistic body armor for all escorts

_____
Facility Head                                    Date

D.1800_02_01_19.doc

# EXHIBIT 3



***State of North Carolina***
***Department of Public Safety***
***Prisons – North Carolina***
***Correctional Institution for***
***Women***

Chapter:       H
Section:       .0300
Title:         **Use of Force and Restraints**
Issue Date:    02/01/19
Supersedes:    07/19/18

## *Standard Operating Procedures*

## .0301 PURPOSE

(a)     To provide NC Correctional Institution for Women with guidance regarding the use of force and restraints


## .0302 POLICY

(b)     It is the policy of NC Correctional Institution for Women to provide employees with proper training and guidance on the permissible use of force at this facility and to ensure that force is only used when necessary, and only to the degree necessary, to subdue an individual and to restore order. Deadly force maybe used to prevent an escape, protect the public, or protect other lives. The use of force, security equipment, and restraint equipment is intended only as a control measure and when absolutely necessary-these measures are not intended and will not be used as punishment.


## .0303 PROCEDURAL GUIDELINES

(c)     The use of force is sometimes necessary in our facility for self defense, protect others and protection of property.  The Warden has established the guidelines for the use of force at this facility.

(d)     **Direct Contact Force**

   (1)     If verbal directives are not followed then the first level of force available to a staff member is the use of OC Pepper then direct contact force. The approved CRDT is justified to subdue unruly offenders who escalate into a physical fight; or in self-defense; or when defending staff, offenders, or other persons; and to move offenders who fail to comply with lawful orders.

(e)     **Batons**

   (1)     The use of batons as a part of a use of force is prohibited inside the perimeter of NC Correctional Institution for Women.  However, in the event of an emergency situation (major disturbance, riot, etc.) the Officer in Charge may order the use of batons to assist with gaining control.  At no time will the baton be used for the

sole purpose of punishment. Batons are stored in various locations to include Eagle (9), Falcon (2), Phoenix (2), Master Control (3), Tag & Dup (1), Armory/Gatehouse (10) and can be supplied along with shields and other protective equipment.

(f)     **Restraints**

(1)     The use of restraint equipment is intended to prevent escape, assault, or the commission of some other offense by violent or disruptive offenders; to protect staff and offenders; and under circumstances approved by the Warden that are outlined in this section of the policy. Staff assigned to yard patrol, transportation and segregation are authorized to carry handcuffs. Offenders will be handcuffed from behind unless there are medical restrictions or security requirements.

(2)     Offenders in segregation will be in restraints when moved out of their cells for any purpose; staff in segregation have been trained on the proper handling of the cuff and key and advised of the importance of accounting for this key at all times.

(3)     Offenders in general population units generally are not moved in restraints and the use of restraints are authorized only when behavior dictates the need for added control and when all other reasonable methods of control have failed.

(4)     An offender can not be restrained to a bed, chair etc. in segregation at this facility. Four/five point restraints are only approved to occur in the Inpatient Mental Health Unit. The Warden has directed that the use of four/five point restraint can only occur via a physician's order. The Warden's designee, Special Housing Lieutenants and/or the Shift OIC are to be immediately notified when an order for clinical four/five point restraint is written. Specific policy guidelines governing the use of restraints in the Mental Health Unit are discussed in the Health Services Manual.

(5)     The Deputy Warden, Assistant Superintendent for Custody and Operations and the Security Captain are the approving authority for the guidelines governing use of restraints and nonlethal means of control that include use of handcuffs, leg irons, waist chains, black box security devices for handcuffs, and flex restraints at NC Correctional Institution for Women.

(6)     All offenders admitted to the outside hospitals shall be restrained to the bed. One arm and one leg shall be restrained. (Ex:--The left leg and right arm). The staff shall use the Flex cuffs when the offender is to undergo a medical procedure and the metal restraints would be detrimental. The medical doctor may request that the offender not be restrained to the bed for medical purposes only. The staff shall notify the OIC and document the request on the hospital activity log.

(7)     Training is provided in the necessary techniques for each of the devices

employed, including techniques for the use of hard and soft restraints; therapeutic restraining offenders to beds; use of restraints for normal escort activity and for movement in the segregation area; and reporting requirements for other uses of restraints.

(8)     Note:  Although restraints are provided for the maternity offender while transporting to and from the hospital during pregnancy and immediately post partum the offender will only be handcuffed from the front.  The maternity offender WILL NOT have leg restraints applied. The offender shall not be restrained during active labor. The offender shall be restrained after birth of the child and the medical authorities have completed their work with the offender. The offender shall not have her hands restrained while bonding and feeding the baby. Any exception to this must be made by the Officer in Charge and must directly relate to a custody and security situation that is deemed an immediate threat.  **No offender will be restrained while in delivery.**

(g)     **OC Pepper**

(1)     The Warden has authorized the use of chemical agents prior to the use of physical force and after verbal directives fail.  This authorization is in compliance with Departmental Use of Force policy.  The Officer working in Mental Health and the Infirmary will use the provide Pepper Foam.

(h)     **Deadly Force**

(1)     Deadly force may be applied to prevent an escape from this maximum security facility, protect the public, or to protect other lives, including protecting property where there is likelihood lives may be jeopardized. This latter instance may be created, for instance, by the need to shoot at an offender about to set fire to a building. In an emergency where it is not possible or practical to seek authorization, an employee will use appropriate force and later will be required to justify that action.  At no time will the use of personal firearms be authorized in the line of official duty.

(2)     Firearms will be used only in situations where there is danger of death or grievous bodily harm, and will not be discharged if less extreme measures will suffice, except in escape situations. The Deputy Warden and the Assistant Superintendent for Custody/Operations have written and approved Post Orders for the designated armed posts.  Designated armed post at NC Correctional Institution for Women are:

(A)     Tower 1

(B)     Roving Patrol

(C)     Security Supervisors (Outside Hospitals, Court and Transportation)

(3)     These Standard Operating Procedures are a complete set of instructions regarding weapons use that are sufficiently detailed so as to provide staff with a clear understanding of the circumstances under which they may consider the use of deadly force.

(4)     These Standard Operating Procedures specify that an officer may consider discharging a firearm under the following circumstances:

    (A)     an offender whom the officer has seen kill or seriously injure another person and who refuses to halt when ordered

    (B)     an escaping offender, and if the escape is actually in progress and cannot be reasonably prevented in a less violent manner and under reasonable knowledge that the offender is a felon

    (C)     an offender is carrying a weapon or attempting to obtain a weapon by force, and the officer has reason to believe that the offender intends to cause death or serious injury

    (D)     to protect property in cases such as arson, and under reasonable knowledge that the offender is a felon and the act is likely to cause serious injury or death

(5)     Verbal warnings will be used prior to the use of firearms. If aimed fire at an offender is necessary, the intention will be to wound, not kil1. Staff members who are fired upon by an offender may return fire, taking into account the safety of noncombatants who may be in the vicinity. Staff using deadly force will employ all possible caution when in the proximity of civilians, or when a fired shot may carry into an inhabited area. Only staff that are weapons-qualified may draw or be authorized to use firearms in the course of their duties. The facility Training Coordinator will ensure that qualifying standards for all weapons training are met for all certified staff at this facility.

(6)     Employees supervising offenders outside the institution's perimeter shall follow specific procedures for ensuring the security of the weapons. No firearm is to be left unattended or unsecured at any time or in any place accessible to the public or offenders, either directly or indirectly.

(7)     Firearms are not permitted inside the perimeter of this facility and this includes the gatehouse. Only the Incident Commander can authorize weapons inside the facility perimeter. This directive does apply to Law Enforcement officers/agents who visit NC Correctional Institution for Women in the capacity of official business. In the cases were these officers/agents must drive their vehicle inside the sally port area of Transportation, their weapons must be secured in the weapons locker located outside the entry gate of that area. If their vehicle does not have to enter the perimeter, they must secure their weapons in the trunk of their official vehicle prior to entering the perimeter of the facility.

(i)     **Follow Up**

    (1)     In order to ensure that offenders subject to use-of-force techniques are not unduly injured and/or to provide necessary treatment after inadvertent injuries, the following procedures will be put into effect.

        (A)     After force has been used on an offender, and particularly when chemical agents are used, the offender will be examined by a medical staff member and receive any necessary treatment as soon as possible, including the opportunity to shower.

        (B)     If Injuries were suffered, immediate medical attention will be provided.

        (C)     An offender will not be kept in restraints any longer than necessary to control the specific behavior involved.

        (D)     Staff injuries will be treated and a full report will be filed (Use of Force report) as soon as possible.  The Deputy Warden, Assistant Superintendent for Custody/ Operations and the Security Captain are the Reviewing Authorities to ensure all relevant policy and procedures are followed.  The Warden is the final Approving Authority that all policies and procedures are followed.

(j)     **Reporting Requirements**

    (1)     The Warden is immediately notified when any type of force is used, including an accidental weapon discharge.

    (2)     A written statement by the officer involved will be completed no later than the conclusion of that shift, and included in a written report that must be completed and reviewed by the facility Reviewing Authority and ultimately approved by the Warden.  The report will include the following:

        (A)     an accounting of the events leading to the use of force

        (B)     an accurate and precise description of the incident and reasons for employing force

        (C)     a description of the weapon or device used, .if any, and the manner in which it was used

        (D)     a description of the injuries suffered, if any, and the treatment given or received; reports of all injuries are a part of the offender's unit file and the employee's personnel record

        (E)     a list of all participants and witnesses to the incident

        (F)     a copy of all written statements compiled as a result of the incident

(k)      **Allegations Against Staff**

(1)      The Warden has directed the investigation of all allegations of improper use of force, and does notify the Female Command office when such allegations or suspicions are made.   In cases where possible criminal acts are involved, the appropriate law enforcement agency is notified.   Additionally, in order to safeguard against unwarranted accusations of excessive force videotaping of all anticipated use of force is authorized.


_____
Facility Head                                          Date

H.0300_02_01_19.doc