THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO. 5:21-CT-03270-D

| | |
|---|---|
| TRACEY EDWARDS, | ) |
| Plaintiff, | ) **RESPONSE TO PLAINTIFF'S** |
| | ) **SECOND MOTION** |
| v. | ) **FOR SANCTIONS** |
| | ) **[D.E. 134]** |
| EDDIE BUFFALOE, JR., et al., | ) |
| Defendants. | ) |

**NOW COME** Defendants, by and through undersigned counsel, Special Deputy Attorney General Laura McHenry and Special Deputy Attorney General Bettina J. Roberts, responding to Plaintiff's Second Motion for Sanctions. [D.E. 134] In short, Plaintiff's motion is an attempt to establish facts by asking this Court to instruct a jury to infer certain things, as opposed to Plaintiff having to actually prove these allegations to a jury at trial. Additionally, Plaintiff is trying to force a resolution of this matter by accumulating exorbitant attorneys' fees and asking for monetary sanctions, rather than having this case adjudicated on the merits. Defendants have complied with the Court's orders. Even assuming *arguendo* the Court finds that its orders were not complied with–which Defendants adamantly deny–any failure was not willful or in bad faith. Sanctions are inappropriate and Plaintiff's motion should be denied.

## LEGAL STANDARDS APPLICABLE TO PLAINTIFF'S MOTION

Rule 37(b) authorizes the district court to impose appropriate sanctions where a party fails to obey an order to provide or permit discovery. *See, e.g., Sines v. Kessler*, No. 3:17-cv-72, 2021 U.S. Dist. LEXIS 199110, *10 (W.D. Va. Oct. 15, 2021) (citing Fed. R. Civ. P. 37(b)(2)(A)). However, before the court can reach the question of appropriate sanctions, it must first make the

threshold determination under Rule 37(b) that a prior discovery order has been violated. *Id.* (citations omitted).

Only if that initial threshold is reached do the "gears of the rule's sanction machinery" begin to engage. *Id.* (quoting *R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991). And even then, any sanction issued must be (1) just; and (2) specifically related to the particular claim that was at issue in the order to provide discovery. *Id.* (citing *Ins. Corp. of Ir. V. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)). The courts' inherent power to sanction a litigant "must be exercised with restraint and discretion." *Franklin Livestock, Inc. V. Boehringer Ingelheim Vetmedica, Inc.,* 251 F. Supp. 3d 962, 967 (E.D.N.C. 2017) (quoting *Chambers v. NASCO, Inc.* 501 U.S. 32, 44-45 (1991)). The court must therefore be mindful of the policy favoring resolution of a case on the merits. *Id.* (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462-63 (4th Cir. 1993)).

If the court determines that a discovery abuse has occurred and sanctions are appropriate, the court must consider "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998). Additionally, the power to impose sanctions under Rule 37(b) is left to the trial court's discretion. It is not, however, a discretion without bounds or limits but one to be exercised discreetly and never "when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of [the non-complying party]." *Wilson v. Volkswagen of Am.*, 561 F.2d 494, 503 (4th Cir. 1977).

Finally, even where a district court is inclined to find that a party violated a discovery order,

2

it may defer a ruling on a motion for sanctions where the harm is "indeterminable before trial." *Nuvasive, Inc. v. Kormanis*, 2019 U.S. Dist. LEXIS 40195, *45-46 (M.D.N.C. 2019) (recommending that the court defer a ruling on the motion for sanctions until the trial). For example, an element of a claim that could be supported by discovery material that is the subject of a motion for sanctions may still be proven at trial using witness testimony or other evidence. Thus the harm to the moving party may not be determinable at the time the motion for sanctions is filed or heard. In that instance, a court may defer judgment until the trial. *Id.*

## ARGUMENT

Contrary to Plaintiff's accusations, Defendants have not abused the discovery process. Defendants conducted a reasonable investigation into Plaintiff's discovery requests, produced responsive documents and properly prepared 30(b)(6) designees. Defendants did not withhold, destroy or otherwise spoliate evidence. Moreover, Plaintiff's requested relief is disproportionate to the alleged noncompliance and unauthorized by governing case law. For example, while a trial court has discretion to *permit* a jury to draw the inference that destroyed evidence would have been unfavorable to the party that destroyed it, Defendants are aware of no case law where the trial court can *order* a jury to draw an adverse inference.

    **A.    Defendants Performed a Reasonable Search for and Produced all Documents Ordered by the Court.**

        **i.    Emails**

Plaintiff's allegations that responsive emails have not been produced are simply not true. Plaintiff requested a variety of electronic records, materials, and communications, including (as referenced in Plaintiff's motion, section IV.A.i.) communications regarding NCCIW's shackling and MOUD policies. In an effort to narrow search results of an enormous electronic database to facilitate retrieval of responsive, relevant documents, the parties discussed and agreed upon search

3

parameters. (See email thread, attached and incorporated herein as Exhibit A). Those agreed-upon search parameters included keyword searches, such as "polic*", "SOP", "procedure", and other variations and combinations of terms. Plaintiff's counsel collaborated with defense counsel in developing these keyword searches and explicitly agreed to these search parameters. Ex. A. The search parameters were then sent to the North Carolina Department of Information Technology for processing. All emails containing those search terms were routed to the office of undersigned counsel for review. Undersigned counsel produced all responsive emails from this search.

In the Local Rule 7(c)(2) Certification, Plaintiff's counsel admits that she "asked [undersigned counsel] to please ensure that the communications between NCCIW and the state regarding the MOUD program were produced **if they existed** . . ." (See [DE 135, p 14]) (emphasis added). From June 1 to June 13, counsel for the parties discussed and agreed to additional search terms, custodians, and media, to make sure that a search would capture all responsive documents in existence. *Id.* On June 16, Defendant provided responsive documents retrieved during the supplemental searches.

Defendants met their obligation under Rule 26(g) to conduct a reasonable and diligent search for relevant documents and produce documents responsive to discovery requests. *Compare Bans Pasta, LLC v. Mirko Franchising, LLC*, No. 7:13-cv-360, 2015 U.S. Dist. LEXIS 197029, *7-9 (W.D. Va Feb. 6, 2015) (finding defendant had not met obligation to conduct a reasonable search where it tasked an employee to search defendant's computer system and could not provide any details regarding the search methodology, the search terms used, and whether there was any oversight or quality control in place).

Plaintiff's claims that Defendants have failed to conduct a reasonable search for responsive documents is simply not accurate. Sanctions are not appropriate, and this Court should not

4

entertain Plaintiff's request to strike Defendant's good faith affirmative defense or provide adverse inference jury instructions.

### ii. Policies

Plaintiff's allegation that all relevant policies have not been produced is also incorrect. Plaintiff's initial discovery requests sought all versions of responsive policies. While this request was arguably overbroad, Defendants provided the relevant policies and Standard Operating Procedures listed in Exhibit B, along with the corresponding page numbers.

On April 28, 2023, Plaintiff sent a list of ten responsive policies she asserts had not been produced: D.1800, D.3700, H.0300, K.0100, S.0100, TX I-16, A.0800, A.1400, A.1500, and B.0300. [See DE 135, p 5, DE 135-2, pp 2-4]. She also requested that Defendants supplement their earlier production with any additional versions of policies that had not yet been produced. Since February 14, 2023, Defendants have produced the following policies:

| Policy Requested | Title | Versions Provided (listed by effective date) |
|---|---|---|
| D.1800 | Offender Restraints | • December 10, 2015<br>• June 20, 2018<br>• March 16, 2021<br>• April 28, 2021<br>• September 22, 2021 |
| D.3700 | Offender Transportation | • June 18, 2018<br>• February 1, 2019<br>• May 11, 2021 |
| H.0300 | Use of Force and Restraints | • December 10, 2015<br>• July 19, 2018<br>• March 16, 2021 |
| K.0100[1] | Employee Training | • May 22, 2018<br>• January 7, 2021 |

---

[1] Upon receiving Plaintiff's counsel's April 28, 2023, request, undersigned counsel contacted Plaintiff's counsel to inform her that policy K.0100 is titled Sodium Hypochlorite Solution, and asked if that is the policy Plaintiff was seeking. [DE 135, Ex. A] Plaintiff's counsel indicated she meant to request the policy entitled, Employee Training. *Id.* Defendants provided both versions of the requested policy.

| E.0200[2] | Health Care Policy | • August 1, 2017 |
|---|---|---|
| TX I-16 | Alcoholism and Chemical Dependency Programs | • Attached hereto as Exhibit C[3] |
| A.0800 | Logs and Record Keeping | • December 10, 2015<br>• May 16, 2018<br>• February 14, 2022 |
| A.1400 | Organizational Chart | • December 10, 2015<br>• May 16, 2018<br>• February 14, 2022 |
| A.1500 | Policy Review | • December 10, 2015<br>• May 6, 2018 |
| B.0300 | General Training and Standards | • February 1, 2019 |

Yet in her second motion for sanctions, Plaintiff asserts that Defendants have still not produced all versions of responsive policies.

However, during the April 28, 2023, conference between counsel, Plaintiff's counsel noted, "Since I don't know how often the policies are updated, I can't say whether we have all responsive versions of the [sic] all the policies that we do have." [DE 135, p 14] Then on June 1, 2023, counsel again suggested that "there may be other versions of policies that may not have been produced." *Id.* In her memorandum, Plaintiff characterizes these comments as "reminders," but they also involve conjecture that additional responsive documents <u>might</u> exist. This accusation that there "may" be additional responsive documents, while conceding she has no support for that accusation, is not sufficient to justify an award of sanctions. This Court should deny Plaintiff's motion.

### iii. Training Documents

---

[2] There is no policy S.0100. However, in an email dated December 6, 2022, Plaintiff's counsel clarified that she was seeking "S.0100 (Health Care Policy)." Undersigned counsel understood that Plaintiff's counsel intended to request policy E.0200, titled "Health Care Policy," and produced the requested policy.

[3] In preparing this response, undersigned counsel realized that policy TX I-16 was not included in an earlier production. Policy TX I-16 is attached hereto as <u>Exhibit C</u>.

6

At the outset, Defendants acknowledge that they inadvertently produced the current training materials related to treatment of offenders who are pregnant, post-partum, or have OUD, rather than the training materials from May 14, 2019, to June 4, 2021, as Plaintiff requested. Defendants discovered this error upon review of Plaintiff's second motion for sanctions and Defendants' earlier productions. Defendants now cure that deficiency by producing the relevant versions of the requested training material, attached as Exhibit D.

Second, Plaintiff alleges that Defendants should have produced shift narratives from November 2019 as a way to provide training details. Defendants do not contest that select shift narratives were responsive to some of Plaintiff's discovery requests; those shift narratives were produced. *See* Bates Stamp #108-123. However, it is not clear that all shift narratives from the requested time period would even contain the training notations that Plaintiff seeks. Furthermore, document retrieval for all shift narratives from the requested time period would be voluminous, as shift narratives are drafted twice a day for each unit and each shift, and each shift narrative is multiple pages long. Given that this voluminous production would likely not produce responsive material, the request is disproportionate to the needs of the case. Plaintiff's assertion that Defendants failed to search the November 2019 shift narratives does not warrant the requested jury instruction.

In the event the court determines Defendants' production of shift narratives was deficient, Defendants request the opportunity to cure, with the caveat that the requested production is likely to be minimal given the unlikely scenario that the shift narratives contain any training notations.

Finally, Plaintiff contends that Defendant failed to produce documents referenced by Dr. Amos during his deposition related to MOUD trainings given to nurses. The testimony to which Plaintiff refers is found on page 119 of Dr. Amos' first 30(b)(6) deposition, which reads,

> A. …there is constant training of how COWS[4] is scored. So it's not just providers who do the scale.
> Q. And when you say there's training, who is providing that training?
> A. Our trainer. Every institution has a nurse trainer.
> Q. And does the institution keep records of that training?
> A. Of who was trained, yes.

(Transcript of 30(b)6 Deposition of Elton Amos, M.D., January 6, 2023, attached and incorporated herein as <u>Exhibit E</u>, p. 119) Contrary to Plaintiff's assertion that this testimony shows Defendants failed to produce training materials, Dr. Amos's testimony clearly indicates that there are records of "who was trained" on how to score opioid withdrawal scores–not that there are additional training materials that had not previously been produced. These records do not speak to "Defendants' knowledge of the harm and the need to train employees to conform with state policy and constitutional obligations." [DE 135, p 7] Nor does this allegation of discovery abuse warrant a jury instruction that Defendants failed to provide required training regarding MOUD and restraints during the third trimester of pregnancy, labor, delivery, and postpartum recuperation. Plaintiff's motion should be denied.

### iv. MOUD Documents

Defendants have produced all responsive documents related to NCCIW's MOUD Program. Plaintiff alleges that meeting minutes related to MOUD were not produced, and asks the Court to provide an adverse inference instruction to the jury. This allegation is untrue, and Plaintiff's request of the Court is an overreach.

Dr. Alexander testified in his first deposition that he provided all meeting minutes to which he had access to counsel. (Transcript of Deposition of Dr. James Alexander, April 14, 2023, attached and incorporated herein as <u>Exhibit F</u>, p. 29). Those documents were produced to Plaintiff.

---

[4] "COWS" refers to Clinical Opiate Withdrawal Scale.

Dr. Amos testified that no minutes are taken at the periodic meetings with medical providers (Ex. E, pp. 59-60). He further testified that NCCIW "really didn't do minutes." (*Id*. at p. 149). Dr. Amos goes on to say that all relevant MAT documents were contained in either the medical records ("HERO") or in emails. (*Id*. at p. 182). Lastly, Dr. Amos testified in his second deposition that he "looked for meeting program minutes and anything related to our MAT relationship from our documents and found none." He explained, when discussing the MOUD pilot program, that it is not a NCCIW program, but rather operated by NCDAC. (Transcript of 30(b)6 deposition of Elton Amos, M.D., June 23, 2023, attached and incorporated herein as Exhibit G, pp. 34-35)

As previously stated, all emails were searched by NCDIT in accordance with the agreed upon search terms. Dr. Amos, therefore, had no need to personally ask NCDIT how to access his emails prior to July 2020. Dr. Amos' own search of his inbox may be limited to documents as far back as July 2020, as he testified, but that does not mean that the NCDIT search did not retrieve, or that Defendants did not produce, responsive emails prior to that date. Plaintiff's attempts to use testimony out of context to contradict Defendants' productions is either misguided or disingenuous.

Plaintiff also alleges that meeting minutes are stored on Defendant Witherspoon's work computer. Defendant Witherspoon testified that in some meetings, no notes were taken. In the meetings where minutes were recorded or personal notes were written down, those were later typed and disseminated via email. (Transcript of Deposition of Benita Witherspoon, April 19, 2023, attached and incorporated herein as Exhibit H, pp. 60-61, 67-70, 120-21) Therefore, if there were meeting minutes responsive to Plaintiff's discovery requests, those would have been turned over with the results of the comprehensive email search by NCDIT.

For the above reasons, Plaintiff's requested sanction, an adverse inference instruction, is

9

inappropriate and would be unjust.

### B. Defendants Did Not Spoliate Evidence.

The Fourth Circuit has defined spoliation as "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. GMC,* 271 F.3d 583, 590 (4th Cir. 2001). The court may impose sanctions for spoliation when it finds some degree of fault, and the court has broad discretion in choosing an appropriate sanction. *Id.* Permissible sanctions for spoliation include an instruction to the jury allowing it to infer that the destroyed evidence would have been unfavorable to the party that destroyed it. *See Buckley v. Mukasey,* 538 F.3d 306, 322-23 (4th Cir. 2008); *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir. 1995).

The Fourth Circuit has explained that for such an instruction to be given there must be a showing "'that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'" *Buckley,* 538 F.3d at 323 (quoting *Vodusek,* 71 F.3d at 156). This is a burden Plaintiff cannot meet.

First, Plaintiff is asking for an adverse inference instruction based on a mere assumption that relevant evidence was destroyed. For example, Plaintiff's assertion that information and documents are only retained in the CTS database for two (2) years is a mischaracterization of May's testimony. In fact, Mr. May's testified that he was not sure how long documents are stored in CTS (Transcript of Deposition of David May, June 21, 2023, attached and incorporated herein as <u>Exhibit I</u>, pp. 117-118)

What's more, this request is also based on Plaintiff's conjecture about what these documents *could have* contained. For example, Plaintiff asserts that Ms. Witherspoon's meeting notes were not properly preserved, and speculates that these unproduced, responsive materials

"could also include directives from the state regarding the use of shackling policies," or "could have demonstrated Ms. Witherspoon's state of mind, including her awareness of the harm of relevant shackling and MOUD policies and her knowledge that the practices were continuing." Sanctions, particularly of the severity requested here, cannot be based on hypothesizing and suspicion. *See, e.g., Wimbush v. Matera*, No. SAG-11-1916, 2014 U.S. Dist. LEXIS 173922, *32 (D.Md. Dec. 17, 2014) ("A successful claim for spoliation of evidence cannot be premised on mere speculation on the existence of such evidence.").

Additionally, Rule 37(e) recognizes that "reasonable steps" must be taken to preserve electronically stored information; it does not call for perfection. In fact, the committee notes related to this particular subsection of Rule 37 state that "due to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible." (*Id*.) To hold Defendants to this impossible standard, and then, without any evidence of intent or willful conduct by Defendants, "order the jury to infer" that the hypothetical documents would have shown that the State was knowingly violating state law and Plaintiff's constitutional rights would surely be unjust.

### C. Defendants Properly Prepared for the 30(b)6 Depositions.

Defendants have complied with the Court's order to retake the 30(b)(6) depositions, which will include payment of Plaintiff's attorneys' fees and costs associated with reopening the depositions. Yet Plaintiff alleges that Defendants still have failed to satisfy their duty to properly prepare the 30(b)(6) designees.

Each designee was properly prepared to answer questions related to the specific topics of which the designee was required to have knowledge. "Although Rule 30(b)(6) requires that [a]

11

Case 5:21-ct-03270-D    Document 158    Filed 08/15/23    Page 11 of 15

designee possess knowledge about the noticed topics, '[a]bsolute perfection is not required." *Id.* (quoting *Walls v. Ford Motor Co.,* No. 1:20cv98, 2021 U.S. Dist. LEXIS 82757, at *6 (M.D.N.C. Apr. 30, 2021)). The fact that a designee could not answer every question on a certain topic does not necessarily mean the corporation failed to comply with its obligation. *Id.* Indeed, an inability to fully testify on all the topics set forth in Plaintiff's 30(b)(6) deposition is not tantamount to a complete failure to appear, nor does it indicate that NCDPS or NCCIW acted willfully or in bad faith to obstruct discovery. *See United States v. Massachusetts Indus. Fin. Agency*, 162 F.R.D. 410, 1995 U.S. Dist. LEXIS 18549 (D. Mass. 1995) (denying motion to bar defendant from presenting evidence related to unanswered 30(b)(6) questions).

For example, Plaintiff asserts that there was no one designated to discuss the medical aspects of topic number seven. Admittedly, when asked whether he was designated to testify on topic number seven, Dr. Amos responded that the word "designated" was not an accurate term. However, he went on to clarify that he was prepared to testify regarding NCCIW's practices and procedures regarding updating its internal policies. (Ex. E, pp. 24-25) In an email regarding 30(b)(6) designations, dated November 29, 2022, and attached as Ex. J, undersigned counsel informed Plaintiff's counsel that "the best person to discuss mental health treatment/policies/etc. would be the psychiatric director, Dr. Brian Sheitman." Thus, Plaintiff was on notice that Dr. Sheitman, not Dr. Amos, was designated to respond to any mental health aspects of the deposition topics.[5]

As another example, Plaintiff alleges that Dr. Amos did not speak to anyone else to prepare for his portion of the 30(b)(6) deposition. Dr. Amos, in his role as Medical Director, is personally

---

[5] The relevance of Plaintiff's assertion that Dr. Sheitman could not testify regarding discovery materials [DE 135, p 10] is unclear to Defendants. Regardless, Defendants properly prepared Dr. Amos, Dr. Sheitman, and its other 30(b)(6) designees.

involved in all aspects of clinical medical care at NCCIW. He would have knowledge of the medical aspects of the topics to which he was designated, without having to speak with anyone else. Additionally, Dr. Amos testified that he would have liked to speak with the former Medical Director, but she is deceased.

Plaintiff further alleges that Dr. Amos did not review any communications other than his own emails after sometime in 2020. This is false. Dr. Amos testified that he reviewed copies of the materials that were produced, including email communications, (Ex. E, pp. 21-22) reviewed any history he could find, and searched his office for evidence of MOUD documentation prior to his arrival. He further stated he put in more than 20 hours in preparation for his deposition. Similarly, Deputy Warden May testified that he reviewed policy, medical records, discovery responses, emails, personnel files, and training materials, in addition to speaking with staff. (Ex. I, pp. 10-11)

There is no set criteria for how many individuals the designee must consult, how many hours the designee spends interviewing employees, or how many documents the designee reviews in advance of the deposition. Proper preparation of a 30(b)(6) designee may look different in each case, and even for each designee within the same case. Plaintiff's complaints that multiple witnesses were designated to cover the numerous deposition topics, or that a designee only spoke with others for "five minutes at a time" in preparation for a 30(b)(6) deposition are not grounds for sanctions. *See, e.g., M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, 2022 U.S. Dist. LEXIS 50418, *12-14 (E.D.N.C. 2022) (denying motion to sanction litigant for not producing a prepared Rule 30(b)(6) designee). For the above reasons, Plaintiff's request for sanctions is inappropriate and the motion should be denied.

## CONCLUSION

In light of the above arguments set forth, none of the sanctions requested by Plaintiff are appropriate. Defendants respectfully request that Plaintiff's Second Motion for Sanctions be denied.

This the 15th day of August, 2023.

**JOSHUA H. STEIN**
**Attorney General**

/s/ Laura McHenry
Laura McHenry
Special Deputy Attorney General
N.C. State Bar No. 45005
N.C. Department of Justice
Special Litigation Section
P. O. Box 629
Raleigh, North Carolina 27699-9001
Telephone: (919) 716-6900
Facsimile: (919) 716-6761
E-Mail: lmchenry@ncdoj.gov

/s/ Bettina J. Roberts
Bettina J. Roberts
Special Deputy Attorney General
N.C. State Bar No. 43356
N.C. Department of Justice
Public Safety Section
P. O. Box 629
Raleigh, North Carolina 27699-9001
Telephone: (919) 716-6540
Facsimile: (919) 716-6761
E-Mail: bjroberts@ncdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I electronically filed this **RESPONSE TO PLAINTIFF'S SECOND MOTION FOR SANCTIONS [D.E. 134]** with the Clerk of the Court using the CM/ECF system, which will provide an electronic copy to:

Erika K. Wilson
UNC School of Law Clinical Programs
102 Ridge Road;
Chapel Hill, NC 27524
Email: wilsonek@email.unc.edu

Lauren A. Kuhlik
Tycko & Zavareei LLP
1828 L. Street NW; Suite 1000
Washington, DC 20036
Email: lkuhlik@tzlegal.com

April N. Ross
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
Email: aross@crowell.com

Elizabeth Guild Simpson
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
919-682-1149
Email: elizabeth@emancipatenc.org

D. Dangaran
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, DC 20001
202-540-0029
Email: d@rightsbehindbars.org

This the 15th day of August, 2023.

/s/ Bettina J. Roberts
Bettina J. Roberts
Special Deputy Attorney General