THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3270-D

| | |
|---|---|
| Tracey Edwards,<br><br>Plaintiff<br><br>v.<br><br>Todd Ishee, Benita Witherspoon, Anthony Perry, James Alexander, Gary Junker, Elton Amos, Kavona Gill, Tamara Brown, Nikita Dixon, Tammy Williams, Shelda Brodie, Tianna Lynch, and Lorafaith Ragano,<br><br>Defendants | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## Definitions

| Medical Terminology | |
|---|---|
| **Opioid Use Disorder ("OUD")** | Opioid Use Disorder is a chronic medical condition characterized by addiction to opiates. |
| **Medication for Opioid Use Disorder ("MOUD") and Medication Assisted Treatment ("MAT")** | Medication for Opioid Use Disorder (MOUD) and Medication Assisted Treatment (MAT) are both terms that refer to the use of FDA-approved medications for individuals who are addicted to opiates. SUMF ¶ 149 |
| **Buprenorphine** | A medication approved by the FDA as MOUD. SUMF ¶¶ 149-150. |
| **Suboxone/Subutex** | Forms of buprenorphine. SUMF ¶ 151. |
| **Postpartum Mood Disorders** | Depression and anxiety resulting from or occurring postpartum. Also known as "postpartum depression" and "postpartum anxiety". |
| **Zoloft** | Also known as "sertraline", Zoloft is a medication prescribed to treat anxiety and depression. SUMF ¶ 251. |
| **Vistaril** | Also known as "hydroxyzine", Vistaril is a medication prescribed to treat anxiety. SUMF ¶¶ 252-53. |
| **Epidural** | An epidural is a medication that is injected into the spine to help with labor pain during childbirth. SUMF ¶ 13. |
| **Induction of Labor** | The process by which labor is medically, rather than naturally, started. |
| **Cesarean section ("C-section")** | Surgical removal of newborn during childbirth. |
| **Prison and NCCIW-related Terminology** | |
| **Standard Operating Procedures ("SOPs")** | Policy documents issued by NCCIW and are intended "to provide staff assigned to the facility with direction in the use of specific techniques as it relates to the job duty." SUMF ¶ 23 (quoting Ex. F, Witherspoon Dep. 49:25-50:4). |
| **Post Orders** | Orders specific to a specific "post" or location at the facility where the officer is stationed. SUMF ¶ 19. |
| **The Count** | The Count is a prison custodial procedure where offenders are physically counted at least three times per day. A late count occurs when there is a problem with the Count, and offenders are not allowed to attend appointments until the Count is complete. SUMF ¶ 249 |
| **"x-waiver"** | A Drug and Enforcement Administration certification that permits the health care provider to prescribe buprenorphine. SUMF ¶ 189. |
| **Shackling** | Shackling is defined as "using any physical restraint or mechanical device to control the movement of a prisoner's body or limbs, including handcuffs, leg irons, and belly chains." Ex. B, Stuebe Report at 3. |
| **"black box"** | A form of shackling to a stationary box that restricts hand movement. SUMF ¶ 57. |

# TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II. FACTUAL BACKGROUND..........................................................................................9

    A.    NCCIW's shackling practice violated the law and the standard of care ....................9

    B.    NCCIW's Shackling of Plaintiff..................................................................... 12

    C.    NCCIW's Denial of Medication for Opioid Use Disorder (MOUD)........................ 14

    D.    NCCIW's Denial of Mental Health Treatment................................................... 16

III. LEGAL STANDARDS ................................................................................................ 18

    A.    Summary Judgment Standard...................................................................... 18

    B.    Eighth Amendment Standard....................................................................... 19

    C.    Americans with Disabilities Act and Rehabilitation Act Standard............................ 20

IV. ARGUMENT ............................................................................................................. 22

    A.    Ms. Edwards is entitled to summary judgment against Defendant Witherspoon on her Eighth Amendment shackling claim............................................ 22

        i.    It is undisputed that Ms. Edwards was shackled during pregnancy and postpartum. ................................................................................ 23

        ii.    Ms. Edwards is entitled to summary judgment on her Eighth Amendment claim against Defendant Witherspoon for shackling her during pregnancy, labor, and postpartum. ...................................... 24

            1.    Ms. Edwards is entitled to summary judgment on the objective prong of "deliberate indifference" for her shackling claim. ........................................................................................ 25

            2.    Ms. Edwards is entitled to summary judgment on the first part of the subjective prong of deliberate indifference because Defendant Witherspoon was aware of the risks of shackling. ......................................................................... 28

            3.    Plaintiff is entitled to summary judgment on the second part of the subjective deliberate indifference prong because Defendant Witherspoon disregarded the risks of shackling by failing to take reasonable steps to prevent it................................ 30

    B.    Plaintiff is entitled to summary judgment against Defendant Amos on her claim regarding denial of MOUD postpartum. ................................................... 33

        i.    It is undisputed that Plaintiff was denied buprenorphine for non-medical reasons postpartum. ...................................................... 33

        ii.    Plaintiff is entitled to summary judgment on her Eighth Amendment claim against Elton Amos for denial of buprenorphine. ................................. 34

            1.    Opioid Use Disorder is a serious medical need. .................................. 35

            2.    ██████████████████████████████████ .................. 38

                a.    ███████████████████████ . ................. 39

b.      Defendant Amos is liable for implementing an inadequate withdrawal policy. ...................................... 41

C.      Ms. Edwards is entitled to summary judgment on the objective prong of her Eighth Amendment psychiatric medication claim. .................................. 44

i.      It is undisputed that NCCIW did not provide Ms. Edwards postpartum psychiatric care. ................................................. 45

ii.     Ms. Edwards' postpartum psychiatric care was a serious medical need. ............................................................. 45

D.      Plaintiff is entitled to summary judgment against Defendant Ishee on her Americans with Disabilities Act and Rehabilitation Act Claims ............................ 47

i.      Ms. Edwards has disabilities as defined by the ADA. ................................. 47

ii.     Ms. Edwards is an otherwise qualified person as defined by the ADA ................................................................. 48

iii.    Ms. Edwards was denied access to programs, services, or activities by reason of her disability due to NCCIW's blanket ban on MOUD and failure to provide reasonable accommodations. .......................... 48

iv.     Defendants were deliberately indifferent to the substantial likelihood that Ms. Edwards' rights under the ADA and RA would be violated. ........ 51

1.      Defendants knew that harm to a federally protected right was substantially likely. .......................................... 52

2.      Defendants failed to act on their knowledge. .................................. 53

V.   CONCLUSION .................................................................................................. 54

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cnty., MD*,
515 F.3d 356 (4th Cir. 2008) ...................................................................................48

*Abraham v. McDonald*,
493 Fed. App'x. 465 (4th Cir. 2012) .......................................................................43

*Alvarado v. Westchester County*,
22 F. Supp. 3d 208 (S.D.N.Y. 2014).......................................................................38

*Baird ex rel. Baird v. Rose*,
192 F.3d 462 (4th Cir. 1999) .............................................................................47, 48

*Belfield v. Bowmen*,
No. 5:19-ct-3310-FL, 2021 WL 4476625 (E.D.N.C. Sept. 29, 2021) ...................8, 46

*Bone v. Univ. of N. Carolina Health Care Sys.*,
No. 1:18-cv-994, 2023 WL 4144277 (M.D.N.C. June 22, 2023)............................50

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2003) ...................................................................................33

*Brawley v. Washington*,
712 F. Supp. 2d 1208 (W.D. Wash. 2010)....................................................3, 20, 23

*Brawner v. Scott Cnty., Tennessee*,
14 F.4th 585 (6th Cir. 2021) ....................................................................................38

*Brown v. Dep't of Pub. Safety & Corr. Servs.*,
383 F. Supp. 3d 519 (D. Md. 2019).....................................................................48, 51

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................................18

*Charette v. Wexford Health Sources, Inc.*,
No. 19-cv-33, 2023 WL 5876682 (D. Md. Sept. 11, 2023).....................................42

*De'Lonta v. Angelone*,
330 F.3d 630 (4th Cir. 2003) ...................................................................................19

*De'lonta v. Johnson*,
708 F.3d 520 (4th Cir. 2013) ...................................................................................20

*Duvall v. County of Kitsap*,
260 F.3d 1124 (9th Cir. 2001) .................................................................................52

*Est. of LeRoux v. Montgomery Cnty., Maryland*,
No. 8:22-CV-00856-AAQ, 2023 WL 2571518 (D. Md. Mar. 20, 2023) ................53

*Estelle v. Gamble*,
429 U.S. 97 (1976).........................................................................................*passim*

*Farmer v. Brennan*,
511 U.S. 825 (1994)......................................................................................*passim*

*Glaser v. Smith*,
No. 4:22-cv-1019, 2023 WL 4052470 (N.D. Ohio, June 16, 2023) ....................8, 46

*Gordon v. Schilling*,
937 F.3d 348 (4th Cir. 2019) ........................................................................*passim*

*Helling v. McKinney*,
509 U.S. 25 (1993)..................................................................20, 24, 25, 37

*Hope v. Pelzer*,
536 U.S. 730 (2002)............................................................................4

*Iko v. Shreve*,
535 F.3d 225 (4th Cir. 2008) ...............................................19, 34, 45

*Innes v. Bd. of Regents of Univ. Sys. of Maryland*,
29 F. Supp. 3d 566 (D. Md. 2014)......................................................52

*Jackson v. Blain*,
No. 20-cv-01932 SVW-KS, 2022 WL 9538172 (C.D. Cal. July 29, 2022) ....................43

*Jackson v. Lightsey*,
775 F.3d 170 (4th Cir. 2014) .....................................6, 34, 38, 40

*Jamison v. Clarke*,
No. 7:18-CV-00504, 2021 WL 969201 (W.D. Va. Mar. 15, 2021) ........................43

*Kovari v. Brevard Extraditions, LLC*,
461 F. Supp. 3d 353 (W.D. Va. 2020) ...............................................42

*Lacy v. Cook County*,
897 F.3d 847 (7th Cir. 2018) ............................................................52

*Lewis v. N. Carolina Dep't of Pub. Safety*,
No. 1:15-cv-284-FDW, 2018 WL 310142 (W.D.N.C. Jan. 4, 2018) .....................39

*Libertarian Party of Virginia v. Judd*,
718 F.3d 308 (4th Cir. 2013) ...........................................................18

*M.C. v. Jefferson Cnty., New York*,
No. 6:22-CV-190, 2022 WL 1541462 (N.D.N.Y. May 16, 2022) ........................50

*Makdessi v. Fields*,
789 F.3d 126 (4th Cir. 2015) ...........................................................30

*Mathis v. Georgia State Prison*,
No. 6:15-cv-122, 2016 WL 183753 (S.D. Ga., Jan. 14, 2016) ...........................8, 46

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...........................................................................18

*Mays v. Sprinkle*,
992 F.3d 295 (4th Cir. 2021) ...........................................................19

*Mendiola-Martinez v. Arpaio*,
836 F.3d 1239 (9th Cir. 2016) ......................................................3, 23

*Miller v. Rauner*,
No. 17-cv-859, 2017 WL 4284568 (S.D. Il., Sept. 27, 2017)............................8, 46

*Mitchell v. Data Gen. Corp.*,
12 F.3d 1310 (4th Cir. 1993) ...........................................................19

*Nat'l Fed'n of the Blind v. Lamone*,
813 F.3d 494 (4th Cir. 2016) ......................................................20, 21

*Nelson v. Corr. Med. Servs.*,
583 F.3d 522 (8th Cir. 2009) .................................................*passim*

*Olmstead v. L.C.*,
    *527 U.S. 581 (1999)* ................................................................49

*P.G. v. Jefferson Cnty., New York*,
    2021 WL 4059409 ................................................................50

*P.G. v. Jefferson Cnty., New York*,
    No. 5:21-cv-388, 2021 WL 4059409 (N.D.N.Y. Sept. 7, 2021)................38

*Paine ex re. Eilman v. Johnson*,
    No. 06-cv-3173, 2010 WL 785397 (N.D. Ill. Feb. 26, 2010) ................51

*Pandazides v. Virginia Bd. of Educ.*,
    13 F.3d 823 (4th Cir. 1994) ................................................21, 51

*Parrish ex rel. Lee v. Cleveland*,
    372 F.3d 294 (4th Cir. 2004) ................................................28

*Paulone v. City of Frederick*,
    787 F. Supp. 2d 360 (D. Md. 2011) ................................................52

*Pennsylvania Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998)................................................21, 48

*Pesce v. Coppinger*,
    355 F. Supp. 3d 35 (D. Mass. 2018) ................................................38, 49

*Pfaller v. Amonette*,
    55 F.4th 436 (4th Cir. 2022) ................................................19, 38

*Pierce v. District of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) ................................................21

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ................................................44

*Proctor v. Prince George's Hosp. Ctr.*,
    32 F. Supp. 2d 820 (D. Md. 1998) ................................................52

*Raynor v. Pugh*,
    817 F.3d 123 (4th Cir. 2016) ................................................25

*Rhodes v. Chapman*,
    452 U.S. 337 (1981) ................................................25

*Rosen v. Montgomery County*,
    121 F.3d 154 (4th Cir. 1997) ................................................21

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*,
    729 F.3d 248 (3d Cir. 2013)................................................52

*Scinto v. Stansberry*,
    841 F.3d 219 (4th Cir. 2016) ................................................19, 28, 35, 45

*Scott v. Clarke*,
    64 F. Supp. 3d 813 (W.D. Va. 2014) ................................................37

*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*,
    673 F.3d 333 (4th Cir. 2012) ................................................2, 20

*Smith v. Aroostook Cnty*,
    376 F. Supp. 3d 146 (D. Me.) ................................................*passim*

*Smith v. N.C. Dep't of Safety*,
   2019 WL 3798457 (M.D.N.C. Aug. 13, 2019) ................................................. 51

*Thompson v. Commonwealth of Virginia*,
   878 F.3d 89 (4th Cir. 2017) ........................................................................... 25

*Thompson v. Potomac Elec. Power Co.*,
   312 F.3d 645 (4th Cir. 2002) ......................................................................... 18

*Torcasio v. Murray*,
   57 F.3d 1340 (4th Cir. 1995) ................................................................... 21, 51

*Villegas v. Metro. Gov't of Nashville*,
   709 F.3d 563 (6th Cir. 2013) ............................................................... 3, 22, 25

*Williams v. Griffin*,
   952 F.2d 820 (4th Cir. 1991) ......................................................................... 43

*Wilson v. Seiter*,
   501 U.S. 294 (1991) ....................................................................................... 19

*Women Prisoners of D.C. Dept. of Corrs. v. District of Columbia*,
   877 F. Supp. 634 (D.D.C. 1994) ............................................................ 3, 4, 23

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* .................................. *passim*

N.C. Gen. Stat. Ann. § 153A-229.2 .......................................................................... 27

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ...................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................... 24, 54

**Regulations**

28 C.F.R. § 35.108 ................................................................................................... 54

28 C.F.R. Pt. 35 ...................................................................................................... 55

29 C.F.R. § 1630.2(g) ............................................................................................. 54

**Other Authorities**

*Anti-Shackling Laws*, Advocacy and Research on Reproductive Wellness of
   Incarcerated People ............................................................................... 10, 33

*Claire E. Scavone, Battleground of the Opioid Crisis: The Eighth Amendment Right to
   Medication-Assisted Treatment in Prisons and Jails, and Upon Release, 71 Emory L.J. 1273,
   1281 (2022)* ........................................................................................... 20, 50

## I.    INTRODUCTION

On December 20, 2019, Plaintiff Tracey Edwards gave birth to her second daughter. Plaintiff's Statement of Undisputed Material Facts ("SUMF") 12. This time should have been one of the happiest in her life, but instead, Defendants' actions left her physically and emotionally traumatized. SUMF 17. They shackled her during her pregnancy, labor, and postpartum recuperation, causing her pain and terror and interfering with the brief time she had to bond with her newborn daughter. SUMF 45-68. When they brought her back to the prison from the hospital, they compounded her agony by denying prescribed medication for her Opioid Use Disorder ██████████████████████████████████████████████████████ ████████████████████████████████████████████████. SUMF 149-75. And just two weeks postpartum, Defendants allowed her prescribed medication for postpartum depression and anxiety to expire without renewal, despite knowing about her mental health disabilities. SUMF 245-78. Each one of these decisions violated basic human dignity and demonstrated Defendants' deliberate indifference in the face of known risks. But when taken together, these actions amount to torture. Even today, years after the fact, she is reminded of her experience frequently, and she fears that she may not recover. SUMF 17.

Ms. Edwards is moving for summary judgment on her claims under the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. The Eighth Amendment prohibits cruel and unusual punishment. In order to succeed on her claims against Defendants Benita Witherspoon and Elton Amos in their personal capacity, Ms. Edwards has to show that they each acted with deliberate indifferent to her serious medical needs and/or to a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Here, she can show that Defendant

Witherspoon, as the Warden of the North Carolina Correctional Institution for Women ("NCCIW") displayed deliberate indifference to the substantial risk of physical and emotional harm that shackling posed to her by instituting a policy to require shackling during pregnancy, labor, and postpartum recuperation that violated state law and a consensus of courts and legislatures across the country. Similarly, she can show that Defendant Amos acted with deliberate indifference when, as Medical Director of NCCIW, ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████. *See Gordon v. Schilling*, 937 F.3d 348, 358 (4th Cir. 2019). Ms. Edwards can also show that her psychiatric disabilities were serious medical needs, as required to establish the objective component of her Eighth Amendment claim regarding denial of psychiatric care postpartum.

Title II of the Americans with Disabilities Act and Rehabilitation Act requires Ms. Edwards to show that she is an otherwise qualified person with a disability who was denied access to or the benefits of state programs or services due to her disability, and/or that she was denied reasonable accommodations that would have allowed her to participate in those programs and services. *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 (4th Cir. 2012). Here, Defendants denied her access to their medical services by instituting a blanket ban on buprenorphine and by refusing to allow her to take buprenorphine as a reasonable accommodation to allow her access to NCCIW's medical services. SUMF 172-73, 177. They also discriminated on the basis of her psychiatric disabilities by denying her a refill of prescribed medication solely because her medical condition was a psychiatric disability.

As will be laid out in detail *infra*, Ms. Edwards has iron-clad evidence in the form of under-oath testimony, verified discovery responses, and documentary proof in support of each of her factual allegations. This proof is irrefutable. Defendants have not served a single discovery request. They have not taken a single deposition. They can present no dispute to the facts in this case, and they will have no defense at trial.

Over a year before Ms. Edwards gave birth, the state of North Carolina implemented a policy to prohibit the use of shackles during transport to the hospital to give birth, all stages of labor, and the first six weeks of postpartum recuperation. SUMF 72-78. They did so in order to bring North Carolina's practices in line with the rest of the country—as Attorney General Josh Stein has stated, the use of shackling in these circumstances put "women and their unborn children in grave danger."[1] Courts and legislatures across the country agree that the use of shackling during pregnancy, labor, and postpartum recuperation is cruel, unusual, and unnecessary, and thus a violation of the Eighth Amendment's prohibition on cruel and unusual punishment. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1251, 1257 (9th Cir. 2016); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 533 (8th Cir. 2009); *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1221 (W.D. Wash. 2010); *Women Prisoners of D.C. Dept. of Corrs. v. District of Columbia*, 877 F. Supp. 634, 668 (D.D.C. 1994) (abrogated in part on other grounds). *Cf. Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 574 (6th Cir. 2013). *See also See Anti-Shackling Laws*, ADVOCACY AND RESEARCH ON REPRODUCTIVE WELLNESS OF INCARCERATED PEOPLE, https://arrwip.org/anti-shackling-laws/ (showing the number of states that have passed anti-shackling legislation).

---

[1] *See* Press Release, Attorney General Josh Stein, Attorney General Josh Stein Honors Five Eastern North Carolina Residents with Dogwood Awards (Nov. 23, 2021), https://ncdoj.gov/attorney-general-josh-stein-honors-five-eastern-north-carolina-residents-with/.

Given the changes the body goes through during pregnancy, shackling can be painful and both cause falls and prevent the person from breaking them, leading to terror and even miscarriage. SUMF 108-114, 125. Shackling during any stage of labor is humiliating and excruciating, especially considering the pain of childbirth, and can interfere with emergency medical care. SUMF 103, 107, 117-119, 125. Shackling postpartum risks continued agony and blood clots, given the swelling and other changes in the person's body, and interferes with their ability to hold and bond with their newborn for the precious few days they get together before being separated again indefinitely. SUMF 120-24. The pain, risk, and emotional devastation are the exact type of "serious harms" that the Eighth Amendment is intended to protect against—so much so that courts have held that the harms of shackling in these circumstances is "obvious." *See, e.g.*, *Nelson*, 583 F.3d at 534 ("The obvious cruelty inherent in this practice should have provided [Defendant] with some notice that [her] alleged conduct violated [Plaintiff's] constitutional protection against cruel and unusual punishment. [Plaintiff] was treated in a way antithetical to human dignity . . . and under circumstances that were both degrading and dangerous") (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)); *Women Prisoners of D.C. Dep't of Corr.*, 877 F. Supp. at 669 (use of shackles on women in their third trimester, labor, and postpartum recuperation creates a "risk of injury to women prisoners" that "is obvious").



. SUMF 130-35, 140.

d. SUMF 133-35. , instead requiring officers to follow

a separate policy that she had implemented that *required* the use of shackling except during an undefined period of time referred to as "active labor." SUMF 84-89. Because Defendant Witherspoon had actual knowledge of the harms of shackling but failed to take reasonable (or any) measures to abate them, she was deliberately indifferent to the substantial risk of harm, in violation of the Eighth Amendment.

As a result of Defendant Witherspoon's illegal policy, Defendants forced shackles onto Ms. Edwards' swollen body every day to take her out for medical care for months, well into her third trimester. SUMF 45. They handcuffed her when they brought her to the hospital to be induced into labor. SUMF 46. They kept her shackled while Ms. Edwards was induced into labor, only removing the shackles when doctors told her to start pushing and putting her in wrist and ankle shackles barely an hour after she gave birth. SUMF 47-51. The pain was physically excruciating, since the shackles were tight on Ms. Edwards' body, and she couldn't even move to try to alleviate the agony of labor. SUMF 59. She remained shackled by her ankle and sometimes her wrist the entire time she was in the hospital, even when she held her newborn daughter and tried to bond with her. SUMF 52-54. The shackles reminded her at every moment that she was a chained-up prisoner even when she was trying to focus on being a mother, and she felt demeaned and humiliated. SUMF 60; Ex. A, Declaration of Tracey Edwards ("Edwards Decl."), ¶ 20. On the way back to NCCIW, right after she was separated from her baby and knew she couldn't see her daughter for months, she was put in "full restraints"—a belly chain, handcuffs, ankle shackles, and a black box in front to ensure she could not move around. SUMF 57. The shackles pressed hard against the bruise from her epidural, where she had medication injected into her spine during labor, and when she arrived at NCCIW, she had to jump to the ground because Defendants wouldn't even help her out. SUMF 65-68. Her pain and humiliation were complete.

The deposition testimony and documentary evidence are irrefutable: NCCIW, the only prison that incarcerated pregnant people in the state, never implemented North Carolina's shackling policy, ███████████████████████████████████████████████. As a result, Ms. Edwards was always shackled except when she "pushing" during labor, despite the state policy and despite the consensus of legislatures and courts that doing so constitutes deliberate indifference.

After Ms. Edwards was brought back to NCCIW, Defendants only worsened her torture. Doctors who deny prescribed medical treatment that they themselves believe is necessary are quintessentially deliberately indifferent. *See Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). Denying such treatment undermines their obligations as physicians and puts their patients at known risk. Doctors are not permitted by the Constitution to simply wait idly by while their patients deteriorate, and only take action once the worst has occurred. Instead, they have an obligation to act to *prevent* the harm before the disease has progressed to a more dangerous or even fatal form. *See Gordon*, 937 F. 3d. at 359.

Deposition testimony and documentary evidence show that Ms. Edwards had been prescribed buprenorphine, a treatment for her chronic OUD during her pregnancy, consistent with an NCCIW policy ██████████████████████████████████████████. SUMF 154, 179. Defendant Amos's own testimony, along with documentary evidence, shows that Defendant Amos had the authority to prescribe buprenorphine to anyone under his care, that terminating buprenorphine treatment from someone with OUD puts them at substantial risk of agonizing withdrawal followed by a risk of relapsing on drugs, overdosing, and dying, that NCCIW had a pharmacy contract that included buprenorphine, and that there were no diversion concerns related to NCCIW's buprenorphine program. SUMF 188, 192, 225, 239. And this evidence proves

that ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████. SUMF 179. OUD is a chronic condition that Defendant Amos agrees can be fatal. SUMF 218.

Defendant Amos, as a Rule 30(b)(6) witness, admitted under oath that Ms. Edwards returned to NCCIW with a current, active prescription for buprenorphine, as her providers at the hospital had prescribed it to her to treat her OUD. SUMF 158. Yet, when she returned, NCCIW providers refused to provide it to her, ███████████████████████. SUMF 160. In her vulnerable state, separated from her newborn, the pain and humiliation of her shackling still fresh on her mind, and still suffering from postpartum pain because she had given birth so recently, Ms. Edwards was denied buprenorphine, predictably causing her excruciating pain as well as vomiting, diarrhea, anxiety, sleeplessness, and racing heart and thoughts. SUMF 164, 265. The was was even worse than the pain of childbirth. SUMF 164. Even after Ms. Edwards requested her medication, she was denied. SUMF 172-73. As a result, throughout the remainder of her stay, even as she continued to desperately miss her children and tried to stay healthy so she could eventually go back to being a good mother for them, she was plagued by opioid cravings and knew that she risked relapsing. SUMF 175.

While Ms. Edwards was suffering agonizing withdrawal from her prescribed buprenorphine, Defendants compounded her emotional torment by failing to renew her prescribed medication to treat her postpartum anxiety and depression. SUMF 264-77. Her providers at the hospital had prescribed her Zoloft and Vistaril to treat her postpartum depression and anxiety and ordered a "mood check" at two weeks to determine if the medications were working and to renew them. SUMF 256-59. These conditions, along with other conditions that NCCIW providers

diagnosed her with, constitute serious medical needs under case law from this district and other courts. *See, e.g., Belfield v. Bowmen*, No. 5:19-ct-3310-FL, 2021 WL 4476625, at *4 (E.D.N.C. Sept. 29, 2021); *Glaser v. Smith*, No. 4:22-cv-1019, 2023 WL 4052470, at *3 (N.D. Ohio, June 16, 2023); *Miller v. Rauner*, No. 17-cv-859, 2017 WL 4284568, at *5 (S.D. Il., Sept. 27, 2017); *Mathis v. Georgia State Prison*, No. 6:15-cv-122, 2016 WL 183753, at *7 (S.D. Ga., Jan. 14, 2016).

As a result, as well as the concomitant termination of her buprenorphine, Ms. Edwards suffered a severe exacerbation of her anxiety and depression. SUMF 265. She often couldn't sleep, and when she did, she was plagued by nightmares, and she had to deal with bad anxiety and racing thoughts. *Id.* She made multiple requests for help to NCCIW health care providers, noting these exact symptoms, and another NCCIW doctor even noted that she needed to be prescribed Zoloft, but they did nothing. SUMF 267-77. This months-long torment, especially when combined with the other pain that Ms. Edwards was forced to endure, is unjustifiable.

The facts in this case are undisputed and irrefutable, and they make clear that the actions of Defendants Witherspoon and Amos violated the Eighth Amendment and state Defendants violated the Americans with Disability Act and Rehabilitation Act. Defendants have not even tried to mount a defense. They have made no discovery requests and taken no depositions. Their own expert— even assuming he survives Plaintiff's pending motion to exclude—has disclaimed any attempt to argue that Defendants' treatment of Ms. Edwards was medically sound or met any reasonable standard of care. *See generally* Dkt. 149-2. They have no basis on which to argue a defense, and they have no case that they can make to this Court or a jury. Ms. Edwards has suffered enough, and just as Defendants ignored their obligations when it came to her care, so they have ignored their obligations in this case. The time has come to start putting Defendants' liability to rest.

Ms. Edwards is requesting that the Court grant her summary judgment against Defendant Witherspoon, for violating the Eighth Amendment by implementing an illegal policy requiring correctional officers to shackle prisoners during the third trimester of pregnancy, labor, and postpartum recuperation; against Defendant Amos, for violating the Eighth Amendment by ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████, and solely on the objective component of her Eighth Amendment claim regarding denial of psychiatric care; and against Defendant Ishee in his official capacity as the Secretary of the Department of Adult Correction for violations of the ADA regarding NCCIW's illegal buprenorphine and psychiatric medication policies.

## II.      FACTUAL BACKGROUND

Plaintiff Tracey Edwards entered NCCIW custody for a nonviolent drug offense on May 15, 2019. SUMF 4. After an intake screening that month, she learned that she was pregnant. SUMF 8. At that time, NCCIW policy allowed pregnant patients with OUD to take Medication for Opioid Use Disorder ("MOUD"), including buprenorphine, during their pregnancy. SUMF 154. Ms. Edwards has Opioid Use Disorder, and Defendant Elton Amos, the NCCIW Medical Director, approved her prescription for buprenorphine. SUMF 2, 234. As a result, Ms. Edwards was brought from NCCIW to Southlight, an MOUD provider, every day starting in June 2019. SUMF 155.

### A.      NCCIW's shackling practice violated the law and the standard of care

Shackling and restraints can include handcuffing (in front of or behind the body), ankle shackles that shackle the ankles together or shackle one ankle to another person or object, belly chains, and more. As Ms. Edwards' expert, Dr. Alison Stuebe, testified in her report, shackling people who are pregnant, in labor, and/or in postpartum recuperation places them at substantial risk

of serious harm and violates the standard of care. SUMF 103. Dr. Stuebe is a board-certified Maternal-Fetal Medicine subspecialist who is the Director of the Division of Maternal Fetal Medicine at UNC Department of Obstetrics and Gynecology, who regularly provides care to pregnant people incarcerated at NCCIW. SUMF 103, fn. 1. In addition to her medical degree, Dr. Stuebe has a Master's of Science degree in Epidemiology from the Harvard School of Public Health. *Id.* She has published more than 200 peer-reviewed articles relating to prenatal and postpartum care, as well as book chapters and other publications, and she has received well over a dozen awards for excellence in her studies, teaching, research, and practicing medicine. *Id.*

Restraints during pregnancy are dangerous and harmful because they can place pregnant people off-balance, risking dangerous falls, due to physiological changes that affect a pregnant person's center of gravity, and these falls can cause significant harm such as dislocating joints, causing the placenta to detach from the uterus, fetus distress, life-threatening bleeding, and stillbirth. SUMF 109-114. Shackling during pregnancy or the postpartum period (defined as at least six weeks after giving birth) is also dangerous because it can inhibit mobility, increasing the risk of dangerous blood clots. SUMF 122-24. Throughout pregnancy and in all stages of labor, shackling can interfere with medical providers' ability to safely practice medicine by limiting their ability to assess pregnant or laboring patients or to act in case of emergency. SUMF 116-19. The pain and risk, when combined with the pains that come naturally with pregnancy and childbirth, can cause or exacerbate emotional trauma to the pregnant person. SUMF 125. And postpartum shackling, in which new parents are chained to a bed while they meet and hold their newborns, can interfere with the ability to care for their babies. SUMF 120. For all these reasons, numerous medical associations oppose the use of shackling during pregnancy, labor, and/or postpartum recuperation, and most states have laws likewise prohibiting or restricting the practice. SUMF 104-05.

In 2018, the Department of Public Safety ("DPS"), which oversees all North Carolina state prisons including NCCIW, enacted a policy restricting the use of shackles during pregnancy, labor, and postpartum recuperation. SUMF 72-78. Because NCCIW was the only state prison that incarcerated pregnant people, the requirements of this DPS policy applied only to NCCIW. SUMF 20. That policy specifically prohibited the use of shackling in the following circumstances:

- When a prisoner is "in labor, defined as occurring at the onset of contractions."

- When a prisoner is "identified by medical staff as in postpartum recuperation," a time period that is defined as at least the first six weeks after delivery.

- When a prisoner is "transported or housed in an outside medical facility for treating labor and delivery."

- Once the "intravenous line" for induction "has been placed and the induction medication has been started."

- "[D]uring initial bonding with the newborn child, including nursing and skin to skin contact."

SUMF 73-78. ██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ SUMF 80. NCCIW, like all prisons in North Carolina, creates Standard Operating Procedures ("SOP") that are supposed to implement state policy at the prison level, and Post Orders that provide more specific instruction to officers at their individual posts. SUMF 22-25. These SOPs and Post Orders must comply with state-level DPS policies. SUMF 81.

However, at the time that Ms. Edwards gave birth, NCCIW SOPs and Post Orders were in direct conflict with DPS policies and actually *required* the use of shackling in the following circumstances:

- Pregnant prisoners were required to wear handcuffs in the same manner as non-pregnant prisoners, except when a "[p]regnant offender is in active labor," a term that was not defined by policy or training.

- Whenever the pregnant or postpartum prisoner was "leaving the security confines of the facility" including transportation to the hospital to give birth and back to the prison postpartum.

- When a prisoner was lying in their hospital bed or treatment gurney, they "will be secured with one hand restrained to the bed/gurney with a handcuff and the opposite leg restrained to the bed/gurney with a leg iron."

- While a postpartum prisoner was bonding with and breastfeeding their newborn, the prisoner was required to be shackled with a leg iron.

- While a postpartum prisoner is in postpartum recuperation and not holding or bonding with their newborn, the prisoner was required to be shackled with handcuffs and leg irons.

SUMF 88-93. Up through December 2019, when Ms. Edwards gave birth, it is undisputed that officers were trained to, and did, shackle prisoners who were pregnant except during active labor. SUMF 88-89, 101. There is also no dispute that this violated the DPS policy that prohibited such shackling.

### B. NCCIW's Shackling of Plaintiff

Ms. Edwards was shackled using at least handcuffs every day as she was brought to and from Southlight. SUMF 45. On December 19, 2019, when Ms. Edwards was 39 weeks pregnant, she was transported to UNC-Chapel Hill Hospital to be induced into labor by one of the Officer Defendants. SUMF 11. Throughout that ride, the Officer Defendants kept Ms. Edwards handcuffed. SUMF 46. At the hospital, the Officer Defendants shackled one of Ms. Edwards' arms and one of

her legs to the hospital bed, even after she was provided intravenous medication to induce her labor. SUMF 47-50. She remained that way for hours, unable to move to alleviate her pain or discomfort. SUMF 49. The experience was demeaning and terrifying, and she remains traumatized to this day. SUMF 59-60.

The Officer Defendants only removed the shackles when UNC doctors told Ms. Edwards to start pushing on December 20, 2019. SUMF 50. Only an hour after Ms. Edwards gave birth, Officer Defendants re-handcuffed her and shackled her ankles together as they moved her from the delivery room. SUMF 51. During the next two days at the hospital, Officer Defendants continued to shackle one of Ms. Edwards' legs to the bed and sometimes also shackled one of her wrists to the bed. SUMF 52. Ms. Edwards' leg remained shackled to the hospital bed even while she was holding and breastfeeding her newborn daughter, making it harder for her to fully focus on and bond with her during the brief time they had together. SUMF 53-54, 64. The Officer Defendants only fully unshackled Ms. Edwards to allow her to go to the bathroom and twice to walk her baby around the hallway. SUMF 55-56. The shackles caused her physical pain in addition to mental torment, as they rubbed her ankles raw and prevented her from moving around postpartum to make herself more comfortable. SUMF 59-63.

On December 22, 2019, two Officer Defendants transported Ms. Edwards back to NCCIW. SUMF 57. They shackled her ankles together, handcuffed her, placed a belly chain around her stomach, and connected her chains with a black box in front of her so that she could not even move her hands. *Id.* Ms. Edwards was in severe pain, particularly at the site of her epidural. SUMF 65-66. At NCCIW, Ms. Edwards was forced to jump out of the vehicle because the Officer Defendants would not help her, which caused her additional pain because she was only two days postpartum. SUMF 58.

### C. NCCIW's Denial of Medication for Opioid Use Disorder (MOUD)

Opioid Use Disorder ("OUD") is a chronic medical condition. SUMF 5. Opioid use rewires the brain for addiction, causing " compulsive use of opioids and an increasing need for additional doses over time that becomes damaging to a person's life." *Smith v. Aroostook Cnty*, 376 F. Supp. 3d 146, 149 (D. Me.), *aff'd,* 922 F.3d 41 (1st Cir. 2019). For this reason, the *only* efficacious treatment for OUD is a class of medications referred to as either Medication for Opioid Use Disorder ("MOUD") or Medication for Addiction Treatment ("MAT"). SUMF 149, 201-03, 224. *See also Claire E. Scavone, Battleground of the Opioid Crisis: The Eighth Amendment Right to Medication-Assisted Treatment in Prisons and Jails, and Upon Release, 71 Emory L.J. 1273, 1281 (2022)* ("The reality is that people need MAT to overcome their brain's rewiring.").

The medications approved by the FDA to treat OUD include buprenorphine. SUMF 149-51. Without MOUD, individuals with OUD are liable to relapse, overdose, and die. SUMF 152. This is particularly true of incarcerated people who are denied access to MOUD. SUMF 201. Access to MOUD is particularly important during the postpartum period because of the high rates of relapse during this time. SUMF 203, 222. Ms. Edwards was prescribed buprenorphine prior to her incarceration in 2019. SUMF 6. After her pregnancy was confirmed, Ms. Edwards was prescribed buprenorphine at NCCIW pursuant to NCCIW policy to allow only pregnant prisoners to take prescribed MOUD. SUMF 154.

Since NCCIW implemented an in-house program to prescribe buprenorphine to pregnant patients on December 1, 2019, there have not been any concerns regarding diversion of this medication. SUMF 200. Ms. Edwards took buprenorphine at this in-house clinic from December 1 to December 19, 2019. SUMF 156. After Ms. Edwards gave birth and while she was still at UNC Hospital, UNC providers prescribed and gave her buprenorphine treat her OUD. SUMF 157. When

Ms. Edwards returned to NCCIW on December 22, 2019, she had an active prescription for buprenorphine from UNC. SUMF 158. However, pursuant to NCCIW's policy only to prescribe buprenorphine to pregnant patients, NCCIW doctors refused to provide Ms. Edwards with her prescribed buprenorphine. SUMF 160. Instead, they provided oxycodone (an opioid that is not MOUD) and other non-MOUD medications to treat her withdrawal symptoms. SUMF 161.

As a result of her withdrawal from buprenorphine, Ms. Edwards suffered from pain, diarrhea, and vomiting for weeks. SUMF 164. She was sometimes unable to eat or shower because of the intensity of her symptoms. SUMF 174. When Ms. Edwards later saw a doctor at NCCIW, that doctor informed her that being off the buprenorphine was putting her at high risk of relapse. SUMF 166. This statement is in conformance with medical standards of care at the time, which are that MOUD is the only efficacious treatment for OUD. SUMF 203. Throughout the remainder of her incarceration, Ms. Edwards experienced severe cravings for opioids and worried about the possibility of relapse and how that would impact her ability to be released, retain custody of her children, and care for them after the end of her sentence. SUMF 175. Even today, she still has trauma and is reminded of her experience regularly. SUMF 17.

The standard of care for terminating buprenorphine, when doing so is appropriate, is to taper down the buprenorphine slowly over a period of weeks or months. SUMF 212. Doing otherwise increases the risk of significant withdrawal symptoms, without medical justification. SUMF 215. Furthermore, the standard of care when terminating buprenorphine is to provide medications to treat withdrawal symptoms of insomnia, anxiety, nausea, pain, and diarrhea. SUMF 208. The standard of care also requires medical providers to use the Clinical Opiate Withdrawal Scale to monitor withdrawal symptoms. SUMF 216. In Ms. Edwards' case, NCCIW doctors and nurses terminated her buprenorphine immediately with no taper, failed to provide appropriate medications

to treat withdrawal symptoms, and did not use the Clinical Opiate Withdrawal Scale to monitor her during withdrawal. SUMF 160, 163, 170, 171.

At the time that Ms. Edwards was denied her buprenorphine, NCCIW providers could have prescribed buprenorphine to non-pregnant prisoners because at least one of them had the "x-waiver," a designation allowing medical providers to prescribe buprenorphine, SUMF 190-92, NCCIW had a pharmacy contract that included buprenorphine, SUMF 194, and no state or federal entity prohibited NCCIW providers from prescribing it. SUMF 195-99.

### D. NCCIW's Denial of Mental Health Treatment

Ms. Edwards has a history of diagnosed mental health disabilities, both before and during her incarceration at NCCIW. SUMF 245-53. An NCCIW psychiatrist prescribed her Zoloft (sertraline) and Vistaril (hydroxyzine) for depression and anxiety, but Ms. Edwards discontinued taking those medications during her pregnancy in order to protect the health of her pregnancy. SUMF 250-54. While she was at UNC Hospital postpartum in December 2019, her doctors there prescribed her a two-week course of Zoloft and Vistaril for possible postpartum depression and anxiety. SUMF 256-57. Her providers also ordered a postpartum "mood check" appointment to take place two weeks after she gave birth, by January 5, 2020, when the prescription would run out. SUMF 259.

After Ms. Edwards returned to NCCIW on December 22, 2019, she was provided with her Zoloft and Vistaril daily until January 5, 2020, when it ran out. SUMF 263. She did not see a doctor by that date to have a "mood check" or renew her prescription. SUMF 264, 266. NCCIW clinical policy prohibits doctors other than psychiatrists from writing prescriptions for mental health medications. SUMF 289.

On January 7, 2020, Ms. Edwards submitted a sick call request (also referred to as a mental health services referral request), noting that her prescriptions had expired and that she was suffering from nightmares, anxiety, and racing thoughts. SUMF 267. On January 10, 2020, she had an appointment with an obstetrician/gynecologist ("ob/gyn"), at NCCIW. SUMF 270. The doctor noted that Ms. Edwards' Zoloft prescription had been "discontinued" and that Ms. Edwards needed the prescription to be renewed, but that NCCIW policy prohibited her from writing this prescription. *Id.* On January 12, Ms. Edwards submitted another sick call request, noting that she was suffering from "really bad anxiety" and was unable to sleep due to nightmares. SUMF 271.

On January 15, 2020, Ms. Edwards saw a health care coordinator who was not a psychiatrist, Daniel Rohda. SUMF 272. Mr. Rohda again noted that her Zoloft and Vistaril prescriptions were expired, and referred her to an appointment with a psychiatrist. *Id*. But for reasons that were not noted in her records, she was unable to make the appointment. SUMF 273. The missed appointment was never noted in her records, so it is unclear if it was even entered into the proper systems. *Id.* And it was not rescheduled. *Id.* Over a month later, after seeing Mr. Rohda for a second time, Ms. Edwards was scheduled for another appointment with a psychiatrist on February 27, 2020, but Ms. Edwards was not permitted to attend this appointment due to a "count" of prisoners in her unit occurring late and interfering with her appointment time. SUMF 274-76. She was not actually able to attend an appointment with a psychiatrist—the only type of provider authorized to prescribe psychotropic medications under NCCIW policy—until March 2020, almost two months after her Zoloft and Vistaril prescriptions expired. SUMF 277-78.

After Ms. Edwards' psychiatric prescriptions expired, she experienced significant mental health symptoms including anxiety, sleeplessness, nightmares, and racing thoughts. SUMF 265. These symptoms were entirely predictable, both because of Ms. Edwards' psychiatric history and

because the postpartum period is one that is particularly vulnerable for those with mental health disabilities. SUMF 279-86. Postpartum depression is a common problem that can be caused or exacerbated by stressful situations such as those that Ms. Edwards encountered—forced separation from her newborn, shackling, and denial of care for her other health conditions such as OUD. SUMF 280. The symptoms of postpartum depression or anxiety can be severe, and so postpartum mental health care is a key competency for obstetrician/gynecologists. SUMF 279-85.

## III. LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.... [and a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the non-moving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To avoid summary judgment, the non-moving party must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986) (citations and internal quotes omitted). "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-moving party's] case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted). Instead, the non-movant must point to evidence in the record

that would be admissible at trial and support a judgment in its favor. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

**B.    Eighth Amendment Standard**

To succeed on her Eighth Amendment claims, Ms. Edwards must show that Defendants were deliberately indifferent to a serious medical need and/or a substantial risk of serious harm. *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 302-03 (1991)); *Estelle*, 429 U.S. at 104; *Mays v. Sprinkle*, 992 F.3d 295, 300-301 (4th Cir. 2021). Deliberate indifference has a subjective and an objective component. The objective prong "requires a plaintiff to prove that the alleged deprivation was 'sufficiently serious'" while the subjective prong "requires a plaintiff to show that prison officials acted with 'deliberate indifference.'" *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022) (quoting *Farmer*, 511 U.S. at 834 and *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).

This objective prong is satisfied if the challenged condition poses "a substantial risk" of a "serious or significant physical or emotional injury resulting from the challenged conditions" or, in the case of medical needs, if the medical need has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (citing to *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) and *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (cleaned up). The subjective prong is satisfied if the prison official had "actual knowledge of the risk of harm to the inmate" and behaved with "criminal-law recklessness" in response. *Pfaller*, 55 F. 4th at 445 (cleaned up).

Courts have long held that officers and officials who shackle pregnant women, especially during labor and in postpartum recuperation, are deliberately indifferent if there is no exceptional circumstance that may justify the shackling, because shackling or restraining someone who is

enduring pregnancy, labor, or postpartum recuperation—and all the pain, swelling, physiological changes, and emotional upheaval that entails—risks obvious trauma to the person's physical and emotional safety, and can have devastatingly painful and even fatal consequences. *See, e.g.*, *Nelson*, 583 F.3d at 533; *Brawley*, 712 F. Supp. 2d at 1221. Doctors who deny prescribed medical care without medical justification, or who implement policies directing their subordinates to do so, may be deliberately indifferent if they are or should have been aware that such denial contradicts established medical standards and denial of care risks exacerbating physical or emotional health problems. *See De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013). When an illness—such as Opioid Use Disorder or depression—can progress to a more dangerous form or even cause death if untreated, the Constitution does not permit doctors to wait until the illness worsens or the worst outcome happens before they act. *See Helling v. McKinney*, 509 U.S. 25, 36 (1993).

### C.     Americans with Disabilities Act and Rehabilitation Act Standard

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[2] Under the statute, "discrimination" is not limited to instances of animus toward individuals with disabilities. Rather, it "includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Seremeth*, 673 F.3d at 336 (quoting 42 U.S.C. § 12112(b)(5)(A)); *see also, e.g.*, *Pierce v. District of Columbia*,

---

[2] For simplicity, Ms. Edwards focuses on the ADA for purpose of this analysis, but this discussion applies in equal force to her claims under the Rehabilitation Act. As the Fourth Circuit has held, "[c]laims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." *Seremeth*, 673 F.3d at 336 n.1. This includes reasonable-accommodation claims. *See id.*; *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 510 (4th Cir. 2016) [hereinafter *NFB*] (reinforcing that both the ADA and the Rehabilitation Act carry an affirmative duty to afford certain reasonable accommodations).

128 F. Supp. 3d 250, 269 (D.D.C. 2015) ("Section 504 and Title II mandate that entities act *affirmatively* to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services.").

The ADA "unmistakably includes State prisons and prisoners within its coverage," and encompasses the services offered by prisons. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–11 (1998). Indeed, the "affirmative duty" to accommodate "is seemingly at its *apex* in the context of a prison facility, in light of the uneven power dynamic between prison officials and inmates that inherently and appropriately exists, and also the fact that departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all." *Pierce*, 128 F. Supp. 3d at 269.

"To make out a violation of Title II, plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *NFB*, 813 F.3d at 502–03 (4th Cir. 2016).

A public entity violates the ADA when it fails to provide a reasonable accommodation to disabled individuals "that will allow them the meaningful access" to which they are entitled. *NFB*, 813 F.3d at 507–08. The entity may be liable under a direct theory of liability or on a secondary basis for the violations of its agents. *Rosen v. Montgomery County*, 121 F.3d 154, 157 n.3 (4th Cir. 1997). And the ADA and RA generally afford plaintiffs "a full panoply of legal remedies," including compensatory damages. *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 & n.9 (4th Cir. 1994); *Torcasio v. Murray*, 57 F.3d 1340, 1342 n.2 (4th Cir. 1995).

A prison may not implement a blanket denial of medical care only for a certain type of disability, and then refuse to provide treatment for that disability even when such reasonable

accommodation is requested. Doing so deprives individuals with that disability from accessing the medical services at the same level that prisoners with other chronic conditions can, depriving them of their rights solely due to their disability. *See Smith*, 376 F. Supp. 3d at 160 ("Without her desired accommodation [of prescribed buprenorphine], the Plaintiff will be deprived of the only form of treatment shown to be effective at managing her disability and therefore will be denied 'meaningful access' to the Jail's health care services.").

## IV.    ARGUMENT

### A.    Ms. Edwards is entitled to summary judgment against Defendant Witherspoon on her Eighth Amendment shackling claim.

Ms. Edwards is entitled to summary judgment on her claims against Defendant Witherspoon for shackling her during pregnancy, labor, and postpartum, because the evidence in support of her allegations is undisputed. There is no dispute that in December 2019, NCCIW shackled Ms. Edwards during pregnancy, labor, and postpartum in violation of DPS policy. This shackling, which put both Ms. Edwards and her child at risk, occurred because Defendant Witherspoon required it. Defendant Witherspoon *repeatedly* ignored her responsibility to ensure that NCCIW complied with DPS policy, ██████████████████████████████████████████████ ████████████ SUMF 126-48. By December 2019, the *only* action Defendant Witherspoon had taken with respect to NCCIW's shackling practices in the thirteen months she had been Warden was to approve multiple NCCIW policies that required shackling pregnant and postpartum women in circumstances *in direct contradiction of DPS policy*. SUMF 129.

Multiple courts have recognized that shackling incarcerated people during labor and postpartum does or can violate contemporary standards of decency. In *Villegas*, the Sixth Circuit held that "shackling of pregnant detainees while in labor offends contemporary standards of human decency such that the practice violates the Eighth Amendment's prohibition against

the 'unnecessary and wanton infliction of pain'—i.e., it poses a substantial risk of serious harm." 709 F.3d at 574 (overturning grant of summary judgment on basis not relevant here, and sending case to trial). Other courts concur. *See Mendiola-Martinez*, 836 F.3d at 1252, 1257 (Plaintiff "presented sufficient evidence for a reasonable jury to conclude that by restraining [Plaintiff] when she was in labor and postpartum recovery, the County Defendants exposed her to a substantial risk of serious harm."); *Brawley*, 712 F. Supp. 2d at 1219 ("There is sufficient evidence in the record to conclude that Plaintiff endured unnecessary pain, was exposed to a sufficiently serious risk of harm, and had a serious medical need when she was shackled to the hospital bed [during labor and immediately postpartum]); *Nelson*, 583 F.3d at 534 ("[t]he obvious cruelty inherent in [shackling during labor] should have provided [the officer defendant] with some notice that [her] alleged conduct violated [Plaintiff's] constitutional protection against cruel and unusual punishment. [Plaintiff] was treated in a way antithetical to human dignity ... and under circumstances that were both degrading and dangerous.") (citation omitted); *Women Prisoners of D.C. Dept. of Corrs.*, 877 F. Supp. at 668 ("In general . . . the physical limitations of a woman in the third trimester of pregnancy and the pain involved in delivery make complete shackling redundant and unacceptable in light of the risk of injury to a woman and baby.").

Consequently, there is no dispute that Defendant Witherspoon's actions—and inaction—constitute deliberate indifference to the serious risk of harm posed by shackling Ms. Edwards during her pregnancy and postpartum. The Court should grant Plaintiff summary judgment on her Eighth Amendment shackling claim.

### i. It is undisputed that Ms. Edwards was shackled during pregnancy and postpartum.

The factual predicate of Ms. Edwards' shackling claim—that she was shackled during pregnancy and postpartum—is undisputed. Specifically, there is no dispute that Ms. Edwards was

shackled daily during her pregnancy (including her third trimester); during transport to the hospital to give birth; during labor except when "pushing"; during postpartum recuperation at the hospital; and during transport back to NCCIW from the hospital two days after she gave birth. SUMF 45-58.

There is no dispute that Ms. Edwards was shackled each time that she was brought out to Southlight to receive buprenorphine from June 2019 until December 1, 2019, SUMF 45, even after

███████████████████████████████████████████████████████

███████████████████████. SUMF 133-35.

There is no dispute that Ms. Edwards was handcuffed during the ride to the hospital to give birth, that her handcuffs were only removed when she started "pushing" in labor, and that officers re-applied wrist and ankle shackles less than an hour after she gave birth. SUMF 46-51. She remained shackled by at least a leg iron and sometimes a handcuff throughout her two-day stay at the hospital postpartum, SUMF 52-56, and she was shackled using full restraints (ankles shackled together, handcuffs, a belly chain around her stomach, and a "black box"[3] in front her) for transport from the hospital back to NCCIW. SUMF 57.

> **ii.** **Ms. Edwards is entitled to summary judgment on her Eighth Amendment claim against Defendant Witherspoon for shackling her during pregnancy, labor, and postpartum.**

In order to succeed on her Eighth Amendment claim against Warden Witherspoon, Ms. Edwards must show that Warden Witherspoon was deliberately indifferent to a substantial risk of serious harm. First, Plaintiff must demonstrate the "objective factor" of deliberate indifference: to show that shackling during pregnancy, labor, and postpartum placed her at a risk of harm "so grave that it violates contemporary standards of decency[.]" *Helling*, 509 U.S. at 36. Ms. Edwards has done so—she has provided unrebutted expert testimony and a clear consensus among subject matter

---

[3] A "black box" is a device that fixes handcuffs together to restrict hand movement. SUMF 57.

experts and legislators that shackling during pregnancy, postpartum, and labor, places her at an unacceptable risk of harm. Second, Ms. Edwards must meet the requirements for the "subjective factor": "the prison official had a 'sufficiently culpable state of mind,' which, in this context, consists of 'deliberate indifference to inmate health or safety.'" *Raynor v. Pugh*, 817 F.3d 123, 127–28 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834).[4] Ms. Edwards has provided undisputed evidence that Warden Witherspoon established and enforced a policy requiring shackling during pregnancy, labor, and postpartum, in contravention of DPS policy ███████████████ ████████████████████████████. Ms. Edwards is accordingly entitled to summary judgment on her Eighth Amendment claim against Defendant Witherspoon.

### 1. Ms. Edwards is entitled to summary judgment on the objective prong of "deliberate indifference" for her shackling claim.

To determine whether shackling posed a substantial risk of serious harm, the court must assess "whether [the plaintiff] had a serious medical need or whether a substantial risk to her health or safety existed." *Nelson*, 583 F.3d at 529. "An inmate need not show that she in fact suffered serious harm to prevail on this prong because 'the Eighth Amendment protects against future harm.'" *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 107 (4th Cir. 2017) (citing *Helling*, 509 U.S. at 33-34. This is an objective inquiry, and the court should consider whether the risk "'violates contemporary standards of decency—that is, it 'is not one that today's society chooses to tolerate.'" *Villegas*, 709 F.3d at 568 (citing *Helling*, 509 U.S. at 36); *Rhodes v. Chapman*, 452 U.S. 337, 346–47 (1981) (finding that courts may determine standards of contemporary decency

---

[4] Although courts generally classify Eighth Amendment deliberate indifference claims into three common rubrics—conditions of confinement, excessive force, and medical needs—courts have recognized that shackling of pregnant persons presents a cross-over claim where the conditions that a prisoner is subjected to increase the risk of serious medical complications and harm. *See Villegas*, 709 F.3d at 570-71 (discussing in-depth the analysis required for a pregnancy shackling claim, as opposed to a pure medical needs or conditions of confinement case).

through "objective indicia derived from history, the action of state legislatures, and the sentencing by juries.").

In addition to the clear consensus of courts across this country, *see supra*, Ms. Edwards' unrebutted expert evidence and the consensus among health providers and legislatures shows there is no genuine dispute that shackling during pregnancy, labor, and the postpartum period violates contemporary standards of decency and poses a substantial risk of serious harm.

The unrebutted opinion of Ms. Edwards' medical expert, Dr. Alison Stuebe, M.D., is that "[a]ny shackling of pregnant, laboring, and postpartum people is a violation of human rights and of standard of care. It is psychologically devastating, dehumanizing, and painful, and it increases risks to mother and baby." SUMF 103. Dr. Stuebe details the numerous ways in which shackling places a pregnant individual at risk of significant injury and pain, including skin breakdown, nerve damage, and bone fractures; falling—including falls leading to fetal distress and stillbirth; interference with medical care, such as with the ability of providers to respond to signs of fetal distress during labor or provide an emergency cesarean section; potentially fatal blood clots in the legs; and impaired infant care. SUMF 106-24.

Additionally, there is ample undisputed evidence that shackling during pregnancy and postpartum violates contemporary standards of decency. The clear consensus of well-respected health organizations, including the American Medical Association, the National Commission on Correctional Health Care, the American College of Obstetricians and Gynecologists, and the Association of Women's Health, Obstetric and Neonatal Nurses, is that shackling during pregnancy and the postpartum period poses a substantial risk of material harm to both mother and child, and can even be fatal. SUMF 105.

That this practice is uniformly accepted as dangerous is reinforced by the fact that the vast majority of states—including North Carolina—have passed laws specifically prohibiting shackling during pregnancy, labor, and/or postpartum recuperation. *See Estelle*, 429 U.S. at 103 (looking to "modern legislation" to determine standards of decency). By the end of 2019, 27 states had anti-shackling laws. *Id.* [5] That number has since grown to 40.[6]

In North Carolina, the 2021 "Dignity Act" expressly prohibits the use of restraints during the second and third trimester of pregnancy, during labor and delivery, and during the postpartum recovery period (defined as, at a minimum, the six-week period following delivery). N.C. Gen. Stat. Ann. § 153A-229.2. North Carolina's Governor has described the Act as "a matter of basic human dignity," "a matter of safety" and "a matter of respect for families, mother and child, no matter where they are and no matter who they are."[7] North Carolina Attorney General Josh Stein, when presenting an award to a North Carolina ob/gyn who advocated for the law, stated that, prior to the law's passage, "North Carolina was in a minority of states that allowed pregnant women in jails and prisons to be shackled, putting women and their unborn children in grave danger."[8] He explained that the law allowed them to access "reproductive health care they need with dignity, which is their right" and that the law helps "protect their and their children's lives."[9]

---

[5] *See Anti-Shackling Laws*, Advocacy and Research on Reproductive Wellness of Incarcerated People, https://arrwip.org/anti-shackling-laws/ [https://perma.cc/DE8L-UQ46] (last visited Oct. 11, 2023).

[6] *Id.*

[7] Travis Fain, *Governor signs anti-shackling bill, help for incarcerated pregnant women, into law*, WRAL News (Sept. 10, 2021), https://www.wral.com/story/governor-signs-anti-shackling-bill-help-for-incarcerated-pregnant-women-into-law/19868292 [https://perma.cc/U5HB-CK4B].

[8] *Attorney General Josh Stein Honors Five Eastern North Carolina Residents with Dogwood Awards*, NCDOJ (Nov. 23, 2021), https://ncdoj.gov/attorney-general-josh-stein-honors-five-eastern-north-carolina-residents-with/ [https://perma.cc/DA5J-AVWF].

[9] *Id.*

The unrebutted evidence shows that Defendants' conduct in shackling Ms. Edwards during pregnancy, labor, and postpartum posed a substantial risk of serious harm to Ms. Edwards and her baby. Defendants have not, and cannot, adduce any evidence that shackling during pregnancy, labor, and postpartum is anything but dangerous and outside contemporary standards of decency.

> **2.** **Ms. Edwards is entitled to summary judgment on the first part of the subjective prong of deliberate indifference because Defendant Witherspoon was aware of the risks of shackling.**

For the subjective prong of the deliberate indifference standard, "[a] prison official is deliberately indifferent if she 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health or safety." *Nelson*, 583 F.3d at 528. A plaintiff need not show that defendant "actually believed" that shackling would cause plaintiff harm. *Id.* at 529. "[I]t is enough that the official acted or failed to act despite [her] knowledge of a substantial risk of serious harm." *Id.* In addition, "[a] plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates 'that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it....'" *Scinto*, 841 F.3d at 226 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

There can be no genuine dispute that Defendant Witherspoon was aware of the risks of shackling during pregnancy, labor, and postpartum recuperation. Throughout the entire time Defendant Witherspoon was Warden at NCCIW, DPS policy prohibited *any* shackling of a pregnant person during transport to the hospital to give birth, when at the hospital to give birth, during labor, or during postpartum recuperation (including specifically during initial bonding with the newborn child). SUMF 72-78. As Warden of NCCIW, Defendant Witherspoon was personally responsible for ensuring that NCCIW complied with DPS policies. SUMF 27. She was required to review all

DPS policies for this purpose when she assumed her role as Warden. SUMF 29. While Defendant Witherspoon testified that she reviewed DPS policy as required, *see* Ex. F (Witherspoon Tr., 45:12-22) it is undisputed that she did <u>not</u> bring NCCIW's shackling practices into compliance with DPS policy when she became Warden in November 2018 or at any time before December 2019. SUMF 100, 139, 142.

Not only was it Defendant Witherspoon's job as Warden to know and implement DPS policy as a general matter, the undisputed evidence proves that ██████████████████████ ████████████████████████████████████████████████████████ ███████

- ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████
█ ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████

Defendant Witherspoon was aware, too, that the reason DPS and others were concerned about shackling pregnant and postpartum women was because of the risks that shackling posed to their health and safety. She testified that shackling of pregnant and postpartum women was a "hot topic" in April 2019, because of concerns about "the appearance of shackling someone who's pregnant and how that would affect the unborn child and maybe nurturing the child after – after he or she is born." *See* Ex. F (Witherspoon Tr.), 41:21-25, 47:9-12 And she understood that DPS policy limiting shackling of pregnant and postpartum women was intended to "make sure that we have a healthy baby delivered…" and to ensure the State is carrying out "our responsibility to care for the – to have care for anybody under our supervision and especially an unborn child." *See id.*, 90:4-23.

In short, the undisputed evidence proves that Defendant Witherspoon *knew* DPS policy prohibited shackling during pregnancy and the postpartum period, *knew* NCCIW was shackling pregnant and postpartum women in violation of DPS policy, and ███████████████████ ████████████████████████████████████████████████ ███████████████████ "Prison officials may not simply bury their heads in the sand and thereby skirt liability." *Makdessi v. Fields*, 789 F.3d 126, 129 (4th Cir. 2015). There is no genuine dispute that Defendant Witherspoon was aware of the risks of shackling pregnant and postpartum women, yet she continued to disregard those risks and engage in that inhumane practice.

3. **Plaintiff is entitled to summary judgment on the second part of the subjective deliberate indifference prong because Defendant Witherspoon disregarded the risks of shackling by failing to take reasonable steps to prevent it.**

A prison official who knew of a substantial risk to inmate health or safety may be found free from liability only if they responded reasonably to the risk. *Farmer*, 511 U.S. at 844. No reasonable juror could find that Defendant Witherspoon reasonably responded to the risks of shackling pregnant and postpartum women as Warden of NCCIW. To the contrary, at every turn

Defendant Witherspoon *affirmatively reinforced* NCCIW's inappropriate shackling practices—despite clear directives otherwise—or *did nothing*:

- Upon becoming Warden of NCCIW in November 2018, Defendant Witherspoon was required to ensure that NCCIW SOPs and Post Orders complied with DPS shackling policy. SUMF 127. She did not do so. Instead, in February 2019 she approved two NCCIW SOPs that *directly conflicted* with DPS shackling policy. SUMF 129. DPS policy *specifically prohibited* shackling of a pregnant person during transport to the hospital to give birth, when at the hospital to give birth, during labor, and during postpartum recuperation (including specifically during initial bonding with the newborn child). SUMF 72-79.

- The SOPs Defendant Witherspoon approved *required* shackling of pregnant or postpartum people being transported to the hospital to give birth and when at the hospital to give birth at all times other than during "active labor."[10] SUMF 82-100. It is undisputed that these SOPs remained in place through December 2019 when Ms. Edwards gave birth, and that Ms. Edwards was shackled in accordance with these SOPs and in violation of DPS policy.

- ███████████████████████████████████████████████████████████████
  █████████████████████████████████████████. SUMF 130-31. Defendant Witherspoon again did nothing to bring NCCIW's practices into compliance with DPS policy. Instead, in April 2019 she approved a NCCIW Post Order that *directly conflicted* with DPS policy just as her 2019 SOPs did. SUMF 96-99. It is undisputed that this Post Order remained in place through December 2019 when Ms. Edwards gave birth, and that

---

[10] Specifically, NCCIW SOPs *required* the use of handcuffs on pregnant prisoners during transport to the hospital to give birth, required that a pregnant or postpartum prisoner lying on their hospital bed or treatment gurney be shackled using one handcuff and a leg iron, required the use of a leg iron on a prisoner who is bonding with her newborn child, and required the use of handcuffs o n a postpartum prisoner being transported back to NCCIW after giving birth. SUMF 88-95.

Ms. Edwards was shackled in accordance with this Post Order and in violation of DPS policy. SUMF 97.

- ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████

  ████ Three weeks later, Ms. Edwards was shackled during transport to the hospital to give birth in violation of this explicit directive to Defendant Witherspoon. SUMF 46.

- ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████
  ████████████████████████████████████████████████. SUMF 140-45.

There is no genuine dispute that Defendant Witherspoon did not take reasonable action in response to the risks of shackling. Quite the opposite: she repeatedly approved NCCIW practices that direct conflicted with DPS policy, ██████████████████████████████████ ██████████████████████████ did not discipline officers she knew violated DPS shackling policy, and ██████████████████████████████████████████████████████ ██████████████ Nor can she point to any legitimate reason behind her wholesale abdication of her responsibilities to conform NCCIW policies and actions to DPS policy.

Defendant Witherspoon was deliberately indifferent to the serious risk of harm posed by shackling Ms. Edwards during pregnancy, labor, and postpartum. There is no genuine dispute as to any of the material facts, and the Court should grant Plaintiff summary judgment on her Eighth Amendment shackling claim.

### B. Plaintiff is entitled to summary judgment against Defendant Amos on her claim regarding denial of MOUD postpartum.

Ms. Edwards is entitled to summary judgment on her claims against Defendant Amos for the discontinuation of her prescribed buprenorphine because the evidence in support of her allegations is undisputed. *See, e.g.*, *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (summary judgment is appropriate if the adverse party fails to present "verified evidence" demonstrating a dispute of fact "on a material point"). Specifically, there is no dispute that Ms. Edwards had an active prescription for buprenorphine when she returned to NCCIW from the hospital after giving birth; there was always at least one provider at NCCIW who was authorized to prescribe buprenorphine, and NCCIW's pharmacy contract included buprenorphine; Dr. Amos was authorized to prescribe buprenorphine; █████████████████████████████

████████████████████████████████████████████████████████████

██████████ ; Dr. Amos was aware that the standard of care for treating Opioid Use Disorder was treatment with Medication for Opioid Use Disorder, including buprenorphine; and Dr. Amos was aware that denying access to buprenorphine would put postpartum patients at higher risk of pain and suffering, relapse, overdose, and death. SUMF 158, 179, 190, 194, 223-225. Thus, there is no dispute that Dr. Amos was deliberately indifferent to her serious medical need of Opioid Use Disorder because ██████████████████████████████████

      **i.**    **It is undisputed that Plaintiff was denied buprenorphine for non-medical reasons postpartum.**

Ms. Edwards has been diagnosed with Opioid Use Disorder, both before she was incarcerated at NCCIW and by doctors at NCCIW during her pregnancy. SUMF 2, 246. Dr. Amos approved her buprenorphine prescription during her pregnancy, ███████████████████ ██████████████████████████████. SUMF 179, 234.

When Ms. Edwards returned to NCCIW after giving birth, she had an active prescription for buprenorphine. SUMF 158. However, beginning on December 23, 2019, NCCIW providers refused to provide this prescribed medication to her, ██████████████████████████ ████████████████ to only prescribe or offer buprenorphine to pregnant patients. SUMF 160.

In December 2019, Dr. Amos had an "x waiver" and was thus authorized to prescribe buprenorphine. SUMF 192. NCCIW was classified as a clinic or hospital. SUMF 193. Additionally, NCCIW had a contract with a pharmacy that included buprenorphine in December 2019, which Dr. Amos was aware of because he prescribed buprenorphine to pregnant patients at NCCIW, including Ms. Edwards. SUMF 238. There were no other restrictions that would have prevented Dr. Amos from doing so. SUMF 188-200.

ii.     **Plaintiff is entitled to summary judgment on her Eighth Amendment claim against Elton Amos for denial of buprenorphine.**

In order to succeed on her Eighth Amendment claim against Dr. Amos, Ms. Edwards must show that Dr. Amos was deliberately indifferent to her serious medical needs. This requires that she demonstrate that Opioid Use Disorder is a serious medical need, defined as one that has "been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241. Deliberate indifference is established if the physician has "fail[ed] to provide the level of care that a treating physician himself believes is necessary[.]" *Jackson*, 775 F.3d at 179 (cleaned up). Here, the evidence

demonstrates that Opioid Use Disorder is a serious medical need because (1) ██████████

█████████████████████████████████████████████████████████████████████████,

SUMF 179; (2) the relevant medical associations that ████████████████████████████

██████████████████████ recognize that Opioid Use Disorder mandates treatment in the form

of Medication for Opioid Use Disorder such as buprenorphine, SUMF 226-31; and (3) the harms

that Dr. Amos knew were likely to result if buprenorphine were terminated, namely, pain and

suffering, relapse, overdose, and death, are the significant harms that the Constitution forbids

doctors to impose on their incarcerated patients. *See Gordon*, 937 F.3d at 358. She is therefore

entitled to summary judgment on the objective prong of deliberate indifference.

Ms. Edwards can also show that Dr. Amos was subjectively deliberately indifferent. ██

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. Additionally, he has no

defense that he was somehow disallowed from prescribing or providing buprenorphine, because, as

he was aware, he and other providers at NCCIW were legally permitted to prescribe buprenorphine

to their patients regardless of pregnancy status. SUMF 188.

### 1. Opioid Use Disorder is a serious medical need.

Opioid Use Disorder is a serious medical need that has "been diagnosed by a physician as

mandating treatment." *Scinto*, 841 F.3d at 225. As Dr. Amos testified, Opioid Use Disorder is a

serious illness that can be fatal. SUMF 218. NCCIW physicians recognized that Ms. Edwards had

this serious medical need, as they prescribed her buprenorphine, a medication approved by the FDA

to treat Opioid Use Disorder, during her pregnancy. SUMF 154. ████████████████████

████████████████████████████████. SUMF 234. ███████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████. SUMF 179. Therefore, it is beyond dispute that Opioid Use Disorder is a medical condition that has been diagnosed by a physician as mandating treatment.

Alternatively, Ms. Edwards is entitled to summary judgment on the question of whether Opioid Use Disorder is a serious medical need because ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. SUMF 227. These organizations considered OUD to be a diagnosable medical condition mandating treatment in the form of MOUD. SUMF 229 ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ SUMF 228. Ms. Edwards' expert, Dr. Stuebe identified guidance by the American College of Obstetrician-Gynecologists, the Society for Maternal-Fetal Medicine, and the American Society for Addiction Medicine as setting the standard of care for treating Opioid Use Disorder in pregnant and postpartum patients. *See* Ex. B (Stuebe Expert Report) at 6. In her report, she testified that, beginning prior to 2019, the "standard of care for Opioid Use Disorder in the postpartum period is continuation of Medications for Opioid Use Disorder (MOUD), because discontinuation of MOUD increases risk of relapse, overdose and maternal death." *Id*. Therefore, even apart from the fact that Dr. Amos himself recognized that OUD is a serious medical need mandating treatment, it is clear that physicians in general hold this view.

Finally, even apart from Dr. Amos's own recognition that OUD requires treatment with MOUD including buprenorphine and Ms. Edwards' expert testimony regarding the standard of care for postpartum patients, the risks of forced termination of buprenorphine are the exact type of risks that the Constitution proscribes. "The Constitution does not mandate comfortable prisons…, but neither does it permit inhumane ones," and prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care[.]" *Farmer*, 511 U.S. at 832; *see also Scott v. Clarke*, 64 F. Supp. 3d 813, 824 (W.D. Va. 2014) (granting summary judgment on the objective prong of deliberate indifference and describing a host of ailments that are serious medical needs because they involve pain and "absent treatment, could give rise to further significant injury and the unnecessary infliction of pain"). Dr. Amos recognized that individuals with Opioid Use Disorder who are denied buprenorphine have an increased risk of relapse, overdose, and death. SUMF 225. Such risks are prime examples of serious risks of harm that mandate treatment. *See, e.g.*, *Estelle*, 429 U.S. at 103 ("denial of medical care" that results in "pain and suffering which no one suggests would serve any penological purpose . . . is inconsistent with contemporary standards of decency").

The fact that Ms. Edwards has not suffered the worst possible outcome from denial of buprenorphine has no bearing on whether OUD is a serious medical need, or indeed, whether Dr. Amos was deliberately indifferent. The Supreme Court has made clear that "a remedy for unsafe conditions need not await a tragic event" because "the Eighth Amendment protects against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain. *Helling*, 509 U.S. at 34-35. Therefore, Ms. Edwards "states a cause of action under the Eighth Amendment by alleging that [defendant]s have, with deliberate indifference, exposed [her] to [conditions] that pose an unreasonable risk of serious damage to his future health." *Id.*

Given the undisputed risks of untreated Opioid Use Disorder, multiple courts outside of the Fourth Circuit have held that Opioid Use Disorder is a serious medical need, and that denying MOUD treatment is likely deliberately indifferent thereto. *See, e.g.*, *P.G. v. Jefferson Cnty., New York*, No. 5:21-cv-388, 2021 WL 4059409, at *5 (N.D.N.Y. Sept. 7, 2021) (citing *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 217 (S.D.N.Y. 2014)); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47 (D. Mass. 2018); *see also Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 598 (6th Cir. 2021), *cert. denied,* 143 S. Ct. 84 (2022) (denying summary judgment for nurse who denied jail detainee suboxone (a form of buprenorphine) and holding that "a reasonably jury could find that [plaintiff] had an objectively serious medical need, and that [defendant] was either subjectively aware of the risk to [plaintiff] from suddenly discontinuing her medications and failed to respond reasonably to that risk, or that [defendant] recklessly failed to act…").

For all these reasons, Ms. Edwards is entitled to summary judgment on the objective prong of deliberate indifference.

### 2. Dr. Amos acted with deliberate indifference when he enacted a policy to deny patients buprenorphine postpartum.

Ms. Edwards is also entitled to summary judgment against Dr. Amos on the subjective prong of deliberate indifference. Deliberate indifference is established if a defendant is conscious of the risk of denying care but behaves with a culpability of at least recklessness in doing so. *See Pfaller*, 55 F.4th at 445. In the case of a doctor, deliberate indifference can be shown if the physician fails "to provide the level of care that a treating physician himself believes is necessary . . ." *Jackson*, 775 F.3d at 179. A prison medical director may be held liable even if they did not treat a particular patient if they implement a policy that denies care they realize is necessary. *See Gordon*, 937 F. 3d. at 362 (The medical director "may not escape liability by claiming that he did not know the identities of the inmates who would suffer under his policies . . . To rule otherwise would encourage

prison officials to turn a blind eye to the real-world consequences of their policymaking and permit them to escape liability for constitutional harms caused by their decisions.").

**a.** ███████████████████████████████████

Here, Dr. Amos was deliberately indifferent because he consciously disregarded the risk to Ms. Edwards and other patients by ████████████████████████████████████████

████████████████████████████████████████████████████ As the medical director, Dr. Amos was responsible for implementing clinical policies. SUMF 41. Dr. Amos was aware that denial of buprenorphine increased the risk of relapse, overdose, and death, and he has

████████████████████████████████████████████████████

████████████████████████ . SUMF 223-31. As the medical director and a physician who regularly prescribed buprenorphine, he could also be presumed to have knowledge of the risks of allowing OUD to go untreated. *See Gordon*, 937 F.3d at 360 ("by virtue of [Chief Physician's] role, it is entirely reasonable to presume that he is familiar with the risks presented by untreated [Hepatitis C Virus]."). ████████████████████████████████████

████████████████████████████████████████████████████

████ . SUMF 179.

Dr. Amos therefore ████████████████ that was knowingly contrary to the standard of care, and he has offered no medical justification for doing so. This is quintessential deliberate indifference. *See, e.g.*, *Gordon*, 937 F.3d at 360-61 (medical director could be held liable for "failing to rescind" Hepatitis C treatment guidelines that resulted in a blanket denial of treatment for certain categories of prisoners because he was aware that "a lack of treatment" for someone with Hepatitis C "creates a substantial risk of harm to that person"); *Lewis v. N. Carolina Dep't of Pub. Safety*, No. 1:15-cv-284-FDW, 2018 WL 310142, at *10 (W.D.N.C. Jan. 4, 2018) (policy that

"contravenes clearly established . . . professional medical community standard of care" for "non-medical reasons" could be deliberately indifferent).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████. A physician who diagnoses a patient

with a serious medical condition and prescribes them treatment, and then denies that same

treatment, is almost by definition deliberately indifferent. *See Jackson*, 775 F.3d at 179 (because

"failure to provide the level of care that a treating physician himself believes is necessary may

constitute deliberate indifference," plaintiff stated a claim when he alleged that what he "wanted

was exactly the testing and treatment that [defendant] prescribed") (cleaned up). In the same

manner, ██████████████████████████████████████████████████

████████████████████████████████████████. *See Gordon*, 937 F.3d at 360-

61. This is true even if the disease has not yet progressed to its most dangerous form. *See id.* at 359

(collecting cases for the proposition that "it is inconsistent with the Eighth Amendment for a prison

official to withhold treatment from an inmate who suffers from a serious, chronic disease until the

inmate's condition significantly deteriorates").

████████████████████████████████████████████████████████

████████████████████████████████████████. SUMF 179, 234. Ms.

Edwards even alerted the medical staff that she needed her prescribed buprenorphine and was

suffering because of their refusal to prescribe it. SUMF 172-73. ████████████████████

██████████████████████████.

In this way, this case is similar to *Smith v. Aroostook County*, in which a jail that had previously provided buprenorphine to a pregnant detainee later denied a non-pregnant woman buprenorphine based on a blanket policy. 376 F. Supp. 3d 146, 151 (D. Me. 2019). The court considered it relevant that the jail had the ability to prescribe buprenorphine to patients but was withholding it from non-pregnant patients for non-medical reasons. *See id.* at 159 (when the defendants "provided MAT to a pregnant woman, they did so in the Jail itself without any known problems. The Defendants have offered no reason that the same could not be done for Ms. Smith.").[11] Similarly, here, NCCIW was providing buprenorphine to pregnant prisoners in the prison "without any known problems." SUMF 156. Defendant James Alexander, an NCCIW healthcare administrator, even testified that there were no issues or concerns with diversion of the buprenorphine. SUMF 200. ███████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████.

The Court should therefore hold that Dr. Amos was deliberately indifferent to Ms. Edwards' serious medical need ███████████████████████████████████████

██████.

**b.** ████████████████████████████████████████

In addition, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ He was aware that forced termination of buprenorphine could cause unnecessary

---

[11] Although the court declined to reach the Eighth Amendment because it decided that denial of buprenorphine was an ADA violation, it recognized that, as of March 2019, "[t]he evidence presented in this action suggests that a scientific consensus is growing that refusing to provide individuals with their prescribed MAT is a medically, ethically, *and constitutionally* unsupportable denial of care." *Id.* at 161 n.20 (emphasis added).

suffering and that any change to the dosage of buprenorphine was supposed to be monitored using the Clinical Opiate Withdrawal Scale. SUMF 239-41. However, he refused to require the nursing staff to monitor patients using the Clinical Opiate Withdrawal Scale, or to implement a policy to taper the buprenorphine appropriately. SUMF 160, 163. Furthermore, the standard of care for buprenorphine termination, even when appropriate (which it was not here) is to slowly taper the buprenorphine over the course of weeks or months. SUMF 212.

Dr. Amos, as a physician with the x-waiver who treated many patients with addiction, would have been aware of this standard of care. ███████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████ His decision not to require monitoring under the Clinical Opiate Withdrawal Scale exacerbated this problem by ████████████████████████ ██████████████████████ and then refusing to monitor (and therefore know how to treat) that withdrawal. Even if a particular act by itself (e.g., failure to monitor) would not rise to the level of deliberate indifference, the circumstances of forced termination of buprenorphine, failure to taper properly, and the other instances of deliberate indifference that would exacerbate her pain as described herein must be considered. *See, e.g.*, *Charette v. Wexford Health Sources, Inc.*, No. 19-cv-33, 2023 WL 5876682, at *29 (D. Md. Sept. 11, 2023) (even if certain "circumstances, on their own, may only rise to the level of medical negligence[,]" the physician's knowledge of the patient's necessary course of treatment and failures to follow that course can "generate[] a dispute of material fact as to his deliberate indifference"); *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 382 (W.D. Va. 2020) ("That a totality of prison conditions can be combined to show an Eighth Amendment violation is a proposition established in many cases.") (quoting *Williams v. Griffin*,

952 F.2d 820, 824 (4th Cir. 1991)). He was therefore deliberately indifferent to Ms. Edwards' serious medical needs by consciously disregarding the risk of harm that she faced.

Although Ms. Edwards does not need to prove actual injury to establish her Eighth Amendment claim, here, she did suffer tremendously, both physically and mentally as a result of Dr. Amos's deliberate indifference. First, her withdrawal—without a proper buprenorphine taper or even adequate monitoring—was physically excruciating. She had vomiting, diarrhea, and severe pain that was even worse than childbirth. SUMF 164. These effects are the type of harm that go beyond the punishment of prison and are proscribed by the Constitution. *See, e.g.*, *Abraham v. McDonald*, 493 Fed. App'x. 465, 467 (4th Cir. 2012) ("pain, vomiting and blood in [plaintiff's] urine" sufficient to demonstrate "substantial harm" from a delay in treatment).[12] *See also Jamison v. Clarke*, No. 7:18-CV-00504, 2021 WL 969201, at *8 (W.D. Va. Mar. 15, 2021) (symptoms such as "frequent vomiting, blood in his vomit, continued and persistent pain, headaches, and a skin condition that was resistant to treatment" could be serious medical needs); *Jackson v. Blain*, No. 20-cv-01932 SVW-KS, 2022 WL 9538172, at *13 (C.D. Cal. July 29, 2022), *report and recommendation adopted*, No. 20-cv-1932 SVW-KS, 2022 WL 9544308 (C.D. Cal. Oct. 13, 2022) ("severe back pain and extreme symptoms of opioid withdrawal undisputedly establish the existence of a serious medical need"). Furthermore, her pain and suffering were entirely predictable from the forced termination of buprenorphine. SUMF 215. The denial of buprenorphine caused her suffering throughout the remainder of her incarceration. She experienced significant cravings for opioids that had been suppressed, and she recognized that these cravings put her at great risk for relapse and other harms. SUMF 175. As a single mother who looked forward to raising her children

---

[12] Because the *Abraham* case deals with *delay* of medical care, not *denial*, the plaintiff was required to show actual harm, not just risk of harm. This standard is inapplicable to the buprenorphine claim here, which involves a complete denial of care after Ms. Edwards gave birth.

when she was released, she suffered further emotional torment due to the fear that the risk of overdose might impact her ability to care for her children. *Id.*

Because Opioid Use Disorder rewires the brain for addiction, it is predictable that forced termination of buprenorphine will cause uncontrollable cravings, increasing the risks that Ms. Edwards faced, and causing ongoing physical and emotional suffering. *See* Scavone, 1280-81. This emotional suffering, just as much as physical suffering, when imposed without justification, is antithetical to treating prisoners with dignity and therefore is unconstitutional. *See, e.g.*, *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) (affirming summary judgment on the objective prong of deliberate indifference because the challenged conditions "pose a 'substantial risk' of serious psychological and emotional harm"). Although Ms. Edwards was able to access buprenorphine after her release from prison in 2021, she is frequently reminded of the pain and suffering caused by the termination of her buprenorphine and then its ongoing denial. SUMF 17. The purposeless pain and degradation therefore continue, ████████████████████████████████████████ ██████████████████████████████████████████████████████████████.

Therefore, the Court should grant summary judgment to Ms. Edwards and against Dr. Amos in his personal capacity on her Eighth Amendment claim regarding denial of buprenorphine and order a trial solely to assess damages.

### C. Ms. Edwards is entitled to summary judgment on the objective prong of her Eighth Amendment psychiatric medication claim.

It is undisputed that NCCIW provided Ms. Edwards with *no* psychiatric care for 74 days postpartum, and it is undisputed that NCCIW's failure to provide Ms. Edwards psychiatric care has *no* medical justification. SUMF 277-78. NCCIW simply allowed Ms. Edwards' prescriptions for psychiatric medications, prescribed by her UNC providers after she gave birth, to expire without any psychiatric consultation or evaluation. SUMF 264. As a result, Ms. Edwards—who was *known*

to have an extensive history of psychiatric treatment and was *known* to be in the vulnerable postpartum period—received no psychiatric care for 74 days after giving birth.

i. **It is undisputed that NCCIW did not provide Ms. Edwards postpartum psychiatric care.**

It is undisputed that Ms. Edwards did not receive any psychiatric care from NCCIW for 74 days after she gave birth. SUMF 277-78. Immediately after delivery, Ms. Edwards' UNC providers prescribed Zoloft and Vistaril to treat her mental health conditions. SUMF 256-57. These initial prescriptions were for two weeks' worth of medication, and her UNC doctors ordered that she be seen by a psychiatrist for a mood check at the end of those two weeks. SUMF 258-59. Once Ms. Edwards returned to NCCIW, however, Defendant Amos and his clinical staff allowed her prescriptions to expire with *no* medical consultation or evaluation. SUMF 264. NCCIW did not schedule the mood check that Ms. Edwards' UNC providers ordered. SUMF 266. And Ms. Edwards did not see a psychiatrist, or any provider permitted under NCCIW policy to prescribe psychotropic medications, until 74 days after giving birth. SUMF 277-78.

ii. **Ms. Edwards' postpartum psychiatric care was a serious medical need.**

As explained in Section 4.B.ii, *supra*, a "serious" medical need is one that has "been diagnosed by a physician as mandating treatment, or … is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (quoting *Iko*, 535 F.3d at 241) (cleaned up). There is no genuine dispute that Ms. Edwards' psychiatric care was a serious medical need. She was *repeatedly* diagnosed with psychiatric conditions mandating treatment—before incarceration, by NCCIW providers during her pregnancy, and by UNC providers after she gave birth. SUMF 245-53, 256-57, 270.

Ms. Edwards saw NCCIW psychiatrists during her pregnancy. SUMF 249-52. She reported existing diagnoses of severe mental health conditions, including bipolar disorder, and the NCCIW

psychiatrists diagnosed her with severe mental health conditions as well, such as anxiety and depression. SUMF 245-52. When Ms. Edwards entered NCCIW, she had existing psychotropic prescriptions, and had previously been prescribed Zoloft and Vistaril. SUMF 247-48. And NCCIW psychiatrists prescribed Vistaril and Zoloft during her pregnancy. SUMF 250, 252. During her pregnancy, Ms. Edwards chose to stop taking psychiatric medication due to concerns about her pregnancy health. SUMF 254-55. But immediately after giving birth, her UNC providers re-initiated her Vistaril and Zoloft (the same medications NCCIW had prescribed during her pregnancy). SUMF 256-57.

Many courts, including the Eastern District of North Carolina, have recognized that mental health conditions including anxiety, PTSD, depression, and bipolar disorder are serious medical conditions. *See, e.g. Belfield*, 2021 WL 4476625, at *4 (finding mental health conditions including bipolar disorder and anxiety disorder are "serious medical needs"); *Glaser*, 2023 WL 4052470, at *3 ("courts to consider the issue have found mental health issues, including severe anxiety, can rise to the level of a 'sufficiently serious' medical need for Eighth Amendment purposes."); *Miller*, 2017 WL 4284568, at *5 (finding objective component of Eighth Amendment claim satisfied where plaintiff had been diagnosed with "serious medical conditions" including bipolar disorder, depression, anxiety, and insomnia); *Mathis*, 2016 WL 183753, at *7 ("[b]ased on Plaintiff's allegations, he has a serious medical need, depression and other mental health issues.").

While Ms. Edwards' psychiatric history alone establishes a serious medical condition, it is the unrebutted opinion of Ms. Edwards' medical expert that because she was postpartum, she was at a serious risk of postpartum mood disorders. Postpartum depression and anxiety are serious "leading cause[s] of maternal mortality." Ex. B (Stuebe Expert Report) at 5.. Risk factors for postpartum depression and anxiety include personal history of depression or anxiety, comorbid

substance use disorder, and adverse life events." *Id.* And she was even *more* at risk for postpartum mood disorders as an incarcerated individual with a history of depression, anxiety, and substance use. *Id.* And "[a]mong women who give birth while incarcerated, 66% report symptoms of postpartum depression." *Id.* There is no genuine dispute that Ms. Edwards' postpartum psychiatric care was a serious medical need, and summary judgment should be granted to Plaintiff on the objective prong of her Eighth Amendment psychiatric medication claim.

### D. Plaintiff is entitled to summary judgment against Defendant Ishee on her Americans with Disabilities Act and Rehabilitation Act Claims

Ms. Edwards is entitled to summary judgment on her ADA and Rehabilitation Act claims against Defendant Ishee. She has established her prima facie case because she has provided undisputed evidence that (1) she has a disabilities, including OUD, PTSD, anxiety, bipolar disorder, and depression; (2) she is otherwise qualified to receive access to medical programs, services, or activities; and (3) she was denied the access to medical programs, services, or activities and her exclusion was by reason of her disability. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999). NCCIW's failure to provide her access to medical care or otherwise reasonably accommodate her disability is therefore unlawful under the ADA and RA. *See* Fed. R. Civ. P. 56(a).

### i. Ms. Edwards has disabilities as defined by the ADA.

A plaintiff has a "disability" for the purposes of the ADA if she (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Ms. Edwards has Opioid Use Disorder as well as mental health difficulties that limit her major life activities. SUMF 2, 3, 164, 168. Each of these qualifies her as an individual with a disability under the meaning of the ADA. Addiction to drugs is a "disability" under the ADA. *See* 42 U.S.C. § 12102, 28 C.F.R. § 35.108; *see A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 367 (4th Cir. 2008) ("Unquestionably, drug addiction constitutes an impairment under the ADA."). Ms. Edwards' OUD, when untreated, limits her major life activities such as sleeping, eating, and caring for herself. SUMF 164, 168. And Ms. Edwards's mental health difficulties substantially limit her major life activities such as concentrating, thinking, and communicating. SUMF 265; *see, e.g.*, *Baird*, 192 F.3d at 467. Troublingly, one ob/gyn who saw her postpartum agreed with her symptoms and that she should be prescribed Zoloft, but she indicated that NCCIW policy prohibited her from prescribing it. SUMF 270.

### ii. Ms. Edwards is an otherwise qualified person as defined by the ADA.

It is black letter law that the ADA applies to state prisoners, and that there is no ambiguity as to whether state prisoners are qualified individuals under the statute. *Yeskey.*, 524 U.S. at 210 (1998) (holding that the ADA "defines the term to include anyone with a disability."). As such, Ms. Edwards is a qualified individual by the terms of the statute because she was a state prisoner who, absent discrimination, would otherwise have access to NCCIW's programs, services, or activities.

### iii. Ms. Edwards was denied access to programs, services, or activities by reason of her disability due to NCCIW's blanket ban on MOUD and failure to provide reasonable accommodations.

Ms. Edwards was denied access to NCCIW's medical services. Medical services are a service under the ADA. *See e.g.*, *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 556 (D. Md. 2019) (quoting *Yeskey*, 524 U.S. at 210, and identifying medical services as a

service covered by the ADA).[13] Ms. Edwards had no choice but to "rely on prison authorities to treat h[er] medical needs," thus, "if the authorities fail to do so, [her] needs will not be met." *Estelle*, 429 U.S. at 103. Therefore, when Ms. Edwards was denied buprenorphine and her previously prescribed mental health medication, she was denied access to medical services.[14] And when NCCIW refused her requests for buprenorphine as prescribed, it denied her a reasonable accommodation.

Ms. Edwards was denied buprenorphine as part of NCCIW's blanket ban on provision of MOUD. SUMF 179. She was allowed to be on buprenorphine when she was pregnant. SUMF 154. But she was involuntarily removed postpartum. SUMF 160. Defendants do not deny or alter medically necessary, physician-prescribed medications to prisoners to accommodate other serious, chronic medical conditions such as diabetes. *See* Defendants' Answer to First Amended Complaint, Dkt. 30, ¶ 166. Rather, they have a blanket ban only for MOUD, and thus, individuals with OUD are denied access to NCCIW's medical services solely by reason of their disability.

Other courts have held clearly that such blanket denials of MOUD violate the ADA. *See e.g.*, *Pesce*, 355 F. Supp. 3d at 45–47 (D. Mass. 2018) (holding that a denial of methadone, a form of MOUD, was a denial of medical services that likely violated the ADA); *Smith*, 376 F. Supp. 3d at 159–61 (holding that denial of MAT (a synonym for MOUD) likely violated the ADA for a

---

[13] The Department of Justice—the federal agency tasked with administering Title II and promulgating regulations implementing it—has interpreted Title II to apply to "anything a public entity does." 28 C.F.R. Pt. 35, App. B (Section 35.102 Application) at 687 (2017).

[14] The Department of Justice itself has used jail programs that deny prescribed MOUD as a clear example of a policy that violates the ADA. *See* U.S. Dep't of Justice, *The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery* 2, https://archive.ada.gov/opioid_guidance.pdf [https://perma.cc/AUE3-LELG]. Although not binding, the Supreme Court has counseled that the views expressed by the Department of Justice in the implementing ADA regulations "warrant respect." *Olmstead v. L.C., 527 U.S. 581*, 597–98 (1999).

plaintiff who was incarcerated at a prison that had only provided buprenorphine to a pregnant detainee); *M.C. v. Jefferson Cnty., New York*, No. 6:22-CV-190, 2022 WL 1541462, at \*4 (N.D.N.Y. May 16, 2022) ("Plaintiffs have been diagnosed with OUD and will be eligible for medical treatment while incarcerated at Jefferson Correctional . . . The refusal to provide access to methadone deprives plaintiffs 'meaningful access' to Jefferson Correctional's healthcare services."); *P.G. v. Jefferson Cnty., New York*, 2021 WL 4059409, at \*5 ("a refusal to guarantee access to methadone treatment likely violates the ADA"). Ms. Edwards required access to medical services, but was denied. That constitutes disability discrimination under the ADA and RA. *See Bone v. Univ. of N. Carolina Health Care Sys*., No. 1:18-cv-994, 2023 WL 4144277, at \*17 (M.D.N.C. June 22, 2023) ("Taken together, the Acts prohibit the exclusion of individuals with disabilities from the services, activities, and programs, including health programs, of entities receiving public funding.").

Furthermore, NCCIW's failure to make an accommodation for Ms. Edwards' request for buprenorphine treatment for her OUD violates the ADA and the RA. *See Smith*, 376 F. Supp. 3d at 160 ("Without her desired accommodation, the Plaintiff will be deprived of the only form of treatment shown to be effective at managing her disability and therefore will be denied 'meaningful access' to the Jail's health care services."). Ms. Edwards specifically requested MOUD treatment consistent with her physician's recommendations, which equate to requests to be exempt from NCCIW's blanket ban on MOUD. SUMF 172. These requests were denied, with no other reason other than that it was against policy.  SUMF 173. And her requests were reasonable: NCCIW had provided her with the exact same treatment without issue when she was pregnant. SUMF 154; *Smith*, 376 F. Supp. 3d at 160 ("The Plaintiff's request was not unreasonable, as evidenced by the fact that the Defendants previously provided the same accommodation to a pregnant inmate without

issue"). Therefore, NCCIW denied Ms. Edwards a reasonable accommodation through its failure to provide Ms. Edwards with necessary treatment for her disability.

Ms. Edwards was similarly denied continued access to mental health services postpartum. Ms. Edwards was unable to meet with a psychiatrist for 74 days after giving birth and did not restart her Zoloft of Vistaril despite having prescriptions and repeated entries into her medical records by non-psychiatrist medical providers that these prescriptions were necessary for her health. SUMF 262, 269-70. NCCIW's long delay in providing mental health services and psychotropic care was a failure to reasonably accommodate her severe depression and other mental health issues postpartum. NCCIW thus failed to allow Ms. Edwards to fully participate in the mental health services that it offered. *See Brown*, 383 F. Supp. 3d at 556 (listing "medical services" as a program or service); *see also, e.g.*, *Paine ex re. Eilman v. Johnson*, No. 06-cv-3173, 2010 WL 785397, at *8 (N.D. Ill. Feb. 26, 2010) (finding that failure to provide psychiatric treatment or evaluation is a denial of a reasonable accommodation of a psychiatric disability). By denying Ms. Edwards access to the same mental health services that it offered others, NCCIW denied her access to these services by reason of her disability.

### iv. Defendants were deliberately indifferent to the substantial likelihood that Ms. Edwards' rights under the ADA and RA would be violated.

The ADA and RA generally afford plaintiffs "a full panoply of legal remedies," including compensatory damages. *Pandazides*, 13 F.3d at 830 & n.9; *Torcasio*, 57 F.3d at 1342 n.2. Compensatory damages are available for intentional discrimination within the meaning of the ADA and RA, which encompasses acts of discriminatory animus and deliberate indifference alike. *See id.*; *see also Smith v. N.C. Dep't of Safety*, 2019 WL 3798457, at *3 (M.D.N.C. Aug. 13, 2019) ("While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination [so as to recover compensatory damages], the majority of circuits to have

decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit.").[15] Deliberate indifference exists where a defendant has "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Lacy*, 897 F.3d at 863 (internal quotation marks and citation omitted). Thus, "compensatory damages are available for failure to accommodate a plaintiff if defendants acted knowingly, voluntarily, and deliberately, even if the violations resulted from mere thoughtfulness [sic] and indifference rather than because of any intent to deny Plaintiff's rights." *Innes v. Bd. of Regents of Univ. Sys. of Maryland*, 29 F. Supp. 3d 566, 583 (D. Md. 2014); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 374 (D. Md. 2011) ("[T]he question of intent in accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she. Rather, intentional discrimination is shown by an intentional, or willful, violation of the Act itself." (quoting *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998))).

Ms. Edwards readily meets this test.

### 1. Defendants knew that harm to a federally protected right was substantially likely.

"When the plaintiff has alerted the public entity to [her] need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Ms.

---

[15] *Accord*, *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (deciding to "follow in the footsteps of a majority of our sister courts and hold that a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504 of the RA and [Title II] of the ADA"); *Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018) ("We now agree with the majority of courts that have spoken on the question and hold that a plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference.").

Edwards repeatedly alerted the prison to her need for accommodation.

Among other efforts, she submitted numerous requests to be placed back on the medication that she was previously allowed to have. SUMF 172, 267, 271. And she spoke with a doctor during a postpartum visit in January and indicated her need for psychotropic medication. SUMF 270. Multiple providers also noted that she needed to be seen by "Mental Health" to renew her prescribed medication. SUMF 268-69.

In February, she filed a medical grievance expressing her need for MOUD. SUMF 172. NCCIW medical staff denied her claims, loosely referencing policy. SUMF 173. Since both Ms. Edwards and multiple health care staff noted the need for her medications in Ms. Edwards' official prison medical records, Defendants were clearly aware of the need to provide these medications. *See Est. of LeRoux v. Montgomery Cnty., Maryland*, No. 8:22-CV-00856-AAQ, 2023 WL 2571518, at *8 (D. Md. Mar. 20, 2023) ("A plaintiff can establish that a defendant had such knowledge by showing that the individual with a disability or a third party explicitly asked for modification, though a specific request is not required."). Defendants were also clearly aware of Ms. Edwards' need for MOUD, since they had previously prescribed her this medication, and they only denied it to her due to their policy to deny such medication to non-pregnant patients.

### 2. Defendants failed to act on their knowledge.

Defendants failed to act on their knowledge of Ms. Edwards's needs for MOUD and mental health medication.

Defendants not only failed to accommodate Ms. Edwards's OUD when they denied her buprenorphine, her previously prescribed and explicitly requested accommodation, they failed to provide her any accommodation for her OUD postpartum. Ms. Edwards continued to have an active prescription for buprenorphine when she returned to the prison on December 22, 2019. SUMF 158. Defendants nevertheless refused to provide her with her medication starting on December 23, 2019,

even after she requested it via sick call or grievance. SUMF 160, 173. Several medical providers, including Defendant Amos, had an "x waiver"—the only legal requirement for prescribing buprenorphine beyond ordinary legal requirements to prescribe controlled substances. SUMF 188, 190-92. And NCCIW had a contract in place with a pharmacy that allowed them to purchase buprenorphine. SUMF 194. Defendants never requested the right to prescribe buprenorphine to non-pregnant people, and no state-level entity (such as NCDPS or the Department of Health or Human Service) ever told them that they could not prescribe buprenorphine to non-pregnant people. SUMF 195-99. Additionally, Defendants failed to taper Ms. Edwards from buprenorphine properly or to monitor her during her withdrawal. SUMF 161-74.

Similarly, though doctors at the hospital had prescribed her with medications including Zoloft and ordered a postpartum mood check after giving birth, once she returned to prison, Defendants failed to schedule her for a mood check with any practitioner who was authorized under NCCIW policies to prescribe her Zoloft or Vistaril. SUMF 256-59, 266, 278. An ob/gyn who saw her noted that Ms. Edwards should be prescribed Zoloft, but stated that prison policy prohibited her from doing so. SUMF 270. Despite her numerous requests, the prison did not renew her medications or even schedule Ms. Edwards to see a psychiatrist until 74 days after postpartum. SUMF 278.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff requests the Court to enter summary judgment for her and against Defendant Benita Witherspoon in her personal capacity on Plaintiff's Eighth Amendment claim regarding shackling; against Defendant Elton Amos in his personal capacity on Plaintiff's Eighth Amendment claims regarding denial of buprenorphine; against Defendant Amos on the objective component of her Eighth Amendment claim regarding denial of psychiatric

medication and mental health care; and against Defendant Todd Ishee in his official capacity on Plaintiff's Americans with Disabilities Act and Rehabilitation Act claim; and to send the remainder of her claims to trial. In the alternative, Plaintiff requests that the Court send all of Plaintiff's claims to trial.

Dated: October 11, 2023

Respectfully submitted,

*/s/ Lauren Kuhlik*
Lauren Kuhlik (*By Special Appearance*)
Hassan Zavareei (*By Special Appearance*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave. NW, Ste 1010
Washington, D.C. 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: lkuhlik@tzlegal.com
      hzavareei@tzlegal.com

Erika K. Wilson
N.C. Bar. No. 45020
Elizabeth Guild Simpson
N.C. Bar No. 41596
**University of North Carolina School of Law Clinical Programs**
102 Ridge Road
Chapel Hill, NC 27514
Telephone: (919) 962-2552
Fax: (919) 962-2883
Email: wilsonek@live.unc.edu
      elizabeth@emancipatenc.org

*Local Rule 83.1 (d) Counsel for Plaintiff*

April N. Ross (*By Special Appearance*)
NC Bar No. 35478
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 624-2500
Email: aross@crowell.com

Oren Nimni (*By Special Appearance*)
D Dangaran *(By Special Appearance)*
**Rights Behind Bars**
416 Florida Avenue, NW #26152
Washington, D.C. 20001

Phone: (202) 540-0029
Email: oren@rightsbehindbars.org
        d@rightsbehindbars.org

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of October, 2023 a copy of the foregoing was filed and served via the Court's CM/ECF system, which shall separately serve via electronic mail upon all counsel of record.

 _/s/ Lauren Kuhlik_
Lauren Kuhlik