THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO.  5:21-CT-03270-D

|  |  |
|---|---|
| TRACEY EDWARDS,<br><br>               Plaintiff,<br><br>v.<br><br>TODD ISHEE, et al.,<br><br>               Defendants. | **MEMORANDUM OF LAW<br>IN SUPPORT OF<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

NOW COME Defendants, by and through undersigned counsel, and respectfully move the Court for summary judgment on Plaintiff's claims pursuant to Fed. R. Civ. P. 56(a), and respectfully submits this Memorandum of Law in support of Defendants' Motion for Summary Judgment [DE 214].

## INTRODUCTION

This lawsuit alleges violations of an offender's constitutional rights while under the supervision of medical professionals and correctional staff at the North Carolina Correctional Institution for Women (NCCIW). Specifically, Plaintiff alleges the use of restraints during her pregnancy, the discontinuation of daily suboxone treatment after she delivered her baby, and the denial of certain postpartum mental health treatment violated her rights under the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act. However, after an extensive discovery process, Plaintiff has failed to produce sufficient evidence to support her claims. No

genuine issue of material fact exists, and based on the authorities and arguments presented below, judgment in Defendants' favor is proper as a matter of law.

## STATEMENT OF THE CASE

Plaintiff commenced this litigation on September 2, 2021. [DE 1] Plaintiff's Second Amended Complaint, filed on April 7, 2022, is the operative complaint in this action. [DE 39] Plaintiff brings twenty-one claims against thirteen Defendants, which can be summarized as follows:

- Violation of the Eighth Amendment, accusing Defendants of cruel and unusual punishment for using restraints on Plaintiff during her pregnancy, transport to the hospital, labor and delivery, and postpartum period.

- Violation of the Eighth Amendment, the ADA, and the Rehabilitation Act, for tapering Plaintiff off opioids following childbirth and the immediate postpartum period.

- Violation of the Eighth Amendment, the ADA, and the Rehabilitation Act, alleging that Defendants failed to provide necessary medical and mental health treatment postpartum.

[DE 39] Plaintiff seeks a declaratory judgment, injunctive relief, compensatory damages, punitive damages, costs and attorneys' fees. [DE 39]

## UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 56.1(c), Defendant incorporates by reference its Statement of Undisputed, Material Facts [DE 215], filed contemporaneously with this memorandum of law in support of Defendants' motion for summary judgment.

## PARTIES' EXPERTS AND REPORTS

Plaintiff's expert is **Dr. Alison M. Stuebe**, a board-certified Maternal-Fetal Medicine subspecialist who provides "preconception, prenatal, intrapartum, and postpartum care for medically complicated pregnancies, including individuals with mental health conditions and substance use disorder." (Pl's Expert Report of Dr. Allison Stuebe, p 2)

Defendants' expert is **Dr. Paul Adler**, the Chief Executive Officer and Chief Medical Officer for Correctional Health Management, which provides and oversees healthcare services in the correctional setting. (Defs' Expert Report of Dr. Adler, pp 1-2) Dr. Adler has served as an expert witness in seven cases since 2017.

Both Dr. Stuebe and Dr. Adler opined on (1) the use of restraints, (2) the provision of suboxone and other opioid medications, and (3) mental health treatment for pregnant and postpartum offenders generally and Plaintiff specifically. (Stuebe Rep. pp. 2-8; Adler Rep., pp 3-8)

### (1) Use of Restraints

Dr. Stuebe opined that any shackling of pregnant, laboring, and postpartum people is a violation of human rights and of standard of care. (Stuebe Rep. p 2) Dr. Stuebe specifically averred that the use of restraints on Plaintiff at any point during pregnancy, labor, or postpartum violated the standard of care because it can lead to complications and heightened risks to mother and baby. (Stuebe Rep. p 3) For example, because of joint laxity and a shifting center of gravity during pregnancy, restraints can increase the risk of falling. If the offender falls on their abdomen, the force of the fall can cause the placenta to detach

3

from the uterus, causing placental abruption, fetal distress, life-threatening bleeding, and stillbirth. (Stuebe Rep. p 4) Dr. Stuebe concluded that using restraints on Plaintiff "during her daily transport to and from Southlight for MOUD, and during her transfer to the hospital, put her and her fetus at risk of avoidable harm."

Conversely, Dr. Adler acknowledged that the use of restraints for pregnant offenders has evolved since the events giving rise to this suit. (Adler Rep. p 7) For non-pregnant offenders, it is customary across all correctional systems to use restraints any time an offender is being transported to or from a court appearance or a medical appointment. (Adler Rep. p 7) Even an unconscious offender will be restrained at one arm and one leg while in a hospital bed. (Adler Rep. p 7) In 2019, a pregnant inmate would ordinarily be transported with wrist restraints in the front so long as she is not in active labor. (Adler Rep. p 7) Dr. Adler explained that the use of restraints during active labor was rare in 2019, and even in the event restraints were used, they would always be removed if requested by medical personnel. (Adler Rep. pp 7-8)

During the acute post-partum period (up to 72 hours after delivery), there is no standard of care regarding the use of restraints. (Adler Rep. p 8) Dr. Adler concluded that *if* restraints were placed on Plaintiff after delivery, it would be consistent with common practice for non-pregnant inmates in a non-locked hospital unit. (Adler Rep. p 8)

Dr. Stuebe and Dr. Adler's expert opinions align with respect to the material facts: the risk of falls during pregnancy, and the potential harm of a fall to the fetus, justify the use of wrist restraints in the front during transport, and removal of restraints during active labor and delivery.

4

**(2) Provision of Opioid Medications**

Dr. Stuebe opines that the standard of care for someone with Opioid Use Disorder (OUD) is Medication for Opioid Use Disorder (MOUD). (Stuebe Rep. pp 3, 5) Dr. Stuebe cites guidelines published in 2017 for treatment of OUD in pregnancy, which recommend MOUD is recommended during pregnancy and postpartum to avoid fatal relapse. (Stuebe Rep. p 6) Dr. Stuebe also observes that incarcerated individuals with OUD are especially vulnerable to overdose death following release from prison. (Stuebe Rep. p 6)

Dr. Stuebe's report concludes that discontinuation of MOUD after Plaintiff was released from the hospital, and the use of oxycodone instead of buprenorphine during the tapering period, violated the standard of care. (Stuebe Rep. pp 6-7) Dr. Stuebe also notes that in October 2019 the Department of Health and Human Services recommended tapering the use of opioids over the course of four weeks for patients who used opiates for chronic pain. (Stuebe Rep. p 7)

Finally, Dr. Stuebe states that, "[i]n clinical care, it is the standard of care to quantify withdrawal symptoms with Clinical Opiate Withdrawal Scale score, or COWS score, and the presence of symptoms is used to inform treatment." (Stuebe Rep. p 7) Dr. Stuebe states that no COWS scores[1] are documented in Plaintiff's medical record, and cites a 2020 resource for guidelines on how to treat withdrawal symptoms for pregnant offenders. (Stuebe Rep. p 7)

---

[1] Dr. Adler also notes that Plaintiff's medical records should reflect official COWS scores. (Adler Rep. p 7)

5

Dr. Adler's expert report supplements Dr. Stuebe's expert opinions by, first, explaining the difference between Medication for Opioid Use Disorder (MOUD) and Medication Assisted Treatment (MAT). MOUD emphasizes medication as the primary or sole treatment for OUD, whereas MAT utilizes medication as part of a larger treatment plan that includes counseling and behavioral therapy. (Adler Rep. p 5) Most correctional facilities that treat OUD today use MAT, not MOUD. (Adler Rep. p 5) Dr. Adler also notes that there is more acceptance of using opioid medication, such as suboxone, in the correctional setting today than there was in 2019. (Adler Rep. p 5)

Dr. Adler's report points out that many facilities providing suboxone experience significant problems with diversion, leading to hoarding, sharing, or selling suboxone within the facility. (Adler Rep. p 5) In fact, Dr. Adler observes, Plaintiff herself diverted suboxone during her incarceration at NCCIW. (Adler Rep. p 5) It was common in 2019, Dr. Adler notes, for correctional facilities not to continue the use of narcotics. (Adler Rep. p 6) The perspective at the time was that the correctional system should not be complicit in continuing or enabling addiction. (Adler Rep. p 6)

In 2019, there was no standard of care for when to stop using suboxone for a formerly-pregnant inmate after delivery, or even whether to use suboxone at all to treat inmates with OUD. (Adler Rep. pp 5-6). Dr. Adler states that it was "definitely not the norm" or the standard of care to provide suboxone in the correctional setting in 2019. (Adler Rep. p 6) When MAT or MOUD is offered, "an oxycodone taper is part of a widely acceptable spectrum of humane withdrawal protocols for the tapering off of illegal narcotics." (Adler Rep. p 5) Dr. Adler also observed no evidence in Plaintiff's medical

6

records of nausea, vomiting or diarrhea related to opioid withdrawal, but notes that if Plaintiff complained of those symptoms, they should have been treated. (Adler Rep. p 7) Dr. Adler does observe that Plaintiff received Benadryl and Tylenol for suboxone withdrawal. (Adler Rep. p 7)

### (3) Mental Health Treatment

Dr. Stuebe's report highlights the risks of postpartum depression and anxiety among the general population, and observes that 66% of women who give birth while incarcerated report symptoms of postpartum depression. (Stuebe Rep. p 5) Dr. Stuebe states that NCCIW did not provide post-partum psychiatric care until 72 days after childbirth, and that this delay equates to a violation of the standard of care. (Stuebe Rep. p 5)

Again, Dr. Adler's report provides more detail. Dr. Adler explains that the postpartum period is divided into two phases: acute and sub-acute. (Adler Rep. p 6) The first 8-19 hours after delivery is the acute phase, and the sub-acute phase usually lasts up to two weeks but may last up to six weeks. (Adler Rep. p 6) A delayed postpartum period can last up to eight months. (Adler Rep. p 6)

Dr. Adler's report then refers to Plaintiff's medical records, observing that Plaintiff was monitored by mental health providers and did not exhibit symptoms of severe depression at two weeks postpartum. (Adler Rep. p 6) Plaintiff received the medication permitted by Kaiser Permanente[2] to treat any symptoms she reported, but frequently chose not to take her prescribed medications. (Adler Rep. pp 6-7) Plaintiff also expressed she did

---

[2] Plaintiff received the same medication a non-inmate would receive in a Kaiser Permanente clinical setting. (Adler Rep. pp 4, 7)

7

not want to continue taking one of the medicines and was prescribed a new medication. (Adler Rep. pp 6-7) Dr. Adler observes, based on Plaintiff's medical records, that Plaintiff exhibited no ill effects from the change in her medication or her own noncompliance with her prescribed medications. (Adler Rep. p 7)

## APPLICABLE LEGAL STANDARDS

Summary judgment is proper where the pleadings, depositions, affidavits, and other materials, when considered in the light most favorable to the nonmoving party, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 283 (4th Cir. 2004). The nonmoving party must affirmatively demonstrate a genuine issue of material fact in order to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'"). If the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

Although the evidence is viewed in the light most favorable to the nonmoving party, any inferences drawn "must still be within the range of reasonable probability." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995) (quotation omitted). Conclusory allegations, speculative assertions, or conjecture are insufficient to defeat a properly supported motion for summary judgment. *See, e.g., Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir. 2002).

8

## ARGUMENT

### I.     Eleventh Amendment Immunity Bars Claims Brought Against Official Capacity Defendants.

A claim against a state official is a claim against the state itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The Eleventh Amendment bars claims brought against the state in federal court. U.S. Const. amend. XI. Therefore, Plaintiff's claims brought against Defendants in their official capacity are barred and must be dismissed as a matter of law.

The Eleventh Amendment provides, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *Id.* Eleventh Amendment protection extends to "state agents and state instrumentalities," meaning arms of the state and state officials. *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001). Put another way, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. Therefore, state officers acting in their official capacity are entitled to Eleventh Amendment immunity and summary judgment is appropriate.

Here, Plaintiff attempts to bring claims against the following state officers in their official capacities:

9

- Todd Ishee.[3], in his official capacity as Secretary of the North Carolina Department of Public Safety;

- Anthony Perry,[4] in his official capacity as the Warden of the North Carolina Correctional Institution for Women;

- Dr. James Alexander, in his official capacity as the Healthcare Facility Health Treatment Administrator of the North Carolina Correctional Institute for Women;

- Dr. Gary Junker, in his official capacity as the Director of Health and Wellness Services of the Department of Public Safety; and

- Dr. Elton Amos, in his official capacity as the Medical Director for the North Carolina Correctional Institution for Women.

[DE 39] All of Plaintiff's claims against these Defendants in their official capacities are barred by Eleventh Amendment immunity. *See, e.g., Will*, 491 U.S. at 71. Accordingly, Count I should be dismissed as to Defendants Ishee and Perry; Count II should be dismissed as to Defendants Ishee, Perry, Alexander, Junker and Amos; and Counts III-VII should be dismissed in their entirety.

The official capacity Defendants (i.e., Ishee, Perry, Alexander, Junker and Amos), as extensions of the State, enjoy immunity from Plaintiff's claims. *Id.* Defendants are entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 56(a) and these claims

---

[3] The current DPS Secretary, Todd Ishee, has been substituted for Eddie Buffaloe, who was the DPS Secretary at the time Plaintiff's Complaint was filed.

[4] The current Warden, Anthony Perry, has been substituted for Claudette Edwards, who was the NCCIW Warden at the time Plaintiff's Complaint was filed.

should be dismissed.

## II.   Qualified Immunity Bars Plaintiff's Claims Brought Against Individual Capacity Defendants.

Under the doctrine of qualified immunity, claims brought against state actors for individual liability are also barred so long as those individuals' actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See, e.g., Danser v. Stansberry,* 772 F.3d 340, 345 (4th Cir. 2014) (reversing district court's denial of qualified immunity for prison officials). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

When determining whether qualified immunity applies, courts follow the two-step approach outlined by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), as modified by the Court's later decision in *Pearson*. *See Danser*, 772 F.3d at 345. First, a court must determine whether the undisputed facts demonstrate that the defendant's actions violated the plaintiff's rights. *Id.* at 346 (citations omitted). "When the plaintiff has satisfied this initial step, a court must determine whether the right at issue was clearly established at the time of the events in question." *Id.* (quotations and citations omitted). These determinations are questions of law and appropriately made at the summary judgment stage by a court, not at a trial by a jury. *See, e.g.,* W*illingham v. Crooke,* 412 F.3d 553, 560 (4th Cir. 2005).

11

Plaintiff's remaining claims are brought against the following individual capacity Defendants under three theories of liability:

- Benita Witherspoon, Kavona Gill, Tamara Brown, Nikitia Dixon, Tammy Williams, Shelda Brodie, Tianna Lynch, and Lorafaith Ragano for violations of Plaintiff's Eighth Amendment rights related to the use of restraints (Count I);

- Benita Witherspoon, Dr. James Alexander, Dr. Gary Junker, and Dr. Elton Amos for violations of Plaintiff's Eighth Amendment rights related to the denial of MOUD (Count II); and

- Dr. Elton Amos, to the extent this claim is brought against Dr. Amos in his personal capacity, for violations of Plaintiff's Eighth Amendment rights related to the alleged denial of mental health treatment postpartum (Count V).

[DE 39] To present these claims to a jury, Plaintiff must be able to demonstrate that she had a clearly established constitutional right that was violated by each individual-capacity Defendant. Otherwise, these Defendants are entitled to qualified immunity and Plaintiff's claims fail as a matter of law. *E.g.*, *Danser,* 772 F.3d at 345.

As explained below, there is no support for Plaintiff's claims that either her rights were violated or those rights were "clearly established" at the time of the alleged violation. The individual-capacity Defendants acted reasonably at all times, and their actions did not violate Plaintiff's clearly established rights. The remaining claims, i.e., the ones not barred outright by the Eleventh Amendment, are subject to dismissal as a matter of law under the doctrine of qualified immunity. *See, e.g., Fauconier v. Clarke*, 966 F.3d 265, 280 (4th Cir. 2020) (affirming district court's dismissal of plaintiff's claims for damages against defendants in their individual capacities on qualified immunity grounds).

12

**A. A pregnant inmate does not have a clearly established Eighth Amendment right to be free from restraints during transport, labor, or after delivery.**

The first step in the qualified immunity analysis is to determine whether the undisputed facts show that Defendants' actions violated Plaintiff's Eighth Amendment rights. According to the complaint, Plaintiff alleges that she was restrained during transport, labor, and within one hour of childbirth. [DE 39, ¶¶ 25-34] However, the record evidence demonstrates that Plaintiff was only restrained during transport to the medical facilities where she received care, and during the postpartum period, eight hours after giving birth, while a patient at UNC Hospital, a nonlocked facility. (DPS policy F.1100, effective date 09/06/2018, attached and incorporated herein as Exhibit E; UNC medical records, attached and incorporated herein as Exhibit L, p. 168) There is no legal authority to support Plaintiff's position that the use of restraints in these settings violated Plaintiff's rights, and her claims should be dismissed as a matter of law.

**1. Even assuming, without conceding, that Plaintiff was restrained by handcuffs or leg irons during labor, the use of restraints during labor is not a violation of Plaintiff's clearly established Eighth Amendment rights.**

The allegations in the Second Amended Complaint that Plaintiff was restrained either by handcuffs or leg shackles during labor are unsubstantiated. She has failed to produce any evidence to support these allegations. (Ex. L, pp. 167-168, Dixon Dep. Tr., pp 97-98, Lynch Dep. Tr., pp 50-51, Williams Dep. Tr., pp 35-39) However, even assuming Plaintiff could produce evidence of this allegation sufficient to overcome summary judgment, there is no binding case law in this jurisdiction holding that the use of restraints during labor equates to a violation of Plaintiff's Eighth Amendment rights. In fact, the only

13

case addressing the use of restraints on pregnant offenders in this district held that the use of restraints during labor, delivery, and shortly thereafter did <u>not</u> violate a clearly established right. *Fain v. Rappahannock Reg'l Jail*, No. 3:12cv-293-JAG, 2013 U.S. Dist. LEXIS 86384, at *14 (E.D. Va. June 19, 2013). In that case, the district court found that, because there was no clearly established right that had been violated, defendants were entitled to qualified immunity and plaintiff's claims were barred. *Id.*

Since *Fain* was decided, Defendants note that courts in other jurisdictions have held that the use of restraints during labor violates a clearly established right. *See Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563 (6th Cir. 2013); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522 (8th Cir. 2009); *Brawley v. Washington*, 712 F. Supp. 2d 1208 (W.D. Wash. 2010). These decisions, while not controlling, may of course be instructive to this Court's analysis. However, in order for this court to even consider those decisions in its analysis, it would first have to find that Plaintiff met her burden to point to specific evidence in the record, beyond the bald assertions of her complaint, supporting her allegation that she was restrained during labor. *Accord Smith v. Perry*, No. 1:16-cv-396, 2018 U.S. Dist. LEXIS 131047, at *54 (M.D.N.C. Aug. 2, 2018) (granting summary judgment on plaintiff's constitutional claim because bald assertions and conclusory allegations, unsupported by record evidence, fail to provide any basis from which a reasonable fact finder could rule in her favor); *Tillery v. Borden*, No. CBD-07-1092, 2010 U.S. Dist. LEXIS 92501, at *20-21 (D. Md. Sept. 3, 2010) (granting summary judgment because plaintiff's "bald assertion is insufficient to overcome a motion for summary judgment which is supported by record evidence.").

14

Even if Plaintiff could point to record evidence supporting her allegation that she was restrained during labor, which she cannot, the Fourth Circuit has not recognized a clearly established Eighth Amendment right to be free from restraints during labor, and Defendants would be entitled to qualified immunity on this claim.

### 2. A pregnant inmate does not have a clearly established Eighth Amendment right to be free of restraints during transport.

The undisputed material facts demonstrate that, while pregnant, Plaintiff was restrained during transport to Southlight and UNC Hospital, where she received medical treatment. There is no case law to support Plaintiff's position that the use of restraints during transport violates her Eighth Amendment rights. Defendants are entitled to qualified immunity and Plaintiff's claim should be dismissed as a matter of law.

The most relevant decision of which Defendants are aware involving a pregnant inmate challenging the use of restraints during transport is *Brown v. Cumberland Cnty.*, 557 F. Supp. 3d 169 (D. Me. 2021). There, the plaintiff alleged that correctional officers violated her constitutional rights when they handcuffed her at 35 weeks pregnant during transport from the prerelease center to the main jail while accompanied by a correctional officer. *Id.* at 177. State law and the correctional facility's policy prohibited the use of restraints on pregnant inmates. *Id.* at 174-75. Defendants asserted that qualified immunity barred plaintiff's claim because they had not violated a clearly established constitutional right. *Id.* at 176.

The district court explained that the central question in determining whether a right was clearly established is "whether the law was sufficiently clear that every reasonable

official would understand that what he is doing is unlawful." *Id.* (internal quotations and citation omitted). "The legal principle at issue must have a sufficiently clear foundation in then-existing precedent," the court went on, "and it must be dictated by controlling authority or a robust consensus of cases of persuasive authority–not just suggested by precedent." *Id.* at 176-77 (internal quotations and citations omitted).

Yet, the district court observed, the plaintiff failed to "identify a single case in which a court has held that it was unconstitutional to handcuff a pregnant woman who is not in labor or immediately post-partum." *Id.* at 178-79. Even acknowledging that state law in Maine prohibited the use of restraints on a pregnant inmate at the time of the facts giving rise to the suit (which is not the case here), the court held that, "[w]ithout case law that establishes widespread acceptance of a federal constitutional right, state law is not enough." *Id.* at 179.

Plaintiff here faces the same reality as the plaintiff in *Brown*: there is simply no clear legal foundation or controlling authority dictating that the use of restraints on a pregnant inmate during transport violates the inmate's Eighth Amendment rights to be free from cruel and unusual punishment.

Moreover, even a facility or agency policy prohibiting the alleged conduct by state actors is inadequate to establish a violation of a clearly established constitutional right. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."). Therefore, even though the Department of Public Safety had announced a directive in November 2019 that restraints should not be used on pregnant

16

inmates during transport, [Email dated November 22, 2019, attached and incorporated herein as Exhibit H, p. 3] a violation of this directive by correctional officers at NCCIW in December 2019 does not demonstrate that Defendants violated Plaintiff's clearly established constitutional rights. *Id; see also Brown,* 557 F. Supp. 3d at 179 (quoting *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) ("While a violation of state law may bolster the plaintiff's argument that a reasonable officer in the officer's circumstances would have believed that his conduct violated the Constitution it does not, in and of itself, establish a constitutional violation.") (cleaned up)). Nor does the fact that the policy changed serve as evidence that the officers' conduct violated Plaintiff's constitutional rights. *Fain*, 2013 U.S. Dist. LEXIS 86384, at *16 ("That the defendants changed their approach does not demonstrate that their initial policy violated the Eighth Amendment. At best, it shows a willingness to make a change that seems reasonable, although not constitutionally required.")

In fact, Defendants' actions were consistent with DPS policy, as alleged in the complaint. DPS Policy F.1100, "Transporting Offenders" expressly allows the use of wrist restraints "during any internal escort or external transport" of a pregnant offender. [DE 39, ¶ 70] According to DPS policy, "wrist restraints shall only be applied in the front and in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall." *Id.* Officer's shift notes, Plaintiff's medical records, and testimony from various individuals who accompanied and/or observed Plaintiff during her incarceration, demonstrate that while pregnant, Plaintiff was only restrained using handcuffs on her wrists, placed at the front of her body, during transport to an outside facility for medical

inmates during transport, [Email dated November 22, 2019, attached and incorporated herein as Exhibit H, p. 3] a violation of this directive by correctional officers at NCCIW in December 2019 does not demonstrate that Defendants violated Plaintiff's clearly established constitutional rights. *Id; see also Brown,* 557 F. Supp. 3d at 179 (quoting *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) ("While a violation of state law may bolster the plaintiff's argument that a reasonable officer in the officer's circumstances would have believed that his conduct violated the Constitution it does not, in and of itself, establish a constitutional violation.") (cleaned up)). Nor does the fact that the policy changed serve as evidence that the officers' conduct violated Plaintiff's constitutional rights. *Fain*, 2013 U.S. Dist. LEXIS 86384, at *16 ("That the defendants changed their approach does not demonstrate that their initial policy violated the Eighth Amendment. At best, it shows a willingness to make a change that seems reasonable, although not constitutionally required.")

In fact, Defendants' actions were consistent with DPS policy, as alleged in the complaint. DPS Policy F.1100, "Transporting Offenders" expressly allows the use of wrist restraints "during any internal escort or external transport" of a pregnant offender. [DE 39, ¶ 70] According to DPS policy, "wrist restraints shall only be applied in the front and in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall." *Id.* Officer's shift notes, Plaintiff's medical records, and testimony from various individuals who accompanied and/or observed Plaintiff during her incarceration, demonstrate that while pregnant, Plaintiff was only restrained using handcuffs on her wrists, placed at the front of her body, during transport to an outside facility for medical

treatment consistent with DPS Policy F.1100. [Brodie Dep. Tr., p 44-45, 64-65, 71-74, 77-78, 114; Williams Dep. Tr., pp 48]

A plaintiff's claim must be grounded in well-established law before it can be tried before a jury. Where a plaintiff cannot identify any controlling authority holding that the alleged conduct violated a clearly established right, the plaintiff fails to meet this threshold requirement. *Brown*, 557 F. Supp. 3d at 178-79. Here, like the inmate in *Brown*, Plaintiff cannot point to a single case where a court has held that it was unconstitutional to restrain Plaintiff at the wrists, in front of her body, during transport to and from the correctional facility for medical treatment. Defendants Witherspoon, Gill, Brown, Dixon, Williams, Brodie, Lynch and Ragano are entitled to qualified immunity and Plaintiff's Eighth Amendment claims related to shackling should be dismissed as a matter of law. *Id.*

### 3. An inmate does not have a clearly established Eighth Amendment right to be free of restraints eight hours after childbirth.

For the same reasons outlined above, any claim based on the use of restraints after Plaintiff gave birth fails as a matter of law. There is no case law that supports her claim that her Eighth Amendment rights were violated when restraints were placed on Plaintiff eight hours after delivery [Ex. L, pp. 167-168; Dixon Dep. Tr. pp 58-61, 76, 86-87, 96, Williams Dep. Tr., pp 23, 48,], nor that such a right was clearly established. *Accord Fain*, 2013 U.S. Dist. LEXIS 86384, at *6 (holding qualified immunity barred plaintiff's Eighth Amendment claims where plaintiff remained shackled in some form at all times during labor and after delivery until she returned to the jail).

The Fourth Circuit has explained that a court need only look to the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the highest court of the state in which the case arose to determine whether a right was clearly established at the time of the alleged violation. *Id.* at *11. "[I]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id.* (quoting *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir. 1998), *cert. granted, judgment vacated on other grounds*, 526 U.S. 1142 (1999).

Furthermore, a clearly established right is one that is "clearly defined in a concrete factual situation such that its contours are clear, unmistakable, and applicable to the precise conduct at issue." *Id.* at *13 *(citing Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In *Fain,* the district court observed that at the time of the alleged unconstitutional shackling of plaintiff, there were only two cases holding that the defendants' conduct violated the Eighth Amendment (neither of which were decisions from the Supreme Court, the Fourth Circuit, or the state's highest court). *Id.* Therefore, the court determined, "the defendants could not have known that their actions violated [plaintiff's] Eighth Amendment rights. *Id.* at *15 (citations omitted). Where the legality of a particular course of action is open to reasonable dispute, an officer is not liable under the Eighth Amendment. *Id.* at *15-16. "[U]nder the doctrine of qualified immunity, 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Id.* at *16 (citing *Wilson v. Kittoe*, 337 F.3d 392, 402-03 (4th Cir. 2003).

Plaintiff cannot identify a single case in this or any jurisdiction holding that a pregnant inmate's constitutional rights are violated when she is placed in restraints eight

19

hours after childbirth in an unlocked facility (i.e., a public hospital or other birthing facility that does not employ the security measures commonplace in a correctional facility). In *Fain*, the Court concluded that there was not a clearly established right to be free of restraints during childbirth. *Id.* at *17. Since then, only two decisions have emerged that provide any further guidance.

First, in 2019, a Wisconsin district court considered a claim from a pregnant inmate who was restrained at the wrist and ankle during transport to the hospital and during the postpartum recovery period at the hospital. *Terry v. Cty. of Milwaukee,* 357 F. Supp. 3d 732 (E.D. Wisc. 2019). Restraints were removed to allow plaintiff to hold her baby and switched to permit the IV to be moved. *Id.* at 742. The court determined there were genuine issues of material fact regarding the constitutionality of a policy requiring the use of restraints during transport without regard for an individual inmate's medical status, security threat, or flight risk. *Id.* at 756-57. The court did not conclude, however, that the use of restraints during transport was an Eighth Amendment violation.

In 2020, a Pennsylvania district court wrestled with the question at the Rule 12 stage, ultimately denying defendants' motion to dismiss because the plaintiff plausibly alleged that the individual-capacity defendants were aware of the substantial risk of harm of shackling Plaintiff during transport to and from the hospital, while in labor, and during postpartum recovery, and that they were deliberately indifferent to that risk by shackling plaintiff under those circumstances. *Remlinger v. Lebanon Cty.*, No. 1:18-cv-984, 2020 U.S. Dist. LEXIS 55480, at *25-26 (M.D. Pa. March 27, 2020)

The landscape has not changed dramatically since *Fain*. In this jurisdiction, a pregnant inmate does not have a clearly established right to be free of restraints during transport or postpartum. Defendants did not overstep a bright line or show deliberate indifference to Plaintiff's needs in their use of restraints before and after Plaintiff's labor and delivery. *See Wilson*, 337 F.3d at 403. Thus they are entitled to qualified immunity. All of Plaintiff's claims relating to the use of restraints fail and should be dismissed as a matter of law pursuant to Fed. R. Civ. P. 56(a).

### B. An inmate does not have a clearly established Eighth Amendment right to continue MOUD after childbirth.

Plaintiff's next claim is that she had an Eighth Amendment right to continue receiving opioid medication after childbirth. [DE 39, ¶¶ 78-84] Plaintiff admits that the reason she was provided opioid medication while incarcerated was to protect a pregnant inmate's fetus from the harms of withdrawal. [DE 39, ¶ 80; Transcript of 30(b)6 Deposition of Elton Amos, M.D., January 6, 2023, attached and incorporated herein as Exhibit C, pp. 75, 93-94] Withdrawal symptoms can lead to spontaneous abortion and the DPS policies in place in 2019 were designed to protect the fetus of a pregnant inmate with opioid addiction. [*Id.*]

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. U.S. Const. amend. VIII. It imposes upon prison officials the duty to provide humane conditions of confinement, such as adequate food, clothing, shelter, and medical care. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 832 (1994). The Fourth Circuit utilizes the two-part inquiry to determine whether prison officials violate their duty under

the Eighth Amendment to provide humane conditions of confinement. *Williams v. Branker*, 462 F. App'x 348, 353 (4th Cir. 2012). First, the inquiry asks whether the conditions of confinement objectively inflict harm. *Id.* (citing *Farmer*, 511 U.S. at 834). Second, the inquiry asks whether prison officials subjectively acted with deliberate indifference to an inmate's health or safety, that is, with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. The deliberate indifference standard "sets a high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Mere negligence is not enough to meet this bar; rather, the treatment of an inmate "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Spann v. Perry*, No. 1:18-cv-175-MOC-WCM, 2021 U.S. Dist. LEXIS 68755, at *48-49 (W.D.N.C. Apr. 8, 2021) (internal quotations and citations omitted), *aff'd,* 2022 U.S. App. LEXIS 26351 (4th Cir. 2022). Plaintiff cannot meet this burden.

Plaintiff cannot show she has a clearly established constitutional right to receive MOUD under the governing case law, or that Defendants were deliberately indifferent to her health or safety. For example, in *Chamberlain v. Va. Dep't of Corr.*, No. 7:20-cv-45, 2020 U.S. Dist. LEXIS 177361 (W.D. Va. 2020), a Virginia inmate alleged that he suffered from OUD and the denial of medication assisted treatment for OUD by the correctional facility constituted deliberate indifference to his serious medical needs in violation of the Eighth Amendment. *Chamberlain,* 2020 U.S. Dist. LEXIS 177361, at *4. The plaintiff alleged that other inmates, including those in local jails, halfway houses, on parole, probation and supervision, were permitted to receive MOUD but he was not. *Id.* at *4-5. The district court observed that the plaintiff was receiving routine medical treatment and

monitoring in the prison, and deferred to the prison system's individualized assessment of the inmate's medical needs. *Id.* at *15.

Here, Plaintiff makes a similar claim. She asserts that some inmates (i.e., pregnant inmates, including herself) were eligible for MOUD but that, following childbirth, she was no longer eligible to receive this medical treatment. [DE 39, ¶¶ 85-86] Plaintiff asserts that she should have received this treatment "to maintain stability and forego withdrawal." [DE 39, ¶86] However, like the plaintiff in *Chamberlain*, Plaintiff was under close monitoring of her physical and mental health needs before, during, and after her pregnancy. [Clinical encounters, dated 12/22/2019, attached and incorporated herein as Exhibit M; Inpatient medical records, attached and incorporated herein as Exhibit Q] This Court should defer to NCCIW's assessment of Plaintiff's medical needs and the widely accepted standards of care for treatment of OUD in the correctional facility at the time of Plaintiff's incarceration. [Ex. C, pp. 63-68; Adler Rep. pp 5-6]

Defendants have not violated Plaintiff's Eighth Amendment rights, and certainly did not show deliberate indifference or a culpable state of mind in tapering her opioid medication following childbirth. Defendants are entitled to qualified immunity and this claim should be dismissed.

### C. An inmate does not have a clearly established Eighth Amendment right to specific or alternative mental health treatment postpartum.

Defendant is unaware of any case law specifically addressing an inmate's constitutional right to postpartum care in the correctional setting. Accordingly, Plaintiff is unlikely to demonstrate that some clearly established right was violated when she was

23

monitored and treated for postpartum depression and anxiety in the acute and subacute postpartum periods.

The record evidence demonstrates that Plaintiff was monitored both at the hospital and at the NCCIW infirmary for any physical or mental health needs related to her labor and delivery. [Ex. M; Ex. Q; Adler Rep. p 4] Plaintiff was prescribed a 14-day course of Zoloft and Vistaril for anxiety and depression. [Ex. M, p. 11; Adler Rep. p 3] When seen by mental health providers during post-partum safety checks, Plaintiff reported she was "doing good." [Adler Rep. p 4; Ex. Q, pp. 7, 14, 17, 22, 26, 29, 32, 38, 51, 57, 67, 73, 76, 78, 91, 93, 100] After two weeks, Plaintiff indicated she did not want to continue taking Vistaril, which was prescribed for anxiety. [Adler Rep. p 4] Plaintiff was prescribed Strattera instead. [Adler Rep. p 4] Plaintiff expressed that she was having trouble sleeping and was given Melatonin to help initiate sleep. [Adler Rep. p 4]

This Court should find, as a matter of law, that there are no genuine issues of material fact with regard to Plaintiff's postpartum treatment, and that Plaintiff has failed to establish Dr. Elton Amos was deliberately indifferent to her postpartum medical needs. Dr. Amos is entitled to qualified immunity and this claim should be dismissed.

### III. Plaintiff's ADA and § 504 Claims Fail as a Matter of Law.

There is no support for Plaintiff's claims under the ADA or the Rehabilitation Act under the governing law. First, as explained above, Plaintiff's ADA claim is brought against Defendant Buffaloe in his official capacity and is barred by Eleventh Amendment immunity. *See* § I *supra.* Even if the DPS Secretary was not entitled to Eleventh

Amendment immunity, Plaintiff cannot establish that the denial of MOUD or her alleged insufficient postpartum care violated either federal statute.

The elements of a claim under either the ADA or § 504 of the Rehabilitation Act are the same. Plaintiff must establish that she (1) has a disability, (2) is otherwise qualified for the benefit in question, and (3) that she was denied the benefit solely on the basis of her disability. *See, e.g., Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995).

As to NCCIW's policy to discontinue Suboxone after Plaintiff was no longer pregnant, Plaintiff fails to forecast evidence demonstrating the elements of either an ADA or § 504 claim. Plaintiff did not qualify for continued MAT because she was no longer pregnant, not because she had a disability. *See id.* Pregnancy is not a disability. *See Parker v. Children's Nat'l Med. Ctr., Inc.*, ELH-20-3523, 2021 U.S. Dist. LEXIS 235885, at *36 ("With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA.") (citations omitted). Indeed, the fact that Plaintiff received Suboxone while she was pregnant undermines her claim that she was denied MAT because of her OUD disability. *See Chamberlain v. Va. Dep't of Corr.*, 2021 U.S. Dist. LEXIS 170554, at *33 (granting summary judgment for defendants and noting that plaintiff's acknowledgement that some individuals with OUD (e.g., pregnant inmates) received MAT undermined his claim that defendants denied him MAT because of his OUD).

Medical providers and correctional staff at NCCIW complied with all applicable laws, policies, and recognized standards of care for treatment of OUD in the correctional setting at the time. Defendants provided daily medication throughout the course of her

25

pregnancy, prescribed and provided opioid medications to taper her opioid use after childbirth, and monitored and treated her for any withdrawal symptoms or discomfort she experienced. [Inpatient medical records, attached and incorporated herein as Exhibit Q] Plaintiff does not aver that she did not receive medical care; she simply asserts that she did not receive her preferred medical care in the form of continued Suboxone. "An inmate's medical treatment or lack of medical treatment, however, does not give rise to an ADA claim." *Id.* Even where a treating physician agrees that a plaintiff's preferred medication might be appropriate for the plaintiff "in the right setting," if that physician determines the medication is not medically necessary, no claim under the ADA or § 504 exists. *Id.* at *34. "[D]isagreement with a reasoned medical judgment is not sufficient to state a disability discrimination claim." *Id.* at *33 (entering summary judgment for defendants on plaintiff's ADA claim that he is not receiving the "proper" or preferred treatment for opioid use disorder).

Plaintiff also received mental health services postpartum. [Adler Rep. p 4] The record evidence demonstrates that the specific medical treatment she complains of not receiving (i.e., counseling and medication for mental health needs) was not medically necessary. Accordingly, the denial of medical care (assuming care was denied) is not based on Plaintiff's disability but rather on the medical necessity of the treatment. *Id. See also Koon v. North Carolina,* 50 F.4th 398, 416 (4th Cir. 2022) (finding prison officials did not violate the ADA with deliberate indifference and therefore plaintiff was not entitled to a jury trial). Again, Plaintiff's claims under the ADA and § 504 of the Rehabilitation Act

26

merely assert disagreements with the medical decisions and care provided, but do not actually equate to a violation of law.

These claims should be dismissed both on qualified immunity grounds and because Plaintiff has failed to state a claim for relief under either statute.

## IV.     Many of Plaintiff's Requests for Relief Fail as a Matter of Law.

Even if Plaintiff could present evidentiary and legal support for her claims, which Defendants do not concede, she would not be entitled to much of the relief she seeks from this Court. Even in the event the Court does not grant Defendants' motion for summary judgment, it should limit the damages Plaintiff may be allowed to pursue at trial.

### A. Plaintiff cannot recover compensatory or punitive damages under the ADA or the Rehabilitation Act.

Punitive damages are not available under the ADA or the Rehabilitation Act. *See, e.g., Barnes v. Gorman,* 536 U.S. 181, 189 (2002). Monetary damages for ADA or Rehabilitation Act violations are not routinely awarded either, since plaintiffs can only recover compensatory damages if they prove that public officials intentionally discriminated against them because of their disability. *See, e.g., Koon,* 50 F.4th at 400. Without forecasting any evidence that Defendants intentionally discriminated against Plaintiff in violation of the ADA or § 504, Plaintiff cannot recover any compensatory damages.

27

## B. Plaintiff's requests for injunctive relief are moot.

In addition to the declaratory judgments, damages and attorneys fees Plaintiff seeks, which the law does not support, Plaintiff also asks for injunctive relief. Plaintiff's requests for injunctive relief are moot for several reasons.

First, DPS policy and North Carolina state law, modified since the commencement of Plaintiff's Complaint, already prohibit shackling during the second and third trimester of pregnancy, during labor and delivery, and during the postpartum recovery period. N.C.G.S. § 148-25.2(a), amended by HB 608/SL 2021-143 [NCCIW Standard Operating Procedure D.1800, issued 09/22/2021, attached and incorporated herein as Exhibit R] Moreover, Plaintiff is no longer incarcerated at NCCIW and is no longer pregnant or in her post-partum recovery period, and so lacks standing. *See Stafford v. Baker*, 520 F. Supp. 3d 803, 813 (E.D.N.C. 2021); *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) (holding that, "as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.") The requisite personal interest that must exist at the commencement of the litigation, i.e., standing, must continue throughout the litigation or the claims become moot. *Stafford*, 520 F. Supp. 3d at 813. *See also SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 389 (4th Cir. 2017) ("A claim is moot when the parties lack a legally cognizable interest in the outcome.").

Finally, federal courts must ensure the framing of injunctive relief does not extend beyond those "required by the precise facts" of a Plaintiff's claim. *Stafford*, 520 F. Supp. 3d at 813 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S.

167, 193 (2000)). Where there is no effective relief that the plaintiff has not already received, her claim is moot. *Id.* (citing *SAS*, 874 F.3d at 389)).

Plaintiff's requests for injunctive relief are moot and should be dismissed as a matter of law.

## **CONCLUSION**

For the reasons outlined above, Defendants respectfully pray that the Court enter summary judgment in favor of Defendants and dismiss Plaintiff's Second Amended Complaint with prejudice.

Respectfully submitted this the 11th day of October, 2023.

JOSHUA H. STEIN
Attorney General

/s/ Bettina J. Roberts
Bettina J. Roberts
Special Deputy Attorney General
N.C. State Bar No. 43356
E-Mail: bjroberts@ncdoj.gov

/s/ Laura H. McHenry
Laura H. McHenry
Special Deputy Attorney General
N.C. State Bar No. 45005
Email: lmchenry@ncdoj.gov

N.C. Department of Justice
9001 Mail Service Center
Raleigh, North Carolina 27699-9001
Telephone: (919) 716-6540
Facsimile: (919) 716-6761
*Counsel for Defendants*

29

# CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law does not exceed 8400 words, in compliance with L.R.7.2(f)(3)(A). Based on the word count generated by the word processing software used to draft it, the foregoing memorandum contains 7565 words.

This 11th day of October 2023.

*/s/ Laura H. McHenry*
Laura H. McHenry
Special Deputy Attorney General