THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3270-D

| | |
|---|---|
| Tracey Edwards,<br><br>             Plaintiff,<br><br>   v.<br><br>Todd Ishee, Benita Witherspoon,<br>Anthony Perry, James Alexander, Gary<br>Junker, Elton Amos, Kavona Gill, Tamara<br>Brown, Nikitia Dixon, Tammy Williams,<br>Shelda Brodie, Tianna Lynch, and Lorafaith<br>Ragano,<br><br>          Defendants. | **PLAINTIFF'S STATEMENT OF<br>UNDISPUTED MATERIAL FACTS<br>IN SUPPORT OF PLAINTIFF'S<br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT** |

Plaintiff Tracey Edwards ("Ms. Edwards" or "Plaintiff"), by counsel, pursuant to Local Civil Rule 56.1, hereby submits the following Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment against Defendants Benita Witherspoon and Elton Amos in their personal capacities, and Todd Ishee, in his official capacity as Secretary of the North Carolina Department of Adult Corrections.

## STATEMENT OF UNDISPUTED FACTS

**I.    Ms. Edwards' Background and Pregnancy at NCCIW**

1.    Ms. Tracey Edwards is from South Carolina and has two children. (Ex. A, Declaration of Tracey Edwards ("Edwards Decl."), at ¶¶ 3, 6).

1

2. Ms. Edwards was diagnosed with Opioid Use Disorder ("OUD") before she was incarcerated. (Ex. A, Edwards Decl., at ¶ 4; Ex. KK, Medical Records, at BS000232 (PDF 19)[1] ("████████████████████████████████████████ ██████.")).

3. Ms. Edwards had a documented history of mental health disorders, including depression, anxiety, bipolar disorder, ████████, and post-traumatic stress disorder ("PTSD"). (Ex. A, Edwards Decl., at ¶ 7; Ex. KK, Medical Records, at BS 1511-1529 (PDF 125-143); Ex. C, Deposition of Brian Sheitman ("Sheitman Dep."), 70:12-19.

4. In 2019, Ms. Edwards was arrested and incarcerated for a nonviolent drug offense related to her Opioid Use Disorder. (Ex. A, Edwards Decl., at ¶ 4).

5. Opioid Use Disorder is a chronic medical condition. (Ex. B, Expert Report of Dr. Allison Stuebe ("Stuebe Report"), at 6); Ex. KK, Medical Records, at BS 1491 (PDF 122) ("Marking Ms. Edwards' Opioid Use Disorder as "Chronic").

6. Before her incarceration, Ms. Edwards was taking buprenorphine to treat her Opioid Use Disorder. (Ex. A, Edwards Decl., at ¶ 5; Ex. KK, Medical Records, at BS000232 (PDF 19)).

7. Ms. Edwards was incarcerated at North Carolina Correctional Institution for Women ("NCCIW") on May 15, 2019, to March 15, 2021 ("Relevant Time Period"). (Ex. M, Anthony Perry's Responses to Plaintiff's First Set of Request for Admissions ("Perry RFA"), No. 6).

---

[1] For simplicity, Plaintiff cites to both the Bates numbers and PDF numbers for Exhibit KK, because the Bates numbers are not continuous throughout the exhibit. PDF numbers can be found in red in the upper right-hand corner of each page, and correspond.

8.     Ms. Edwards learned that she was pregnant with her second child when NCCIW administered a pregnancy test during an intake screening on May 16, 2019. (Ex. M, Perry RFA, No. 7; Ex. A, Edwards Decl., at ¶ 6)

9.     The pregnancy test that NCCIW administered to Ms. Edwards on May 16, 2019, was positive. (Ex. M, Perry RFA, No. 8).

10.     Ms. Edwards was at a very high risk of postpartum depression and anxiety ("postpartum mood disorders"), because of her personal history of mental health disorders and comorbid substance use disorder. (Ex. B, Stuebe Report, at 5).

11.     Ms. Edwards was transported to UNC-Chapel Hill Hospital on December 19, 2019, to be induced into labor. (Ex. M, Perry RFA, No. 9).

12.     Ms. Edwards gave birth on December 20, 2019, at 11:04 AM. (Ex. M, Perry RFA, No. 10; Ex. KK, Medical Records, at BS 1564 (PDF 146); Ex. NN, NCCIW Shift Narratives at BS 110).

13.     Ms. Edwards was given an epidural during the childbirth process. (Ex. A, Edwards Decl., at ¶ 13; Ex. KK, Medical Documents, at BS 1567 (PDF 149)). An epidural is a medication that is injected into the spine to help with labor pain during childbirth. (Ex. A, Edwards Decl., at ¶ 13).

14.     Ms. Edwards was in the hospital from December 19, 2019, to December 22, 2019. (Ex. O, Claudette Edwards' Responses to Plaintiff's First Set of Interrogatories, No 1; Ex. KK, Medical Records, at BS 1569 (PDF 151)).

15.     NCCIW did not consider Ms. Edwards to be a security or flight risk before or during the time that she was in the hospital. (Ex. D, June 2022 Deposition of David May ("May I Dep."), 81:10-82:8; Ex. OO, Outside Hospital Activity Log, at BS 95-BS 105; Ex. KK, Medical Records,

at BS 1513 (PDF 127) (██████████████████████████████████████████
████████████ )).

16.　　Ms. Edwards was transported from UNC-Chapel Hill Hospital back to NCCIW on December 22, 2019. (Ex. M, Perry RFA, No. 11).

17.　　As a result of her experiences at NCCIW, Ms. Edwards remains traumatized to this day. (Ex. A, Edwards Decl., at ¶ 33).

**II.　　NCCIW Management and Structure**

18.　　As of December 2019, NCCIW was a prison within North Carolina that was under the reporting structure of the North Carolina Department of Public Safety ("DPS"). (Ex. D, May I Dep., 164:2–165:2).

19.　　As of January 1, 2023, North Carolina Department of Adult Corrections became a separate state agency that oversees corrections in North Carolina. (Defendants' Motion for Substitution of Party and to Update Case Caption, Dkt. 105).

20.　　NCCIW is the only state prison in North Carolina that incarcerates pregnant prisoners. (Ex. D, May I Dep., 170:6-7, 179:20-180:6).

21.　　NCCIW employees follow three types of policy documents: DPS Policies, NCCIW Standard Operating Procedures, and NCCIW Post Orders. (Ex. E, August 2023 Deposition of David May ("May II Dep."), 25:1-7).

22.　　DPS policies are mandatory guidance issued by the state and must be followed by all state prisons. (Ex. F, Deposition of Benita Witherspoon ("Witherspoon Dep."), 48:7-25, 49:13-15 ("[the purpose of a DPS policy is] [t]o make sure that each facility operates under one umbrella")).

23.     NCCIW Standard Operating Procedures ("SOP") are policy documents issued by NCCIW and are intended "to provide staff assigned to the facility with direction in the use of specific techniques as it relates to the job duty." (Ex. F, Witherspoon Dep. 49:25-50:4).

24.     NCCIW Post Orders are the orders specific to a specific "post" or location at the facility where the officer is stationed. (Ex. F, Witherspoon Dep. 49:17-20 ("the Post Orders are. . . the roadmap to carry out the Standard Operating Procedures that fall under the DPS policy and procedures.")).

25.     NCCIW employees, including the warden, officers, and medical staff, are required to follow DPS Policies, NCCIW Standard Operating Procedures, and NCCIW Post Orders. (Ex. F, Witherspoon Dep. 50:5-7; Ex. D, May I Dep., 62:20-63:18; Ex. M, Perry RFA, 12).

**A.     Warden Benita Witherspoon**

26.     Benita Witherspoon ("Warden Witherspoon") was the Warden of NCCIW from November 2018 until July 2020. (Ex. D, May I Dep., 52:16-18, 200:6-10).

27.     Warden Witherspoon was personally responsible for overseeing and implementing DPS and NCCIW policy documents at NCCIW. (Defendants' Answer to Second Amended Complaint ¶ 142; Ex. D, May I Dep., 71:3-9; Ex. F, Witherspoon Dep., 25: 5-13).

28.     In December 2019, Warden Witherspoon was personally responsible for ensuring that NCCIW Standard Operating Procedures were consistent with DPS policies. (Ex. R, Witherspoon's Responses to Plaintiff's First Set of Requests for Admission ("Witherspoon RFA"), No. 3).

29.     Upon starting as Warden of NCCIW, Warden Witherspoon was required to review all NCCIW policy documents and ensure that the documents were up to date and in compliance with DPS policies. (Ex. D, May I Dep., 51:13-21).

5

30. Warden Witherspoon was also required to review NCCIW policy documents every year to ensure they were current and up to date. (Ex. D, May I Dep., 73:7-74:2; Ex. F, Witherspoon Dep., 46:12-18).

31. Warden Witherspoon received updated policies from DPS, and was responsible for delegating subordinates to update NCCIW policy documents after DPS issued an updated policy. (Ex. D, May I Dep., 43:6-11, 60:16-20, 61:8-15; Ex. F, Witherspoon Dep., 23:1-21).

32. Warden Witherspoon had to review any updates to NCCIW policy documents and approve the updated document. (Ex. D, May I Dep., 44:11-15, 46:1-3, 55:11-18, 71:3-9; Ex. F, Witherspoon Dep., 57:6-9).

33. Warden Witherspoon was responsible for instructing her subordinates to share information with prison officers regarding updated policy documents. (Ex. D, May I Dep., 60:9-15, 61:9-15).

**B.    Dr. Elton Amos**

34. Defendant Elton Amos has been the Medical Director at the NCCIW from June 2018 to the present. (Ex. G, January 2023 Deposition of Elton Amos ("Amos I Dep."), 36:10-14).

35. At least nine medical providers who provide direct patient care report to Dr. Amos. (Ex. G, Amos I Dep., 37:5-10).

36. The Medical Director is responsible for clinical oversight of the medical care provided to prisoners. (Ex. G, Amos I Dep., 41:7-12).

37. The Medical Director is responsible for primarily drafting medical operating procedures at NCCIW. (Ex. G, Amos I Dep., 42:13-21, 48:14-22).

38. Medical operating procedures at NCCIW are required to comply with DPS policies. (Ex. G, Amos I Dep., 47:7-10).

6

39. The Medical Director is responsible for reviewing medical policies. (Ex. G, Amos I Dep., 42:22-43:10).

40. Dr. Amos reviews NCCIW medical operating procedures on an annual basis. (Ex. G, Amos I Dep., 49:19-50:3).

41. The Medical Director is responsible for implementing medical operating procedures at NCCIW. (Ex. G, Amos I Dep., 48:14-22).

42. The Medical Director has the authority to approve the distribution of medication to prisoners. (Ex. G, Amos I Dep., 108:20-109:5).

43. The Medical Director is responsible for answering questions regarding clinical processes at NCCIW. (Ex. G, Amos I Dep., 41:7-14).

44. The Medical Director is responsible for approving "utilization review" requests, which in 2019 included providers' requests for pregnant patients to be prescribed buprenorphine. (Ex. G, Amos I Dep., 108:14-109:5; Ex. PP, MAT Provider Handbook, at NCDOJ 003473).

## III. Shackling

### A. Plaintiff was shackled during pregnancy, labor, and postpartum recuperation despite not posing any risk of harm or flight

45. Ms. Edwards was shackled every day when she was transported to and from Southlight to receive buprenorphine until December 1, 2019, well into her third trimester. (Ex. A, Edwards Decl., at ¶¶ 6, 9).

46. When Ms. Edwards was transported to the hospital to be induced into labor, she was shackled using handcuffs. (Ex. A, Edwards Decl., at ¶ 11; Ex. AA, Email Chain with Subject Line WRAL Cullen at NCDOJ 006187; Ex. I, Deposition of Tianna Lynch ("Lynch Dep."), 34:16-19; Ex. J, Deposition of Tamara Brown ("Brown Dep."), 22:7-20).

47.     Upon arrival at the hospital, the Officer Defendants shackled one of Ms. Edwards' arms and one of her legs to the hospital bed. (Ex. A, Edwards Decl., at ¶ 12),

48.     Ms. Edwards was shackled to the bed for hours during labor before she began pushing, even after she was induced through an intravenous line. (Ex. A, Edwards Decl., at ¶ 12).

49.     While she was shackled by to the bed by one arm and one leg, Ms. Edwards was unable to adjust her position to make herself more comfortable. (Ex. A, Edwards Decl., at ¶ 12).

50.     Ms. Edwards' shackles were removed when the UNC doctors instructed Ms. Edwards to start pushing, on December 20, 2019. (Ex. A, Edwards Decl., at ¶ 14).

51.     Less than 1 hour after she gave birth, the Officer Defendants shackled Ms. Edwards using handcuffs and shackled her ankles together when they moved her from the delivery room to another room in the hospital. (Ex. A, Edwards Decl., at ¶ 16).

52.     For the next two days, December 20–22, 2019, Ms. Edwards was shackled to the hospital bed by at least one leg, and occasionally shacked by her wrist as well. (Ex. A, Edwards Decl., at ¶¶ 17-18).

53.     Every time she held her newborn baby from December 20-22, 2019, Ms. Edwards was shackled to her hospital bed by one leg. (Ex. AA, Email Chain with Subject Line WRAL Cullen at NCDOJ 006187; Ex. E, May II Dep., 90:21-24, 105:6-17, 108:18-22).

54.     When she was not bonding with her newborn child, Ms. Edwards was shackled to the hospital bed by both a handcuff and leg iron. (Ex. AA, Email Chain with Subject Line WRAL Cullen at NCDOJ 006187; Ex. E, May II Dep., 105:6-17, 108:18-22).

55.     The Officer Defendants unshackled Ms. Edwards to allow her to use the bathroom. (Ex. A, Edwards Decl., at ¶ 17).

56.     On approximately two occasions, the Officer Defendants unshackled Ms. Edwards to allow her to walk her baby around the hospital hallway. (Ex. A, Edwards Decl., at ¶ 17; Ex. NN, NCCIW Shift Narratives, at BS 115).

57.     On the way back to NCCIW from the hospital on December 22, 2019, the Officer Defendants shackled Ms. Edwards by shackling her ankles together, handcuffing her, placing a belly chain around her stomach, and connecting her chains with a black box in front of her. (Ex. A, Edwards Decl., at ¶ 21; Ex. K, Deposition of Nikita Dixon (Dixon Dep.), 60:24-61:10; Ex. Q, Edwards Response to Plaintiff's Second Set of Interrogatories, No. 8). The black box restricts hand movement. (Ex. A, Edwards Decl., at ¶ 21).

58.     Upon arrival at the prison, the Officer Defendants refused to assist Ms. Edwards in exiting the vehicle. Because she was unable to step down from her seat in the car while shackled, Ms. Edwards was forced to jump from the car and experienced immense pain upon landing. (Ex. A, Edwards Decl., at ¶ 22).

59.     Shackling Ms. Edwards during transport to and from the hospital and during hospitalization for childbirth caused her pain and emotional anguish. (Ex. A, Edwards Decl., at ¶ 23).

60.     Ms. Edwards also felt demeaned and mistreated for being shackled during this time period. She remains traumatized to this day. (Ex. A, Edwards Decl., at ¶¶ 23, 33).

61.     Her anxiety was exacerbated by her understanding that the Officer Defendants could not have unshackled her fast enough for her to get the care she needed in an event of a medical emergency. (Ex. A, Edwards Decl., at ¶ 23).

62.     Ms. Edwards was afraid of falling while she was shackled during pregnancy and postpartum. (Ex. A, Edwards Decl., at ¶ 23).

9

63.     Ms. Edwards suffered raw skin around her ankles from a leg iron. (Ex. A, Edwards Decl., at ¶ 12).

64.     Ms. Edwards was sometimes unable to hold and comfort her newborn due to her shackling, and being shackled while she held and nursed with her daughter interfered with her bonding. (Ex. A, Edwards Decl., at ¶ 18).

65.     Ms. Edwards suffered back pain at the site of her epidural. (Ex. A, Edwards Decl., at ¶ 24).

66.     Ms. Edwards' back pain was exacerbated by the belly chain that wrapped around her belly and back when she was brought back to NCCIW on December 22, 2019. (Ex. A, Edwards Decl., at ¶ 21).

67.     Ms. Edwards reported her back pain as a result of her epidural during medical visit on May 4, 2020. (Ex. KK, Medical Records, at BS 459-461 (PDF 38-40)).

68.     Ms. Edwards experienced back pain for months. (Ex. A, Edwards Decl., at ¶ 24).

69.     Ms. Edwards did not pose an immediate, serious threat of harm to herself or others during this time period. (Ex. D, May I Dep., 81:10-82:8; Ex. OO, Outside Hospital Activity Log, at BS 95-BS 105).

### B.     Policies and Practices Regarding Shackling

70.     DPS and NCCIW both issue policy documents related to the treatment of prisoners. *See, e.g.*, (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019; Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018).

71.     NCCIW SOPs and Post Orders are required to comply with DPS policies. (Ex. D, May I Dep., 44:17-19, 75:1-6; Ex. F, Witherspoon Dep., 25:14-16).

72.     DPS issued an updated Policy F.1100, Transporting Offenders, on September 6, 2018, which was operative during the time that Ms. Edwards was pregnant, in labor, and postpartum. (Ex. D, May I Dep., 75:7-9; Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1657).

73.     In December 2019, DPS policy F.1100 prohibited the use of shackling on "[a]n offender who is in labor, which is defined as occurring at the onset of contractions." (Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1663).

74.     In December 2019, DPS policy prohibited the use of shackling on "[a]n offender who is identified by medical staff as in post-partum recuperation." (Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1663).

75.     The post-partum recuperation period is at least 6 weeks after delivery. (Ex. D, May I Dep., 192:5-18).

76.     In December 2019, DPS policy prohibited the use of shackling on "[a]n offender who is transported or housed in an outside medical facility for treating labor and delivery." (Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1663).

77.     In December 2019, DPS policy prohibited the use of shackling on "[a]n offender for induction once the intravenous line has been placed and the induction medication has been started." (Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1663).

78.     In December 2019, DPS policy prohibited the use of shackling on "[a]n offender during initial bonding with the newborn child, including nursing and skin to skin contact." (Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1663-64).

79.	In December 2019, DPS policy permitted an exception for the use of shackles on pregnant or postpartum prisoners if there were reasonable grounds to believe that the prisoner presents an immediate, serious threat to herself, staff or others, and there must be documentation explaining why restraints were used in such circumstances. (Ex. D, May I Dep., 79:16-80:5, 80:20-82:8; Ex. T, DPS Policy F.1100, Transporting Offenders, dated September 6, 2018 at BS 1663).

80.	On November 22, 2019, DPS Region Director Cynthia Thornton issued an interim directive to Warden Witherspoon that "[a]ny offender in their third trimester should not be restrained. This applies even if they are not in pre or active labor" ("DPS interim policy"). (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, at NCDOJ 006432).

81.	When DPS updates a policy, the NCCIW Warden is required to bring any corresponding SOPs and Post Orders into compliance with the DPS policy. (Ex. D, May I Dep., 44:17–19 ("Q:…So does an NCCIW policy have to comply with DPS policies? A: Yes, ma'am."), 45:1-46:19 (describing warden's role in approving the updated NCCIW policy documents), 68:9-11 ("I can't recall actually seeing it written out but I know it's definitely understood that our policies must match DPS policies"), 71:3-9 ("Q…[I]s someone at NCCIW required to go through the existing NCCIW policies to make sure they are all in compliance? A: Yes, ma'am. As I was saying, the warden is actually ultimately responsible for the policies."); Ex. E, May II Dep., 31:20-32:15).

82.	There are at least two NCCIW SOPs, D.1800 and H.0300, that contain requirements relevant to pregnant prisoners. (Ex. CC, Email Chain Titled "Another Pregnancy Policy Question" at NCDOJ 006202).

83.	There is at least one NCCIW Post Order, Security Supervisor, that contains requirements relevant to pregnant prisoners. (Ex. F, Witherspoon Dep., 34:7-35:17).

12

84.     After DPS updated policy F.1100, Benita Witherspoon approved NCCIW SOP D.1800, Offender Restraints in 2019. (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019; Ex. E, May II Dep., 37:10-38:9).

85.     The 2019 version of NCCIW SOP D.1800 was issued on February 1, 2019. (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019; Ex. E, May II Dep., 37:10-38:9).

86.     The February 1, 2019, SOP D.1800 was the operative NCCIW SOP during the time that Ms. Edwards was pregnant, in labor, and in postpartum recuperation. (Ex. M, Perry RFA, ¶ 3; Ex. V, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated March 16, 2021 at NCDOJ 004278).

87.     The February 1, 2019, SOP was not updated again until March or April 2021. (Ex. E, May II Dep., 39:19-40:1; Ex. V, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated March 16, 2021 at NCDOJ 004278).

88.     The February 1, 2019, SOP D.1800 had the following requirements regarding pregnant prisoners:

   a.  Pregnant prisoners were not to wear leg irons or a waist chain. (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019 at NCDOJ 006155, NCDOJ 006156);

   b.  Pregnant prisoners were required to wear handcuffs in the same manner as non-pregnant prisoners, except when a "[p]regnant offender is in active labor." (*Id.* at NCDOJ 006153, NCDOJ 006155, NCDOJ 006156);

   c.  The term "active labor" was not defined in the policy. (Ex. D, May I Dep., 131:7-9).

13

89.     Prison officers were not trained on the meaning of the term "active labor". (Ex. K, Dixon Dep., 95:18-96:8; Ex. I, Lynch Dep., 27:8-10).

90.     In December 2019, NCCIW SOP D.1800 did not contain any prohibitions against the use of shackling on postpartum prisoners during transportation from the hospital, and postpartum prisoners were restrained in the same way as any other non-pregnant prisoner. (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019; Ex. D, May I Dep., 127:11-17; Ex. K, Dixon Dep., 60:24-61:10).

91.     In December 2019, NCCIW SOP D.1800 orders required the use of shackles on all prisoners "when leaving the security confines of the facility, unless otherwise directed by the Officer in Charge." (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019 at NCDOJ 006154; Ex. AA, Email Chain with Subject Line WRAL Cullen).

92.     In December 2019, NCCIW SOP D.1800 required that a prisoner who is lying in their hospital bed or treatment gurney "will be secured with one hand restrained to the bed/gurney with a handcuff and the opposite leg retrained to the bed/gurney with a leg iron," and "[a]t NO time will an offender be unrestrained while lying in a hospital bed or treatment gurney." (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019 at NCDOJ 006158; Ex. AA, Email Chain with Subject Line WRAL Cullen).

93.     In December 2019, NCCIW SOPs and post orders required the use of a leg iron on a prisoner who is bonding with her newborn child but permitted removal of handcuffs while the prisoner holds her newborn child. (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019 at NCDOJ 006158; Ex. AA, Email Chain with Subject Line WRAL Cullen).

94.     The February 1, 2019, version of NCCIW SOP H.0300, Use of Force and Restraints, was operative during the time that Ms. Edwards was pregnant, in labor, and in postpartum recuperation. (Ex. M, Perry RFA, ¶ 5; Ex. F, Witherspoon Dep. 81:21-82:20; Ex. D, May I Dep., 125:6-15).

95.     In December 2019, NCCIW SOP H.0300 was consistent with NCCIW SOP D.1800 with regards to:

    a.  Prohibiting the use of waist chains or leg irons on pregnant prisoners. (Ex. W, NCCIW Standard Operating Procedure H.0300, Use of Force and Restraints, dated February 1, 2019, at 3);

    b.  Requiring the use of handcuffs on pregnant prisoners during transportation to the hospital. (Ex. W, NCCIW Standard Operating Procedure H.0300, Use of Force and Restraints, dated February 1, 2019, at 3)

    c.  Removing restraints from a pregnant prisoner only during "active labor." (Ex. W, NCCIW Standard Operating Procedure H.0300, Use of Force and Restraints, dated February 1, 2019, at 3);

    d.  Requiring the use of a leg iron on postpartum prisoners while bonding with their newborn child. (Ex. W, NCCIW Standard Operating Procedure H.0300, Use of Force and Restraints, dated February 1, 2019, at 2, ("All offenders admitted to the outside hospitals shall be restrained to the bed. One arm and one leg shall be restrained."), 3 ("The offender shall be restrained after birth of the child and the medical authorities have completed their work with the offender. The offender shall not have her hands restrained while bonding and feeding the baby."));

15

e.  Requiring the use of a handcuff and leg iron on postpartum prisoners during times when she is not bonding with her newborn child. (Ex. W, NCCIW Standard Operating Procedure H.0300, Use of Force and Restraints, dated February 1, 2019, at 3);

f.  Requiring the use of handcuffs on a postpartum prisoner during transportation from the hospital. (Ex. W, NCCIW Standard Operating Procedure H.0300, Use of Force and Restraints, dated February 1, 2019, at 3).

96.  Warden Witherspoon approved a version of NCCIW Security Supervisor Post Order on Security Supervisor for UNC Hospital on April 20, 2019. (Ex. X, NCCIW Post Order Security Supervisor for UNC Hospital, dated April 20, 2019 at NCDOJ 003455).

97.  Warden Witherspoon approved a new version of NCCIW Security Supervisor Post Order for UNC Hospital on January 20, 2020. (Ex. Y, NCCIW Post Order Security Supervisor for UNC Hospital, dated January 20, 2020).

98.  The first sentence of portions of the January 20, 2020, post order that are highlighted in yellow were the only changes made to the document between the April 20, 2019, version and the January 20, 2020, version. (Ex. F, Witherspoon Dep., 40:11-41:8).

99.  ████████████████████████████████████████████ ███████████████████████████████████:

a.  ███████████████████████████████████████. (Ex. X, NCCIW Post Order Security Supervisor for UNC Hospital, dated April 20, 2019 at NCDOJ 003455).

16

b. ██████████████████████████████████████

██████. (Ex. X, NCCIW Post Order Security Supervisor for UNC Hospital, dated April 20, 2019 at NCDOJ 003455).

c. ██████████████████████████████████████

██████████ (Ex. X, NCCIW Post Order Security Supervisor for UNC Hospital, dated April 20, 2019 at NCDOJ 003455).

d. ██████████████████████████████████████

████████████████████████████ (Ex. X, NCCIW Post Order Security Supervisor for UNC Hospital, dated April 20, 2019 at NCDOJ 003455).

e. ██████████████████████████████████████

██████████████. (U Ex. X, NCCIW Post Order Security Supervisor for UNC Hospital, dated April 20, 2019 at NCDOJ 003455).

100.    In December 2019, NCCIW Standard Operating Procedure D.1800 conflicted with DPS policy as they related to the shackling of prisoners who were pregnant, in labor, and/or in postpartum recuperation. (Ex. F, Witherspoon Dep., 137:8-15; Ex. CC, Email Chain Titled "Another Pregnancy Policy Question" at NCDOJ 006202-006203; Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019 at NCDOJ 006158).

101.    Prison officers were expected to follow the NCCIW standard operating procedures and post orders, and therefore as of December 2019, would only remove restraints during "active labor." (Ex. M, Perry RFA, ¶ 12; Ex. I, Lynch Dep.  22:3-13; Ex. J, Brown Dep., 62:4-13, 72:13-73:3; Ex. K, Dixon Dep., 96:19-97:5).

17

**C.** **Shackling during Pregnancy Poses a Substantial Risk of Harm**

102. Shackling of Ms. Edwards at any point during pregnancy, labor, or postpartum violated the standard of care. (Ex. B, Stuebe Report, at 3)

103. Any shackling of pregnant, laboring, and postpartum people is psychologically devastating and dehumanizing, and it increases risks to mother and baby. (Ex. B, Stuebe Report, at 3).[2]

104. In 2005, the UN Committee against torture characterized shacking during childbirth as "gender-based humiliation." (Ex. B, Stuebe Report, at 3)

105. The use of restraints on pregnant people who are incarcerated is opposed by The American College of Obstetricians and Gynecologists, The American Medical Association; the National Commission on Correctional Health Care; Association of Women's Health, Obstetric and Neonatal Nurses; and the United Nations Committee Against Torture. (Ex. B, Stuebe Report, at 3)

106. Complications such as raw skin, inability to hold and care for an infant, and back pain at the site of an epidural. are known sequelae of shackling during childbirth. (Ex. B, Stuebe Report, at 3)

107. Use of restraints during hospitalization can cause skin breakdown, nerve damage, and fractures, particularly if cuffs are overly tightened. (Ex. B, Stuebe Report, at 4)

108. The physiologic changes of pregnancy multiply the risks of shackling. (Ex. B, Stuebe Report, at 4)

---

[2] Dr. Stuebe is a board-certified Maternal-Fetal Medicine subspecialist who is the Director of the Division of Maternal Fetal Medicine at UNC Department of Obstetrics and Gynecology, who regularly provides care to pregnant people incarcerated at NCCIW. In addition to her medical degree, Dr. Stuebe has a Master's of Science degree in Epidemiology from the Harvard School of Public Health. She has published more than 200 peer-reviewed articles relating to prenatal and postpartum care, as well as book chapters and other publications, and she has received well over a dozen awards for excellence in her studies, teaching, research, and practicing medicine. *See generally*, Ex. B, Stuebe Report, Ex. A).

18

109.    Pregnant women are more at risk of falling because of physiological changes that affect a pregnant person's center of gravity. One in four women fall during pregnancy. Compared with non-pregnant women, pregnant women are less able to maintain balance starting around 14 weeks of pregnancy, and these differences persist through 6 to 8 weeks postpartum (Ex. B, Stuebe Report, at 4).

110.    Falls are more hazardous to women during pregnancy than outside of pregnancy: hormonal changes increase joint laxity, raising the risk of dislocating joints in the event of a fall. (Ex. B, Stuebe Report, at 4).

111.    If the patient falls on their abdomen, the force of the fall can cause the placenta to detach from the uterus. This condition, called a placental abruption, can cause fetus distress, life-threatening bleeding, and stillbirth. (Ex. B, Stuebe Report, at 4).

112.    Compared with women who did not fall during pregnancy, those that fell had a 4.4-fold higher risk of preterm birth, an 8-fold risk of the placenta tearing away from the uterine wall, and a 2.1-fold risk of fetal distress. (Ex. B, Stuebe Report, at 4).

113.    Shackling during pregnancy directly increases the risk of falls because shackling affects balance and mobility. (Ex. B, Stuebe Report, at 4).

114.    Shackling in the third trimester, when pregnant women are less able to balance, increases the risk of falls and associated harm, including the placenta tearing away from the uterine wall and fetal distress. (Ex. B, Stuebe Report, at 4).

115.    Shackling Ms. Edwards during her daily transport to and from Southlight for MOUD, and during her transfer to the hospital, put her and her fetus at risk for avoidable harm. (Ex. B, Stuebe Report, at 4).

19

116. While a pregnant individual is hospitalized, shackling interferes with medical care. (Ex. B, Stuebe Report, at 4).

117. If there are signs of fetal distress during labor, medical staff need to be able to change the laboring patient's position, including turning her from side to side or getting her on her hands and knees. If the patient is restrained, these maneuvers can be delayed, putting the fetus at risk. (Ex. B, Stuebe Report, at 4).

118. Some complications require immediate c-section. For example, if the umbilical cord gets in front of the fetal head, a condition called cord prolapse, the pressure of the head on the cord can cut off blood flow to the fetus. To treat this complication, the medical team must rush to the operating room immediately. (Ex. B, Stuebe Report, at 4).

119. Had Ms. Edwards' fetus required resuscitation or emergency c-section, shackling could have delayed care, with potential lasting harm to the fetus. (Ex. B, Stuebe Report, at 4).

120. After delivery, shackling interferes with the mother's ability to safely care for her infant. (Ex. B, Stuebe Report, at 4).

121. The postural changes of pregnancy persist through 6 to 8 weeks postpartum, so patients who are restrained are at higher risk of falling and sustaining injuries. (Ex. B, Stuebe Report, at 4).

122. By limiting mobility, restraints on the postnatal unit impede caretaking for the infant. (Ex. B, Stuebe Report, at 4).

123. Moreover, when individuals are shackled, they are unable to get up and walk. This reduction in movement increases the risk of blood clots in the legs. These clots, called venous thromboemboli, or VTE, can travel to the lungs and cause difficulty breathing, cardiovascular

20

collapse and death. Pregnancy further increases the risk of VTE, with the highest risk in the postpartum period. VTE is a leading cause of maternal mortality. (Ex. B, Stuebe Report, at 4-5).

124.    Because shackling of pregnant people increases risk of VTE, this practice increases the risk of severe maternal morbidity and mortality. (Ex. B, Stuebe Report, at 5).

125.    The pain and risk of shackling can cause or exacerbate emotional trauma to the pregnant person. (Ex. B, Stuebe Report, at 3-5).

     **D.**    **Witherspoon's Knowledge of a Substantial Risk of Harm**

126.    As Warden of NCCIW, Warden Witherspoon was required to know and implement DPS policy. (Ex. F, Witherspoon Dep. 52:3–11).

127.    Upon becoming Warden of NCCIW in November 2018, Warden Witherspoon was required to ensure that NCCIW policy documents complied with DPS shackling policy. (Ex. F, Witherspoon Dep. 52:3–11; 76:10-13).

128.    Warden Witherspoon had personal knowledge that NCCIW policy had to comply with DPS Policy. (Ex. F, Witherspoon Dep., 25:14-16).

129.    In February 2019, Warden Witherspoon approved at least one NCCIW policy document that directly conflicted with DPS shackling policy: the D.1800 Offender Restraints SOP. (Ex. U, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated February 1, 2019 at NCDOJ 006158; Ex. F, Witherspoon Dep. 137:8-11; 77:18-78:5, 81:13-16 (confirming that the February 2019 version of D.1800 was the operative version of the policy document throughout her time at NCCIW)).

130.    No later than April 2019, Warden Witherspoon had three phone calls with a DPS official about shackling policies in response to the concerns of a community group about NCCIW's shackling of pregnant women. (Ex. F, Witherspoon Dep. 27:12-24, 30:5-24, 35:6-36:25).

131. These calls specifically included discussion about shackling pregnant women during transport to the hospital to give birth and during their stay at the hospital—both of which were prohibited by DPS policy. (Ex. F, Witherspoon Dep. 37:11-18).

132. In November 2019, DPS informed Warden Witherspoon that an NCCIW prisoner had been shackled during pregnancy while at the Wake Medical Hospital to give birth. The shackles had been ordered to be removed because of concerns of the hospital's leadership and the Governor's office. (Ex. DD, Email Chain Titled "Patient Issue - Need Your Assistance", at NCDOJ 6423).

133. On November 22, 2019, DPS Region Director Cynthia Thornton emailed Warden Benita Witherspoon informing her that DPS had implemented an interim policy that "[a]ny offender in their third trimester should not be restrained. This applies even if they are not in pre or active labor." (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, at NCDOJ 006432). This email directed Warden Witherspoon to review DPS Policies regarding the use of shackling postpartum. (*Id.* ("[P]lease also review the existing division policies regarding post labor.")).

134. Warden Witherspoon was required to notify officers to comply with the interim policy. (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, NCDOJ 006432 ("Please ensure that you notify your staff of this temporary directive.")).

135. Warden Witherspoon was directed to *immediately* stop shackling people in their third trimester. (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive).

136. In response, Warden Witherspoon emailed a subordinate to ask him to ensure that this training took place from November 22 to November 26, 2019, and to document it on shift

22

narratives. (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, at NCDOJ 006431).

137. Prison officers did not receive training on the interim DPS policy as directed by DPS Region Manager Cynthia Thornton. (Ex. I, Lynch Dep., 18:14-19:6).

138. Warden Witherspoon did not take any further action to ensure that this training actually took place. (Ex. E, May II Dep., 84:6-9).

139. Warden Witherspoon did not update NCCIW Standard Operating Procedures to comply with DPS policy regarding the use of shackles on pregnant or postpartum people before she left NCCIW. (Ex. CC, Email Chain Titled "Another Pregnancy Policy Question" at NCDOJ 006202; Ex. V, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated March 16, 2021 at NCDOJ 004278; Ex. F, Witherspoon Dep. 84:15-17 (D.1900), 86:16-20 (all policies)).

140. On March 18, 2020, DPS Region Director Cynthia Thornton emailed Warden Witherspoon, asking her to "please confirm that this directive [to stop restraining prisoners during the third trimester of pregnancy] is still being followed pending the revision of division policy" and noting that once DPS policy was updated, DPS "will need your SOP updated ASAP." (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, at NCDOJ 006436).

141. On March 18, 2020, Warden Witherspoon responded, stating that they would also have to "provide our SOPs to Legal" and incorrectly telling Cynthia Thornton that "we added: any offender in their third trimester should not be restrained. This applies even if they are not in pre or active labor. If there is a serious security concern with the offender not being restrained it should be discussed with the Region Director prior to restraints being added. Any offender in their first or second trimester may be restrained UNLESS they go into pre or active labor in which case they

23

would not be restrained." (Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, at NCDOJ 006436).

142.    In fact, the relevant NCCIW SOPs were not updated between February 2019 and March 2021. (*See* Ex. E, May II Dep., 39:19-40:4 ("Q: ...Since February of 2019, how many times had the SOP NCCIW D.1800 been updated? A: Yes, ma'am. And the answer to your question is three times, ma'am. Q: And which dates—on what dates was it updated? A: March 16, 2021, April 28, 2021, and September 22, 2021. Q: So the policy was – the SOP was not updated at all in the year 2020? A: No, ma'am."). *See also* Ex. CC, Email Titled "Another Pregnancy Policy Question" ("These policies and any others that do not match the wording of red book in relation to pregnant offenders need to be updated ASAP. . . .While you personally haven't been asked to complete this in the past; NCCIW was directed to prior to your arrival and it apparently didn't get done.")).

143.    The NCCIW SOPs were not updated until 2021, the same day that Cynthia Thornton directed Warden Edwards to implement the policy, and noted that she had requested Warden Witherspoon to do so but "it apparently didn't get done." *See* (Ex. CC, Email Titled "Another Pregnancy Policy Question", at NCDOJ 006202 ("These policies and any others that do not match the wording of red book in relation to pregnant offenders need to be updated ASAP. . . .While you personally haven't been asked to complete this in the past; NCCIW was directed to prior to your arrival and it apparently didn't get done."); Ex. V, NCCIW Standard Operating Procedure D.1800, Offender Restraints, dated March 16, 2021 at NCDOJ 004278).

144.    Warden Witherspoon did not update the NCCIW Security Supervisor Post Order to comply with the DPS policies or Interim Policy regarding shackling until after December 2019. (Ex. F, Witherspoon Dep., 40:12-41:6, 43:20-44:4; Ex. Y, NCCIW Post Order Security Supervisor for UNC Hospital, dated January 20, 2020, at NCDOJ 003466-003467).

145.     Warden Witherspoon did not update any NCCIW SOPs or other NCCIW Post Orders at the time she updated the NCCIW Security Supervisor Post Order in 2020. (Ex. F, Witherspoon Dep., 44:5-10).

146.     Warden Witherspoon was aware that, in November 2019, Deputy Assistant Warden David May spoke with individuals from the North Carolina Governor's office with regards to the shackling of a pregnant offender. (Ex. DD, Email Chain Titled "Patient Issue- Need Your Assistance", at NCDOJ 006422-6423).

147.     Warden Witherspoon knew that officers had violated the state shackling policy. (Ex. DD, Email Chain Titled "Patient Issue- Need Your Assistance", at NCDOJ 006424-006425; Ex. BB, Email Regarding Pregnant Female Offender Temporary Directive, at NCDOJ 006432).

148.     Warden Witherspoon never disciplined any officers for violating DPS shackling policy. (Ex. E, May II Dep., 17:7-22).

## IV.     Medication for Opioid Use Disorder (MOUD)

### A.  Plaintiff Was Denied MOUD Pursuant to NCCIW Standard Operating Procedures

149.     Medication for Opioid Use Disorder (MOUD) and Medication Assisted Treatment (MAT) are both terms that refer to the use of FDA-approved medications for individuals who are addicted to opiates. (Ex. G, Amos I Dep., 35:12-15, 36:2-9).

150.     MOUD and MAT both include buprenorphine. (Ex. G, Amos I Dep., 35:12-15, 36:2-9).

151.     Suboxone and Subutex are both forms of buprenorphine.  (Ex. H, June 2023 Deposition of Elton Amos ("Amos II Dep."), 22:4-7; Ex. KK, Medical Records, at BS 1572 (PDF 154)).

152.    Without MOUD, Ms. Edwards risked relapse, overdose, and death. (Ex. B, Stuebe Report, at 6).

153.    Ms. Edwards' history of Opioid Use Disorder placed her at an even higher risk of postpartum depression and anxiety. (Ex. B, Stuebe Report, at 5).

154.    Ms. Edwards was prescribed buprenorphine during her pregnancy to prevent withdrawal during pregnancy. (Ex. M, Perry RFA, No. 13; Ex. KK, Medical Records, at BS 240-241 (PDF 27-28), BS 713 (PDF 86), BS 918 (PDF 92), BS 1116 (PDF 102)).

155.    Ms. Edwards received buprenorphine at the Southlight Clinic, an external MOUD provider, from June 2019 until November 30, 2019.  (Ex. FF, Email Chain Titled "Current Doses for Southlight Patients", at NCDOJ 9001; Ex. EE, Email Chain Titled "SouthLight Participants", at NCDOJ 9002; Ex. GG, Email Chain Titled "FYI_Southlight offenders as of 07/16/19", at NCDOJ 6415; Ex. KK, Medical Records, at BS 232-236 (PDF 19-23)).

156.    Ms. Edwards received buprenorphine at NCCIW from December 1, 2019, until December 19, 2019. (Ex. KK, Medical Records, at BS 1457 (PDF 114)).

157.    Ms. Edwards was prescribed buprenorphine by her provider at UNC-Chapel Hill hospital after she gave birth. (Ex. KK, Medical Records, at BS 67 (PDF 8), BS 1572 (PDF 154); Ex. G, Amos I Dep., 113:15-21).

158.    Ms. Edwards had an active prescription for buprenorphine when she returned to the prison on December 22, 2019. (Ex. G, Amos I Dep., 113:15-21; Ex. KK, Medical Records, at BS 1572 (PDF 154)).

159.    Ms. Edwards' active prescription for buprenorphine was reflected in NCCIW records at the time of discharge. (Ex. KK, Medical Records, at BS 1572 (PDF 154)).

160. NCCIW did not provide Ms. Edwards with buprenorphine on or after December 23, 2019. (Ex. M, Perry RFA, No. 14; Ex. KK, Medical Records, at BS 1456-57 (PDF 113-114); Ex. A, Edwards Decl., at ¶ 27).

161. Instead of using buprenorphine, NCCIW gave Ms. Edwards oxycodone to taper. (Ex. G, Amos I Dep., 101:10-15; Ex. KK, Medical Records, at BS 79 (PDF 14)).

162. Ms. Edwards' taper from oxycodone occurred over 9 days. (Ex. B, Stuebe Report, at 7; Ex. KK, Medical Records, at BS 586 (PDF 73), BS 1459 (PDF 116)).

163. NCCIW did not monitor Ms. Edwards using the Clinical Opiate Withdrawal Score (COWS) during withdrawal. (Ex. H, Amos II Dep. 72:23-73:5).

164. After returning to NCCIW after giving birth, Ms. Edwards experienced physical symptoms of withdrawal from buprenorphine and felt sick, including pain, diarrhea, and vomiting, for several weeks. (Ex. LL, Grievance Submitted by Tracey Edwards on February 19, 2020, at BS 1745; Ex. B, Stuebe Report, at 7; Ex. A, Edwards Decl., at ¶ 27). The pain was even worse than childbirth. (Ex. A, Edwards Decl., at ¶ 27).

165. Ms. Edwards remained in the infirmary at NCCIW from December 23, 2019, to January 13, 2020. (Ex. Q, Claudette Edwards' Supplemental Responses to Plaintiff's Second Set of Interrogatories, No. 13; Ex. KK, Medical Records, at BS 490 (PDF 43)).

166. When Ms. Edwards later saw a doctor at NCCIW, that doctor noted that Ms. Edwards "went through withdrawal after delivery per policy" and that she had informed Ms. Edwards of the "high relapse rate" and need to "seek treatment/support after release." (Ex. KK, Medical Records, at BS 505 (PDF 52)).

167. Women with opioid use disorder relapse far more often in the postpartum period compared with during pregnancy. (Ex. B, Stuebe Report, at 6).

168.     Ms. Edwards experienced nausea, diarrhea, insomnia and anxiety while in the infirmary. (Ex. A, Edwards Decl., at ¶¶ 27-28).

169.     The DSM-V and NCCIW's MAT Provider Handbook recommend that the withdrawal symptoms be treated with diphenhydramine, ondansetron, acetaminophen, loperamide, and clonidine.  (Ex. B, Stuebe Report, at 7-8; Ex. PP, MAT Provider Handbook, at NCDOJ 3476).

170.     Ms. Edwards was only prescribed one of these five medications. (Ex. B, Stuebe Report, at 8; Ex. KK, Medical Records, at BS 1456-1463 (PDF 113-120), BS 586-589 (PDF 73-76)).

171.     Ms. Edwards was not given several non-opiate medications that would have provided symptomatic treatment. (Ex. B, Stuebe Report, at 8).

172.     Ms. Edwards requested buprenorphine in a grievance on February 19, 2020. (Ex. LL, Grievance Submitted by Tracey Edwards on February 19, 2020, at BS 1745).

173.     NCCIW did not provide Ms. Edwards buprenorphine after receiving the February 19, 2020, grievance from Ms. Edwards. (Ex. M, Perry RFA, No. 14; Ex. LL, Grievance Submitted by Tracey Edwards on February 19, 2020, at BS 1746). Instead, NCCIW loosely referenced its policy not to provide MOUD to non-pregnant individuals. (*See id.*).

174.     She was sometimes unable to eat or shower because of the intensity of her symptoms. (Ex. A, Edwards Decl., at ¶ 29).

175.     Throughout the remainder of her incarceration, Ms. Edwards experienced severe cravings for opioids and worried about the possibility of relapse and how that would impact her ability to be released, retain custody of her children, and care for them after the end of her sentence. (Ex. A, Edwards Decl., at ¶¶ 30-31).

**B.     Defendants' Policies and Practices Regarding MOUD**

176.    When a prisoner with an active prescription for MOUD comes to NCCIW, NCCIW is aware of that prescription. (Ex. G, Amos I Dep., 74:1-7).

177.    During the relevant time frame, NCCIW offered buprenorphine only to pregnant prisoners who were addicted to opioids. (Ex. G, Amos I Dep., 35:21-36:9, 74:8-15; Ex. N, Anthony Perry's Supplemental Responses to Plaintiff's First Set of Requests for Admission, No. 15).

178.    When a non-pregnant offender with an active prescription for MOUD came to NCCIW during the relevant time period, that prescription would be discontinued. (Ex. G, Amos I Dep., 74:13-15).

179.    The NCCIW Medical Director was responsible for implementing the policy to only provide buprenorphine to pregnant people. (Ex. PP, MAT Provider Handbook, at NCDOJ 3473 ("Offender is no longer eligible for MAT treatment/medications once she delivers or the pregnancy is no longer viable."); Ex. G, Amos I Dep., 109:1-5 ("Q: And do you have the ability to issue an approval such that the pharmacy will prescribe that medication? A: I do. That is the role of the director.").

180.    From May 2019 to November 30, 2019, pregnant prisoners with buprenorphine prescriptions were provided buprenorphine at an outpatient center, Southlight. (Ex. HH, Email Titled "MAT Confirmation Brief" at BS 1770; Ex. G, Amos I Dep., 75:10-17).

181.    Pregnant prisoners who received buprenorphine at Southlight were transported to Southlight on a daily basis. (Ex. G, Amos I Dep., 75:10-17).

182.    On December 1, 2019, NCCIW began an in-house program to provide buprenorphine to pregnant prisoners at NCCIW. (Ex. G, Amos I Dep., 75:18-21; Ex. HH, Email Titled "MAT Confirmation Brief" at BS 1770).

183. From December 2019 to March 2021, NCCIW did not provide buprenorphine to non-pregnant prisoners. (Ex. N, Perry's Supplemental Responses to Plaintiff's First Set of Requests for Admission, No. 15).

184. NCCIW sometimes uses oxycodone as a form of pain relief during withdrawal from opioids. (Ex. G, Amos I Dep., 102:3-9).

185. Providers at NCCIW were expected to follow the Clinical Opiate Withdrawal Scale (COWS) to monitor someone in withdrawal from buprenorphine. (Ex. II, Email Titled "NCCIW MAT protocol follow-up", at BS 1779; Ex. PP, MAT Provider Handbook, at NCDOJ 3474-003475).

186. The purpose of the Clinical Opiate Withdrawal Scale is to monitor withdrawal symptoms from opioid withdrawal and identify any clinical management of withdrawal symptoms. (Ex. G, Amos I Dep., 141:2-8, 141:17-142:7).

187. Providers at NCCIW were expected to complete at least one written assessment on the Clinical Opiate Withdrawal Scale for a prisoner withdrawing from buprenorphine. (Ex. G, Amos I Dep., 149:5-8).

**C.    Defendants Were Authorized to Prescribe MOUD**

188. Dr. Amos and Dr. Alexander were aware that the only legal requirement to prescribe buprenorphine, was that the health care provider had an "x waiver." (Ex. H, Amos II Dep., 53:3-7; Ex. L, Deposition of James Alexander ("Alexander Dep."), 52:17-20).

189. An "x waiver" is a Drug Enforcement Administration certification that permits the health care provider to prescribe buprenorphine. (Ex. H, Amos II Dep., 59:5-9; Ex. G, Amos I Dep., 170:9-19, 171:21-172:1; Ex. L, Alexander Dep., 52:5-16).

190.     As of December 2019, there was always at least one clinician who was authorized to prescribe buprenorphine. (Ex. M, Perry RFA, No. 17; Ex. G, Amos I Dep., 133:5-17; Ex. H, Amos II Dep., 59:5-18).

191.     As of December 2019, there was at least one physician and one nurse practitioner who was authorized to prescribe buprenorphine. (Ex. G, Amos I Dep., 41:1-6).

192.     As of December 22, 2019, Dr. Amos had an "x waiver" allowing him to prescribe buprenorphine. (Ex. G, Amos I Dep., 171:21-172:1).

193.     As of December 2019, NCCIW was registered with the Drug Enforcement Administration as a hospital or clinic. (Ex. HH, Email Titled "MAT Confirmation Brief" at BS 1772-1774; Ex. H, Amos II Dep., 67:20-23).

194.     As of December 2019, and throughout the relevant time period, Defendants had in place a contract with a pharmacy allowing them to purchase buprenorphine. (Ex. M, Perry RFA, No. 18; Ex. G, Amos I Dep., 134:14-18)

195.     As of December 2019, NCCIW had never requested authorization to prescribe buprenorphine to non-pregnant people. (Ex. G, Amos I Dep., 94:7-11).

196.     As of December 2019, NCCIW had never conducted any research to determine whether it could continue to provide buprenorphine to a prisoner during the withdrawal period. (Ex. G, Amos I Dep., 102:20-103:8).

197.     DPS never told NCCIW they could not prescribe buprenorphine to non-pregnant prisoners. (Ex. L, Alexander Dep., 51:20-52:4, 75:15-20).

198.     North Carolina Department of Health and Human Services authorities never told NCCIW that they could not prescribe buprenorphine to non-pregnant prisoners. (Ex. L, Alexander Dep., 61:24-62:3).

199. NCCIW did not request authorization to prescribe buprenorphine to non-pregnant prisoners from SAMHSA. (Ex. G, Amos I Dep., 93:19-94:11).

200. There were no issues or concerns with the diversion of the buprenorphine related to NCCIW's program to provide buprenorphine to patients at the prison. (Ex. L, Alexander Dep., 93:9-18).

**D.      Denial of MOUD Poses a Substantial Risk of Harm**

201. Incarcerated people who are denied access to MOUD have a greatly increased risk of relapse, overdose, and death. (Ex. B, Stuebe Report, at 6).

202. Discontinuation of MOUD is associated with a five times higher risk of fatal overdose after release. (Ex. B, Stuebe Report, at 6).

203. The standard of care for Opioid Use Disorder in the postpartum period is continuation of Medications for Opioid Use Disorder (MOUD), because discontinuation of MOUD increases risk of relapse, overdose and maternal death. (Ex. B, Stuebe Report, at 6).

204. Substance use disorders increase the likelihood of postpartum mood disorders. (Ex. B, Stuebe Report, at 5).

205. Postpartum mood disorders are a leading cause of maternal mortality. (Ex. B, Stuebe Report, at 5).

206. Women who give birth while incarcerated are at greater risk of experiencing postpartum depression and anxiety. (Ex. B, Stuebe Report, at 5).

207. The standard of care for people with opioid use disorder is to continue the use of Medication for Opioid Use Disorder. (Ex. B, Stuebe Report, at 7).

208. The standard of care when terminating buprenorphine is to also provide medications to treat withdrawal symptoms of insomnia, anxiety, nausea, pain, and diarrhea. (Ex. B, Stuebe Report, at 7–8).

209. Discontinuing buprenorphine increases risk of relapse and overdose. (Ex. B, Stuebe Report, at 6).

210. Discontinuing buprenorphine during the postpartum period places people with Opioid Use Disorder at substantial risk of serious harm. (Ex. B, Stuebe Report, at 6).

211. Discontinuing buprenorphine during the postpartum period violates the medical community standard of care. (Ex. B, Stuebe Report, at 6).

212. If a patient wishes to discontinue buprenorphine, the standard of care for tapering from buprenorphine is that tapering should be done using buprenorphine rather than oxycodone. (Ex. B, Stuebe Report, at 7).

213. At NCCIW, there is no medical or regulatory reason to prescribe oxycodone during tapering from buprenorphine. (Ex. B, Stuebe Report, at 7).

214. The standard of care for tapering from buprenorphine is that tapering occurs over at least 4 weeks. (Ex. B, Stuebe Report, at 7).

215. A rapid taper from buprenorphine increases the risk of experiencing significant withdrawal symptoms. (Ex. B, Stuebe Report, at 7).

216. The standard of care for quantifying withdrawal symptoms is to use the clinical Opiate Withdrawal Scale (COWS). (Ex. B, Stuebe Report, at 7; Ex. G, Amos I Dep., 112:17 ("COWS is a standard across America.")).

217.    The standard of care for treating withdrawal symptoms is to provide symptomatic treatment based on findings from the Clinical Opiate Withdrawal Scale (COWS). (Ex. B, Stuebe Report, at 7-8).

### E.    Dr. Amos' Knowledge of substantial risk of harm

218.    Dr. Amos is personally aware that Opioid Use Disorder is a serious and potentially deadly condition. (Ex. G, Amos I Dep., 69:8-11).

219.    Dr. Amos co-authored the article "Medications for Opioid Use Disorder in Pregnancy in a State Women's Prison Facility," which was published in September 2020, based on a retrospective cohort study of pregnant women with OUD at NCCIW from 2016-2018. (*See* Ex. SS, Article Co-authored by Elton Amos Titled "Medications for Opioid Use Disorder in Pregnancy in a State Women's Prison Facility" dated September 1, 2020 ("Amos Article")).

220.    In this article, Dr. Amos wrote that "Women's OUD experiences in pregnancy are shaped by interactions between trauma, social forces, and physiology. Pregnant women with OUD face tremendous stigma from the legal system, their families and society, and are at risk for death from overdose during pregnancy and postpartum." (Ex. SS, Amos Article, at 2).

221.    Dr. Amos also wrote that "[a]lthough continued drug use, including injection use, occurs within jail and prison facilities, women who abstain during incarceration are at extremely high risk of overdose death when they return to the community." (Ex. SS, Amos Article, at 2).

222.    The article also states that "[w]omen with OUD are particularly vulnerable to overdose immediately post-incarceration and also in the postpartum period. Ensuring that women who have initiated MOUD during pregnancy can continue treatment postpartum and are referred to community providers is an important step in continuity of care for OUD." (Ex. SS, Amos Article, at 7).

34

223. Dr. Amos is personally aware that there is a generally acceptable treatment for Opioid Use Disorder in the community (Ex. G, Amos I Dep., 70:3-7).

224. Dr. Amos is personally aware that the standard of treatment for Opioid Use Disorder in the community involves prescribing medication. (Ex. G, Amos I Dep., 71:1-10 ("The clinical standard of treatment for Opioid Use Disorder would be to choose a medication that allows the individual to operate functionally while dealing with their substance abuse with the ultimate goals of keeping them safe from overdosing and eventual death.")).

225. Dr. Amos is personally aware that terminating buprenorphine places people at a heightened risk of relapse, overdose, and death. (Ex. G, Amos I Dep., 168:8-15).

226. Dr. Amos is personally aware that the standard of care is influenced by guidance from national organizations, local organizations, and regulatory systems. (Ex. G, Amos I Dep., 125:20-126:20; Ex. H, Amos II Dep., 79:1-25, 82:10-18).

227. Dr. Amos identified the Substance Abuse and Mental Health Services Administration (SAMHSA), the American Society for Addiction Medication (ASAM), the World Health Organization, the National Institute on Drug Abuse, the American Psychiatric Association, and the American Medical Association as organizations that helped set the standard of care for addiction treatment in 2019. (Ex. JJ, Email Titled "Some Research on MAT/MOUD Standards of Care in Prisons" at NCDOJ 6018).

228. Dr. Amos identified SAMHSA, ASAM, and the American College of Obstetricians and Gynecologists as setting the standard of care for addiction treatment postpartum. (Ex. H, Amos II Dep. 90:11-23, 92:7-13).

229.     These organizations considered Opioid Use Disorder a diagnosable medical condition mandating treatment in the form of MOUD. (Ex. B, Stuebe Report, at 6; Ex. H, Amos II Dep. 83:5-17).

230.     Dr. Amos is personally aware that guidance from organizations would have contributed to understandings about the standard of care for postpartum treatment. (Ex. H, Amos II Dep., 92:1-13).

231.     Dr. Amos is personally aware that the standard of care for prisons should not deviate from the standard of care in the community. (Ex. H, Amos II Dep., 89:1-12).

232.     Dr. Amos is personally aware that the standard of care requires doctors in prisons to be alert to the specific health needs of the prison population. (Ex. H, Amos II Dep., 89:1-12).

233.     Dr. Amos is personally aware that the standard of care for individuals with Opioid Use Disorder is the same for the pre-pregnancy and postpartum period. (Ex. G, Amos I Dep., 71:18-20).

234.     Dr. Amos approved the "utilization review" request in May 2019 for Ms. Edwards to receive buprenorphine during her pregnancy. (Ex. KK, Medical Records, at BS 232 (PDF 19)).

235.     Dr. Amos was personally aware of the harm that denying buprenorphine causes harm to individuals. ((Ex. II, Email Titled "NCCIW MAT protocol follow-up", at BS 1788).

236.     Dr. Amos knew the only requirement for prescribing buprenorphine to nonpregnant individuals was an "x waiver." (Ex. H, Amos II Dep., 59:5-9; Ex. G, Amos I Dep., 170:9-19).

237.     Dr. Amos was aware that there was at least one NCCIW provider who had the "x waiver" in December 2019. (Ex. G, Amos I Dep., 41:1-6, 58:17-19; 171:21-172:1; Ex. H, Amos II Dep., 59:5-18).

36

238. Dr. Amos was aware that there was a pharmacy contract in place to provide buprenorphine in December 2019. (Ex. G, Amos I Dep., 134:14-18, 194:6-12).

239. Dr. Amos is personally aware that withdrawal from buprenorphine can cause pain and nausea. (Ex. G, Amos I Dep., 117:17-118:21).

240. Dr. Amos knew that providers at NCCIW were expected to follow the Clinical Opiate Withdrawal Scale (COWS) and that nurses were supposed to be trained in monitoring opioid withdrawal. (Ex. G, Amos I Dep., 118:22-119:9).

241. Dr. Amos was personally aware of potential harm that may result from sudden withdrawal from buprenorphine. (Ex. II, Email Titled "NCCIW MAT protocol follow-up", at BS 1779, 1788).

242. In May 2023, Dr. Amos sent an email summarizing six different organizations that set the "standard of care" for using "Medication for Opioid Use Disorder" to treat prisoners with Opioid Use Disorder. (Ex. H, Amos II Dep., 77:6-78:19; Ex. JJ, Email Titled "Some Research on MAT/MOUD Standards of Care in Prisons" at NCDOJ 6017-6022).

243. Dr. Amos knew that the organizations cited in the email set the standard of care. (Ex. H, Amos II Dep., 77:6-78:19, 82:10-18; Ex. JJ, Email Titled "Some Research on MAT/MOUD Standards of Care in Prisons" at NCDOJ 6017-6022).

244. Dr. Amos knew the standard of care was to treat opioid use disorder includes using medication for opioid use disorder. (Ex. H, Amos II Dep. 83:5-17).

## V. Psychiatric Care

245. Ms. Edwards' NCCIW medical records prior to giving birth note historical diagnoses of several mental health conditions, including bipolar disorder, post-traumatic stress disorder ("PTSD"), ███████ depression, and anxiety. (Ex. KK, Medical Records, at BS 1518-19 (PDF 132-133); Ex. C, Sheitman Dep., 69:24-25, 70:12-19).

246.     Ms. Edwards has Opioid Use Disorder. (Ex. KK, Medical Records, at BS 1350 (PDF 110); Ex. B, Stuebe Report, at 3).

247.     Prior to incarceration, Ms. Edwards had been prescribed Zoloft, ██████, ████████████████████████████████, Vistaril, and ████████ (Ex. KK, Medical Records, at BS 1523-1525 (PDF 137-139)).

248.     When Ms. Edwards entered NCCIW, she had existing prescriptions for ████████████ ██████████████ (Ex. KK, Medical Records, at BS 1525 (PDF 139)).

249.     NCCIW medical records indicate that prior to December 2019, NCCIW psychiatrists diagnosed Ms. Edwards with ████████████████████████████████████ "Anxiety Disorder, Unspecified", Opioid Use Disorder, and ████████████████████████████ ████████████████████████. (Ex. KK, Medical Records, at BS 1491 (PDF 122), BS 1518-19 (PDF 132-133), 1526 (PDF 140)). ████████████████████████████████████████████████ ████████████████████" (*Id.* at BS 10 (PDF 6)).

250.     On June 10, 2019, Dr. Ralph H Newman, a psychiatrist at NCCIW, prescribed Ms. Edwards Zoloft at 100mg "for treatment of depression." (Ex. KK, Medical Records, at BS 1518-19 (PDF 132-133)).

251.     Zoloft is a brand name for sertraline. (Ex. KK, Medical Records, at BS 001572 (PDF 154)).

252.     On June 10, 2019, Dr. Newman prescribed Ms. Edwards 125 mg of Vistaril daily "for treatment of anxiety." (Ex. KK, Medical Records, at BS 1519 (PDF 133)).

253.     Vistaril is the brand name for hydroxyzine. (Ex. KK, Medical Records, at BS 001572 (PDF 154)).

38

254. Ms. Edwards ceased taking medication for her mental health conditions during her pregnancy. (Ex. C, Sheitman Dep., 68:4-11).

255. Ms. Edwards made the decision to cease taking mental health medication to protect the health of her pregnancy. (Ex. A, Edwards Decl., at ¶ 8; Ex. C, Sheitman Dep., 68:4-11).

256. Doctors at UNC-Chapel Hill hospital prescribed Ms. Edwards 25mg of Zoloft after she gave birth. (Ex. M, Perry RFA, No. 20; Ex. KK, Medical Records, at BS 1572 (PDF 154)).

257. Doctors at UNC-Chapel Hill hospital prescribed Ms. Edwards 50mg of Vistaril after she gave birth. (Ex. KK, Medical Records, at BS 707 (PDF 80); BS 1572 (PDF 154)).

258. When Ms. Edwards was discharged from UNC-Chapel Hill hospital, her Zoloft and Vistaril prescriptions were set to expire in two weeks. (Ex. C, Sheitman Dep., 66:17-67:5; Ex. KK, Medical Records, at BS 707 (PDF 80)).

259. Ms. Edwards' ob/gyn at UNC recommended a mood check at two weeks postpartum to evaluate for a response to treatment and determine whether to adjust her medication dose. (Ex. B, Stuebe Report, at 5; Ex. KK, Medical Records, at BS 1570 (PDF 152)).

260. NCCIW medical records reflect that Ms. Edwards' providers were instructed by her UNC providers to refer her to the Mental Health department for postpartum depression. (Ex. KK, Medical Records, at BS 852 (PDF 160)).

261. Ms. Edwards' maternity care providers at UNC acted within the standard of care by prescribing her an antidepressant. (Ex. B, Stuebe Report, at 5).

262. When Ms. Edwards was discharged from UNC-Chapel Hill hospital on December 22, 2019, she had active prescriptions for Zoloft and Vistaril. (Ex. M, Perry RFA, No. 20; Ex. C, Sheitman Dep., 73:14-17; Ex. KK, Medical Records, at BS 1572 (PDF 154); BS 707 (PDF 80)).

263.    Ms. Edwards took her new Zoloft and Vistaril prescriptions for 14 days until January 5, 2020. (Ex. KK, Medical Records, at BS 1460 (PDF 117); BS 586-587 (PDF 73-74)).

264.    Ms. Edwards' Zoloft and Vistaril prescriptions expired on January 5, 2020. ((Ex. KK, Medical Records, at BS 1458 (PDF 115); BS 1460 (PDF 117); BS 541 (PDF 67)).

265.    On and after December 22, 2019, Ms. Edwards experienced symptoms demonstrating exacerbation of her mental health conditions, including nightmares, bad anxiety, racing thoughts, and insomnia. She was sometimes unable to eat or shower due to the severity of her symptoms. (Ex. A, Edwards Decl., at ¶¶ 28-29).

266.    Ms. Edwards did not have a documented mood check, as recommended by her ob/gyn. (Ex. B, Stuebe Report, at 5).

267.    On January 7, 2020, Ms. Edwards submitted a sick call request, also known as a Mental Health Services Referral, alerting her providers that her prescriptions had expired and that she was experiencing mental health degradation, including anxiety, sleep issues, and racing thoughts. (Ex. KK, Medical Records, at BS 799 (PDF 90)).

268.    NCCIW medical records show that on January 6, 2020, Christina M. Sanderson, LPN, made a request for renewal for Ms. Edwards' Vistaril prescription. (Ex. KK, Medical Records, at BS 541 (PDF 67)).

269.    NCCIW medical records show that on January 8, 2020, two different health care providers noted in Ms. Edwards' file that her Vistaril prescription had expired, and that Ms. Edwards needed to be seen by "Mental Health" to renew them. (Ex. KK, Medical Records, at BS 523 (PDF 62); BS 519 (PDF 58)).

270.    On January 10, 2020, during a post-partum visit with Dr. Alison Goulding at the NCCIW prenatal clinic, Dr. Goulding reported that Ms. Edwards' Zoloft was "discontinued" and

recommended that Ms. Edwards re-start her Zoloft prescription due to Ms. Edwards' reports of "increased stress, anxiety, and depression," but was "unable to prescribe Zoloft at the NCCIW.". (Ex. KK, Medical Records, at BS 505 (PDF 52)).

271.    On January 12, 2020, Ms. Edwards put in a sick call request alerting NCCIW health care workers that her prescriptions had expired and that she was experiencing mental health degradation, including anxiety and trouble sleeping. (Ex. KK, Medical Records, at BS 798 (PDF 89)).

272.    On January 15, 2020, Ms. Edwards met with Daniel C. Rohda, the psychological services coordinator. The Mental Health Progress Notes state that Ms. Edwards' Zoloft and Vistaril prescriptions expired, and that he will refer her to psychiatry. The Mental Health Progress Notes also show that she was referred to psychiatry for an appointment on January 16, 2020, at "00:00," with a follow up appointment with Mr. Rohda scheduled for February 24, 2020, also at "00:00." (Ex. KK, Medical Records, at BS 713 (PDF 86)).

273.    Ms. Edwards did not see a psychiatrist on January 16, 2020, and her missed appointment was not reported in the system nor rescheduled. (Ex. KK, Medical Records, at BS 711 (PDF 84)).

274.    On February 27, 2020, Ms. Edwards saw Mr. Rohda, the Psychological Service Coordinator. (Ex. KK, Medical Records, at BS 711 (PDF 84)).

275.    Although she had a scheduled appointment with a psychiatrist later that day on February 27, 2020, Ms. Edwards not allowed to report due to a late count. (Ex. KK, Medical Records, at BS 710 (PDF 83)).

276.    ███████████████████████████████████

█████████████████. (Ex. QQ, North Carolina Department of Public Safety Training "Prison

Security Functions and Procedures" dated July 1, 2019, at NCDOJ 4359-4360). A late count occurs when there is a problem with the Count, and offenders are not allowed to attend appointments until the Count is complete. (Sheitman Dep. 69:4-19).

277.    NCCIW failed to renew Ms. Edwards' Zoloft and Vistaril prescriptions after they expired, and for 74 days postpartum. (Ex. B, Stuebe Decl., at 2; Ex. M, Perry RFA, Nos. 22-23).

278.    During the 74-day period after giving birth, Ms. Edwards did not see a provider who was authorized to prescribe psychotropic medications under NCCIW medical policy. (Ex. M, Perry RFA, Nos. 22-23).

279.    Treatment of depression and anxiety is part of routine maternity care and is one of the core competencies required for training in Obstetrics and Gynecology. (Ex. B, Stuebe Report, at 5).

280.    Risk factors for these disorders include personal history of depression or anxiety, comorbid substance use disorder, and adverse life events. (Ex. B, Stuebe Report, at 5).

281.    Among women who give birth while incarcerated, 66% report symptoms of postpartum mood disorders. (Ex. B, Stuebe Report, at 5).

282.    These disorders are a leading cause of maternal mortality. (Ex. B, Stuebe Report, at 5).

283.    The American College of Obstetricians and Gynecologists recommends routine screening for postpartum depression, and states: "Clinical staff in obstetrics and gynecology practices should be prepared to initiate medical therapy, refer patients to appropriate behavioral health resources when indicated, or both." (Ex. B, Stuebe Report, at 5).

284.    The American College of Obstetrician-Gynecologists, the Society for Maternal-Fetal Medicine physicians, and American Society of Addiction Medicine recommend routine

screening for postpartum depression for individuals with substance use disorders. (Ex. B, Stuebe Report, at 6).

285.    Timely treatment is required for postpartum mood disorders. (Ex. B, Stuebe Report, at 5).

286.    Ms. Edwards' symptoms of mental health conditions are consistent with inadequately treated postpartum depression and anxiety. (Ex. B, Stuebe Report, at 5).

287.    NCCIW's failures to provide Ms. Edwards post-partum psychiatric care until 74 days after giving birth violated the standard of care. (Ex. B, Stuebe Report, at 5).

288.    NCCIW has documented in trainings that prisoners are at a high risk of postpartum difficulties. (Ex. RR, "The Dignity of Incarcerated Offenders Training Series" at NCDOJ 3121).

289.    A psychiatrist is the only medical provider authorized to prescribe psychotropic medication under NCCIW policy. (Ex. M, Perry RFA, Nos. 20-23).

290.    DPS issued policy guidelines recommending psychotropic medications to be renewed every 30 days. (Ex. Z, DPS Health Services Policy and Procedure Manual, Policy TX II-11, dated December 2016, at NCDOJ 3258).

291.    DPS issued policy guidelines recommending a psychiatric provider to evaluate the offender and their prescribed medication each time it is renewed. ((Ex. Z, DPS Health Services Policy and Procedure Manual, Policy TX II-11, dated December 2016, NCDOJ 3258).

292.    NCCIW was aware that a postpartum individual runs the risk of having exacerbated mental health symptoms. (Ex. C, Sheitman Dep., 85:3-5).