IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3270-D

TRACEY EDWARDS,                    )
                                   )
                   Plaintiff,      )
                                   )
        v.                         )          **ORDER**
                                   )
TODD ISHEE, et al.,                )
                                   )
                   Defendants.     )

Tracey Edwards ("Edwards" or "plaintiff"), a former state inmate, asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("RA"). 2d Am. Compl. [D.E. 39] ¶ 5. Edwards's claims arose while she was incarcerated at North Carolina Correctional Institution for Women ("NCCIW"). First, Edwards alleges that correctional officers cruelly and unnecessarily shackled her during her labor and delivery and postpartum recovery, causing extreme pain and emotional distress. 2d Am. Compl. ¶¶ 23–49. Second, Edwards alleges that, without any medical justification, prison medical providers discontinued opioid withdrawal medication ("MOUD") after she gave birth, causing "severe and life-threatening withdrawal," and denied her mental health medication and treatment despite her need for the same. Id. ¶¶ 85–89, 109–124.

Edwards names as defendants Todd Ishee ("Ishee"), the Secretary of the North Carolina Department of Adult Corrections, in his official capacity; Benita Witherspoon ("Witherspoon"), the former NCCIW warden, in her personal capacity; Anthony Perry ("Perry"), the current NCCIW warden, "in [his] official capacity for purposes of injunctive relief[;]" James Alexander

("Alexander"), the NCCIW Healthcare Facility Health Treatment Administrator, in his personal and official capacities; Gary Junker ("Junker"), the Director of Health and Wellness Services of the Department of Public Safety, in his personal and official capacities; and Elton Amos ("Amos"), the NCCIW Medical Director, in his personal and official capacities. 2d Am. Compl. ¶¶ 10–14; see Fed. R. Civ. P. 25(d) (substituting Ishee and Perry for Buffaloe and Warden Edwards). Edwards also names in their personal capacities seven current or former NCCIW correctional officers ("the Officer Defendants") who allegedly "shackled Plaintiff during her pregnancy, labor, and postpartum recovery in contravention of her constitutional rights and North Carolina Department of Public Safety (DPS) Policy." 2d Am. Compl. ¶ 16.

Edwards moves for partial summary judgment. See [D.E. 245]. Specifically, Edwards seeks summary judgment against Witherspoon in her personal capacity on count one of her second amended complaint, alleging violations of the Eighth Amendment in connection with defendants' use of restraints and shackling. See id. at 1; 2d Am. Compl. ¶¶ 133–146. Edwards also seeks summary judgment against defendant Amos in his personal capacity on counts two and five of the second amended complaint, alleging deliberate indifference in violation of the Eighth Amendment to her serious medical need for MOUD and mental health treatment and medication. See [D.E. 245] 1–2; cf. 2d Am. Compl. ¶¶ 147–159, 185–193. Finally, Edwards seeks summary judgment on counts three, four, six and seven of the second amended complaint against defendant Ishee for violations of the ADA and RA in connection with her need for MOUD and mental health treatment and postpartum medication. See [D.E. 245] 2; 2d Am. Compl. ¶¶ 161–184, 194–211. Edwards also moves to exclude the expert report of Dr. Paul Adler [D.E. 257] and to strike certain evidence in defendants' summary judgment appendix [D.E. 293, 302].

Defendants seek summary judgment on all claims. See [D.E. 270] 1–2. As part of their argument, defendants assert that they are entitled to qualified immunity on Edwards's claims under section 1983 and the Eighth Amendment. Id. at 7–21.

As explained below, the court grants the parties' motions to seal, denies plaintiff's motions for partial summary judgment and to exclude and strike evidence, grants defendants' motion for summary judgment, and dismisses all claims.

I.

Edwards was incarcerated at NCCIW, a prison in the North Carolina Department of Adult Corrections ("DAC"), between May 2019, and March 15, 2021.[1] See Pl.'s Statement of Material Facts ("PSMF") [D.E. 250] ¶¶ 7, 18–19; [D.E. 296] 1; Def.'s Statement of Material Facts ("DSMF") [D.E. 271-1] 1–2; [D.E. 289] 1–2; cf. DSMF ¶ 50; [D.E. 289] ¶ 50.[2] "NCCIW is the only state prison in North Carolina that incarcerates pregnant prisoners." PSMF ¶ 20; see [D.E. 296] 1; cf. DSMF 2; [D.E. 289] 2. Edwards "learned that she was pregnant with her second child when NCCIW administered a pregnancy test during an intake screening on May 16, 2019." PSMF ¶¶ 8–9; see [D.E. 296] 1; cf. DSMF 2; [D.E. 289] 2.

Edwards "was diagnosed with Opioid Use Disorder ('OUD') before she was incarcerated[,]" and "had a documented history of mental health disorders . . . ." PSMF ¶¶ 2–3; see [D.E. 296] 1; DSMF ¶ 11; [D.E. 289] ¶ 11. "Opioid Use Disorder is a chronic medical condition." PSMF ¶ 5; see [D.E. 296] 1. NCCIW transported Edwards to an outside clinic every

_____

[1] When the events alleged in the second amended complaint occurred, the agency that oversaw the state prison system was called the North Carolina Department of Public Safety ("DPS"). See [D.E. 289] 5 n.5. The court uses DAC for consistency.

[2] The first two pages of defendants' statement of material facts, and Edwards's response to the same, repeat the paragraph numbers one through three. Citations to material after the first two pages are by paragraph.

3

day from June 2019 until November 30, 2019, to receive buprenorphine, a medication used to treat OUD, and placed Edwards in wrist restraints for the daily transports. See PSMF ¶¶ 45, 155; [D.E. 296] 1, 7; DSMF ¶¶ 5, 9–10; [D.E. 289] ¶¶ 5, 9–10. "On December 1, 2019, NCCIW initiated an in-house MAT program."[3] DSMF ¶ 10; see [D.E. 289] ¶ 10; PSMF ¶ 182; [D.E. 296] 7. "Edwards received buprenorphine at NCCIW from December 1, 2019, until December 19, 2019." PSMF ¶ 156; see [D.E. 296] 7.

On December 19, 2019, NCCIW transported Edwards to UNC Chapel Hill Hospital to be induced into labor, and she gave birth on December 20, 2019. See PSMF ¶¶ 11–12; [D.E. 296] 1; DSMF ¶ 26; [D.E. 289] ¶ 26. Edwards was discharged from the hospital on December 22, 2019, and transported back to NCCIW. See PSMF ¶¶ 14, 16; [D.E. 296] 1. Correctional staff applied handcuffs to Edwards to transport her to the hospital and shackled one of her arms and one of her legs to her hospital bed upon arrival. See PSMF ¶¶ 46–47; [D.E. 296] 1; cf. PSMF ¶ 79; [D.E. 296] 3; DSMF ¶ 17; [D.E. 289] ¶ 17.

The parties disagree about the extent to which Edwards was restrained between her admission on December 19, 2019, and her discharge on December 22, 2019, but they agree that Edwards was unrestrained for certain periods of time. Compare PSMF ¶¶ 48–54 and [D.E. 289] ¶¶ 28–29, 32–34 with DSMF ¶¶ 28–29, 32–34 and [D.E. 296] 1–2. The parties agree that Edwards was unrestrained after doctors instructed her to push during delivery. See DSMF ¶¶ 28–30; [D.E. 289] ¶¶ 28–30; PSMF ¶¶ 50–51; [D.E. 296] 1–2. The parties agree that Edwards was unrestrained

---

[3] "Medication for Opioid Use Disorder (MOUD) and Medication Assisted Treatment (MAT) are both terms that refer to the use of FDA-approved medications for individuals who are addicted to opiates." PSMF ¶ 149; see [D.E. 296] 7. The parties use the acronym MAT to refer to medications provided to pregnant women with OUD in order to prevent fetal loss. See DSMF ¶ 4; [D.E. 289] ¶ 4. "MOUD and MAT both include buprenorphine." PSMF ¶ 150; see [D.E. 296] 7.

4

when she gave birth. See DSMF ¶¶ 28–30; [D.E. 289] ¶¶ 28–30; PSMF ¶¶ 50–51; [D.E. 296] 1–2. The parties also agree that Edwards remained unrestrained for a period of time after giving birth. See DSMF ¶¶ 28–30; [D.E. 289] ¶¶ 28–30; PSMF ¶¶ 50–51; [D.E. 296] 1–2. The parties also agree that, while remaining in the hospital, Edwards was unrestrained to use the bathroom, and on at least two other occasions "to allow her to walk her baby around the hospital hallway." PSMF ¶¶ 55–56; see [D.E. 296] 2.

While returning "to NCCIW from the hospital on December 22, 2019, the Officer Defendants shackled [Edwards] by shackling her ankles together, handcuffing her, placing a belly chain around her stomach, and connecting her chains with a black box in front of her . . . [which] restricts hand movement." PSMF ¶ 57; see [D.E. 296] 2. The parties disagree whether the use of full restraints to transport Edwards back to NCCIW violated DAC policy. Compare DSMF ¶ 38 with [D.E. 289] ¶ 38.

Numerous organizations oppose using restraints on pregnant women who are incarcerated. PSMF ¶¶ 104–05; cf. [D.E. 296] 4. According to those organizations, "[p]regnant women are more at risk of falling because of physiological changes" that affect a pregnant woman's "center of gravity," and those changes "multiply the risks of shackling . . . because shackling affects balance and mobility."[4] PSMF ¶¶ 108–09, 113; see [D.E. 296] ¶¶ 5. Falling during pregnancy poses risks of significant injury to both the woman and the fetus. See PSMF ¶¶ 110–12, 114; [D.E. 296] 5. "The postural changes of pregnancy persist through 6 to 8 weeks postpartum, so patients who are restrained are at higher risk of falling and sustaining injuries." PSMF ¶ 121; cf. [D.E. 296] 5. The use of shackling or restraints during labor and delivery can interfere with medical

---

[4] Edwards "was afraid of falling while she was shackled during pregnancy and postpartum." PSMF ¶ 62; see [D.E. 296] 2.

Case 5:21-ct-03270-D    Document 315    Filed 09/30/24    Page 5 of 26

care, including emergency medical care, although DAC policy requires removal of restraints if they would interfere with medical care. Compare PSMF ¶¶ 116–19 with [D.E. 296] 5. The parties dispute whether restraining Edwards "at any point during pregnancy, labor, or postpartum violated the standard of care." Compare PSMF ¶ 102 with [D.E. 296] 4.

"NCCIW employees follow three types of policy documents: [DAC] Policies, NCCIW Standard Operating Procedures, and NCCIW Post Orders." PSMF ¶ 21; see [D.E. 296] 1. "[DAC] policies are mandatory guidance issued by the state and must be followed by all state prisons." PSMF ¶ 22; see [D.E. 296] 1. "NCCIW Standard Operating Procedures ("SOP") are policy documents issued by NCCIW and are intended 'to provide staff assigned to the facility with direction in the use of specific techniques as it relates to the job duty.'" PSMF ¶ 23; see [D.E. 296] 1. "NCCIW Post Orders are the orders specific to a specific 'post' or location at the facility where the officer is stationed." PSMF ¶ 24; see [D.E. 296] 1. "NCCIW employees, including the warden, officers, and medical staff, are required to follow DPS Policies, NCCIW Standard Operating Procedures, and NCCIW Post Orders." PSMF ¶ 25; see [D.E. 296] 1; DSMF 1; [D.E. 289] 1–2. Prison SOPs and Post Orders must comply with DAC policies, and when DAC updates a policy, the prison warden must "bring any corresponding SOPs and Post Orders into compliance with the [updated] policy." PSMF ¶¶ 71, 81; see [D.E. 296] 2–3.

DAC "Policy F.1100, Transporting Offenders . . . was operative [when Edwards] was pregnant, in labor, and postpartum." PSMF ¶ 72; see [D.E. 296] 2. Among other instances, the policy prohibited shackling an inmate:

- "'who is transported or housed in an outside medical facility for treating labor and delivery[;]'"
- "'once the intravenous line has been placed and the induction medication has been started[;]'"
- "'at the onset of contractions[;]'"

6

- "'during initial bonding with the newborn child, including nursing and skin to skin contact[;]'" and
- "'who is identified by medical staff as in post-partum recuperation.'"

PSMF ¶¶ 73–74, 76–77; see [D.E. 296] 2–3; cf. DSMF ¶¶ 16–18; [D.E. 289] ¶¶ 16–18.[5]

NCCIW had "at least two" relevant SOPs and "at least one" Post Order that addressed the use of restraints on pregnant inmates in effect when "Edwards was pregnant, in labor, and in postpartum recuperation." PSMF ¶¶ 82–86, 96; see [D.E. 296] 3–4. Edwards contends that NCCIW SOP D.1800, Offender Restraints, approved by defendant Witherspoon, the NCCIW warden at the time of the events alleged in the complaint, "conflicted with [DAC Policy F.1100] as they related to the shackling of prisoners who were pregnant, in labor, and/or in postpartum recuperation." PSMF ¶¶ 100, 129; see id. at ¶¶ 90–93; [D.E. 296] 3–4. Defendants respond that the provisions of SOP D.1800 "were never in conflict . . . with the requirements of F.1100" and that "correctional staff knew to implement any exceptions for pregnant offenders outlined in F.1100." [D.E. 296] 4; see id. 5–6.

"No later than April 2019, [Witherspoon] had three phone calls with a [DAC] official about shackling policies in response to the concerns of a community group about NCCIW's shackling of pregnant women. These calls specifically included discussion about shackling pregnant women during transport to the hospital to give birth and during their stay at the hospital—both of which were prohibited by [DAC] policy." PSMF ¶¶ 130–31; see [D.E. 296] 6. "On November 22, 2019, [DAC] Region Director Cynthia Thornton issued an interim directive to [Witherspoon] that any

---

[5] The policy "permitted an exception for the use of shackles on pregnant or postpartum prisoners if there were reasonable grounds to believe that the prisoner presents an immediate, serious threat to herself, staff or others, and there must be documentation explaining why restraints were used in such circumstances." PSMF ¶ 79; see [D.E. 296] 3. "NCCIW did not consider Ms. Edwards to be a security or flight risk before or during the time that she was in the hospital." PSMF ¶ 15; see id. ¶ 69; [D.E. 296] 1–2.

offender in their third trimester should not be restrained. This applies even if they are not in pre or active labor." PSMF ¶ 80 (cleaned up); see id. ¶ 133; cf. [D.E. 296] 3, 6. Witherspoon was out of the office and asked a subordinate to "ensure that this training took place," but correctional officers "did not receive training on the interim [DAC] policy," and Witherspoon "did not take any further action to ensure that this training actually took place." PSMF ¶¶ 136–38; see [D.E. 296] 6. In January 2020, Witherspoon updated the NCCIW Security Supervisor Post Order for UNC Hospital, but "did not update any other NCCIW SOPs or other NCCIW Post Orders" during the remainder of her tenure as warden of NCCIW. PSMF ¶¶ 144–45; see id. ¶ 143; cf. [D.E. 296] ¶¶ 6–7.

While in the hospital, Edwards received 30 mg Suboxone daily, and was discharged with 14-day prescriptions for medications for depression and anxiety and "an active prescription for buprenorphine . . . ." PSMF ¶ 158; see id. ¶¶ 157, 258; DSMF ¶¶ 36–37; [D.E. 289] ¶¶ 36–37; [D.E. 296] 7, 11. When Edwards returned to NCCIW she was placed in an inpatient medical unit. See PSMF ¶ 165; [D.E. 296] 7; DSMF ¶ 39; [D.E. 289] ¶ 39. Edwards "requested continuation of Suboxone, but the request was denied."[6] DSMF ¶ 41; see [D.E. 289] ¶ 41; PSMF ¶ 172; [D.E. 296] 7. "Because [Edwards] was no longer pregnant, she was no longer eligible for MAT." DSMF ¶ 40; cf. [D.E. 289] ¶ 40; see PSMF ¶ 177; [D.E. 296] 7.

"Instead of using buprenorphine, NCCIW gave [Edwards] oxycodone to taper . . . . over 9 days." PSMF ¶¶ 161–62; see [D.E. 296] 7; cf. PSMF ¶ 212; [D.E. 296] 9. Edwards "experienced physical symptoms of withdrawal from buprenorphine and felt sick, including pain, diarrhea, [insomnia, anxiety,] and vomiting, for several weeks." PSMF ¶¶ 164, 168; see [D.E. 296] 7.

---

[6] Suboxone is a form of buprenorphine. See PSMF ¶ 151; [D.E. 296] 7. "MOUD and MAT both include buprenorphine." PSMF ¶ 150; see [D.E. 296] 7.

Although NCCIW could have provided Edwards with "several non-opiate medications" to ease her symptoms, doctors "only prescribed one of these five medications." PSMF ¶¶ 169–171; see [D.E. 296] 7. Defendant Amos "is personally aware that withdrawal from buprenorphine can cause pain and nausea." PSMF ¶ 239; see [D.E. 296] 11.

Discontinuing MOUD poses health risks to individuals with OUD. See PSMF ¶¶ 201–15; cf. [D.E. 296] 8–9. Defendant Amos "is personally aware that Opioid Use Disorder is a serious and potentially deadly condition[,]" and "was personally aware of the harm that denying buprenorphine causes harm [sic] to individuals[,]" including "potential harm that may result from sudden withdrawal from buprenorphine." PSMF ¶¶ 218, 235, 241; see [D.E. 296] 10. Edwards argues that there was no legal reason that she could not continue to receive buprenorphine and that Amos "was responsible for implementing the policy to only provide" MAT, which defendants dispute. Compare PSMF ¶¶ 179, 188–194; and [D.E. 289] ¶ 41; with DSMF ¶ 41; and [D.E. 296] 7–8. The parties agree that NCCIW took no action during the time of the events alleged in the second amended complaint to determine whether it could provide MOUD. Compare PSMF ¶¶ 195–99 with [D.E. 296] 8.

"On January 7, 2020, [Edwards] submitted a sick call request, also known as a Mental Health Services Referral, alerting her providers that her prescriptions had expired and that she was experiencing mental health degradation, including anxiety, sleep issues, and racing thoughts." PSMF ¶ 267; see id. at ¶ 271; [D.E. 296] 12. Several of Edwards's medical providers recommended renewing Edwards's prescriptions, but "Edwards did not see a provider who was authorized to prescribe psychotropic medications under NCCIW medical policy[]" for 74 days after giving birth. PSMF ¶¶ 268–70, 277–78; see [D.E. 296] 12. Postpartum mood disorders are common among incarcerated women, and "a leading cause of maternal mortality." PSMF ¶¶ 281–

9

82; see [D.E. 296] 12. DAC policy guidelines recommend that psychotropic medications be renewed every 30 days and that "a psychiatric provider . . . evaluate the offender and their prescribed medication each time it is renewed." PSMF ¶¶ 290–91; see [D.E. 296] 12.

## II.

## A.

Defendants disclosed Dr. Paul Adler, DO, FACEP, as a rebuttal expert to Edwards's medical expert. See [D.E. 260] 2; [D.E. 275] 1. Edwards contends that Adler's report is inadmissible because he is not a true rebuttal expert and fails to satisfy Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589–95 (1993). See [D.E. 260] 2. The court, however, denies the motion without prejudice because defendants disclosed the report during discovery and do not rely on the report in seeking summary judgment. See, e.g., Doe v. Univ. of Denver, 952 F.3d 1182, 1191 (10th Cir. 2020); Aguayo-Becerra v. FLSmidth, Inc. Cement Projects Ams., 742 F. App'x 306, 306–07 (9th Cir. 2018) (unpublished); Hoyle v. Freightliner, LLC, 650 F.3d 321, 329–30 (4th Cir. 2011); Eckelkamp v. Beste, 315 F.3d 863, 872 (8th Cir. 2002); Sec'y of Lab., U.S. Dep't of Lab. v. Arizona Logistics Inc., No. CV-16-4499, 2022 WL 279585, at *2–3 (D. Ariz. Jan. 31, 2022) (unpublished); Brown Cnty. Water Util., Inc. v. Town of Nashville, No. 1:17-CV-2134, 2019 WL 2123461, at *5 (S.D. Ind. May 15, 2019) (unpublished); In re Genentech Herceptin (Trastuzumab) Mktg. & Sales Pracs. Litig., No. 16-MD-2700, 2018 WL 648369, at *1–2 (N.D. Okla. Jan. 31, 2018) (unpublished); Palmetto Pharms. LLC v. AstraZeneca Pharms. LP, No. 2:11-CV-807, 2013 WL 12148123, at *6 (D.S.C. Feb. 26, 2013) (unpublished).

Edwards moves to strike certain paragraphs from six declarations. See [D.E. 293]; [D.E. 302].[7] The court denies plaintiff's motions to the extent she challenges paragraph 14 of Amos's declaration, paragraph 13 of Witherspoon's declaration, and paragraph 9 of Junker's declaration because defendants did not cite to these paragraphs in their statements of material fact. Cf. Fed. R. Civ. P. 56(c)(1)(B); Loc. Civ. R. 56.1(a)(4).

As for the remaining challenges, the court has considered the record and the parties' arguments under the governing standard. See In re Family Dollar FLSA Litig., 637 F.3d 508, 512–13 (4th Cir. 2011); Erwin v. United States, 591 F.3d 313, 325 n.7 (4th Cir. 2010); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); Rehberg v. Flowers Baking Co. of Jamestown, LLC, 162 F. Supp. 3d 490, 517–18 (W.D.N.C. 2016); Sparks, 134 F. Supp. 3d at 998. Paragraph 9 of Alexander's declaration does not materially conflict with his deposition testimony. Paragraphs 17 and 19 of Amos's declaration do not materially conflict with his deposition testimony. Given that Dr. Sheitman is a 30(b)(6) designee, paragraphs 5 and 12 of his declaration need only be based on NCCIW's knowledge, not his personal knowledge. See Dobbey v. Liping Zhang, 608 F. App'x 406, 409 (7th Cir. 2015) (unpublished); Seifried v. Portfolio Recovery Assocs., LLC, No. 12-CV-32, 2013 WL 6185478, at *2 (E.D. Okla. Nov. 25, 2013) (unpublished). Moreover, paragraph 12 of Dr. Sheitman's declaration is not an improper expert opinion. See, e.g., Modern Auto. Network, LLC, v. E. Alliance Ins. Co., 416 F. Supp. 3d 529, 535–36 (M.D.N.C. 2019). Finally, paragraph 21 of Ragano's declaration is not improper, and the court declines to strike it.

---

[7] The better practice is to object to the challenged paragraphs and ask the court to disregard them. See Sparks v. Oxy-Health, LLC, 134 F. Supp. 3d 961, 998 (E.D.N.C. 2015) (collecting cases); Palmetto Pharms. LLC, 2013 WL 12148123, at *5–6; cf. Suarez v. SouthernCarlson, Inc., No. 7:22-CV-21, 2023 WL 7117939, at *2 n.3 (E.D.N.C. Oct. 27, 2023) (unpublished) (collecting cases).

## B.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleadings, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 248–49. In doing so, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, LLC, 630 F.3d 351, 354 (4th Cir. 2011).

## C.

The court grants summary judgment to defendants concerning Edwards's requests for injunctive and declaratory relief. Edwards is no longer in custody; therefore, these requests are moot. See Rendelman v. Rouse, 569 F.3d 182, 186–87 (4th Cir. 2009); Incumaa v. Ozmint, 507 F.3d 281, 285–87 (4th Cir. 2007); Lowe v. USMS Jefferson, No. 2:23-CV-211, 2023 WL 6393364, at *5 (D. Nev. Sept. 29, 2023) (unpublished). The court also grants summary judgment to defendants on (1) counts one and two of the second amended complaint against defendant Ishee,

12

(2) count two of the second amended complaint against defendants Alexander, Junker, and Amos in their official capacities, (3) count five of the second amended complaint against defendant Amos in his official capacity, and (4) all claims against defendant Perry. See, e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989); Fauconier v. Clarke, 966 F.3d 265, 279–80 (4th Cir. 2020); Tate v. Martin, No. 1:10CV616, 2014 WL 1122338, at *4–5 (M.D.N.C. Mar. 20, 2014) (unpublished), aff'd, 583 F. App'x 60 (4th Cir. 2014) (per curiam) (unpublished).

### D.

Counts one, two, and five of the second amended complaint assert that various defendants violated the Eighth Amendment by (1) shackling Edwards during some of her pregnancy, labor, and the postpartum period, (2) by declining to treat Edwards with MOUD when she returned to NCCIW after giving birth, and (3) by failing to provide her with requested mental health treatment and medication upon her return to NCCIW. See 2d Am. Compl. ¶¶ 134–158, 185–193. To establish a prima facie claim that prison conditions violate the Eighth Amendment, a plaintiff must show "(1) that the deprivation of a basic human need was objectively sufficiently serious, and (2) that subjectively the officials acted with a sufficiently culpable state of mind." De'Lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (cleaned up); see Farmer v. Brennan, 511 U.S. 825, 834 (1994); Scinto v. Stansberry, 841 F.3d 219, 225–26 (4th Cir. 2016); Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997); Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). The objective prong requires the prisoner to show that "the deprivation of [a] basic human need was objectively sufficiently serious." Strickler, 989 F.2d at 1379 (cleaned up); see Scinto, 841 F.3d at 225. "Only an extreme deprivation, that is, a serious or significant physical or emotional injury resulting from the challenged conditions, or substantial risk thereof, will satisfy the objective component of an

13

Eighth Amendment claim challenging the conditions of confinement." De'lonta, 708 F.3d at 525 (quotation omitted); see Scinto, 841 F.3d at 225.

The subjective prong requires the prisoner to show that the prison official acted with deliberate indifference to the inmate's health or safety. See, e.g., Farmer, 511 U.S. at 834–40; De'lonta, 708 F.3d at 525; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); Strickler, 989 F.2d at 1379. Although "deliberate indifference entails something more than mere negligence, . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. Deliberate indifference requires that an official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837; De'lonta, 708 F.3d at 525. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see Makdessi v. Fields, 789 F.3d 126, 133–34 (4th Cir. 2015). "It is not enough that the [prison official] should have recognized" the objectively serious condition, medical need, or risk of harm. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis omitted), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). Rather, a plaintiff must prove "actual knowledge of the risk of harm to the inmate . . . ." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (emphasis omitted); see Short v. Hartman, 87 F.4th 593, 612–15 (4th Cir. 2023) (reaffirming the actual knowledge standard for Eighth Amendment claims), cert. denied, 144 S. Ct. 2631 (2024). A prisoner's failure to give warning of, or protest exposure to, the risk does not conclusively show that a prison official lacked actual knowledge. See Makdessi, 789 F.3d at 134. However, "[a] prison official's subjective actual knowledge can be proven through circumstantial evidence . . . ."

14

Id. at 133. "[A]n injury might be so obvious that the factfinder could conclude that the [prison official] did know of it because he could not have failed to know of it." Id. (quotation omitted).

Beyond such actual knowledge, the prison official "must also have recognized that his actions were insufficient to mitigate" the objectively serious condition, medical need, or risk of harm. Iko, 535 F.3d at 241 (cleaned up). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); see Wilson v. Seiter, 501 U.S. 294, 298–99 (1991). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. Moreover, "[l]iability under § 1983 must be analyzed individually for each defendant." Jones v. Solomon, 90 F.4th 198, 207 (4th Cir. 2024); King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023).

Edwards has not presented evidence of Amos's involvement in her postpartum mental health care. Cf. Williams v. Branker, 462 F. App'x 348, 354–55 (4th Cir. 2012) (unpublished). Edwards also has not presented evidence that any defendant subjectively knew that she faced a substantial risk of serious harm and disregarded that risk by discontinuing MOUD after she gave birth. See, e.g., Quintana v. Santa Fe Cnty. Bd. of Commissioners, 973 F.3d 1022, 1030–31 (10th Cir. 2020); Sylvester v. City of Newark, 120 F. App'x 419, 424 (3d Cir. 2005) (unpublished); Est. of Beland by & through Hayes v. Charleston Cnty. Sheriff's Off., No. CV 1:20-3006, 2021 WL 4754576, at *17 (D.S.C. Oct. 12, 2021) (unpublished), report and recommendation adopted, 2022 WL 304787 (D.S.C. Feb. 2, 2022) (unpublished); cf. Taylor v. Wexford Health Sources, Inc., No. 2:23-CV-475, __ F. Supp. 3d __, 2024 WL 2978782, at *10–11 (S.D. W. Va. June 13, 2024). Accordingly, the court denies Edwards's motion for partial summary judgment, grants defendants'

motion for summary judgment on counts two and five of the second amended complaint, and dismisses those claims.

Defendants argue that they are entitled to qualified immunity on count one of the second amended complaint. See [D.E. 270] 7–21. Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Rivas-Villegas v. Cortesluna, 595 U.S. 1, 4–5 (2021) (per curiam); City of Tahlequah v. Bond, 595 U.S. 9, 12–14 (2021) (per curiam); City of Escondido v. Emmons, 586 U.S. 38, 42–44 (2019) (per curiam); Kisela v. Hughes, 584 U.S. 100, 103–08 (2018) (per curiam); District of Columbia v. Wesby, 583 U.S. 48, 62–68 (2018); Hernandez v. Mesa, 582 U.S. 548, 554 (2017) (per curiam); Ziglar v. Abbasi, 582 U.S. 120, 150–52 (2017); White v. Pauly, 580 U.S. 73, 78–81 (2017) (per curiam); Mullenix v. Luna, 577 U.S. 7, 11–13 (2015) (per curiam); Taylor v. Barkes, 575 U.S. 822, 825–27 (2015) (per curiam); City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 611 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam); Reichle v. Howards, 566 U.S. 658, 664 (2012); Camreta v. Greene, 563 U.S. 692, 705 (2011); Pearson v. Callahan, 555 U.S. 223, 236 (2009); King v. Riley, 76 F.4th 259, 264–68 (4th Cir. 2023); Sharpe v. Winterville Police Dep't, 59 F.4th 674, 682–84 (4th Cir. 2023); Burnes-Fisher v. Romero-Lehrer, 57 F.4th 421, 424 (4th Cir. 2023); Tobey v. Jones, 706 F.3d 379, 385 (4th Cir. 2013). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 584 U.S. at 104; Wesby, 583 U.S. at 63; Ziglar, 582 U.S. at 151–52; White, 580 U.S. at 79–80; Mullenix, 577 U.S. at 12; Taylor, 575 U.S. at 825; Sheehan, 575 U.S. at 611; Carroll, 574 U.S. at 17.

**16**

In analyzing qualified immunity, the court asks (1) "whether the facts that a plaintiff has .
. . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was
clearly established at the time of [the] defendant's alleged misconduct." Pearson, 555 U.S. at 232
(cleaned up); see Wood v. Moss, 572 U.S. 744, 757 (2014); Reichle, 566 U.S. at 664; Lewis v.
Caraballo, 98 F.4th 521, 530 (4th Cir. 2024); King, 76 F.4th at 264–65; Knibbs v. Momphard, 30
F.4th 200, 214 (4th Cir. 2022); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe
ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). Courts may decide
which question to address first. See Pearson, 555 U.S. at 236; Lewis, 98 F.4th at 530. Qualified
immunity shields a defendant if the answer to either question is "no." See Reichle, 566 U.S. at
664; Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011); Miller v. Prince George's Cnty., 475 F.3d
621, 627 (4th Cir. 2007), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009);
Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009).

Although a case need not be directly controlling, "existing precedent must have placed the
statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Reichle, 566
U.S. at 664; King, 76 F.4th at 266–68; Sharpe, 59 F.4th at 682–84. When considering such
precedent, "courts in this circuit ordinarily need not look beyond the decisions of the Supreme
Court, this court of appeals and the highest court of the state in which the case arose." Wilson v.
Kittoe, 337 F.3d 392, 402–03 (4th Cir. 2003) (cleaned up), abrogated on other grounds by Pearson
v. Callahan, 555 U.S. 223 (2009); see Sharpe, 59 F.4th at 683; Dean for & on behalf of Harkness
v. McKinney, 976 F.3d 407, 417 (4th Cir. 2020). "A [g]overnment official's conduct violates
clearly established law when, at the time of the challenged conduct, the contours of a right are
sufficiently clear that every reasonable official would have understood that what he is doing
violates that right." al-Kidd, 563 U.S. at 741 (cleaned up); see Rivas-Villegas, 595 U.S. at 4–5;

17

King, 76 F.4th at 265; Sharpe, 59 F.4th at 682–84. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Bond, 595 U.S. at 12 (quotations omitted); see Wesby, 583 U.S. at 63. An officer is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 584 U.S. at 104 (quoting Mullenix, 577 U.S. at 13); see Wesby, 583 U.S. at 63–66. Nonetheless, courts should not "assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." Harris v. Town of S. Pines, 110 F.4th 633, 644 (4th Cir. 2024 ) (quotation omitted).

Edwards argues that an inmate's "right to be free from shackling during [her] pregnancy, labor, and postpartum [period]" was clearly established in December 2019. In support, she cites five out-of-circuit cases. See [D.E. 286] 14–22 (citing Mendiola-Martinez v. Arpaio, 836 F.3d 1239, 1252–57 (9th Cir. 2016); Villegas v. Metro. Gov't of Nashville, 709 F.3d 563, 567–74 (6th Cir. 2013); Nelson v. Corr. Med. Servs., 583 F.3d 522, 528–34 (8th Cir. 2009) (en banc); Brawley v. Washington, 712 F. Supp. 2d 1208, 1214–21 (W.D. Wash. 2010); Women Prisoners v. District of Columbia, 877 F. Supp. 634, 668 (D.D.C. 1994), vacated in part, modified in part, 899 F. Supp. 659 (D.D.C. 1995)).

In Women Prisoners, the court confronted conditions and procedures in the District of Columbia that resulted in "[a] penologically unnecessary arrangement which contributes to the diminution of life expectancy, an increase in pain, the delivery of a baby in a jail cell, and the anxiety of a prolonged wait for potentially life-saving medical procedures . . . ." Women Prisoners, 877 F. Supp at 668. In light of these facts, the district court held that the District of Columbia's

18

practice of shackling women "in labor and shortly thereafter" was "inhumane" under the Eighth Amendment and violated 42 U.S.C. § 1983. Id. at 668–69.

In Nelson, Nelson was restrained and taken to a medical center where prison staff chained both of her legs to a hospital bed. See Nelson, 583 F.3d at 525–27. Prison staff repeatedly un-chained and rechained each leg as hospital staff refused to administer an epidural and prepared Nelson for a natural birth. See id. Officials only removed the chains immediately before Nelson was taken to the delivery room. See id. In light of these facts, the Eighth Circuit reversed a grant of qualified immunity for the prison staff, holding that Women Prisoners clearly established protections from being shackled during labor. See id. at 528–35.

In Brawley, Brawley was undergoing serious pregnancy complications prison staff restrained her and brought her to a Tacoma-area hospital. See Brawley, 712 F. Supp. 2d at 1211–1214. There, officials chained Brawley to a delivery bed throughout a failed natural birth, and up to the moment before an emergency c-section. See Id. Relying on Women Prisoners and Nelson, the court held that "shackling inmates while they are in labor was clearly established as a violation of the Eighth Amendment . . . ." Id. at 1221. Accordingly, the district court denied prison staff qualified immunity at summary judgment. See id.

In Villegas, Villegas was restrained and taken to a Nashville-area hospital where jail staff kept one of her legs shackled to a hospital bed. See Villegas, 709 F.3d at 566–67. Villegas remained shackled to her bed until two hours before she gave birth. Id. at 567. Relying on Women Prisoners, Nelson, Brawley, and various academic articles, the Sixth Circuit reversed a grant of qualified immunity for the prison staff, holding that "shackling women during labor" violates "the Eighth Amendment." Id. at 571–78. Unlike other courts to have considered the question, the Sixth Circuit recognized that it is clear "from both courts and commentators that the right to be free from

19

shackling during labor is not unqualified." Id. at 574.

In Mendiola-Martinez, prison staff handcuffed and placed ankle shackles on Mendiola-Martinez, an inmate in labor, while transporting her from jail to a Maricopa County hospital. See Mendiola-Martinez, 836 F.3d at 1243–45. At the hospital, Mendiola-Martinez was unrestrained when medical staff performed a c-section. See id. After the procedure, prison staff shackled one of Mendiola-Martinez's ankles to her bed with a six-to-eight-foot chain that allowed her to walk around her hospital room. See id. When leaving the hospital, prison staff handcuffed Mendiola-Martinez, shackled her ankles, and chained her to other inmates. See id. Reversing a grant of summary judgment for Maricopa County, the Ninth Circuit held that, in light of Women Prisoners, Nelson, Brawley, and Villegas, there were triable issues on whether prison staff violated Mendiola-Martinez's Eight Amendment rights. See id. at 1250–56. Specifically, the Ninth Circuit held that a reasonable jury could find that prison staff violated Mendiola-Martinez's Eight Amendment rights as they transported her to-and-from the hospital, but not while she was attached to the six-to-eight-foot chain. See id. at 1257.

Although the five cited cases may suggest an emerging trend in Eighth Amendment jurisprudence, "[i]t is not enough that [a] rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Bond, 595 U.S. at 11. Taken together, these five out-of-circuit cases fall short of establishing the "robust consensus" in December 2019 that the Supreme Court requires to clearly establish a right. Wesby, 583 U.S. at 63. This court concludes that, as of December 2019, the Eighth Amendment question as applied specifically to how the defendants in this case treated Edwards during her pregnancy, labor, and postpartum period was not "beyond

Case 5:21-ct-03270-D   Document 315   Filed 09/30/24   Page 20 of 26

debate" under the Eighth Amendment. al-Kidd, 563 U.S. at 741; see Bond, 595 U.S. at 11; Wesby, 583 U.S. at 63; Reichle, 566 U.S. at 664.

Notably, in December 2019, the Supreme Court, the United States Court of Appeals for the Fourth Circuit, and the Supreme Court of North Carolina had not addressed a pregnant inmate's Eighth Amendment protections from restraint in the situation confronting the defendants in this case. Moreover, the only holding in this circuit that did address whether the Eighth Amendment protects a pregnant inmate from restraint during portions of pregnancy, labor, and postpartum recovery was from another district court. See Fain v. Rappahannock Reg'l Jail, No. 3:12CV293-JAG, 2013 WL 3148145, at *3–6 (E.D. Va. June 19, 2013) (unpublished). Furthermore, in Fain, the court held that an inmate's Eighth Amendment right from restraint during her pregnancy, labor, and postpartum period was not clearly established in April 2010. See id. In so holding, the Fain court noted that only a handful of courts had addressed this question and none of them could create binding precedent in the Fourth Circuit. See id. Both points were true in December 2019 and remain true today.

In framing her qualified immunity argument, Edwards states that she "does not concede the validity of [the] doctrine [of qualified immunity]." [D.E. 286] 14 n.6. In light of binding Supreme Court and Fourth Circuit precedent, however, this court must apply the doctrine of qualified immunity. See, e.g., Kisela, 584 U.S. at 104; King, 76 F.4th at 264–65; Bostic, 667 F. Supp. 2d at 605–06. As the Fourth Circuit recently observed, "qualified immunity is controversial, contested, and binding." Stanton v. Elliott, 25 F.4th 227, 237 (4th Cir. 2022) (cleaned up). Having reviewed the evidence in the light most favorable to Edwards, Edwards's asserted Eighth Amendment right was not clearly established in December 2019. See, e.g., Taylor, 575 U.S. at 826. Having decided that the alleged Eighth Amendment right was not clearly established in

21

December 2019, the court declines to engage in the "academic exercise" of determining whether defendants violated Edwards's Eighth Amendment rights. Pearson, 555 U.S. at 237. Accordingly, even viewing the evidence in the light most favorable to Edwards, defendants Witherspoon, Gill, Brown, Dixon, Williams, Brodie, Lynch, and Ragano are entitled to qualified immunity as to count one of the second amended complaint. See Bond, 595 U.S. at 11; Wesby, 583 U.S. at 63; Reichle, 566 U.S. at 664; al-Kidd, 563 U.S. at 741; Fain, 2013 WL 3148145, at *3–6; cf. Brown v. Cumberland Cnty., 557 F. Supp. 3d 169, 178, 183–85 (D. Me. 2021). Thus, the court grants defendants' motion for summary judgment on count one of the second amended complaint against defendants Witherspoon, Gill, Brown, Dixon, Williams, Brodie, Lynch, and Ragano in their individual capacities.

E.

In counts three, four, six and seven of the second amended complaint, Edwards contends that NCCIW violated the ADA and the Rehabilitation Act by denying her MOUD and postpartum mental health treatment. 2d Am. Compl. ¶¶ 162–184, 195–211. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.; see Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 419–21 (4th Cir. 2015). Title II applies to state prisons. See, e.g., Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998); Fauconier v. Clarke, 966 F.3d 265, 276 (4th Cir. 2020). To state a claim under Title II, Edwards must plausibly allege that: (1) she has a disability; (2) she is otherwise qualified for the benefits of a public service, program, or activity; and (3) she was excluded from participation in or denied the benefits of such service on the basis of her disability. See, e.g., Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454,

461 (4th Cir. 2012); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); Baird ex rel. Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999); Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264–65 (4th Cir. 1995). To show that she has a disability, Edwards must prove (1) that she has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial. Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 254 (4th Cir. 2006); see 42 U.S.C. § 12102(1)(A). A plaintiff may assert a violation of Title II based on "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." A Helping Hand, LLC v. Balt. Cnty., 515 F.3d 356, 362 (4th Cir. 2008).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Due to the similar statutory language in the ADA and the Rehabilitation Act, courts generally construe both acts to impose the same requirements. See, e.g., Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 336 n.1 (4th Cir. 2012); Spencer v. Earley, 278 F. App'x 254, 257–59 (4th Cir. 2008) (unpublished); Baird, 192 F.3d at 468; Doe, 50 F.3d at 1264–65. The Rehabilitation Act also applies to state prisons. See Spencer, 278 F. App'x at 257–59. The causation standard, however, is slightly different. Under the Rehabilitation Act, Edwards must "prove that the defendants' discriminatory conduct was 'solely by reason' of the plaintiff's disability." Constantine, 411 F.3d at 498 n.17 (quoting Baird, 192 F.3d at 469–70); see Wicomico Nursing Home v. Padilla, 910 F.3d 739, 750 (4th Cir. 2018).

Even viewing the evidence in the light most favorable to Edwards, the evidence does not demonstrate an ADA or RA violation with respect to Edwards's lack of access to MOUD and postpartum mental health care. See Richardson v. Clarke, 52 F.4th 614, 621 (4th Cir. 2022); Koon v. North Carolina, 50 F.4th 398, 404–10 (4th Cir. 2022); Hildreth v. Butler, 960 F.3d 420, 430–31 (7th Cir. 2020); Horton v. Methodist Univ., Inc., 788 F. App'x 209, 210 (4th Cir. 2019) (per curiam) (unpublished); Chamberlain v. Virginia Dep't of Corr., No. 7:20-CV-45, 2021 WL 4100354, at *12–13 (W.D. Va. Sept. 9, 2021) (unpublished).

Regarding Edwards's MOUD claims, there is no genuine dispute that Edwards failed to qualify for NCCIW's MOUD program after giving birth. See [D.E. 289] ¶ 40; PSMF ¶ 177; [D.E. 296] 7. NCCIW's MOUD program was reserved for pregnant inmates, and because Edwards was no longer pregnant, she no longer qualified for MOUD. See Cartagena v. Lovell, 103 F.4th 171, 185 (4th Cir. 2024); cf. Horton, 788 F. App'x at 210. Instead of her requested MOUD, Edwards received an oxycodone taper, which is a reasonable accommodation. See [D.E. 289] ¶ 40; Richardson, 52 F.4th at 621; Torcasio v. Murray, 57 F.3d 1340, 1355 (4th Cir. 1995).

Edwards also contends that NCCIW discriminates against inmates with OUD because other disabled inmates are allowed to continue receiving pre-pregnancy medications post-pregnancy, such as diabetic inmates receiving insulin. See [D.E. 286] 33–34. Assuming without deciding that Edwards's framing is correct, her claim still fails. No reasonable jury could find that Edwards was denied access to medications post-pregnancy when her prescriptions for Zoloft and Melatonin were renewed post-pregnancy. See [D.E. 251-2] 77. Moreover, there is no record evidence indicating Edwards was taken off the MOUD program for any reason other than the end of her pregnancy. To that end, Edwards appears to invite the court to consider that NCCIW discriminated against her because she was no longer pregnant. See [D.E. 286] 34 ("NCCIW had provided her

with the exact same treatment without issue when she was pregnant."). Courts, however, have held with "near unanimity" that pregnancy is not a disability under the ADA. Parker v. Children's Nat'l Med. Ctr., Inc., No. CV ELH-20-3523, 2021 WL 5840949, at *16 (D. Md. Dec. 9, 2021) (collecting cases). Here, pregnancy is not a disability under the ADA, and the absence of pregnancy is not a disability either.

Regarding Edwards's postpartum mental healthcare claims, Edwards contends that a 74-day gap from when she gave birth to the date she saw her prescribing psychiatrist amounts to a denial of medical services. See [D.E. 286] 30. Over that 74-day period, however, Edwards repeatedly met with NCCIW medical providers and physicians, received counseling, was recommended psychotropic medications, and was then ultimately prescribed that medication. See, e.g., [D.E. 251-2] 41–79; [D.E. 289] ¶¶ 43–49. At the same time, Edwards reported to medical staff that she "was doing well with minimal problems" and "denied any pain or discomfort." [D.E. 251-2] 86, 84, 66; see [D.E. 289] ¶¶ 43–49. Even viewing the evidence in the light most favorable to Edwards, Edwards received reasonable accommodations. See, e.g., Richardson, 52 F.4th at 621; Torcasio v. Murray, 57 F.3d 1340, 1355 (4th Cir. 1995). Moreover, there is no evidence that any defendant imposed this delay on the basis of Edwards's disabilities. Viewing the evidence in the light most favorable to Edwards, Edwards had access to medical services during this 74-day period. Furthermore, even if a jury could find that Edwards was denied medical services in this period, no reasonable jury could find that this denial was on the basis of Edwards's disabilities.

Edwards's failed ADA claims doom her Rehabilitation Act claims. See, e.g., Wicomico Nursing Home, 910 F.3d at 751; Thomas v. Salvation Army S. Territory, 841 F.3d 632, 641 (4th Cir. 2016). Accordingly, the court denies Edwards's motion for partial summary judgment, grants

defendants' motion for summary judgment, dismisses counts three, four, six, and seven of the second amended complaint, and dismisses defendant Ishee.

### III.

In sum, the court GRANTS the parties' motions to seal [D.E. 252, 261, 265, 277, 281, 291]. See Doe v. Pub. Citizen, 749 F.3d 246, 272–73 (4th Cir. 2014). The court DENIES plaintiff's remaining motions [D.E. 245, 257, 293, 302]. The court GRANTS defendants' motion for summary judgment [D.E. 267], DISMISSES counts one through seven of the second amended complaint, and DISMISSES plaintiff's requests for declaratory and injunctive relief. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and the court's local rules. The clerk SHALL close the case.

SO ORDERED. This 30 day of September, 2024.

JAMES C. DEVER III
United States District Judge