**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-7049**

TRACEY EDWARDS,

Plaintiff - Appellant,

v.

BENITA J. WITHERSPOON; ANTHONY PERRY; JAMES ALEXANDER; GARY JUNKER; ELTON AMOS; LESLIE COOLEY DISMUKES; KAVONA GILL; TAMARA BROWN; NIKITIA DIXON; TAMMY WILLIAMS; SHEIDA BRODIE; TIANNA LYNCH; LORAFAITH RAGANO,

Defendants - Appellees.

------------------------------------

DISABILITY RIGHTS NORTH CAROLINA; LEGAL ACTION CENTER; NATIONAL WOMEN'S LAW CENTER; PREGNANCY JUSTICE; ADDICTION MEDICINE SPECIALISTS,

Amici Supporting Appellant,

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:21-ct-03270-D)

Argued: October 22, 2025 Decided: September 10, 2026

Before DIAZ, Chief Judge, and GREGORY and BENJAMIN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Benjamin wrote the opinion, in which Chief Judge Diaz and Judge Gregory joined.

---

**ARGUED:** Joseph Longley, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C.; Shana Hope Khader, TYCKO & ZAVAREEI LLP, Washington, D.C., for Appellant. Laura Howard McHenry, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** D Dangaran, RIGHTS BEHIND BARS, Washington, D.C.; Sarah Grady, David Howard Sinkman, Amelia Caramadre, KAPLAN & GRADY LLC, Chicago, Illinois; Jaclyn S. Tayabji, Hassan A. Zavareei, TYCKO & ZAVAREEI LLP, Washington, D.C.; Daniel K. Siegel, Amika Medha Singh, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina, for Appellant. Jeff Jackson, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. Jim Davy, ALL RISE TRIAL & APPELLATE, Philadelphia, Pennsylvania, for Amici Addiction Medicine Specialists. Dorianne Mason, Alison Tanner, Ma'ayan Anafi, Emily Gabos, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Russell H. Falconer, Kathryn M. Cherry, Dallas, Texas, Raena Ferrer Calubaquib, Sanjay Nevrekar, Dillon M. Westfall, New York, New York, Robert B. Watson, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Disability Rights North Carolina, Legal Action Center, National Women's Law Center, and Pregnancy Justice.

---

DEANDREA GIST BENJAMIN, Circuit Judge:

Tracey Edwards was incarcerated at the North Carolina Correctional Institution for Women ("NCCIW") in Raleigh, North Carolina, when she found out she was pregnant with her second child. Edwards had a history of opioid use disorder ("OUD") and was thus eligible to receive medication for opioid withdrawal ("MOUD") at NCCIW pursuant to an internal policy that provided MOUD only to pregnant offenders. Edwards was induced and gave birth while in state custody. She was shackled on her way to the hospital, at various times during active labor and delivery, and while returning to NCCIW. Upon her return, Edwards was placed in the NCCIW's inpatient medical facility and requested to continue her MOUD treatment but was denied because she was no longer pregnant.

Edwards sued state and prison officials, alleging Eighth Amendment violations for the restraints used during her labor and delivery and for the denial of MOUD after she gave birth. She also alleged disability discrimination under the Americans with Disabilities Act and § 504 of the Rehabilitation Act for the prison's denial of MOUD after pregnancy. The district court granted summary judgment in favor of the defendants on all claims.

For the reasons below, we affirm in part, vacate in part, and remand for further proceedings.

## I. Background

### A. Tracey Edward's Incarceration

Tracey Edwards was convicted of a nonviolent drug offense in North Carolina and began serving a 70-month sentence at NCCIW in May 2019. [J.A. 116.] She was

incarcerated at NCCIW from 2019 to 2021. [J.A. 116.] NCCIW is the only state prison under the North Carolina Department of Adult Corrections ("DAC")[1] that incarcerates pregnant offenders. [J.A. 118.] During intake, she learned that she was pregnant with her second child. [J.A. 117.]

Prior to her incarceration, Edwards struggled with opioid addiction and was diagnosed with OUD. [J.A. 116.] NCCIW provides treatment for OUD to pregnant offenders to protect the child. [J.A. 365–66, 570–72.] Because Edwards was pregnant, she received a daily dose of Suboxone, a Food and Drug Administration (FDA) approved medication for OUD treatment, to prevent withdrawal. [J.A. 705.] She initially received this treatment daily at an outside clinic and was shackled while transported to and from the clinic. [J.A. 705.] Later, NCCIW initiated its own in-house medication assisted treatment ("MAT")[2] program where Edwards received Suboxone treatment until she was induced. [J.A. 140, 570–72.]

**B. Policy Hierarchy for the DAC**

NCCIW employees, including the warden, officers, and medical staff, must adhere to three sets of guidelines—DAC Policies, NCCIW standard operating procedures

---

[1] At the time of Edwards' incarceration, NCCIW was under the North Carolina Department of Public Safety. Beginning in 2023, the North Carolina Department of Adult Corrections began operations as a separate state agency and is currently responsible for all state prisons, including NCCIW. [J.A. 118.] We use DAC for consistency.

[2] NCCIW refers to its in-house program as MAT. MAT and MOUD are often used interchangeably, and both include the use of FDA-approved medications for OUD treatment, including Suboxone. [J.A. 139.] Hereinafter, we will refer to the treatment as MOUD unless we are referring to NCCIW's specific in-house program.

("SOPs"), and NCCIW post orders. [J.A. 118–19.] The three guidelines operate within a hierarchy. DAC policies, which take precedence over other directives, are mandatory guidance issued by the state that must be followed by all state prison facilities. [J.A. 118, 3075.] NCCIW SOPs are policy documents issued by NCCIW that instruct NCCIW staff on the use of techniques relevant to their jobs. [J.A. 119]. Post orders are procedures related to the specific facility where an officer is stationed. [*Id.*] When DAC updates a policy, the prison warden must update any corresponding SOPs and post orders. [J.A. 3075]

DAC issued Policy F.1100 *Transporting Offenders* on September 6, 2018. F.1100 "outline[s] procedures governing the transportation of offenders outside of the institution/facility." J.A. 504.[3] Section (i) addresses transportation for pregnant offenders:

> (1) An offender with a clinical diagnosis of pregnancy shall not be restrained by leg, waist, or ankle restraints. Wrist restraints may be used during any internal escort or external transport. These wrist restraints shall only be applied in the front and in such a way that the pregnant offender may be able to protect herself and the fetus in the event of a fall.
>
> (2) The following offenders **should not be placed in any restraints**, including wrist restraints, unless there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others, including her fetus or child, or that she presents an immediate, credible risk of escape that cannot be reasonably contained through other methods:
>
> > (A). **An offender who is in labor, which is defined as occurring at the onset of contractions**;
> > (B). An offender who is delivering her baby; . . .
> > (D). An offender who is transported or housed in an outside medical facility for treating labor and delivery;

---

[3] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers refer to the "J.A. #" pagination.

> (E). An offender for induction once the intravenous line has been placed and the induction medication has been started
>
> If restraints are required, they should allow for the mother's safe handling of her infant. . . .
>
> (4) **Upon medical discharge, wrist restraints shall be applied for transport back to the correctional facility. Leg restraints may be applied** when there are reasonable grounds to believe the offender presents an immediate, serious threat of hurting herself, staff, or others, or that she presents an immediate, credible risk of escape that cannot be reasonably contained through other methods.
>
> (5) **Waist restraints shall not be used at any time** during pregnancy or post-delivery, to include transport back to the facility.

J.A. 510–11 (cleaned up) (emphasis added).

On February 1, 2019, NCCIW issued SOPs D.1800 *Offender Restraint* and H.0300 *Use of Force and Restraints*, which were approved by NCCIW Warden Benita Witherspoon. [J.A. 2220.] Both SOPs require an offender in the hospital to be restrained to their bed by one arm and one leg. [J.A. 518; J.A. 523.] Under D.1800, there is an exception to the general policy that an offender should not be restrained outside the facility if a "[p]regnant offender is in active labor." J.A. 513. And H.0300 states that a "maternity offender WILL NOT have leg restraints applied" and "shall not be restrained during active labor." J.A. 524. Active labor is not defined in the SOPs, but F.1100 defines "in labor" as "the onset of contractions." J.A. 510.

Edwards and defendants disagree about whether the SOPs conflict with F.1100 as policies related to the shackling of pregnant offenders. [*see* J.A. 131.] However, in March 2021, a DAC official wrote in an email stating that the SOPs "[did] not match with red

book[4] policy in regard to pregnant offenders" and that NCCIW was notified of the issue previously. J.A. 548. Defendants further represent that "correctional staff knew to implement any exceptions for pregnant offenders outlined in F.1100." J.A. 3060.

**C. Warden Witherspoon's Actions**

Witherspoon was the warden at NCCIW when Edwards was incarcerated and was responsible for ensuring all SOPs and post orders complied with DAC policies. [J.A. 722, 2220, 2258.] By April 2019, DAC's region director and Witherspoon had at least three phone calls to discuss community organizers' concerns with NCCIW's policies, including the shackling of pregnant offenders during hospital transport and stays. [J.A. 135, 321–22, 722,]. In these calls, it was noted that such shackling violated DAC policy. [J.A. 136, 3076]. And the region director and Witherspoon discussed updating the post orders to better comply with DAC policies regarding the use of restraints on pregnant offenders. [J.A. 722]. But no changes were made until January 2020. [*Id.*].

After another pregnant NCCIW offender was shackled during labor against medical advice, DAC issued the following directive on November 22, 2019:

> **Any offender in their third trimester should not be restrained. This applies even if they are not in pre or active labor.** If there is a potential serious security concern with the offender not being restrained it should be discussed with the Region Director prior to restraints being added . . . Please ensure that you notify your staff of this temporary directive.

---

[4] We understand "red book" to be a general term for DAC and/or facility policies that are written down, often in a red book. *See* J.A. 2478, 2486 (discussion of "red book" in reference to DAC policies). The reference here is to DAC policies, but the general term was also used by NCCIW officers to refer to the physical red book where NCCIW SOPs and post orders were written. *See* J.A. 1483 (Officer Tamara Brown noting that the NCCIW red book includes its SOPs and post orders).

J.A. 554–55; 538–39 (emphasis added).

At the time the directive was issued, Witherspoon was out of the office. [J.A. 538.] But she requested that a direct report ensure that the directive and general prison policy were discussed with prison staff. [*Id.*] That training did not take place, and Witherspoon took no action to ensure any training was held. [J.A. 3076–77.] Witherspoon did not update the post order for the University of North Carolina at Chapel Hill Hospital ("UNC-CH"), where Edwards' labor and delivery took place, until after the region director provided an updated DAC policy in January 2020. [J.A. 722.]

A timeline of the relevant institutional policies is below:

| Issuing Body | Date Issued | Title | Key Policies |
| --- | --- | --- | --- |
| DAC | September 6, 2018 | F.1100 *Transporting Offenders*. (J.A. 510–11) | • "An offender with a clinical diagnosis of pregnancy shall not be restrained by leg, waist, or ankle restraints."<br>• "An offender who is in labor … should not be placed in any restraints."<br>• "Waist restraints shall not be used at any time during pregnancy or post-delivery, to include transport back to the facility." |
| NCCIW | February 1, 2019 | SOPs D.1800 *Offender Restraint* (J.A. 513)<br><br>H.0300 *Use of Force and Restraints* (J.A. 524) | • An offender should not be restrained outside the facility where a "[p]regnant offender is in active labor."<br>• "Maternity offender WILL NOT have leg restraints applied" and "shall not be restrained during active labor." |
| NCCIW | April 20, 2019 | Post Order Security Supervisor for UNC-CH | • "Although restraints are provided for the maternity offender while transporting to and from the hospital during pregnancy and immediately |

| | | | |
|---|---|---|---|
| | (later updated in January 2020) | (J.A. 3345) | post-partum the Offender will only be handcuffed from the front. The maternity Offender WILL NOT have leg restraints or waist chain applied. "<br>• "The Offender will not be handcuff[sic] while holding the baby, but will have one leg restrain[sic] per policy." |
| DAC | November 22, 2019 | Directive (J.A. 554–55) | • "Any offender in their third trimester should not be restrained." |

**D. Edwards' Labor and Delivery**

On December 19, 2019, NCCIW officers transported Edwards to be induced at UNC-CH. [J.A. 3114–15]. Officers Shieda Brodie, Tamara Brown, Nikita Dixon, Kavona Gill, Tianna Lynch, and Tammy Williams, and Sergeant Lorafaith Ragano (collectively, the "Officer Defendants") were responsible for Edwards while she was in the hospital. On the way to the hospital, Edwards was handcuffed, and, upon arrival, one of her arms and one of her legs were shackled to the hospital bed. [J.A. 121–22.] Brodie monitored Edwards on December 19 from Edwards' arrival until approximately 7:00 p.m. that evening. [J.A. 623.] Lynch monitored Edwards overnight from approximately 7:00 p.m. on December 19 to 6:00 a.m. on December 20. [J.A. 510, 623.] According to the Officer Defendants' activity logs, Edwards was induced through her intravenous (IV) line at 8:25 p.m. and given an epidural (pain medication provided to pregnant patients) at 11:15 p.m. [J.A. 623.] According to Edwards, she was shackled by one arm and one leg even after she was induced and until she began pushing. [J.A. 167, 624–25, 2110–11.]

Edwards gave birth to her child at 11:04 a.m. on December 20, 2019. J.A. 117. Ragano monitored Edwards during this time. About two hours after giving birth, Edwards was transferred to the maternity ward where Ragano handcuffed Edwards to the wheelchair during the transfer and then shackled one of her arms and the opposite leg to a different bed. J.A. 625, 729–30. Dixon relieved Ragano at 7:00 p.m. on December 20 and Ragano took over once again at 7:00 a.m. on December 21. [J.A. 168.]

While Edwards was in the hospital, she continued to receive Suboxone daily and was prescribed Suboxone upon discharge. [J.A. 3077.]

Edwards remained in the hospital for two days where she was monitored by Ragano, Brown, Gill, and Williams. [J.A. 610–11, 613, 616–18.] She was discharged on December 22 while Williams was on duty. [J.A. 616–18.] According to Edwards, as she was transported back to NCCIW, Williams and one other officer[5] restrained her by shackling her ankles together, handcuffing her, and placing a belly chain around her stomach to restrict her movements. [J.A. 123.] Prison officials did not identify Edwards to be a security or flight risk before or during the time that she was at UNC-CH. [J.A. 3076.]

The parties dispute how long Edwards was shackled during her hospital stay, but the district court identified times that both parties agree she was unrestrained: when Edwards' medical team instructed her to push, when she gave birth, for some period of time after birth, when she went to the restroom, and on at least two other occasions during

[5] During Williams' deposition, she testified that she had another person with her during this transport but did not remember which officer. J.A. 1992.

her stay when she was unshackled to walk with her baby in the hospital hallway. [J.A. 3073–74.]

**E. Edwards' Post-Pregnancy Medical Treatment**

When Edwards returned to NCCIW, she was placed in the inpatient medical unit. Edwards requested MOUD, but NCCIW denied her request pursuant to its policy restricting MOUD to pregnant offenders. [J.A. 141, 636.] Edwards was instead given an oxycodone taper over nine days: 10 milligrams three times a day for three days, then twice a day for three days, and then once a day for three days. [J.A. 169.] She was also given Tylenol and ibuprofen for pain management. [*Id.*]

Edwards experienced withdrawal symptoms including pain, diarrhea, and vomiting for several weeks after she gave birth. [J.A. 3128.] Edwards described the pain as "more painful than giving birth" and alleged that she sometimes could not eat or shower due to the intensity of her symptoms. J.A. 169. Edwards remained in the medical unit until mid-January 2020. [J.A. 141.]

Dr. Elton Amos was the medical director at NCCIW during Edwards' incarceration. [J.A. 46.] Amos supervised nine medical providers responsible for direct patient care and provided clinical oversight, including the drafting of NCCIW's MAT provider handbook. [J.A. 353, 635–36.] The MAT handbook includes the policies and procedures for NCCIW's MAT program and notes that Amos was responsible for preliminary approvals of MOUD medications for pregnant offenders. [J.A. 636.] Dr. James Alexander was the healthcare facility health treatment administrator at the time and was responsible for reviewing NCCIW policies, such as the MOUD policy, to ensure compliance with

statewide policies. [J.A. 568, 737.] Dr. Gary Junker was the behavioral health director for DAC from 2015 until 2020. Junker was responsible for mental health policies across state prisons and provided oversight for medical directors, including Amos. [J.A. 732, 1032, 2219, 2340.]

**F. Procedural History**

In April 2022, Edwards sued DAC officials under 42 U.S.C. § 1983, alleging Eighth Amendment violations for shackling her during labor and postpartum and denying her MOUD after birth, as well as disability discrimination because of her OUD under the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("RA").[6]

Edwards moved for partial summary judgment and all of the defendants moved for summary judgment in full. The district court denied Edwards' motion for summary judgment and granted Defendants' motion for summary judgment, thereby dismissing all of Edwards' claims.

Edwards now appeals. She challenges the district court's decision on three grounds: (1) the district court's grant of qualified immunity to Witherspoon and the Officer

[6] Edwards named the following defendants: James Alexander, the NCCIW healthcare facility health treatment administrator, in his personal and official capacities; Elton Amos, the NCCIW medical director, in his personal and official capacities; Todd Ishee, the secretary of the DAC, in his official capacity; Anthony Perry, the current NCCIW warden, in his official capacity for the purpose of injunctive relief; Gary Junker, the then-behavioral health director, in his personal and official capacities; and Benita Witherspoon, the former NCCIW warden, in her personal capacity. Edwards also named the seven Officer Defendants in their personal capacities. Pursuant to Federal Rules of Civil Procedure 25(d), defendants Ishee and Perry were substituted for their predecessors, former secretary Eddie Buffaloe and former warden Claudette Edwards (as of September 2025, Michelle Carlton is warden at NCCIW).

Defendants for Eighth Amendment violations, specifically her shackling during pregnancy, labor, and postpartum recovery; (2) the district court's finding that there was no constitutional injury committed by DAC medical officials Alexander, Amos, and Junker for denial of postpartum MOUD; and (3) the district court's conclusion that Edwards was not discriminated against under the ADA or RA after being denied postpartum MOUD. [J.A. 3097]. We address each in turn.

We have jurisdiction under 28 U.S.C. § 1291.

## II. Standard of Review

We review the district court's summary judgment and qualified immunity decisions de novo. *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). Summary judgment is proper " 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Id.* (quoting FED. R. CIV. P. 56(a)). All facts and reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Id.* at 283–84.

## III. Eighth Amendment Shackling Claim

### A. Background on Shackling

The shackling of pregnant offenders is controversial and dangerous. The United Nations explicitly prohibits the use of restraints "on women during [labor], during childbirth and immediately after childbirth" in its rules for the treatment of prisoners. *The United Nations Standard Minimum Rules for the Treatment of Prisoners*, United Nations,

at 15 (Dec. 2015). This is for good reason. The American College of Obstetricians and Gynecologists explains that "[p]hysical restraints interfere with the ability of clinicians to safely practice medicine by reducing their ability to assess and evaluate the pregnant patient and the fetus." *Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals*, *Comm. Op. No. 830*, at 30 (July 2021) [https://perma.cc/P2J9-2N8H]. The National Commission on Correctional Health Care notes an increased risk of falls, pain during labor, and complications in postpartum from shackling pregnant prisoners. *Nonuse of Restraints for Pregnant and Postpartum Incarcerated Individuals*, at 2 (Dec. 2025).[7]

Consequently, by 2018, 22 states, the District of Columbia and the federal government had enacted legislation prohibiting or limiting the use of shackling during labor.[8] Ginette G. Ferszt, et al., *Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health 17, 18 (2018). And the Sixth, Eighth, and Ninth Circuits condemn the practice of shackling pregnant offenders who do

---

[7] Edwards' expert cites to an earlier version of this position statement from 2020 concluding the same, which is reaffirmed in the 2025 version cited here.

[8] As of 2025, 40 states have enacted legislation restricting the use of shackles on incarcerated pregnant women. Veronica Brawley & Emma Kurant-Thoma, *Use of Shackles on Incarcerated Pregnant Women*, J. of Obstetric, Gynecologic, & Neonatal Nursing, Oct. 2013, at 87, https://www.jognn.org/action/showPdf?pii=S0884-2175%2823%2900247-2 [https://perma.cc/F53K-CL4W]. Relevant here, in 2021, North Carolina passed the Dignity for Women who are Incarcerated Act, which restricts DAC employees from restraining "a pregnant female incarcerated person during the second and third trimester of pregnancy, during labor and delivery, and during the postpartum recovery period." N.C. GEN. STAT. § 153A-229.2 (2021).

not present a security or flight risk. *See e.g.*, *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 572 (6th Cir. 2013); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1252–55 (9th Cir. 2016).

**B. Edwards' Shackling is a Constitutional Violation**

With this background in mind, we begin with Edwards' shackling claim. The district court granted qualified immunity for Witherspoon and the Officer Defendants because it found one's "right to be free from shackling" while pregnant, during labor, and postpartum was not clearly established. J.A. 3087. It did not discuss the constitutionality of the underlying conduct. We address both issues, starting with whether shackling Edwards violated the Eighth Amendment.

"[T]he qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation." *Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025) (internal quotation marks omitted) (quoting *Aleman*, 80 F.4th at 284). Courts may address the inquiry "in whichever sequence 'will best facilitate the fair and efficient disposition of [the] case.' " *Pfaller v. Amonette*, 55 F.4th 436, 444 (4th Cir. 2022) (quoting *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021)).

The Eighth Amendment's prohibition of cruel and unusual punishments extends to "the treatment a prisoner receives in prison and the conditions under which [s]he is confined." *Helling v. McKinney*, 509 U.S. 25, 31 (1993); U.S. CONST. amend. VIII. The Eighth Amendment "imposes [] dut[ies] on prison officials to 'provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter and

medical care.' " *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). To make out an Eighth Amendment claim in this context, a plaintiff must make two showings. First, that the confinement conditions inflict an "objectively, sufficiently serious" harm that "deprives prisoners of 'the minimal civilized measure of life's necessities.' " *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022) (internal quotation marks omitted in first quotation) (quoting *Farmer*, 511 U.S. at 834). Second, that the officers acted with a culpable state of mind showing " 'deliberate indifference to inmate health or safety' because they knew of but disregarded the inhumane treatment." *Id*. (quoting *Farmer*, 511 U.S. at 834).

**1. Shackling of Pregnant Offenders is Objectively Serious**

To satisfy the objective prong, a deprivation must be "objectively 'sufficiently serious.' " *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The plaintiff must produce evidence of " 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions.' " *Scinto*, 841 F.3d at 225 (alteration in original) (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (*De'Lonta I*)). "Only an extreme deprivation" meets this burden. *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (*De'Lonta II*). We can consider the consensus of experts to prove that a prison official's conduct poses a risk of "serious or significant physical or emotional injury." *Scinto*, 841 F.3d at 225 (quoting *De'Lonta I*, 330 F.3d at 634). We also may take into consideration the "contemporary values concerning the infliction of a challenged sanction" as the Eighth

Amendment " 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Villegas*, 709 F.3d at 572 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

Edwards claims that two sources of evidence are sufficient to meet the objective prong.

First, she points to a growing consensus within the medical community and amongst policymakers that the shackling of pregnant offenders is dangerous and harmful. Edwards adduces evidence from the United Nations Committee Against Torture, the American Medical Association, American College of Obstetricians and Gynecologists, the National Commission on Correctional Health Care, and others condemning the practice of shackling pregnant women, specifically during labor, and identifying the harms that can result from the practice. *See e.g.*, J.A. 174, 180–81; *see also Villegas*, 709 F.3d at 572–75 (relying on a similar set of sources to find that shackling "poses a substantial risk of harm"). Edwards' expert, maternal fetal medicine specialist Dr. Alison M. Stuebe, characterized the use of restraints on a pregnant woman as "psychologically devastating, dehumanizing, and painful." J.A. 173. Steube noted that, as pregnancy impacts a person's balance and mobility, shackling "directly increases" the risks of falls and injury to both the pregnant offender and the baby and "can cause skin breakdown, nerve damage, and fractures." J.A. 175. Stuebe continued that shackling "interferes with medical care" as the ability for medical staff to maneuver a patient, like Edwards, is delayed by restraints putting both the

women and the baby's lives at risk. *Id.* She also assessed that shackling increases the risks of fatal blood clots postpartum because of a reduction in movement. J.A. 175–76.[9]

Second, Edwards points to her labor and delivery experience. Edwards states that she was shackled by one leg and one arm for hours, even after medical staff induced her, leaving her skin "raw and red." J.A. 167. She was unable to move around even while experiencing contractions and the shackles were only removed once doctors told her to start pushing. *Id.* All told, her testimony supports that she was shackled by her hand and foot for at least twelve hours from the time she was induced at 8:25 p.m. until shackles were removed so that she could push and gave birth at 11:04 a.m. the next day. J.A. 117, 623. She then says that she was again shackled with both legs together and one wrist handcuffed within an hour of giving birth as she was moved from a delivery to recovery room. J.A. 168.

---

[9] Defendants argue, citing *Williams v. Branker*, that Edwards' testimony and expert report do not rise to the level of an objectively serious injury or medical need because any discomfort from Edwards' shackling in the hospital was just an aggravation of a preexisting condition that resulted from incarceration. *See* 462 F. App'x 348, 354 (4th Cir. 2012) ("The fact that the conditions to which Williams was subjected aggravated his mental illness is an unfortunate but inevitable result of his incarceration."). But there is a key difference between *Williams* and the case before us. *Williams* centered on allegations that the plaintiff-inmate's mental health suffered due to solitary confinement conditions that included isolation and behavioral restrictions. *Id.* at 354. The court concluded that where the conditions of confinement meet the minimal standards required by the Constitution, any impacts on the inmate's mental health were an "unfortunate but inevitable result of his incarceration" that do not violate the Eighth Amendment. *Id.* Not so here. As we explain below, shackling a pregnant inmate during labor and post-partum, without justification, is an Eighth Amendment violation.

While this court has not opined on this exact issue, other courts condemn shackling of pregnant offenders who do not present a security or flight risk. *See Women Prisoners v. District of Columbia*, 877 F. Supp. 634, 668 (D.D.C. 1994), *vacated in part, modified in part by* 899 F. Supp. 659, 668–69 (D.D.C. 1995) (holding that the District of Columbia Department of Corrections' policy of shackling pregnant women prisoners in the third trimester and immediately after delivery was "inhumane" and "violate[d] contemporary standards of decency"); *Nelson*, 583 F.3d at 525–27, 529 (reversing qualified immunity where officials in the Arkansas Department of Corrections shackled Nelson during her third trimester and labor, including shackling her by both legs to the hospital bed and only removing the restraints immediately before Nelson delivered her child); *Brawley v. Washington*, 712 F. Supp. 2d 1208, 1219–20 (W.D. Wash. 2010) (noting that "[c]ommon sense, and the [Department]'s own policy, tells us that it is not good practice to shackle women to a hospital bed while they are in labor"); *Villegas*, 709 F.3d at 566–67, 574 (finding that there is a qualified "right to be free from shackling during labor" in case where prisoner was shackled to a hospital bed by one leg); *Mendiola-Martinez*, 836 F.3d at 1252–57 (finding issues of fact remained as to whether officers violated Mendiola-Martinez's Eighth Amendment rights by handcuffing and using ankle shackles on her during her transport to and from jail to the hospital as she was in active labor).

This right to be free from shackling during labor is not unqualified. These same cases note there are common sense exceptions for the safety of the prisoner and others and for those determined to be an escape risk. *See Villegas*, 709 F.3d at 574 (noting that professional organizations, including the United Nations, and other courts have exceptions

where there is clear evidence that the offender is a security or flight risk); *Women Prisoners*, 877 F. Supp. at 668 ("The [c]ourt understands that the Defendants may need to shackle a woman prisoner who has a history of assaultive behavior or escapes."); *Nelson*, 583 F.3d at 534 ("[A]n inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk.").

Taken together, the well-documented condemnations of shackling from professional and human rights organizations, the testimony of Edwards and her medical expert, and the consensus among other courts show that shackling "offends contemporary standards of human decency" and presents a substantial risk of serious harm. *See Villegas* 709 F.3d at 574. We hold that, without clear evidence of a security or flight risk, shackling a pregnant offender during labor and immediately postpartum poses an objectively serious risk of harm under the Eighth Amendment.

**2. Defendants Were Aware of the Subjective Risk of Harm**

Next, we consider whether Edwards has shown that defendants had actual knowledge of the harm or risk of harm. The subjective prong requires that a prison official act with deliberate indifference. The standard is "akin to criminal-law recklessness." *Pfaller*, 55 F.4th at 445. "It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta I*, 330 F.3d at 634. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. In other words, the official must have "actual knowledge" of the harm or risk of harm. *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008).

Whether a defendant possesses the requisite knowledge often requires we look to circumstantial evidence. *See Women Prisoners*, 877 F. Supp. at 669 (noting that the [d]eputy's statements that "he would not shackle a third trimester woman" "suggests that he recognizes the risk"). We can presume an officer's knowledge of the rules governing the officer's conduct. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982) ("[A] reasonably competent public official should know the law governing his conduct."). And we can infer "this subjective state of mind . . . from the fact that the risk of harm is obvious." *Brawley*, 712 F. Supp. 2d at 1220 (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

The subjective prong presents a "high bar for recovery," *Iko*, 535 F. 3d at 241, but, on the record before us, a genuine dispute of fact remains as to whether Witherspoon and four of the Officer Defendants—Brodie, Lynch, Williams and Ragano—were deliberately indifferent.

**a. Warden Witherspoon Can Be Liable for Failure to Update Prison Policies**

We start with Witherspoon. As warden at NCCIW, Witherspoon was on notice that NCCIW policies did not comply with DAC policies. Yet Witherspoon made no meaningful effort to bring NCCIW policies into compliance or ensure her staff was adequately trained. Recall that, by September 2018, DAC policy placed significant limits on when and how prison officials could restrain pregnant offenders. F.1100 provided that a pregnant offender "shall not be restrained by leg, waist, or ankle restraints" unless there are "reasonable grounds to believe the offender presents an immediate, serious threat" or

there is a "credible risk of escape." J.A. 510–11. Further, "waist restraints [were] not [to] be used *at any time* during pregnancy or post-delivery." J.A. 511 (emphasis added).

Yet, Witherspoon did not bring NCCIW policy into compliance. The DAC region director met with Witherspoon on three occasions in April 2019 to discuss concerns with NCCIW's practice of shackling pregnant inmates. And in November 2019, another pregnant offender's shackling prompted communications from DAC and state officials about NCCIW's policies. The DAC region director issued a directive on November 22, 2019, that any offender in their third trimester should not be restrained, even if they are not in pre or active labor. Still, Witherspoon took no action to ensure that NCCIW staff were updated or trained on this new directive. She did not update NCCIW's SOPs or post orders at UNC-CH until January 2020, two months after Edwards gave birth.[10]

Witherspoon's knowledge of DAC policies that restricted the use of restraints and her failure to align NCCIW policies accordingly is plausible evidence of deliberate indifference.

Defendants suggest that Witherspoon did not *know* of the risk of harm because the NCCIW and DAC policies were not actually contradictory. Appellees' Br. (ECF No. 64) at 46–47 (hereinafter "Response Br.").[11] However, that is not right. "[A]t least two SOPs at NCCIW"—H.0300 and D.1800—did not match DAC policy "in regards to pregnant

---

[10] The record shows that she only updated the post orders, but not the SOPs. *See* J.A. 836 (noting that the only policy that changed while Witherspoon was warden was the post order issued on January 20, 2020).

[11] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

offenders" and had not for some time. J.A. 548 (email requiring that the wording be updated "ASAP" and noting that NCCIW was directed to make changes previously but "apparently didn't get it done"). As a result, a jury should decide whether Witherspoon's failures constitute deliberate indifference.

**b. Some Officer Defendants Can Be Liable for Shackling Edwards During Labor and Delivery**

Next, we must determine whether the Officer Defendants acted with deliberate indifference. Edwards contends that there is a question of fact for the jury as to the risk of harm each Officer Defendant was aware of when they shackled her. Appellant's Br. (ECF No. 33) at 61 (hereinafter "Opening Br."). We agree that a triable issue of fact exists as to the state of mind of four of the seven officers who shackled Edwards: Brodie, Lynch, Williams, and Ragano. While the claim against Witherspoon relies on her inaction in the face of explicit directives, the claims against the Officer Defendants hinge on the actions each took while Edwards was under their care.

A reasonable juror could find that Brodie, Lynch, Williams, and Ragano acted with deliberate indifference. Brodie was the officer on shift on December 19, 2019, when Edwards arrived at the hospital and was shackled by one arm and one leg to the hospital bed. [J.A. 623.] Lynch was on duty the evening of December 19, and shackled Edwards by one arm and one leg while she was induced and in active labor. Williams was the officer on duty when Edwards was discharged on December 22 and transported Edwards back to NCCIW using leg restraints and a belly chain. And Ragano was the officer on duty while

Edwards remained chained by one arm and one leg immediately before giving birth and in the hours following birth as she was moved to the recovery room.

Moreover, Ragano, Brodie, Williams, and Lynch admitted that they had been trained on the DAC policy, F.1100 *Transporting Officers*, prohibiting their very conduct.[12] [J.A. 726–27 (Ragano); J.A. 747–49 (Brodie); J.A.752–54 (Williams); J.A. 758–59 (Lynch)]. Williams specifically stated that, even at "that time" in 2019, a pregnant offender should "never ever, ever, ever" wear a restraint during active labor. J.A. 1986–87. A jury could conclude that each of these four officers, given that they had been trained on the risks to pregnant women posed by their conduct, had disregarded that risk when they shackled Edwards. *See Women Prisoners*, 877 F. Supp. at 669 (the officer's statements that "he would not shackle a third trimester woman" "suggests that he recognizes the risk"); *see also Harlow,* 457 U.S. at 818–19 ("[A] reasonably competent public official should know the law governing his conduct.").

We reach a different conclusion as to the remaining Officer Defendants—Nikita Dixon, Kavona Gill, and Tamara Brown. The DAC and NCCIW policies that these three officers were trained on distinguish between acceptable and prohibited conduct based in part on whether the offender was in "active labor." *See* J.A. 510 (defining active labor as the onset of contractions). So, it is relevant when each officer monitored Edwards. These three officers monitored her on December 20 and 21, after she gave birth to her daughter but not while she was immediately postpartum. [J.A. 610, 611, 616.] While Edwards was

---

[12] This was despite Witherspoon's failure to update NCCIW policies and to ensure *all* officers received training. *See* Section III.B.2.a.; *see also* Section I.C.

shackled and unshackled at various times during their shifts, she was not in active labor, immediately postpartum, or being transported between the hospital and NCCIW. As a result, we cannot conclude that their conduct was deliberately indifferent—instead it was closer to "mere negligence." *Farmer*, 511 U.S. at 835. And as the subjective prong requires "something more than mere negligence," *id*, summary judgment was appropriate.

* * *

Because the record would permit a reasonable jury to find that Witherspoon, Brodie, Lynch, Williams, and Ragano violated Edwards' Eighth Amendment rights, the district court should not have dismissed Edwards' claims against those five defendants on summary judgment. *See Taylor v. Riojas*, 592 U.S. 7, 9 (2020) ("And although an officer-by-officer analysis will be necessary on remand, the record suggests that at least some officers involved in Taylor's ordeal were deliberately indifferent to the conditions of his cells."). However, we affirm the grant of summary judgment for Edwards' claims against defendants Dixon, Gill, and Brown.

### C. Shackling Edwards While She Was in Active Labor Was Clearly Wrong

#### 1. *Thorpe*

We now address whether Witherspoon, Brodie, Lynch, Williams, and Ragano violated a right " 'clearly established at the time of the challenged conduct.' " *Lewis v. Caraballo*, 98 F.4th 521, 530 (4th Cir. 2024) (quoting *Carroll v. Carman*, 574 U.S. 13, 16 (2014)).

"A right is clearly established if, at the time of the alleged offense, 'the contours of the right allegedly violated were sufficiently clear that a reasonable official would

understand that what he is doing violates that right.' " *Id.* at 534 (alterations omitted) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A clearly established legal principle "must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 704 (4th Cir. 2018) (quoting *Wesby*, 583 U.S. at 63). We consider "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose" to be controlling authority. *Franklin v. City of Charlotte*, 64 F.4th 519, 534 (4th Cir. 2023) (internal quotation marks omitted) (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)).

However, the cases do not have to be identical; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. And "[q]ualified immunity does not protect knowing violations of the law." *Thorpe v. Clarke*, 37 F.4th 926, 930 (4th Cir. 2022) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). If there remains a genuine dispute as "to an official's deliberate indifference" that "if established, [would] necessarily include an awareness of the illegality of the defendant's actions," *Pfaller*, 55 F.4th at 448, then there is no reason to also undertake the traditional clearly established inquiry. *See Thorpe*, 37 F.4th at 934.

In *Thorpe*, the court affirmed the denial of qualified immunity because, on the facts alleged, the prison officials' conduct amounted to an intentional Eighth Amendment violation. There, the prisoner-plaintiffs alleged that their Supermax prison's solitary confinement policy violated the Eighth Amendment. *Thorpe*, 37 F.4th at 930. The defendants responded in part that, regardless of any potential constitutional violations, they

were entitled to qualified immunity because it was not clearly established in 2012 that the solitary confinement program was unconstitutional. *See id*. at 930, 935. However, the district court denied qualified immunity at the motion to dismiss stage. *Id*. at 932.

The court affirmed because "qualified immunity does 'not allow the official who *actually* knows that he was violating the law to escape liability for his actions.' " *Id.* at 933–34 (quoting *Harlow*, 457 U.S. at 821 (1982) (Brennan, J., concurring)). To the contrary, where " 'plaintiffs have made a showing sufficient to' demonstrate an intentional violation of the Eighth Amendment, 'they have also made a showing sufficient to overcome any claim to qualified immunity.' " *Id.* at 934 (quoting *Beers-Capitol*, 256 F.3d at 142 n.15). And "[d]ismissal . . . remains improper so long as the officers' mental state remains genuinely in issue." *See id*. at 934.

Applying this principle, the court reviewed the "circumstantial evidence" and "direct evidence of [the defendants'] consciousness of risk." *Id.* at 935–36 (cleaned up). It pointed to independent expert studies showing the severe and permanent damage caused by solitary confinement, the defendants' knowledge of a Human Rights Watch report finding human rights violations in the state prisons, defendants' knowledge of a United States Department of Justice investigation examining the prison's use of isolation, and judicial precedent going back to 1890 all to show that the prison officials had the "requisite knowledge of a substantial risk." *Id*. at 936. The court determined that plaintiffs presented "more than a mere suggestion to the contrary" that the officers were aware of the substantial risk of harm. *See id*. at 936 (noting that the evidence was "sufficient to defeat summary judgment").

The court expanded on the principles from *Thorpe* in *Pfaller v. Amonette*, 55 F.4th 436 (4th Cir. 2022). There, the court held that a prison doctor's failure to provide timely medical treatment was an intentional violation of the Eighth Amendment. *Pfaller*, 55 F.4th at 446. *Pfaller* concerned the death of an inmate from liver cancer while incarcerated. *Id.* at 441. The inmate's primary doctor regularly tested the inmate's blood to review for liver cancer but, on two occasions, failed to refer the inmate for additional testing against Virginia Department of Corrections medical guidelines. *Id.* at 443. He also misattributed the inmate's other symptoms to other causes. *Id.* The doctor eventually referred the inmate for further testing, and the inmate was ultimately diagnosed with untreatable liver cancer. He died a month later. *Id.* at 443. His estate filed a § 1983 claim alleging the inmate's Eighth Amendment rights were violated due to inadequate medical care. *Id.* at 441.

The court explained that, in Eighth Amendment cases, "not all disputes of material fact as to deliberate indifference will freeze our application of qualified immunity;" rather such cases "exist on a spectrum of intent and harm." *Id*. Where the violation "inherently include[s] [a] knowing disregard for the law," *Thorpe* applies. *Id*. But where "there may be more attenuation between the risk of harm and the defendant's knowledge that his conduct is *constitutionally deficient*, . . . a defendant is less able to 'use his own "state of mind" as "a reference point" to "assess conformity to the law." ' " *Id.* at 446–47 (quoting *Thorpe*, 37 F.4th at 939).

Ultimately, "*Thorpe* most neatly applies to . . . a prison guard, who doesn't need case law to tell him he can't abuse an inmate." *Id*. at 446. So, the court need not separately determine whether the constitutional right at issue was clearly established if there remains

a genuine issue of material fact as to an official's deliberate indifference, because that potential deliberate indifference would, if established, necessarily include an awareness of the illegality of the defendant's actions. *Id.* at 448.

As to the primary care doctor, the court then reasoned that "[the doctor] was on notice that he was violating [the inmate]'s constitutional rights." *Id.* at 452. The court ultimately upheld the district court's denial of qualified immunity. *Id*. at 454.

**2. Edwards' Shackling Warrants Application of *Thorpe***

As discussed above, we find that the conduct of Witherspoon, Brodie, Williams, Lynch and Ragano constitutes "potential deliberate indifference," *id*. at 448, such that summary judgment was inappropriate. So, the remaining issue is whether their conduct was clearly constitutionally deficient such that *Thorpe* applies. We hold that it was. Collapsing the inquiries is appropriate because the risk was obvious and Witherspoon and the four officers were "on notice of the full volley of harms their [shackling] practices created." *Thorpe*, 37 F.4th at 936.

As in *Pfaller*, 55 F.4th at 446, it is a matter of common sense that you should not shackle a pregnant offender while they are in active labor. Giving birth carries risks for both the pregnant offender and baby under any circumstances; between 2019 and 2023, North Carolina reported 29.8 pregnancy-related deaths per 100,000 live births, ranking 34th in the United States for maternal mortality. America's Health Rankings, *Maternal Mortality in North Carolina*, United Health Found., https://www.americashealthrankings.org/explore/measures/maternal_mortality_c/NC (last visited Aug. 3, 2026) [https://perma.cc/P6QC-ZXM6]. It is obviously wrong to compound

these risks by shackling a pregnant offender during labor and immediately after. The obviousness of the harm is only compounded by the consensus of experts decrying the practice and the DAC policy explicitly prohibiting the actions of the relevant defendants. *See Brawley*, 712 F. Supp. at 1219–20 ("Common sense, and the [Department]'s own policy, tells us that it is not good practice to shackle women to a hospital bed while they are in labor.").

Witherspoon and the four officers' non-compliance with DAC policy and the November directive further support collapsing the inquiry. While a policy violation alone does not support a constitutional claim, *see Davis v. Scherer*, 468 U.S. 183, 195 (1984), the existence of such policies can support the conclusion that a reasonable correctional officer "would have known" of the constitutional infirmity. *Hope*, 536 U.S. at 741–42. Like the physician in *Pfaller*, Witherspoon and the four officers ignored DAC guidelines concerning the shackling of pregnant offenders even though they were aware of the guidelines and had been trained on them. *See Pfaller*, 55 F.4th at 449 (noting "a reasonable inference that [the primary doctor], as a staff physician, was aware of those Guidelines" and that he "acknowledged" that "he understood that the Guidelines set the standard of care for the treatment of patients with chronic hepatitis C"). An unconstitutional harm to Edwards resulted. Thus, we can and will collapse the qualified immunity inquiry.[13]

[13] Defendants say *Thorpe* is inapplicable because it involves a motion to dismiss rather than summary judgment. Response Br. at 36. But, whenever "the officers' mental state remains genuinely in issue," disposing of the case is improper. *Thorpe*, 37 F.4th at 934.

* * *

Accordingly, we hold that there is a genuine dispute of fact as to whether defendants Witherspoon, Brodie, Lynch, Williams and Ragano violated Edwards' Eighth Amendment rights when she was shackled before, during, and after her labor and delivery while in the custody of NCCIW. Further, we vacate the district court's finding that these defendants are entitled to qualified immunity on the shackling claim.[14] The decision as to defendants Dixon, Gill, and Brown is affirmed.

## IV. Eighth Amendment MOUD Claim

### A. Background on Opioid Use Disorder

Opioid dependence is a chronic medical condition and " 'extraordinary public health crisis that started at least two decades ago and has accelerated over the past decade.' " *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 239 (4th Cir. 2026) (quoting *City of Huntington v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 647 (4th Cir. 2024)); *see also Preventing Opioid Use Disorder*, Ctr. for Disease Control (May 8, 2024), https://www.cdc.gov/overdose-prevention/prevention/preventing-opioid-use-

[14] While we find that the clearly established analysis folds into the discussion of the constitutional violation, the district court's reliance on *Fain v. Rappahannock Regional Jail*, No. 3:12-cv-293-JAG, 2013 WL 3148145 (E.D. Va. June 19, 2013), to say that this right is not clearly established, is separately unavailing. *See* 2013 WL 3148145, at *5–6. *Fain*, an unpublished district court order, is not controlling authority for clearly established purposes, which is limited to "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Franklin v. City of Charlotte*, 64 F.4th 519, 534 (4th Cir. 2023) (internal quotation marks omitted) (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)).

disorder.html [https://perma.cc/27TE-DXLH]. "OUD is a progressive brain disease characterized by uncontrollable cravings for and/or dependence upon opioids." *Spurlock*, 175 F.4th at 239. In one study of 24 carceral settings, 26% of pregnant people admitted to state prisons and 14% to jails had OUD. Chris Ahlbach et al., *Care for Incarcerated Pregnant People With Opioid Use Disorder: Equity and Justice Implications*, Obstet Gynecol., 2 (Sep. 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7483637/ [https://perma.cc/9MES-YKLU].

The accepted evidence-based standard of care for OUD is prescribing MOUD. *See* Christian Heidbreder et al., *History of the Discovery, Development, And FDA-Approval Of Buprenorphine Medications for the Treatment of Opioid Use Disorder*, Drug and Alcohol Dependence Reports, 2 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10040330/ [https://perma.cc/DT83-2CTQ] (describing MOUD as the "gold standard for OUD treatment"). The FDA first approved MOUD medication for use in treating OUD in 2002. Heidbreder, *supra* at 1, 5. As noted in *Spurlock*, "[t]he World Health Organization, National Institute on Drug Abuse, Substance Abuse and Mental Health Services Administration, National Sheriffs' Association, Centers for Disease Control and Prevention, American Medical Association, and the American Academy of Pediatrics all recommend that medical providers [screen for OUD and prescribe MOUD where needed]." 175 F.4th at 240. Studies from 2007, 2016, and 2020 show "MOUD combined with psychosocial interventions is the most effective treatment option," while other studies from 2000, 2010, 2014, and 2019 note that "MOUD has been shown to be associated with positive outcomes for reducing drug use [and] criminal activity." *See* Heidbreder, *supra*

at 8 (citing these studies and characterizing the results). The MOUD medication, Suboxone, works by blunting the effects of the opiates and preventing cravings in users such that it helps users effectively transition away from addiction. Peter Grinspoon, *5 myths about using Suboxone to treat opioid addiction*, Harvard Health Publ'g (Aug. 8, 2024), https://www.health.harvard.edu/blog/5-myths-about-using-suboxone-to-treat-opioid-addiction-201803201556 [perma.cc/VD8T-3KVV]. Researchers have described prescribing MOUD to pregnant prisoners as "essential for their health, dignity, and well-being." Ahlbach, *supra* at 5.

In contrast, withdrawal from opioids, or detoxification, is considered "fundamentally unethical" and "horrifically painful," as it can lead to injury, death, and increases the risk of relapse, especially for pregnant prisoners. *Id*. at 4. Those with OUD also become more prone to overdose as their tolerance is reduced while abstinent in prison. *Id.* "For those already prescribed MOUD, sudden cessation of the medication can cause withdrawal symptoms similar to opioid withdrawal itself." *Spurlock*, 175 F.4th at 240.

**B. Denial of MOUD is a Constitutional Violation**

The district court granted summary judgment to Amos, Alexander, and Junker on Edwards' claim that denial of MOUD upon her return to NCCIW violated her Eighth Amendment rights. According to the court, Edwards did not make a prima facie showing of an Eighth Amendment violation because she did not show "that any defendant subjectively knew that she faced a substantial risk of serious harm and disregarded that risk by discontinuing MOUD after she have birth." J.A. 3084. We disagree with the district court's decision regarding Amos and Alexander but agree with its grant of summary

judgment to Junker. We first discuss the Eighth Amendment violation. Then, because we conclude there is a plausible Eighth Amendment claim, we also address whether the right is clearly established.

A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 176 (1976)). To establish a claim for deliberate indifference to serious medical needs, a plaintiff must prove two familiar components: " '(1) that the deprivation . . . [is] *objectively* sufficiently serious, and (2) that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.' " *De'Lonta II*, 708 F.3d at 525 (second alteration in original) (quoting *De'Lonta I*, 330 F.3d at 634).

Here, Edwards produced evidence sufficient to create a genuine dispute of fact as to whether medical officials violated the Eighth Amendment in denying her MOUD postpartum. We address the objective and subjective prongs in turn.

**1. Edwards' OUD was Objectively Serious**

The objective prong for a medical needs claim requires demonstration of " 'officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Scinto*, 841 F.3d at 225 (quoting *Iko*, 535 F.3d at 241).

Here, Edwards was formally diagnosed with OUD prior to her incarceration. The court has recognized that a " 'serious medical need' is 'one that has been diagnosed by a

physician as mandating treatment.' " *Iko*, 535 F.3d at 241 (alteration omitted) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Edwards' official OUD diagnosis is sufficient to meet this prong.

**2. A Triable Dispute of Fact Remains as to Whether Prison Officials Were Deliberately Indifferent to Edwards' Serious Medical Need**

The subjective prong "requires proof of the official's 'actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction.' " *Scinto*, 841 F.3d at 226 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). This can be met through direct evidence of an official's "actual knowledge or circumstantial evidence tending to establish such knowledge." *Id*. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). "[A] prison official's '[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.' " *Scinto*, 841 F.3d at 226 (alterations in original) (quoting *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837).

Nor does an official's strict adherence to a blanket policy relieve them of their constitutional obligations. *See Gordon v. Schilling*, 937 F.3d 348, 361 (4th Cir. 2019). In *Gordon*, the court reversed a grant of summary judgment where the prison official enforced a policy that categorically denied hepatitis C treatment to inmates who were within two years of release. *Id.* at 361. In addition to noting the official's awareness of the seriousness of hepatitis C, the court held that "a factfinder could determine that the categorical

postponement of medical care . . . evinced a disregard for the wellbeing of those inmates." *Id*. Even where the official offers a medical justification, there may remain genuine disputes of fact as to the "sufficiency of those justifications." *Id.*; *see id*. (citing a recommendation from a national medical organization as sufficient for creating a genuine dispute of fact as to the official's explanation). It is even more suspect when the protocols are applied categorically as "prison officials still must make a determination that application of the protocols result in adequate medical care." *Roe v. Elyea*, 631 F.3d 843, 860 (7th Cir. 2011); *see also Gordon*, 937 F.3d at 361 (citing *Roe* for the same proposition).

Here, there is sufficient evidence to create a genuine dispute as to whether Amos and Alexander knew of the substantial and obvious risk of harm when they enforced NCCIW's policy denying MOUD to all non-pregnant offenders, including those with an OUD diagnosis or who had previously received MOUD treatment. *See Makdessi*, 789 F.3d at 133. As NCCIW's medical director, Amos was responsible for direct patient care and drafted the handbook prohibiting MOUD to non-pregnant offenders. Yet, Amos himself conceded that OUD is a serious and potentially deadly condition, J.A. 360, the "clinical standard" of treatment is medication, J.A. 362, and "treatment in the postpartum period would not be different than [OUD] in the pre-pregnancy period." *Id*. And Alexander, who reviewed and signed off on NCCIW's MOUD policy, was a board-certified physician in public health with 10 years of experience treating women at NCCIW navigating pregnancy and/or OUD. *See* J.A. 1198–1200. Amos and Alexander's backgrounds and testimony lead us to conclude that a reasonable jury could find that they were "subjectively aware of the risk" associated with discontinuing MOUD while creating NCCIW's policies. *See*

*Brawner v. Scott Cnty., Tennessee,* 14 F.4th 585, 599 (6th Cir. 2021) (determining that a jail nurse's experience could point to her subjective awareness of the risk of harm of suddenly discontinuing a prisoner's medications, including Suboxone.).

Defendants contend that the prison officials acted based on NCCIW policy that only provides MOUD to pregnant offenders. But, as the court has noted, simply following policy does not defeat a constitutional claim. *See Gordon*, 937 F.3d at 361. There is an expectation that officials will still make individual determinations as to the level of care required. *Roe*, 631 F.3d at 843. This expectation was echoed in Alexander's understanding of NCCIW policy. He acknowledged that the facility's SOPs outlined that offenders should be "evaluated by a provider" who "makes the determination on who needs the therapy based on their clinical judgment." J.A. 1201–02. Yet, there is no evidence that medical staff independently assessed whether Edwards still needed MOUD after giving birth. And the MAT handbook authored by Amos categorically denies non-pregnant offenders such treatment. J.A. 636. This policy represents the type of "categorical postponement" we understand to "evince[] a disregard for the wellbeing of . . . inmates." *Gordon*, 937 F.3d at 361; *see also Brawner,* 14 F.4th at 599 (finding a prison's blanket ban on controlled substances insufficient to defeat a constitutional claim because "[the] abrupt discontinuation of substances that could lead to withdrawal symptoms and potential seizures [] pose constitutional problems").

Defendants also argue that they were not deliberately indifferent because NCCIW officials provided the oxycodone taper to lessen Edwards' withdrawal symptoms. Response Br. at 53–54. But the court has expressly held that providing "some treatment"

as an alternative is not de facto constitutionally adequate. *See De'Lonta II*, 708 F.3d at 526 ("[J]ust because Appellees . . . provided [plaintiff] with *some* treatment consistent with the . . . Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment."); *see also Pfaller*, 55 F.4th at 454 ("[The doctor] was on notice that providing some care—even if unreasonable or deficient—does not clear the constitutional bar."). For example, prison officials cannot provide a deaf inmate an interpreter but fail to ensure that interpreter is fluent in American Sign Language and then hope to survive constitutional muster. *See Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 211–12 (4th Cir. 2017) (noting such care was not "constitutionally adequate").

The same logic controls here. The court noted recently that opioid "withdrawal can cause significant suffering" and "increase[] risk of relapse, overdose, and death." *Spurlock*, 175 F.4th at 240; *see id.* (further noting that the "process of withdrawal from opioids, also known as detoxification, is not even considered to be a medical treatment for OUD"). Edwards says she experienced this suffering, alleging that her withdrawal symptoms were "more painful than giving birth." J.A. 169. A reasonable factfinder could conclude that the oxycodone taper was far from "constitutionally adequate treatment." *De'Lonta II*, 708 F.3d at 526.[15]

---

[15] Defendants point out that NCCIW officials could not offer MOUD post-pregnancy as the prison was not licensed as an opioid treatment facility and officials did not have prescribing authority. Response Br. at 53; Oral Argument at 30:35 -33:00. But this lack of licensure does not negate the state's responsibility to provide adequate medical care. *See Estelle*, 429 U.S. at 97. The prison could have explored care alternatives, like utilizing the outside facility it used previously, rather than *categorically* denying MOUD.

Defendants also suggest that we must base our decision on the standard of care at the time of the prisoner's treatment. Oral Argument at 29:25–30:30, *Edwards v. Witherspoon, et al.*, No. 24-7049 (argued Oct. 22, 2025), https://www.ca4.uscourts.gov/oral-argument/oral-argument-audio-files. The court has never stated that such temporal adherence is necessary, and such a restriction does not aid their argument. Suboxone received FDA approval for opioid treatment in 2002 and studies spanning the 2000s and 2010s highlighted MOUD as the most effective treatment for OUD. *See* Heidbreder, *supra* at 5. Additionally, in 2019, there was a growing legal consensus as cases across the country addressed MOUD access. *See Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47–48 (D. Mass. 2018) (holding that it likely violates ADA and Eighth Amendment to deny MOUD without individual assessment and contrary to treating provider's recommendation); *Smith v. Aroostook Cty*., 376 F. Supp. 3d 146, 159–61 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019) (granting a preliminary injunction and holding that it likely violates the ADA to deny incarcerated person access to MOUD without an individualized assessment of the need for medication).

Accordingly, there are genuine disputes of fact as to Amos' and Alexander's subjective knowledge of the harms that could result from denying MOUD.

We reach a different conclusion as to Junker. While Junker was Amos' supervisor, he was primarily responsible for the DAC's mental health care procedures rather than OUD policy. *See* J.A. 732, 1031–32, 2219. He specifically testified that he did not work on OUD policy, and Edwards produced no evidence contradicting this testimony. J.A. 1031–32, 1037. Thus, we cannot conclude that Junker had "actual knowledge" of the risk of

harm to Edwards, nor does "circumstantial evidence" point to that conclusion. *Scinto*, 841 F.3d at 226.

**C. The Right to Access MOUD is Clearly Established**

Whether the defendants violated Edwards' clearly established rights turns on the how we define the "precise right at issue." *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022). In the medical needs context, we routinely define the right as "the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs." *Scinto*, 841 F.3d at 236. In so doing, we acknowledge that this right has been clearly established by "the Supreme Court and this [c]ircuit since at least 1976." *Id.*; *see also Iko*, 535 F.3d at 243 n.12.

And the Eighth Amendment qualified immunity analysis does not require additional granularity. *See Pfaller*, 55 F.4th at 453. *Pfaller* is again helpful to our discussion. In *Pfaller*, the court expressly rejected efforts to define an Eighth Amendment right more narrowly. 55 F.4th at 445, 453. A primary physician wanted to define the right at-issue as "whether it would have been clear to [the physician] that he was providing inadequate medical care in violation of the Eighth Amendment by failing to schedule a specific type of follow-up test (fibroscan) for Pfaller until July 2018." *Id.* at 452. But the court held that requiring that level of specificity would transform qualified immunity into absolute immunity. *Id.* at 453. The court instead applied the right from *Scinto* and found that the doctor was "on notice that he could not refuse necessary medical care to Pfaller." *Id.*

Defendants seek to define the right with similar granularity, arguing that "the constitutional right to receive MOUD has not been clearly established." Response Br. at

50. However, in accordance with our caselaw, we reject the defendants' attempt to "define the rights at issue in accordance with the 'very action[s] in question.'" *Pfaller*, 55 F.4th at 453 (quoting *Scinto*, 841 F.3d at 236).

It is undisputed that Edwards was denied MOUD upon her return to NCCIW pursuant to prison policy to only provide MOUD to pregnant offenders. We hold that Edwards' constitutional right to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs was clearly established. As such, there is a genuine dispute as to whether that right to adequate medical care and freedom from prison officials' deliberate indifference to her medical needs was violated by defendants' conduct. And because that right is clearly established, Amos and Alexander are not entitled to summary judgment.

**V. ADA and RA Claims**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 419–21 (4th Cir. 2015). Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Due to the similar statutory language in the ADA and the RA, courts generally construe both

acts to impose the same requirements. *See Seremeth v. Bd. of Cnty. Comm'rs,* 673 F.3d 333, 336 n.1 (4th Cir. 2012). Further, courts now consider substance abuse and OUD as disabilities pursuant to the ADA and RA. *See Smith*, 376 F. Supp. 3d at 159; *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 376 (S.D. W. Va 2024).

The district court granted summary judgment on Edwards' ADA and RA claims because there was "no genuine dispute that Edwards failed to qualify for NCCIW's MOUD program after giving birth" because she was no longer pregnant. J.A. 3093. As a result, the district court found no discrimination based on any disability. However, the district court misinterpreted Edwards' claims. She alleges statutory violations based on her OUD diagnosis rather than her pregnancy. Viewed in that light, Edwards may well have cognizable ADA and RA claims because of the growing recognition that substance abuse and OUD are disabilities. *See Smith*, 376 F. Supp. 3d at 159; *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d at 376. The mere absence of discrimination based on pregnancy does not disprove discrimination based on Edwards' OUD diagnosis.

As the district court did not correctly evaluate the nature of Edwards' claims, we vacate and remand for further proceedings on the question of whether Edwards has viable claims under the ADA or RA for the prison's denial of MOUD.

## VI. Conclusion

For these reasons, we vacate the grant of summary judgment as to defendants Witherspoon, Brodie, Ragano, Lynch, and Williams on Edwards' shackling claim. And we vacate summary judgment as to defendants Amos and Alexander on her MOUD claims.

We remand the claims against these defendants for further proceedings. We also vacate and remand on the question of whether Edwards has viable claims under the ADA and RA. All other decisions of the district court are affirmed.

*AFFIRMED IN PART,*
*VACATED IN PART, AND REMANDED*